# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

HOTELSAB GREEN, LLC,

Plaintiff,

- against -

REIGNWOOD EUROPE HOLDINGS SARL,

Defendants.

Index No. _____

**SUMMONS**

To the above named Defendant:

You are hereby summoned to serve upon plaintiff's attorneys an answer to the Complaint in this action within 20 days after the service of this summons, exclusive of the day of service, or within 30 days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Plaintiff designates New York County as the place of trial. The venue is designated on the basis of CPLR § 501. Plaintiff HotelsAB Green, LLC is a resident of New York County.

Dated: New York, New York
August 4, 2017

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____
        Leslie Gordon Fagen
        Harry M. Jacobs
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
lfagen@paulweiss.com
hjacobs@paulweiss.com

*Attorneys for Plaintiff HotelsAB Green, LLC*

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

HOTELSAB GREEN, LLC,

                          Plaintiff,

              - against -

REIGNWOOD EUROPE HOLDINGS SARL,

                          Defendants.

---

Index No. _____

**COMPLAINT**

HOTELSAB GREEN, LLC ("HotelsAB Green" or "AB"), by its attorneys Paul, Weiss, Rifkind, Wharton & Garrison LLP, for its Complaint against Defendant REIGNWOOD EUROPE HOLDINGS SARL ("Reignwood") alleges as follows:

### Nature of the Action

1.      This is an action for breach of contract.  It arises from Reignwood's refusal to honor the terms and conditions set forth in a binding joint venture letter agreement dated September 16, 2016, by and between HotelsAB Green and Reignwood (the "Letter Agreement"), relating to the acquisition and financing of the iconic High Line building located at 848 Washington Street, New York, New York (the "Property"), which currently houses The Standard Hotel, The Standard Grill, Top of The Standard, and other establishments.

2.      On September 16, 2016, HotelsAB Green and Reignwood entered into the binding Letter Agreement.  Pursuant to the Letter Agreement, Reignwood agreed to form a joint venture with HotelsAB Green (the "JV") in which Reignwood would invest 90% of the total equity required for the JV to consummate the acquisition of the

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 5 of 277

Property pursuant to a Purchase and Sale Agreement dated August 16, 2016 (the "PSA") by and between HotelsAB Green (the "Buyer") and AB Green Gansevoort, LLC ("AB Green Gansevoort" or the "Seller").

3.     The investment by Reignwood, required under the Letter Agreement, was critical to HotelsAB Green achieving its vision of re-positioning the Property to include a private membership club.

4.     Under the Letter Agreement, in order to obtain the financing necessary to consummate the transaction and the liquor license approval from the New York State Liquor Authority necessary to operate the hotel, Reignwood was required, among other things, to (i) provide information necessary to prepare, complete, and process Buyer's liquor license application (the "Liquor License Application"), which was required to consummate the closing pursuant to the PSA; (ii) provide a guarantor that satisfied certain financial requirements (the "Minimum Financial Criteria") to replace the current guarantor under Seller's existing loan documents (the "Replacement Guarantor"), such that Reignwood (or an affiliated entity) would become the replacement guarantor[1] required under the existing financing agreements for the JV to assume the existing financing and consummate the acquisition of the Property with Seller's existing debt (the "Existing Debt Assumption and Release"); and (iii) negotiate in good faith to execute a more detailed joint venture agreement (the "Joint Venture Agreement") with HotelsAB Green that reflected the express terms and conditions of the Letter Agreement.

---

[1] The existing financing required an acceptable replacement guarantor to provide a customary indemnity for environmental risks and a customary guaranty for certain "bad acts" of the borrower (such as non-permitted transfers and bankruptcy) that are common in real estate financing.

2

5.      However, not long after the parties entered into the Letter Agreement, Reignwood and its Chairman, Dr. Chanchai Ruayrungruang ("Ruayrungruang"), started to advance a cascade of excuses as to why it would not satisfy the explicit requirements of the Letter Agreement, including those relating to the Liquor License Application, the Existing Debt Assumption and Release, and the Joint Venture Agreement.

6.      Reignwood's excuses and delays resulted in multiple breaches of the Letter Agreement.  As a result of these breaches, Seller terminated the PSA and retained HotelsAB Green's nonrefundable $5,000,000 initial deposit (the "Initial Deposit"), and HotelsAB Green lost the lucrative business opportunity to proceed with the acquisition of the Property and private membership club project.

7.      By this action, HotelsAB Green seeks to enforce its contractual rights and to recover the damages caused by Reignwood's willful breaches.

**The Parties**

8.      Plaintiff HotelsAB Green, LLC is a Delaware limited liability company wholly-owned by André Balazs with its principal place of business in New York.

9.      Defendant Reignwood Europe Holdings SARL is an SARL incorporated in Luxembourg with its principal place of business in Hong Kong.

**Jurisdiction and Venue**

10.     The Letter Agreement between the parties expressly provides that "[e]ach party consents to the jurisdiction of such New York courts in any action or legal proceeding and waives any objection to the laying of venue of any such civil action or

legal proceeding in such New York courts." This Court therefore has jurisdiction pursuant to CPLR § 301 in this action because Defendant consented to the jurisdiction of the New York Courts in the Letter Agreement.

11.     Venue is proper in New York County pursuant to CPLR § 501.

## Background

The Contractual Agreements

*The Purchase and Sale Agreement*

12.     On August 16, 2016, HotelsAB Green entered into the PSA (Exhibit A) and agreed to purchase the Property from AB Green Gansevoort subject to the terms and conditions thereof.

13.     The principal terms of the PSA included:

(a)     a nonrefundable initial deposit of $5,000,000;

(b)     an additional deposit of $10,000,000 required to be paid no later than September 29, 2016;

(c)     a scheduled closing date of January 31, 2017 (subject to limited adjournment for specified reasons set forth in the PSA);

(d)     the Existing Debt Assumption and Release, pursuant to which Buyer and its to-be-formed affiliates intended to assume the existing non-recourse mortgage and senior and junior mezzanine loans encumbering the Property, subject to the approval and requirements of the applicable lenders; and

(e)     an obligation to obtain new liquor licenses for the Property or for an endorsement to the existing liquor licenses for the Property by submitting the Liquor License Application with the New York State Liquor Authority ("NYSLA"). Both the PSA and the Letter Agreement specifically noted that the Liquor License Application would require disclosures to and diligence by the NYSLA regarding any future owner of an interest in the Property (which would include indirect owners such as Reignwood, its principals and affiliates).

4

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 8 of 277

14.     HotelsAB Green entered into the PSA with the expressed intent of converting portions of the Property into a private membership club.

*The Letter Agreement*

15.     HotelsAB Green entered into the Letter Agreement with Reignwood in order to raise the capital required to close on the acquisition of the Property pursuant to the PSA.

16.     On September 16, 2016, HotelsAB Green and Reignwood (the "Investor") entered into the binding Letter Agreement (Exhibit B).

17.     Pursuant to the Letter Agreement, the parties agreed to form a joint venture whose sole purpose was to serve as a vehicle for the parties to acquire the Property, with the intention of converting portions of it into a private membership club while still operating other portions as a high-end hotel.

18.     The binding Letter Agreement included the following relevant provisions:

**Liquor License Application**

(a)     "Investor shall (a) from time to time upon request of Buyer's liquor license counsel provide such information as may reasonably be requested by such counsel in order to prepare, complete and process the Liquor License Application";

**Minimum Financial Criteria and Replacement Guarantor**

(b)     "Investor shall . . . (b) provide evidence that Investor satisfies the Minimum Financial Criteria, which will be available for submission to the Existing Debt lender";

(c)     "Buyer is permitted to . . . (ii) offer Investor as a replacement 'bad act' guarantor and environmental indemnitor under the Existing Debt from and after the closing of the transactions contemplated by the PSA (subject to indemnification in the JVA as detailed below)";

5

(d)    "Investor represents and warrants to AB that (a) Investor has a tangible net worth and liquidity that is not less than the Minimum Financial Criteria and (b) Investor and its parent company and/or any of their respective affiliates have sufficient assets to enable Investor (and/or its parent company or any their respective affiliates) to perform the obligations of Investor under this Letter Agreement, including providing all equity required in connection with the closing and the renovation of the Property."

### Contribution of Equity

(e)    "Investor will provide 90% and AB will provide 10%, on an ongoing/current basis as equity is required prior to or at the closing under the PSA, of all of the equity required to consummate the transaction . . . .;

### Definitive Joint Venture Agreement

(f)    "The parties agree to cooperate in good faith to negotiate and, subject to Sections 5 and 6, execute and deliver a definitive joint venture agreement (the "JVA") on or before October 13, 2016. The JVA shall reflect the express terms and provisions of this Letter Agreement, and such other terms and conditions as are otherwise reasonably necessary under the circumstances or otherwise agreed in good faith between the parties (all of the foregoing, collectively, the "JV Standard"). For the avoidance of doubt, cooperation by the parties shall include cooperating with the requirements of the Existing Debt lenders and NYSLA."; and

19.    Pursuant to the Letter Agreement, HotelsAB Green sought to execute and deliver a Joint Venture Agreement reflecting the express terms and provisions of the Letter Agreement so the JV could close on the acquisition and financing of the Property.

20.    However, Reignwood, in clear violation of the Letter Agreement, failed to cooperate in good faith to negotiate and deliver a definitive Joint Venture Agreement, and otherwise breached the Letter Agreement.

<u>Reignwood Failed to Comply with Its Obligations Under the Letter Agreement</u>

6

21.    Almost immediately after entering into the Letter Agreement, Reignwood breached its obligations thereunder in several respects.

*Reignwood Failed to Cooperate and Submit Necessary*
*Materials Required for the Liquor License Application*

22.    Obtaining a liquor license was an essential element to the investment in the Property and a condition precedent to closing under the PSA.

23.    Accordingly, a key provision of the Letter Agreement specifically required Reignwood "to provide such information as may reasonably be requested by such counsel in order to prepare, complete and process the Liquor License Application" because without such information, the NYSLA would not approve a transfer of the liquor license from the Seller to the JV.

24.    HotelsAB Green immediately engaged knowledgeable and respected counsel (the "Liquor License Counsel") to facilitate the Liquor License Application on behalf of itself and the soon-to-be-formed JV.

25.    The Liquor License Counsel then advised Reignwood that one of the NYSLA's fundamental requirements for agreeing to transfer a liquor license is for significant stakeholders and major equity holders in the transferee—*e.g.*, Reignwood's Chairman Ruayrungruang—to submit fingerprint cards on the form approved by the NYSLA.

26.    Reignwood was informed that without submitting complying fingerprint cards, the NYSLA would not approve the Liquor License Application and the Buyer would breach its obligations under the PSA.

27.    Over the ensuing weeks and months, André Balazs, other employees of HotelsAB Green, HotelsAB Green's counsel, and the Liquor License

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 11 of 277

Counsel repeatedly contacted Reignwood—via emails, phone calls, in-person meetings, and text messages—to request complying fingerprint cards from Ruayrungruang, the Reignwood Chairman and a major equity holder, so Reignwood and HotelsAB Green could close under the PSA.

28.     Liquor License Counsel repeatedly and unambiguously warned that Reignwood's failure to provide the fingerprint cards would result in the immediate dismissal of the Liquor License Application.

29.     Despite repeated requests from HotelsAB Green and its counsel, Ruayungruang, in breach of the Letter Agreement, refused to provide compliant fingerprint cards necessary for the successful submission of the Liquor License Application, thereby blocking the acquisition of the Property under the PSA.[2]

30.     Months after the initial request for complying fingerprint cards, and in an attempt to circumvent the requirements of the Letter Agreement—that explicitly required Reignwood to provide this type of information—Reignwood purported to make alternative attempts to obtain the Liquor License Application approval by, among other things, taking steps to amend the Liquor License Application to be in the name of a newly created holding corporation.

31.     However, these delayed attempts, taken as an end-run around requirements specifically stated in the Letter Agreement, were ultimately insufficient to obtain Liquor License Application approval from the NYSLA within the timeframe required under the PSA, thereby dooming Reignwood's and HotelsAB Green's ability to close on the acquisition of the Property under the PSA.

---

[2] Zach Bayman to confirm whether Reignwood ever submitted complying fingerprint cards, even if it occurred past the deadline.

*Reignwood Failed to Provide a Loan Guarantor and otherwise
Cooperate and Provide Necessary Materials and Information
for the Existing Debt Assumption Application*

32.     In order for the JV to finance the acquisition of the Property, it needed to assume the Existing Debt. Consequently, Section 20(c) of the PSA required Buyer to submit "complete applications required by each of the Existing Debt Lenders to obtain the Existing Debt Assumption and Release, together with all documents and information required in connection therewith". Buyer was further required, pursuant to Sections 20(b) and 20(d) of the PSA, respectively:

> "to cooperate with all reasonable requests made by or on behalf of each of the Existing Debt Lenders, any Servicer and/or any Rating Agencies for information regarding Buyer, New Loan Guarantor and their respective direct and indirect owners (including providing all financial statements, organizational documents, background information regarding direct and indirect owners of Buyer and other information and documents reasonably requested by each of the Existing Debt Lenders, any Servicer and/or any Rating Agency and/or required to be provided under the Existing Debt Assumption and Release requirements)."

33.     Because the Existing Debt Assumption and Release was crucial to acquiring the Property, Reignwood's role in that process was specifically provided for in the Letter Agreement. Reignwood was required to provide a "bad act" guarantor and environmental indemnitor that met the "Minimum Financial Criteria" and "provide evidence that [such guarantor] satisfies the Minimum Financial Criteria, which [evidence] will be available for submission to the Existing Debt lender," so the Seller's guarantor could be replaced upon closing, as is customary in commercial real estate transactions that involve loan assumptions.

34.     Upon entering into the Letter Agreement, HotelsAB Green, Reignwood, Seller, and the Existing Debt lenders (the "Existing Debt Lenders") began the Existing Debt Assumption application process, which included filling out required

9

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 13 of 277

forms and applications, providing diligence materials about the Property, the acquisition and Reignwood's new guarantor, and discussing status reports and open items on weekly conference calls.

35.     However, in the face of the explicit requirements in the Letter Agreement, Reignwood repeatedly ignored requests from both HotelsAB Green and the Existing Debt Lenders to deliver certain materials and information to the Existing Debt Lenders that were necessary for such lenders to process and evaluate the Existing Debt Assumption application.

36.     Reignwood's obligation to provide an acceptable replacement guarantor for the purpose of the Existing Debt Assumption application was an essential component of the JV's ability to close the transaction.  The Letter Agreement specifically stated that "Buyer is permitted to . . . offer Investor as a replacement 'bad act' guarantor and environmental indemnitor under the Existing Debt."

37.     HotelsAB Green repeatedly warned Reignwood that it must identify an entity with U.S. assets for the replacement guarantor and that a foreign entity without U.S. assets would not be accepted by the Existing Debt Lenders as a replacement guarantor, a fact that is widely known among real estate finance professionals and was not disputed by Reignwood's U.S.-based counsel.

38.     Notwithstanding the persistent warnings, Reignwood insisted on offering a Hong Kong entity with no U.S. assets as its proposed replacement guarantor, and even then failed to provide requested information about such entity to the Existing Debt Lenders.

39.     After months of repeated email requests and telephone calls, the Existing Debt Lenders rejected Reignwood's proposed foreign entity as the replacement guarantor.

40.     Reignwood was also unable or unwilling to provide an alternative replacement guarantor or propose an alternative solution, such as a letter of credit, to satisfy the Existing Debt Lenders.

41.     Beyond Reignwood's refusal to provide a reasonably acceptable replacement guarantor, Reignwood failed to provide other significant and material items required by the Existing Debt Lenders.

42.     The Letter Agreement required that "Investor shall . . . provide evidence that Investor satisfies the Minimum Financial Criteria, which will be available for submission to the Existing Debt lender."  Time after time, HotelsAB Green and the Existing Debt Lenders requested the necessary items, both in the weekly scheduled conference calls with the lenders and in e-mails to both Reignwood and Reignwood's counsel.  Reignwood repeatedly ignored these requests and failed to provide the necessary materials and information.

43.     Besides failing to provide the necessary substantive diligence materials, Reignwood failed in even the most basic of tasks.  For example, the lenders repeatedly requested that Reignwood (i) execute a simple "joinder letter" (which would allow the entire group of Existing Debt Lenders to rely on one single loan assumption application delivered to the senior lender); (ii) approve various preliminary application paperwork prepared by HotelsAB Green on behalf of the JV; and  (iii) fund small legal retainers required by the Existing Debt Lenders for the lenders' legal fees.

11

44.     Reignwood ignored these requests for months, with neither Reignwood nor its counsel able to explain or justify its failure to perform these simple and customary requests.

45.     In light of Reignwood's inaction, refusal to provide an acceptable guarantor, and failure to provide the simplest of documentation or pay modest and customary legal retainers, on or around January 27, 2017 the existing mezzanine lenders instructed their counsel to suspend all work on the Existing Debt Assumption application, effectively blocking the acquisition from closing.

*Reignwood Failed to Negotiate the Terms of*
*the Joint Venture Agreement in Good Faith*

46.     A key component of the Letter Agreement was the provision requiring the parties "to cooperate in good faith to negotiate and . . . execute and deliver a definitive joint venture agreement on or before October 13, 2016." Having a definitive joint venture agreement is a requirement for entering into any commercial financing arrangement and thus was critical to enabling the closing to occur.

47.     Despite this important and expressly stated requirement, Reignwood failed to negotiate the terms of the Joint Venture Agreement in good faith.

48.     Reignwood caused extensive delays in negotiating the Joint Venture Agreement, which the Letter Agreement contemplated would be executed no later than October 13, 2016.

49.     HotelsAB Green offered to provide the initial draft of the Joint Venture Agreement in order to move the process along, but Reignwood insisted that it provide the initial draft of the Joint Venture Agreement (in that it is customary, though not universal, for a capital partner in a real estate joint venture agreement to provide the

12

initial draft).  Despite numerous requests by HotelsAB Green for such a draft from Reignwood, after the execution of the Letter Agreement in mid-September, Reignwood did not circulate an initial draft until the second week of November, well after the time the Joint Venture Agreement was meant to be finalized.

50.    Not only was Reignwood's initial draft of the Joint Venture Agreement belated, upon review, it became immediately apparent that it was also a material departure from the intended terms expressly agreed upon by the parties in the Letter Agreement in a number of respects.

51.    One of the many examples of Reignwood demanding a departure from the agreed upon terms of the Letter Agreement in the Joint Venture Agreement was with respect to the treatment of the company employed to manage the Property. Paragraph 4 of the Letter Agreement unambiguously required the manager to be terminated upon closing, so a re-positioning of the Property to include a private membership club could occur.  The Letter Agreement states that "Investor requires as a condition of its investment in the Property that the joint venture terminate the [manger's] management agreement as of the closing on the acquisition of the Property (in accordance with any requirements relating to termination set forth in such management agreement)."  Yet Section 1.8 of Reignwood's draft Joint Venture Agreement (Exhibit C) instead provided that Reignwood could decide whether to terminate the management agreement "in its sole and absolute discretion," regardless of whether HotelsAB Green wanted to terminate the management agreement, and Reignwood refused to provide assurances that it intended to terminate the management agreement.

13

52.     Similarly, Paragraph 8 of the Letter Agreement listed fourteen "Mutual Decisions" which HotelsAB Green, as the managing member of the JV, could not make on behalf of the JV without Reignwood's consent.  Yet Section 6.1.3 of the Reignwood draft Joint Venture Agreement more than doubled this list to thirty-seven decisions, totally disregarding the previously agreed-upon list, which was agreed on after extensive negotiations.

53.     When such numerous discrepancies were pointed out and detailed by HotelsAB Green, Reignwood continued to insist on pursuing the terms in its proposed Joint Venture Agreement draft, even though Reignwood acknowledged that such terms did not comport with the express provisions of the binding Letter Agreement.  Despite this about-face, HotelsAB Green nevertheless continued to negotiate in good faith, even conditionally agreeing to some of Reignwood's new positions in an attempt to salvage the JV relationship and finalize the Joint Venture Agreement and proceed to closing.  In response, however, Reignwood's positions continued to remain inconsistent with what was agreed to under the Letter Agreement.

54.     The Letter Agreement contained an express provision enabling the parties to finalize the Joint Venture Agreement by means of arbitration in the event of an impasse.  When it ultimately became clear that Reignwood would not agree to finalize the Joint Venture Agreement in a manner consistent with the Letter Agreement, HotelsAB Green instituted the stipulated arbitration provision in the Letter Agreement on or about December 9, 2016, in hopes of finalizing the Joint Venture Agreement.

55.     Initially, Reignwood refused to comply with the arbitration clause, indicated that it would not agree to arbitrate and threatened to abandon the transaction if

HotelsAB Green attempted to exercise the provision. This was a blatant breach of a provision Reignwood explicitly agreed to in the Letter Agreement. After several weeks, Reignwood finally agreed to exchange names of possible arbitrators.

56. Ultimately, after finally mutually agreeing on an arbitrator, Reignwood once again refused to proceed to arbitrate, requiring HotelsAB Green to make an application to the American Arbitration Association ("AAA") in accordance with the Letter Agreement. Once the application was filed, Reignwood briefly feigned cooperation, only to refuse to cooperate with the AAA process.

57. Despite the instituted arbitration, Reignwood never became willing to adhere to the terms of the Letter Agreement, and thus, the parties never entered into the JV. Ultimately, Reignwood's announcement of its intention not to consummate the transaction mooted the arbitration proceeding.

58. Reignwood's actions in failing to negotiate the Joint Venture Agreement in good faith, as required by the Letter Agreement, made it impossible to consummate the acquisition.

*Reignwood Failed to Provide the Equity*
*Funds Required to Close Under the PSA*

59. Under the Letter Agreement, Reignwood was obligated to contribute a significant amount of capital to the JV and to lend HotelsAB Green additional capital necessary for the JV to acquire the Property and successfully execute its business plan.

60. Reignwood has failed to provide the funding necessary to consummate the closing of the acquisition, a clear breach of the Letter Agreement.

The Venture Received Notice of Default

61.     On February 8, 2017, HotelsAB Green sent Reignwood a letter notifying it that it had failed to comply with its obligation under the Letter Agreement in numerous respects, and in light of the serial breaches of the Letter Agreement, Reignwood had made it impossible for the JV, among other things, to obtain approval of the Liquor License Application and to complete the Existing Debt Assumption and Release.

62.     On February 16, 2017, Seller subsequently sent HotelsAB Green, on behalf of the JV, a closing notice stating that the Closing Date for the transaction was February 21, 2017.

63.     On February 17, 2017, Reignwood sent Seller a letter objecting to, among other things, Seller's closing date set for February 21, 2017.  In the letter, Reignwood disputed the Seller's contention that Buyer was not entitled to an extension of the closing date to April 3, 2017, as requested in a January 19, 2017 extension notice letter from HotelsAB Green to the Seller.

64.     In response to Reignwood's letter, on February 17, 2017, the Seller permitted an extension of the closing date until April 3, 2017, in what it referred to as "a gesture of good will."

65.     Reignwood sent a separate letter to HotelsAB Green on February 17, 2017 accusing HotelsAB Green of making material misrepresentations and breaching the Letter Agreement, and informing HotelsAB Green, among other things, that it was facing challenges to obtain the necessary funds to close the transaction due to capital control restrictions instituted by China, but that it was attempting to find a party to replace them to keep the transaction alive.  However, even after benefiting from the

16

various extensions described above, Reignwood was unable to find a replacement partner. Reignwood ultimately informed Seller that it could not obtain the necessary funds to close the transaction.

66.     On March 30, 2017, Reignwood sent a letter to HotelsAB Green requesting that HotelsAB Green provide notice to Seller to terminate the PSA because it alleged that Seller breached the PSA due to an economic decline in the Property's performance.

67.     As a result of these, and other, failures by Reignwood, on April 10, 2017, the Seller terminated the contract, ending the potential transaction.

68.     By willfully failing to perform its obligations under the Letter Agreement, Reignwood has breached that agreement and caused significant damage to HotelsAB Green.

## CAUSE OF ACTION
### (Breach of Contract)

69.     HotelsAB Green repeats and realleges the allegations in paragraphs 1 through 68 of this Complaint.

70.     HotelsAB Green and Reignwood entered into a binding agreement relating to the investment in the Property. HotelsAB Green complied with its obligations under the Letter Agreement.

71.     Reignwood has repeatedly breached the express terms of the Letter Agreement.

72.     Reignwood's breaches of the Letter Agreement have resulted in HotelAB Green's loss of its deposit and the deterioration of the proposed lucrative investment.

73.     As a direct result of Reignwood's breach of its contractual obligations, HotelsAB Green has suffered damages in the amount of $5,000,000, plus additional costs and expenses incurred during the transaction, and additional lost business opportunities and reputational damage (plus statutory interest).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff HotelsAB Green demands judgment against Defendant Reignwood European Holdings SARL as follows:

(a)     declaring and adjudging that Reignwood breached the Letter Agreement;

(b)     awarding it damages in an amount to be proven at trial plus prejudgment interest at the maximum legal rate;

(c)     awarding it interest and reasonable attorney's fees, court costs and expenses arising out of this litigation; and

(d)     awarding it such other and further relief as the Court deems just and proper.

18

Dated: August 4, 2017
     New York, New York

                  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

                  By: _____
                      Leslie Gordon Fagen
                      Harry M. Jacobs
                  1285 Avenue of the Americas
                  New York, New York 10019-6064
                  (212) 373-3000
                  lfagen@paulweiss.com
                  hjacobs@paulweiss.com

                  *Attorneys for Plaintiff HotelsAB Green, LLC*

19

# EXHIBIT A

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 24 of 277

**PURCHASE AND SALE AGREEMENT**

by and between

**AB GREEN GANSEVOORT, LLC**, as Seller

and

**HOTELSAB GREEN, LLC**, as Buyer

Property Known As:

**THE STANDARD HIGH LINE**
**848 Washington Street, New York, New York 10014**

August 16, 2016

63666358

Page

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| SECTION 1. | Definitions | 1 |
| SECTION 2. | Agreement to Sell and Purchase | 17 |
| SECTION 3. | Purchase Price; Deposit | 20 |
| SECTION 4. | Property Investigation | 21 |
| SECTION 5. | Title and Title Insurance | 24 |
| SECTION 6. | Closing | 27 |
| SECTION 7. | Closing Costs and Adjustments | 28 |
| SECTION 8. | Conditions Precedent | 33 |
| SECTION 9. | Closing Deliveries | 36 |
| SECTION 10. | Seller's Covenants Pending Closing | 39 |
| SECTION 11. | Assignment by Buyer | 45 |
| SECTION 12. | Destruction; Condemnation | 45 |
| SECTION 13. | Defaults and Remedies | 47 |
| SECTION 14. | Seller's Representations and Warranties | 49 |
| SECTION 15. | Buyer's Representations and Warranties | 56 |
| SECTION 16. | Disclaimers and Waivers | 58 |
| SECTION 17. | Notices | 61 |
| SECTION 18. | Management Agreement | 63 |
| SECTION 19. | Liquor License(s) | 63 |
| SECTION 20. | Existing Debt Assumption | 66 |
| SECTION 21. | Survival | 69 |
| SECTION 22. | Broker | 70 |
| SECTION 23. | Pre-Closing Tax Year Contests | 70 |

Page

SECTION 24.    Date for Performance; Time of the Essence ............................................ 71

SECTION 25.    Severability ............................................................................................. 71

SECTION 26.    Successors and Assigns............................................................................ 71

SECTION 27.    Construction............................................................................................. 71

SECTION 28.    Entire Agreement ..................................................................................... 72

SECTION 29.    Amendment .............................................................................................. 72

SECTION 30.    Applicable Law ........................................................................................ 72

SECTION 31.    Relationship of the Parties ...................................................................... 72

SECTION 32.    Incorporation by Reference; References.................................................. 73

SECTION 33.    Captions ................................................................................................... 73

SECTION 34.    Counterparts ............................................................................................ 73

SECTION 35.    Waiver of Trial By Jury; Venue and Jurisdiction; Litigation Costs ......... 73

SECTION 36.    Confidentiality ......................................................................................... 74

SECTION 37.    No Third Party Beneficiary...................................................................... 74

SECTION 38.    No Imputation to Seller of Acts/Knowledge of
               Manager/Enforcement of Management Agreement.................................. 74

SECTION 39.    Exculpation .............................................................................................. 75

SECTION 40.    No Recordation ........................................................................................ 76

SECTION 41.    Further Assurances................................................................................... 76

SECTION 42.    Waiver...................................................................................................... 76

SECTION 43.    Bulk Sales ................................................................................................ 76

SECTION 44.    Employees ................................................................................................ 77

SECTION 45.    1031 Exchange ......................................................................................... 78

SECTION 46.    Alternative Structure ............................................................................... 79

Exhibits:

Exhibit A          -          Legal Description

Exhibit B          -          Excluded Agreements

Exhibit C-1        -          Escrow Agent's Wiring Instructions

Exhibit C-2        -          Seller's Wiring Instructions

Exhibit D          -          Escrow Terms

Exhibit E          -          Specified Permitted Exceptions

Exhibit F          -          Form of Deed

Exhibit G          -          Form of Bill of Sale

Exhibit H          -          Form of General Assignment

Exhibit I          -          Litigation

Exhibit J          -          Intentionally Omitted

Exhibit K          -          Form of Termination of Operating Lease

Exhibit L          -          Allocation of Purchase Price Among Asset Classes

Exhibit M-1        -          Form of Management Agreement Assignment and Assumption

Exhibit M-2 -                 Form of Notice of Assignment of the Management Agreement

Exhibit N          -          Form of Title Affidavit

Exhibit O-1        -          Form of Seller's Certificate of Representations and Warranties

Exhibit O-2        -          Form of Buyer's Certificate of Representations and Warranties

Exhibit P          -          Additional Excluded Property

Exhibit Q          -          Form of FIRPTA Affidavit

Exhibit R          -          Post-Closing Escrow Agreement

Exhibit S          -          Form of Excluded Property Assignment

SCHEDULES

Schedule 10(f)        -       Renewal Permits

Schedule 14(a)(xii)   -       Service Contracts

Schedule 14(a)(xvi)   -       Violations of Permits

Schedule 14(a)(xix)   -       Existing Debt Documents

Schedule 15(a)        -       Buyer Organizational Chart

# PURCHASE AND SALE AGREEMENT

This **PURCHASE AND SALE AGREEMENT** (this "Agreement"), is made and entered into as of August 16, 2016 (the "Effective Date"), by and between **AB GREEN GANSEVOORT, LLC**, a Delaware limited liability company ("Seller"), and **HOTELSAB GREEN, LLC**, a Delaware limited liability company ("Buyer").

## BACKGROUND:

A.     Seller owns the Property (as defined below) relating to that certain hotel commonly known as The Standard High Line Hotel (the "Hotel") located at 848 Washington Street, New York, New York 10014 on the land identified on the tax maps of the City of New York, New York County, as Block 645, Lot 11 (formerly old Lots 9 & 11), as more particularly described in Exhibit A attached hereto and incorporated herein by reference (such land, the "Land"); and

B.     The Hotel is leased to Operating Tenant (as defined below), pursuant to the terms of the Operating Lease (as defined below).

C.     Seller and Buyer have agreed to the sale by Seller and the purchase by Buyer of the Hotel, the Land and the remainder of the Property (as defined below) on the terms and conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the mutual promises and agreements contained in this Agreement and for other good and valuable consideration, the receipt and adequacy of which are hereby mutually acknowledged, Seller and Buyer covenant and agree as follows:

## AGREEMENT:

SECTION 1.   Definitions.   The following terms shall have the indicated meanings:

"AB Green" means AB Green, LLC, a Delaware limited liability company.

"AB Green Interest Holders" means any member or holder of any profit participation or other beneficial interest of AB Green as of the Closing Date (which Buyer acknowledges may be different than those which exist as of the Effective Date).

"ABG Member" means AB Green Gansevoort Member, a Delaware limited liability company.

"Additional Deposit" shall mean Ten Million and No/100 Dollars ($10,000,000.00), together with any interest earned thereon.

"Advance Bookings" shall have the meaning set forth in Section 7(h) hereof.

"Affiliate" shall mean, with respect to any Person, any individual, corporation, limited liability company, partnership, trust or other entity controlling, controlled by or under common

control with the Person in question. Without limiting <u>Section 38</u> hereof, in no event shall (i) New York Standard Owner JV LLC, New York Standard Operator JV LLC or Manager or their respective Subsidiaries (including Seller and Operating Tenant) be deemed to be Affiliates of Buyer or Buyer's Affiliates for purposes of this Agreement and (ii) Buyer or Buyer's Affiliates be deemed to be Affiliates of Seller, Operating Tenant or their respective Affiliates for purposes of this Agreement. Further, Andre Balazs shall at all times be deemed an Affiliate of Buyer for the purposes hereof.

"<u>Agreement</u>" shall have the meaning set forth in the introductory paragraph hereof.

"<u>Alternative Structure</u>" shall have the meaning set forth in <u>Section 46(b)</u> hereof.

"<u>Alternative Structure Confirmation</u>" means, with respect to each Existing Debt Lender, a written confirmation that the implementation of the Alternative Structure in form and substance reasonably satisfactory to Seller, which shall confirm that the consummation of the Alternative Structure shall not be a "Default" or "Event of Default" under the Existing Loan Documents relating to such Existing Debt Lender and shall not give rise to any liability under any of the Existing Debt Guarantees provided to such Existing Debt Lender.

"<u>Alternative Structure Notice</u>" shall have the meaning set forth in <u>Section 46(a)</u> hereof.

"<u>Anti-Money Laundering and Anti-Terrorism Laws</u>" shall mean, collectively, any laws relating to terrorism, money laundering or the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Action of 2001, Public Law 107-56 and/or the Executive Order referred to below.

"<u>Assumed Agreements</u>" shall mean, collectively, to the extent assignable, with respect to the Hotel, all equipment leases, contracts (including Service Contracts), agency agreements, supply, service or maintenance contracts, credit card service agreements, warranties (including all roof and equipment warranties), all architect, engineer and other design professional contracts, miscellaneous agreements, room and other Hotel facility reservation agreements, "trade-out" agreements, advance booking agreements, convention reservation agreements or other agreements of Seller (or Operating Tenant), either entered into prior to the date hereof or from and after the date hereof and prior to the Closing Date in accordance with this Agreement, pertaining to the use, marketing, promotion, maintenance, repair, development and operation of the Hotel, including all prepaid rents and deposits, utility deposits, refundable security deposits, rental deposits, and all guaranties by third parties; <u>provided</u>, <u>however</u>, in no event shall the Existing Debt Documents, the Management Agreement or the Excluded Agreements be considered or deemed to be an "Assumed Agreement" or part of the Real Property.

"<u>Attic Stock</u>" shall mean all furniture, fixtures and equipment, whether in the Hotel or in an off-site storage location, owned and maintained by Seller or Operating Tenant in reserve to replace lost, broken or damaged items in the hotel guests rooms, common areas or other areas of the Hotel.

"<u>Beneficial Interest</u>" shall have the meaning set forth in <u>Section 46(b)(i)</u> hereof.

"<u>Beneficial Owner</u>" shall have the meaning set forth in <u>Section 46(b)(i)</u> hereof.

"Bill of Sale" shall have the meaning set forth in clause (ii) of Section 9(a) hereof.

"Books and Records" shall mean, collectively, with respect to the Hotel, electronic and/or written copies of all books, records and accounts of Seller or Operating Tenant relating to the Hotel and its operation for the period of Seller's ownership of the Hotel, including all records, architect's or engineer's reports and the status of elevator inspections, marketing and advertising materials of Seller or Operating Tenant, warranties, guaranties, manuals, plans of operations, lists of present suppliers, architectural, engineering and other plans (including "as-built" plans) and drawings, if any, relating to the Hotel, in each case, only to the extent in Manager's, Seller's or Operating Tenant's possession and control; provided, however, in no event shall "Books and Records" include (a) confidential or proprietary materials (or materials that are subject to any confidentiality or proprietary restrictions) or (b) Excluded Property, including Manager's Materials or other materials owned by Manager.

"Buck" means Buck 13th Street LLC, a Delaware limited liability company, and/or any other Person(s) which owns all or any portion of the interest initially held by Buck in Owner JV.

"Business Day" shall mean any day other than a Saturday, Sunday or legal holiday in the State of New York.

"Buyer" shall have the meaning set forth in the introductory paragraph hereof.

"Buyer Cause" shall have the meaning set forth in Section 10(e) hereof.

"Buyer's Affiliates" shall have the meaning set forth in Section 39 hereof.

"Buyer's Early Closing Date Right" shall have the meaning set forth in Section 6(c) hereof.

"Buyer's Existing Debt Assumption SPE Entities" shall mean, with respect to each loan included in the Existing Debt, the single member, Delaware limited liability company(ies) that, that if the Existing Debt Assumption and Release occurs at Closing pursuant to Section 20, (a) shall assume such loan, (b) is controlled, directly or indirectly, by Buyer, an Affiliate of Buyer or by a Person in which Buyer or its Affiliates or Andre Balazs or an entity controlled by Andre Balazs is a managing principal and has day-to-day control, (c) is newly formed as of the Closing, and (d) satisfies the requirements of each of the Existing Debt Lenders for a special purpose, bankruptcy remote borrower pursuant to the Existing Debt Documents.

"Buyer's Operating Tenant" shall mean an Affiliate of Buyer who will operate the Hotel pursuant to an operating lease entered into with Buyer at Closing, provided, however, such Buyer's Operating Tenant shall be (x) if the Existing Debt Assumption and Release occurs at Closing, acceptable to each of the Existing Debt Lenders (and Buyer shall provide such evidence reasonably acceptable to Seller of the Existing Debt Lenders acceptance thereof at least ten (10) Business Days prior to Closing) and (y) if the Operating Tenant will be the assignee of the Management Agreement, a permitted assignee of the Management Agreement.

"Buyer's Representatives" shall mean, collectively, (i) Buyer's attorneys, consultants, accountants, architects, engineers, contractors, agents, representatives and other qualified

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 31 of 277

professionals, (ii) any lender of or investor in Buyer and (iii) any consultant, accountant, architect, engineer, agent, representative and other qualified professional of any lender of or investor in Buyer.

"Casualty" shall mean a fire, flood, earthquake or other casualty affecting the Property or any portion thereof.

"Claims" shall mean any demands, rights, causes of action, penalties, actions, judgments, suits, proceedings, claims, liabilities, costs, expenses (including attorneys' fees and disbursements whether a suit is instituted or not), damages (except for special, consequential or punitive damages, unless, in each case, to the extent that an indemnified party is liable therefor to another third party), losses, injuries and liens, whether known or unknown, liquidated or contingent.

"Closing" shall have the meaning set forth in Section 6 hereof.

"Closing Date" shall mean the Scheduled Closing Date, as such date may be adjourned or accelerated pursuant to this Agreement.

"Closing Inventory" shall have the meaning set forth in Section 7(i) hereof.

"Closing Payment" shall mean the Purchase Price (as adjusted for the various apportionments, prorations, credits and other adjustments as set forth in this Agreement, including as set forth in Section 7 hereof), minus the Deposit, and, only if the Existing Debt Assumption and Release occurs at Closing pursuant to Section 20 hereof, minus the Existing Debt Balance.

"Condemnation" shall mean a taking in condemnation or by eminent domain proceeding of the Property or any portion thereof.

"Confidentiality Agreement" shall mean that certain Confidentiality Agreement, dated July 14, 2016 between Seller and Andre Balazs Properties, LLC.

"Consumables and Inventories" shall mean, collectively, with respect to the Hotel, all inventories owned by Seller or Operating Tenant and used or usable in connection with the operation of the Hotel, including provisions in storerooms, refrigerators, pantries and kitchens (including all food and beverages in any "mini-bars"), or other merchandise intended for sale or resale, including any gift shop or newsstand owned and maintained or operated by Seller or Operating Tenant, and held for sale to guests and customers of the Hotel and/or the general public, fuel, mechanical supplies, stationery, guest supplies, maintenance, cleaning and housekeeping supplies, matches and ashtrays, soap and other toiletries, unopened containers of alcoholic beverages (to the extent allowable by applicable law) and non-alcoholic beverages and other supplies and similar items, and all "other inventory" (as defined in the Uniform System of Accounts), which are either located at the Hotel or ordered for future use at the Hotel as of the Closing and subject to depletion, resupply, substitution, replacement and disposition in the ordinary course of business in accordance with the provisions hereof; provided, however, in no event shall the Excluded Property be considered or deemed to be "Consumables and Inventories".

"Control" or "control" and its correlative meanings shall mean, with respect to any Person, majority ownership of capital and profits and the power (either individually or together with others), which may be subject to customary "major decision" rights benefitting other Persons, to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through ownership of voting securities, membership or partnership interests, by contract or otherwise.

"Cutoff Night" shall have the meaning set forth in Section 7(g) hereof.

"Cutoff Time" shall have the meaning set forth in Section 7(b) hereof.

"Data Room" shall mean the electronic due diligence data room for the Property to which Buyer and its counsel have been provided access set up by Seller's counsel through Kiteworks and identified as https://share.kayescholer.com/#/folder/75530?sharedOnly=0&isApp=0.

"Damages Threshold" shall mean Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00).

"Deed" shall have the meaning set forth in clause (i) of Section 9(a) hereof.

"Deposit" shall mean the Initial Deposit, by itself and together with (i) the Additional Deposit, as and when the Additional Deposit has been paid to Seller and (ii) each Liquor License Extension Deposit (or portion thereof, as and when deposited with Escrow Agent (subject to Section 19(c) hereof).

"Effective Date" shall have the meaning set forth in the introductory paragraph hereof.

"Environmental Laws" shall mean all federal, state and local laws, statutes, rules, ordinances and regulations relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata), including, without limitation, laws, statutes, rules, ordinances and regulations relating to emissions, discharges, releases of hazardous substances or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of hazardous substances including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 *et seq.* ("CERCLA"); the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901 *et seq.* ("RCRA"); the Toxic Substance Control Act, 15 U.S.C. §§ 2601 *et seq.*; the Water Pollution Control Act (also known as the Clean Water Act) 33 U.S.C. § 1251 *et seq.*; the Clean Air Act, 42 U.S.C. § 7401 *et seq.*; and the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 *et seq.*, as the same may be amended or modified prior to the Closing Date.

"Escrow Agent" shall mean Old Republic National Title Insurance Company.  Seller and Buyer hereby agree that Escrow Agent shall handle all closing related matters in accordance with this Agreement.

"Escrow Agent's Wiring Instructions" shall mean Escrow Agent's wiring instructions attached hereto as Exhibit C-1.

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 33 of 277

"Excluded Agreements" shall mean, collectively, any agreements or contracts listed on Exhibit B attached hereto, together with the Non-Assumed Service Contracts.

"Excluded Property" shall have the meaning set forth in Section 2(e) hereof.

"Executive Order" shall mean Executive Order No. 13224 (Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism).

"Existing Commitment" shall have the meaning set forth in Section 5(b) hereof.

"Existing Debt" shall mean, collectively, the Senior Loan, Mezzanine Loan A, and Mezzanine Loan B hereof.

"Existing Debt Assumption and Release" shall have the meaning set forth in Section 20(a) hereof.

"Existing Debt Assumption Application" shall have the meaning set forth in Section 20(c) hereof.

"Existing Debt Assumption Application Submittal Deadline" shall have the meaning set forth in Section 20(c) hereof.

"Existing Debt Assumption Extension Option" shall have the meaning set forth in Section 20(h) hereof.

"Existing Debt Assumption Notice" shall have the meaning set forth in Section 20(c) hereof.

"Existing Debt Assumption Requirements" shall have the meaning set forth in Section 20(b) hereof.

"Existing Debt Balance" shall mean the outstanding principal balance of, and any accrued but unpaid interest on, the Existing Debt as of the Closing.

"Existing Debt Borrowers" shall mean, collectively, the Senior Loan Borrower, Mezzanine Loan A Borrower and Mezzanine Loan B Borrower.

"Existing Debt Documents" shall mean, collectively, the Senior Loan Documents, Mezzanine Loan A Documents and Mezzanine Loan B Documents.

"Existing Debt Fees" shall mean, collectively, all fees, costs and expenses to be paid to or on behalf of each Existing Debt Lender, any Servicer and/or any rating agency(ies) and to their agents, attorneys or other representatives, in connection with seeking and obtaining the Existing Debt Assumption and Release, including all transfer, processing, application, servicing and/or assumption fees, additional reserves and escrows, title and UCC insurance fees, endorsement fees, rating agency fees, non-refundable deposits and reasonable legal fees and disbursements,

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 34 of 277

including the payment of the fees and expenses referred to in clauses (b)(ii) and (d) of <u>Section 7.4</u> of each of the Existing Debt Loan Agreements.

"<u>Existing Debt First Extension Option</u>" shall mean the first extension option pursuant to <u>Section 2.5(c)</u> of each of the Existing Debt Loan Agreements so as to extend the maturity date of the Existing Debt to the Payment Date occurring in December 2017.

"<u>Existing Debt First Extension Option Costs</u>" shall mean, collectively, (i) all fees, costs and expenses required by the Existing Debt Documents to be paid by the Existing Debt Borrowers to or on behalf of each Existing Debt Lender, any Servicer and/or any rating agency(ies) and to their agents, attorneys or other representatives, in connection with the Existing Debt Borrowers exercising the Existing Debt First Extension Option, (ii) the payment of all costs and expenses incurred by Existing Debt Borrowers in connection with the Existing Debt Borrowers obtaining a Replacement Interest Cap Agreement (as such term is defined in the Existing Debt Loan Agreements) in accordance with <u>Section 2.5(c)(iii)</u> in each of the Existing Debt Loan Agreements and (iii) any costs and expenses incurred by, or on behalf of, each Existing Debt Lender required by the Existing Debt Documents to be paid by the Existing Debt Borrowers in connection with actions taken as a result of the exercise of the Existing Debt First Extension Option and any subsequent revocation by Existing Debt Borrowers of the Existing Debt First Extension Option pursuant to <u>Section 2.5(c)(ii)</u> in each of the Existing Debt Loan Agreements as result of the Closing occurring on or before December 7, 2016.

"<u>Existing Debt Guarantees</u>" shall mean, collectively, the Senior Loan Guarantees, the Mezzanine Loan A Guarantees and the Mezzanine Loan B Guarantees.

"<u>Existing Debt Guarantors</u>" shall mean, collectively, GAP III Parallel Partners, L.P., Greenfield Acquisition Partners III, L.P., Dune Real Estate Fund LP, Dune Real Estate Parallel Fund LP and Balazs Investors LLC.

"<u>Existing Debt Lenders</u>" shall mean, collectively, the Senior Loan Lender, Mezzanine Loan A Lender and Mezzanine Loan B Lender.

"<u>Existing Debt Lenders Assumption Approval</u>" shall mean the Existing Debt Lenders' written approval of the assumption of the Existing Debt by Buyer or Buyer's Existing Debt Assumption SPE Entities.

"<u>Existing Debt Loan Agreements</u>" shall mean, collectively, the Senior Loan Agreement, Mezzanine Loan A Loan Agreement, and Mezzanine Loan B Loan Agreement.

"<u>Existing Debt Notes</u>" shall mean, collectively, the Senior Loan Note, Mezzanine Loan A Note and Mezzanine Loan B Note.

"<u>Existing Debt Payoff Notice</u>" shall have the meaning set forth in <u>Section 20(i)</u> hereof.

"<u>Existing Debt Pledge Agreements</u>" shall mean, collectively, the Mezzanine Loan A Pledge Agreement and Mezzanine Loan B Pledge Agreement.

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 35 of 277

"Existing Debt Pledged Interests" shall mean, collectively, the Mezzanine Loan A Pledged Interests and the Mezzanine Loan B Pledged Interests.

"Existing Survey" shall mean certain survey prepared by Earl B. Lovell – S.P. Belcher, Inc. dated June 13, 2011, last updated on April 29, 2016.

"Federal WARN Act" shall mean the federal Worker Adjustment and Retraining Notification Act.

"First Liquor License Extension Notice" shall have the meaning set forth in Section 19(c)(i) hereof.

"First Liquor License Extension Option" shall have the meaning set forth in Section 19(c)(i) hereof.

"General Assignment" shall have the meaning set forth in clause (iii) of Section 9(a) hereof.

"Government List" shall mean any of the following lists:  (a) the two lists maintained by the United States Department of Commerce (Denied Persons and Entities); (b) the list maintained by the United States Department of Treasury (Specially Designated Nationals and Blocked Persons); and (c) the two lists maintained by the United States Department of State (Terrorist Organizations and Debarred Parties).

"Governmental Authority" shall mean any federal, state, county, municipal or other government or any governmental or quasi-governmental agency, department, commission, board, bureau, officer or instrumentality, foreign or domestic, or any of them.

"Guest Ledger" shall have the meaning set forth in Section 7(g) hereof.

"Hazardous Materials" shall mean any hazardous, toxic or dangerous waste, substance or material, pollutant or contaminant, as defined for purposes of the CERCLA, or the RCRA, or any other federal, state or local law, ordinance, rule or regulation applicable to the Property, or any substance which is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous, or any substance which contains gasoline, diesel fuel or other petroleum hydrocarbons, polychlorinated biphenyls (PCBs), radon gas, urea formaldehyde, asbestos, lead, or electromagnetic waves

"Hotel" shall have the meaning set forth in the recitals hereof.

"Hotel Employees" shall mean all individuals who are employed by Manager or its Affiliates, who work at or provide services directly to the Hotel (including any employees not actively at work as of the Closing Date, as well as any employees who are on medical disability or leaves of absence and who worked for Manager or its Affiliates immediately prior to such disability or leave).

"Improvements" shall have the meaning set forth in Section 2(b) hereof.

"Initial Deposit" shall mean Five Million and No/100 Dollars ($5,000,000.00), together with any interest earned thereon.

"Intangible Property" shall mean any and all of the following owned by, issued to or licensed to Seller or Operating Tenant and used or usable in connection with the ownership, use, operation, management, maintenance, repair and/or replacement of the Hotel, to the extent Seller's or Operating Tenant's rights and interests therein are transferable: (i) warranties and guaranties, express or implied, held by or on behalf of Seller or Operating Tenant pursuant to any contract or with respect to any of the Real Property or tangible Personal Property, from any contracts, contractors, subcontractors, material men, suppliers or vendors, (ii) any domain names, urls, websites, social media handles and non-exclusive trademarks, servicemarks, trade names and trade dress, together with transactions, adaptations, derivations and combinations thereof, and including all goodwill of the business connected with the use thereof and symbolized thereby, and all applications, registrations, and renewals in connection therewith ("Trademarks"), excepting any Trademarks with respect to the name "Standard Hotel" and any and all other designations, trademarks, tradenames and service marks related to or derived from the "Standard" brand, (iii) all copyrights (including website content), patents, patent applications, trade secrets, know-how and other intellectual property rights, (iv) direct dial telephone numbers for the Hotel, (v) post office boxes, if any, for the Hotel, (vi) all goodwill in connection with the ownership of the Hotel, (vii) all software and computer programs (including applications, interfaces, tools, algorithms and operating systems) and databases and compilations, including any and all libraries, data and collections of data (including the disks) used or held for use in connection with the operation of the Hotel, and all documentation, including programmers' notes and source code annotations, user manuals and training materials relating to any of the foregoing, (viii) all copies and tangible embodiments of the foregoing (in whatever form or medium) and (ix) any past, present or future claims or causes of actions arising out of or related to any infringement, dilution, misappropriation or other violation of any of the foregoing; provided, however, in no event shall "Intangible Property" include (a) confidential or proprietary materials (or materials that are subject to any confidentiality or proprietary restrictions) or (b) Excluded Property, including Manager's Materials or other materials owned by Manager or Manager's Affiliates.

"IRC" shall mean the Internal Revenue Code of 1986, as amended.

"Labor and Employment Law and Requirements" shall mean any federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, guidance, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, or promulgated by a Governmental Authority relating to: (a) hours of work and/or payment of wages, (b) notices to Hotel Employees, (c) discrimination, harassment and retaliation, (d) leaves of absence, (e) employee benefits, or (f) duty to bargain collectively with bargaining unit representative of Hotel Employees.

"Land" shall have the meaning set forth in the recitals hereof.

"Liquor License Application" shall have the meaning set forth in Section 19(a) hereof.

"Liquor License Application Submittal Deadline" shall mean set forth in Section 19(a) hereof.

"Liquor License Approval" shall mean the grant by the Liquor License Authority of new liquor license(s) naming Buyer and Manager as co-licensees or an endorsement to the Liquor Licenses removing Seller and Operating Tenant and substituting Buyer for Seller and Operating Tenant therein (or at Buyer's option, (1) substituting Buyer for Seller and (2) substituting Buyer's Operating Tenant for Operating Tenant).

"Liquor License Authority" shall mean the New York State Liquor Authority.

"Liquor License Extension Deposits" shall mean (i) the Second Liquor License Extension Deposit, as and when the Second Liquor License Extension Deposit has been deposited with Escrow Agent (subject to Section 19(c)(ii) hereof) and (ii) the Third Liquor License Extension Deposit, as and when the Third Liquor License Extension Deposit has been deposited with Escrow Agent (subject to Section 19(c)(iii) hereof).

"Liquor License Renewal" shall mean a renewal of the Liquor Licenses; which shall be deemed to occur regardless of whether the terms, conditions or stipulations governing such renewed Liquor Licenses are less or more favorable, or different, than the terms, conditions or stipulations which currently exist or may have previously existed.

"Liquor Licenses" shall have the meaning set forth in Section 19(a) hereof.

"Major Loss or Damage" shall have the meaning set forth in Section 12(c) hereof.

"Management Agreement" shall mean that certain Hotel Management Agreement dated December 30, 2005 between Seller and HotelsAB, LLC ("HotelsAB"), as assigned by Seller to Operating Tenant pursuant to that certain Assignment and Assumption of Management Agreement dated August 22, 2008, by and between Seller and Operating Tenant, as amended pursuant to that certain letter agreement dated May 19, 2011, by and between HotelsAB and Operating Tenant, as further assigned by HotelsAB to Manager pursuant to that certain Assignment and Assumption of Hotel Management Agreement dated August 30, 2013 by and between HotelsAB and Manager, as the same may be further amended, modified or supplemented in accordance herewith.

"Management Agreement Assignment and Assumption" means that certain Assignment and Assumption of Management Agreement in the form attached hereto as Exhibit M-1.

"Manager" shall mean Standard High Line Management, LLC, a Delaware limited liability company.

"Manager's Materials" shall have the meaning given to such term in Section 15.01(f) of the Management Agreement.

"Mandatory Removal Encumbrance" shall mean (i) a mortgage, deed of trust, security agreement or financing statement recorded or filed against the Property caused or created by Seller or Operating Tenant (other than (a) the Existing Debt Documents, but only if the Existing

Case 1:17-cv-08776-JGK Document 1-1 Filed 11/10/17 Page 38 of 277

Debt Assumption and Release occurs at Closing pursuant to <u>Section 20</u> hereof and (b) as provided in <u>Section 5(g)</u>, if the Existing Debt Assumption and Release does not occur at Closing pursuant to <u>Section 20</u> hereof), (ii) except for such liens caused or created by Buyer, Buyer's Affiliates, Buyer's Representatives or Manager or any Affiliate of Manager (provided that Manager or any Affiliate of Manager is not acting at the direction of Seller or Operating Tenant), other monetary liens encumbering the Property, including judgments and federal, state and municipal tax liens, mechanics' liens and/or materialmen liens relating to work performed at the Real Property, not exceeding $5,000,000 in the aggregate, (iii) the Operating Lease and any memorandum of lease recorded in connection therewith and (iv) other encumbrances which Seller or Operating Tenant has voluntarily, knowingly and intentionally placed on the Property after the Effective Date, other than Permitted Encumbrances.

"<u>Material Labor and Employment Contracts</u>" shall mean all collective bargaining agreement, union contracts and similar agreements pertaining to the Hotel.

"<u>Maximum Liability Amount</u>" shall mean Ten Million and 00/100 Dollars ($10,000,000).

"<u>Mezzanine Loan A</u>" shall mean that certain mezzanine loan, in the original principal amount of $70,000,000 held by Mezzanine Loan A Lender and made to Mezzanine Loan A Borrower, evidenced by the Mezzanine Loan A Note and secured by the Mezzanine Loan A Pledge Agreement.

"<u>Mezzanine Loan A Borrower</u>" shall mean, collectively, New York Standard Mezz I LLC and New York Standard Operator Mezz I LLC.

"<u>Mezzanine Loan A Documents</u>" shall mean, collectively, the Mezzanine Loan A Loan Agreement, Mezzanine Loan A Note, and any other documents executed by the Mezzanine Loan A Borrower in connection with the Mezzanine Loan A, as the same may be amended, modified or supplemented in accordance herewith.

"<u>Mezzanine Loan A Guarantees</u>" shall mean, collectively, that certain Guaranty Agreement (Mezzanine Loan A) and that certain Environmental Indemnity Agreement (Mezzanine Loan A), each dated December 9, 2014, from Existing Debt Guarantors in favor of the Mezzanine Loan A Lender in connection with the Mezzanine Loan A, as the same may be amended, modified or supplemented in accordance herewith.

"<u>Mezzanine Loan A Lender</u>" shall mean, collectively, Altshuler Shaham Provident Funds & Pension LTD and Forethought Life Insurance Company (as successors in interest to Bank of America, N.A.), in each case, together with its successors and/or assignors.

"<u>Mezzanine Loan A Loan Agreement</u>" shall mean that certain Mezzanine Loan A Loan Agreement, dated December 9, 2014, between Mezzanine Loan A Borrower and Mezzanine Loan A Lender, as amended by that certain First Amendment to Mezzanine Loan A Loan Agreement dated July 31, 2015, as the same may be amended, modified or supplemented in accordance herewith.

"<u>Mezzanine Loan A Note</u>" shall mean, collectively, (i) that certain Replacement Promissory Note A-1 (Mezzanine Loan A), dated July 31, 2015, in the original principal amount

of $40,000,000 made by Mezzanine Loan A Borrower in favor of Mezzanine Loan A Lender and (ii) that certain Replacement Promissory Note A-2 (Mezzanine Loan A), dated July 31, 2015 in the original principal amount of $30,000,000 made by Mezzanine Loan A Borrower in favor of Mezzanine Loan A Lender, as the same may be amended, modified or supplemented in accordance herewith.

"Mezzanine Loan A Pledge Agreement" shall mean that certain Pledge and Security Agreement (Mezzanine Loan A), dated December 9, 2014, by Mezzanine Loan A Borrower for the benefit of Mezzanine Loan A Lender, as the same may be amended, modified or supplemented in accordance herewith.

"Mezzanine Loan A Pledged Interests" means the "Pledged Interests" as such term is defined in the Mezzanine Loan A Pledge Agreement.

"Mezzanine Loan B" shall mean that certain mezzanine loan, in the original principal amount of $70,000,000 held by Mezzanine Loan B Lender and made to Mezzanine Loan B Borrower, evidenced by the Mezzanine Loan B Note and secured by the Mezzanine Loan B Pledge Agreement.

"Mezzanine Loan B Borrower" shall mean, collectively, New York Standard Mezz II LLC and New York Standard Operator Mezz II LLC.

"Mezzanine Loan B Documents" shall mean, collectively, the Mezzanine Loan B Loan Agreement, Mezzanine Loan B Note, and any other documents executed by the Mezzanine Loan B Borrower in connection with the Mezzanine Loan B, as the same may be amended, modified or supplemented in accordance herewith.

"Mezzanine Loan B Guarantees" shall mean, collectively, that certain Guaranty Agreement (Mezzanine Loan B) and that certain Environmental Indemnity Agreement (Mezzanine Loan B), each dated December 9, 2014, from Existing Debt Guarantors in favor of the Mezzanine Loan B Lender in connection with the Mezzanine Loan B, as the same may be amended, modified or supplemented in accordance herewith.

"Mezzanine Loan B Lender" shall mean Simone US Private Real Estate Fund I (as successor in interest to Bank of America, N.A.), together with its successors and/or assignors.

"Mezzanine Loan B Loan Agreement" shall mean that certain Mezzanine Loan B Loan Agreement, dated December 9, 2014, between Mezzanine Loan B Borrower and Mezzanine Loan B Lender, as the same may be amended, modified or supplemented in accordance herewith.

"Mezzanine Loan B Note" shall mean that certain Promissory Note (Mezzanine Loan B), dated July 31, 2015, in the original principal amount of $70,000,000 made by Mezzanine Loan B Borrower in favor of Mezzanine Loan B Lender, as the same may be amended, modified or supplemented in accordance herewith.

"Mezzanine Loan B Pledge Agreement" shall mean that certain Pledge and Security Agreement (Mezzanine Loan B), dated December 9, 2014, by Mezzanine Loan B Borrower for

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 40 of 277

the benefit of Mezzanine Loan B Lender, as the same may be amended, modified or supplemented in accordance herewith.

"Mezzanine Loan B Pledged Interests" shall mean the "Pledged Interests" as such term is defined in the Mezzanine Loan B Pledge Agreement.

"Minimum Financial Criteria" shall have the meaning set forth in the Existing Debt Loan Agreements.

"New Loan Guarantor" shall have the meaning set forth in Section 20(a) hereof.

"NLRB" means the National Labor Relations Board.

"Non-Assumed Service Contract" means any Service Contract that is not assignable pursuant to its terms without the payment of any fee.

"NYS WARN Act" shall mean the New York State Worker Adjustment and Retraining Notification Act.

"Occupants" shall mean, collectively, all guests of the Hotel.

"Operating Lease" shall mean that certain Lease Agreement dated September 15, 2008, by and between Seller and Operating Tenant, as amended by (i) that certain First Amendment to Lease Agreement, dated as of January 31, 2011, by and between Seller and Operating Tenant, (ii) that certain Second Amendment to Lease Agreement, dated as of July 7, 2014, by and between Seller and Operating Tenant and (iii) that certain Third Amendment to Lease Agreement, dated as of January 6, 2015, by and between Seller and Operating Tenant, as the same may have otherwise been or may hereafter be amended, modified or supplemented.

"Operating Lease Termination" shall mean a termination agreement in substantially the form attached hereto as Exhibit K that terminates the Operating Lease.

"Operating Tenant" shall mean ABG Standard Operator LLC, a Delaware limited liability company.

"Operating Tenant Owned Property" shall have the meaning set forth in Section 2(d) hereof.

"Ordinary Course of Business" shall have the meaning set forth in Section 10(c) hereof.

"Owner Disposition" shall have the meaning set forth in Section 46(b)(ii) hereof.

"Owner Distribution" shall have the meaning set forth in Section 46(b)(i) hereof.

"Owner JV" means New York Standard Owner JV, LLC, a Delaware limited liability company.

"Owner JV Interest Holders" means the members of Owner JV and the holders of any profit participation or other beneficial interest in Owner JV as of the Closing Date (which Buyer acknowledges may be different than those which exist as of the Effective Date).

"Owner's Property" means the Property owned by Seller and not the Management Agreement, the Assumed Agreements, any other Operating Tenant Owned Property or any Excluded Property.

"Payment Date" shall have the meaning given to such term in the Existing Debt Loan Agreements.

"Permits" shall have the meaning set forth in clause (ii) of Section 2(c) hereof.

"Permitted Exceptions" shall have the meaning set forth in Section 5(f) hereof.

"Person" shall mean an individual, trust, partnership, limited partnership, corporation, limited liability company or other entity of any kind.

"Personal Property" shall have the meaning set forth in clause (i) of Section 2(c) hereof.

"Post-Closing Escrow Agreement" shall have the meaning set forth in Section 14(e) hereof.

"Post-Closing Escrow Funds" shall have the meaning set forth in Section 14(e) hereof.

"Property" shall have the meaning set forth in Section 2(c) hereof.

"Property Investigation" shall have the meaning set forth in Section 4(a) hereof.

"Purchase Price" shall mean Three Hundred Ninety Million and 00/100 Dollars ($390,000,000.00).

"Real Property" shall have the meaning set forth in Section 2(b) hereof.

"Reimbursable Expenses Cap" shall have the meaning set forth in Section 13(a) hereof.

"Renewal Permits" shall have the meaning set forth in Section 10(f) hereof.

"Sales Taxes" shall mean any applicable sales, use or other similar tax applicable to the conveyance of any of the Property, other than Transfer Taxes.

"Scheduled Closing Date" shall mean January 31, 2017.

"Second Liquor License Extension Deposit" shall mean Five Million and No/100 Dollars ($5,000,000.00), together with any interest earned thereon.

"Second Liquor License Extension Option" shall have the meaning set forth in Section 19(c)(ii) hereof.

"Second Liquor License Extension Notice" shall have the meaning set forth in Section 19(c)(ii) hereof.

"Seller" shall have the meaning set forth in the introductory paragraph hereof.

"Seller EOD" shall have the meaning set forth in Section 13(a) hereof.

"Seller Indemnified Parties" shall mean, collectively, any director, officer, employee, shareholder, direct or indirect member, manager, direct and indirect owner or representative, Affiliate, partner, parent, subsidiary, lender, legal counsel and/or agent of Seller and/or Operating Tenant.

"Seller Knowledge Party" shall have the meaning set forth in the definition of "Seller's Knowledge."

"Seller's Knowledge" shall mean and refer solely to facts within the actual knowledge, without any obligation of due inquiry or investigation, other than due inquiry of the Manager (which due inquiry shall be limited to Seller confirming with Manager by electronic email that there are no material inaccuracies with the representations and warranties set forth in Sections 14(a)(iv), (x), (xi), (xii), (xiii), (xiv), (xv), (xvi), (xvii), (xviii), (xix) and (xx)), of Russell Gimelstob, Leyla Leblebici or Barry Marcus (each a "Seller Knowledge Party") and shall not be construed to refer to the knowledge of Manager or any other employee, officer, director, member, manager, direct or indirect owner, Affiliate or agent of Seller; provided, however, in no event shall the foregoing impose any personal liability on the aforementioned individual.

"Seller's Survival Period" shall have the meaning set forth in Section 14(a) hereof.

"Seller's Wiring Instructions" shall mean Seller's wiring instructions attached hereto as Exhibit C-2.

"Senior Loan" shall mean that certain mortgage loan, in the original principal amount of $160,000,000 held by Senior Loan Lender and made to Senior Loan Borrower, evidenced by the Senior Loan Note and secured by the Senior Loan Mortgage.

"Senior Loan Agreement" shall mean that certain Loan Agreement, dated December 9, 2014, among Senior Loan Borrower, Operating Tenant and Senior Loan Lender, as amended by that certain First Amendment to Loan Agreement, dated July 31, 2015, as the same may be further amended, modified or supplemented in accordance herewith.

"Senior Loan Borrower" shall mean Seller.

"Senior Loan Documents" shall mean, collectively, the Senior Loan Agreement, Senior Loan Note, Senior Loan Mortgage, and any other documents executed by the Senior Loan Borrower in connection with the Senior Loan, as the same may be amended, modified or supplemented in accordance herewith.

"Senior Loan Guarantees" shall mean, collectively, that certain Guaranty Agreement and that certain Environmental Indemnity Agreement, each dated December 9, 2014, from Existing

Debt Guarantors in favor of the Senior Loan Lender in connection with the Senior Loan, as the same may be amended, modified or supplemented in accordance herewith.

"<u>Senior Loan Lender</u>" shall mean Bank of China, New York Branch (as successor in interest to Bank of America, N.A.), together with its successors and/or assignors.

"<u>Senior Loan Mortgage</u>" shall mean that certain Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, and Security Agreement, dated December 9, 2014, executed by Senior Loan Borrower and Operating Tenant in favor of Senior Loan Lender, as the same may be amended, modified or supplemented in accordance herewith.

"<u>Senior Loan Note</u>" shall mean that certain Amended, Restated and Consolidated Promissory Note, dated December 9, 2014, made by Senior Loan Borrower in favor of Senior Loan Lender, in the original principal amount of $160,000,000, as the same may be amended, modified or supplemented in accordance herewith.

"<u>Service Contracts</u>" shall mean contracts for the repair, maintenance, care, protection, and operation of the Property.

"<u>Servicer</u>" shall mean, collectively, the servicer(s) of the Senior Loan, Mezzanine Loan A or Mezzanine Loan B.

"<u>Set-Off Rights</u>" shall have the meaning set forth in <u>Section 13(b)(ii)</u> hereof.

"<u>Settlement Statement</u>" shall mean, with respect to the Property, a closing settlement statement apportioning revenues, expenses and any costs as required by this Agreement.

"<u>SI Dispute</u>" means any claim, dispute, litigation, arbitration, court action or similar proceeding that is either (1) by, between or among Manager, any Affiliate of Manager and/or direct or indirect owner, member or shareholder of Manager, on the one hand, and Seller, Operating Tenant, any Affiliate of Seller or Operating Tenant and/or direct or indirect owner, member or shareholder of Seller or Operating Tenant, on the other hand, as result of, relating to, or in connection with a breach of any of Buyer's representations and warranties set forth in <u>Section 15</u> of this Agreement, the execution and delivery of this Agreement and/or the consummation of the transactions contemplated hereunder and/or (2) by, between or among Buyer, any Affiliate of Buyer and/or direct or indirect owner, member or shareholder of Buyer, on the one hand, and Manager, any Affiliate of Manager and/or direct or indirect owner, member or shareholder of Manager, on the other hand.

"<u>SI Injunction</u>" means a court order or injunction issued by a court of competent jurisdiction preventing the sale of the Property to Buyer pursuant to this Agreement as a result of, relating to or in connection with an SI Dispute.

"<u>Tax Department</u>" shall have the meaning set forth in <u>Section 43</u> hereof.

"<u>Third Liquor License Extension Deposit</u>" shall mean Five Million and No/100 Dollars ($5,000,000.00), together with any interest earned thereon.

"Third Liquor License Extension Notice" shall have the meaning set forth in Section 19(c)(iii) hereof.

"Third-Party Sale" shall have the meaning set forth in Section 13(a) hereof.

"Third-Party Sale Profit" shall have the meaning set forth in Section 13(a) hereof.

"Title Affidavit" shall have the meaning set forth in clause (xi) of Section 9(a) hereof.

"Title Company" shall mean Stewart Title Insurance Company (with fifty percent (50%) co-insurance from First Nationwide Title Agency, LLC insuring through Old Republic National Title Insurance Company or such other national title company licensed in the State of New York which is reasonably acceptable to Buyer); it being agreed and understood, however, that Stewart Title Insurance Company shall act as the lead Title Company; provided, however, Seller and Buyer hereby agree that Escrow Agent shall handle all closing related matters in accordance with this Agreement.

"Title Objection" shall have the meaning set forth in Section 5(c) hereof.

"Title Objection Statement" shall have the meaning set forth in Section 5(c) hereof.

"Title Policy" shall mean an ALTA owner's policy of title insurance on the standard form issued by the Title Company in the State of New York.

"Transfer Tax Returns" shall mean the State of New York Real Property Transfer Report (RP-5217 NYC), the New York State Department of Taxation and Finance Combined Real Estate Transfer Tax Return, Credit Line Mortgage Certificate, and Certification of Exemption from the Payment of Estimated Personal Income Tax (TP-584) and the NYC-RPT Real Property Transfer Tax Return and similar documents required to be filed with respect to the transfer of the Real Property.

"Transfer Taxes" shall mean, collectively, all state, county and local transfer taxes, realty transfer taxes, deed taxes, document recording taxes or other similar taxes.

"Violation Fine Cap Amount" shall have the meaning set forth in Section 5(h) hereof.

"Violations" shall have the meaning set forth in clause (vi) of Section 5(f) hereof.

"Warranty Notice" shall have the meaning set forth in Section 14(c) hereof.

SECTION 2.   Agreement to Sell and Purchase.

(a)   Land.   Subject to the terms and conditions of this Agreement, Seller hereby agrees to sell and convey to Buyer, and Buyer hereby agrees to purchase and accept from Seller, the Land, together with all of Seller's right, title and interest in and to any easements, interests, privileges, tenements, hereditaments, rights of way, appurtenances, sidewalks, alleys, gores or strips of land adjoining or appurtenant to the Land or the Improvements or any portion

thereof and in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof.

(b)  <u>Improvements</u>.  In connection with the purchase and sale of the Land, and subject to the terms and conditions of this Agreement, Seller hereby agrees to sell, grant and convey to Buyer, and Buyer hereby agrees to purchase and accept from Seller, all buildings and improvements located on the Land (collectively, the "<u>Improvements</u>"), including the Hotel, together with all of Seller's right, title and interest in and to the systems, fixtures and equipment, now attached or appurtenant to the Land (the Land, together with the Hotel, buildings, improvements, systems, fixtures and equipment attached or appurtenant to the Land, is referred to as the "<u>Real Property</u>").

(c)  <u>Associated Property and Interests</u>.  In connection with the purchase and sale of the Real Property, and subject to the terms and conditions of this Agreement, Seller hereby agrees to sell and convey to Buyer, and to cause Operating Tenant to convey to Buyer, and Buyer hereby agrees to purchase and accept from Seller, all of Seller's and Operating Tenant's right, title and interest in and to the following, in each case, only to the extent assignable and transferrable in accordance with the applicable and relevant documents and applicable law (the Real Property, together with all of the associated property and interests described below and relating to the Real Property, but excluding all Excluded Property, is referred to as the "<u>Property</u>"):

(i)  all tangible personal property and fixtures (other than those which constitute Real Property) located in or on the Real Property and used or usable in the operation or maintenance of the Hotel as of the Effective Date (or acquired by Seller or Operating Tenant prior to Closing in accordance with the terms of this Agreement and so usable or used prior to the Closing), including (A) all furniture, furnishings, machinery, equipment, signs and related personal property, (B) all heating, lighting, plumbing, drainage, electrical, air conditioning, fire protection and security systems and other mechanical fixtures and equipment and systems, (C) all elevators, and related motors and electrical equipment and systems, (D) all hot water heaters, furnaces, heating controls, motors and equipment, all shelving and partitions, all ventilating equipment, and all disposal equipment, (E) all equipment used in connection with the use and or maintenance of the guestrooms, common areas and recreational areas, (F) all linens, towels, uniforms, carpet, drapes, beds, furniture, televisions and other furnishings, (G) computers, computer hardware, telephones, reservations terminals, systems equipment, televisions and other audio-video equipment and art work, (H) all stoves, ovens, freezers, refrigerators, icemakers,  dishwashers, disposals, kitchen equipment and utensils, tables, chairs, plates and other dishes, glasses, silverware, serving pieces and other restaurant and bar equipment, apparatus and utensils, and (I) all Attic Stock, in all cases subject to depletion, resupply, substitution, replacement and disposition in the ordinary course of business in accordance with the provisions hereof; but excluding in any case (1) personal property owned by Occupants, Manager or utility companies, or otherwise excluded by this Agreement and (2) any Consumables and Inventories (all such personal property and fixtures with respect to the Real Property, after giving effect to the specifically excluded categories, are referred to collectively as the "<u>Personal Property</u>");

(ii)     all rights, privileges and appurtenances, if any, belonging to and inuring to the benefit of the Land, including all easements, rights of way, covenants, reciprocal easement agreements, licenses (but excluding the Liquor Licenses), franchises, permits, consents, authorizations and approvals (including any local law, zoning, subdivision, building safety and/or health approvals), registrations and certificates issued by any Governmental Authority relating to the development, construction, ownership, occupancy, use, occupancy, maintenance, repair or operation of the Real Property, together with any deposits made by or on behalf of Seller or Operating Tenant thereunder, to the extent said deposits are transferable and Seller receives a credit from Buyer for such deposits at Closing (all of the foregoing (other than the Liquor Licenses) are collectively referred to as the "Permits");

(iii)     all Assumed Agreements, the Management Agreement (subject to the Management Agreement being in full force and effect at Closing) and, if the Existing Debt Assumption and Release occurs at Closing, the Existing Debt Documents; provided, however, notwithstanding the foregoing, in no event shall any Excluded Agreement be assigned to Buyer or be considered or deemed to be an "Assumed Agreement" or part of the Property;

(iv)     copies of all Books and Records; provided, that, (A) Seller may retain copies of the Books and Records and (B) the following shall not be conveyed to Buyer at Closing: (1) Manager's personnel files and employment records for all Hotel employees, (2) items that belong to or are proprietary to Seller, Operating Tenant, Manager and any of their respective Affiliates or other third parties (including Manager's Materials); (3) internal memoranda regarding the sale, financing and/or valuation of the Hotel; and (4) confidential information and materials, including any materials and information that are covered by the attorney-client privilege or any confidentiality agreement entered into by or binding on Seller, Operating Tenant, Manager or any of their respective Affiliates;

(v)     all Consumables and Inventories;

(vi)     all Advance Bookings;

(vii)     all Intangible Property;

(viii)     subject to Section 12 hereof, any claims and proceeds in respect of any Casualty and any award made or to be made for any Condemnation; and

(ix)     any development or air rights appurtenant to the Land or the Improvements or any portion thereof.

(d)     Certain Property Owned by Operating Tenant.  Notwithstanding anything to the contrary contained herein, the parties acknowledge and agree that (i) prior to the Effective Date, Seller entered into the Operating Lease pursuant to which Operating Tenant operates the Hotel, (ii) Operating Tenant, rather than (or in addition to) Seller may have rights, title and interests in and to some of the Property as of the Effective Date and the Closing Date (collectively, the "Operating Tenant Owned Property"), (iii) Operating Tenant is signing this

Agreement solely for the purpose of agreeing to transfer all of its right, title and interest in and to such Operating Tenant Owned Property to Buyer at the Closing and (iv) Operating Tenant shall not have any liability for or as a result of any default or breach by Seller of any of Seller's representations, warranties and/or obligations hereunder.  If so directed by Buyer at least ten (10) Business Days prior to the Closing, Operating Tenant shall transfer all or a portion of the Operating Tenant Owned Property (including, subject to the Management Agreement being in full force and effect at Closing, the Management Agreement) to Buyer's Operating Tenant.

(e)     Excluded Property.   Notwithstanding anything to the contrary contained herein, Seller and Buyer agree that the following shall be excluded from the sale to Buyer at Closing and shall not be conveyed or assigned to Buyer at Closing: (i) any and all intellectual property of any kind owned directly or indirectly by Manager or any of its Affiliates with respect to the Hotel, including any trade names, trademarks, service marks, logos and designs used in the operation, management and/or ownership of the Hotel, and any website(s), URL's, or social media outlets or other intellectual property affiliated or associated in any way with the Hotel; (ii) any and all property of any kind (intellectual or otherwise) owned directly or indirectly by Manager or any of its Affiliates, including the "Standard" name, (iii) subject to Section 9(a)(xix), those certain items set forth on Exhibit P attached hereto; (iv) Manager's Materials, (v) the Excluded Agreements; and (vi) subject to Section 19, all Liquor Licenses (collectively, the "Excluded Property").

SECTION 3.   Purchase Price; Deposit.

(a)     Purchase Price.   In consideration of the sale to Buyer of the Property, Buyer will pay to Seller the Purchase Price.  The Purchase Price, subject to the credits, prorations and adjustments as provided in this Agreement (including as set forth in Section 7 hereof), shall be payable as follows:

(i)     The Initial Deposit shall be paid by Buyer to Seller within two (2) Business Days after the Effective Date by wire transfer of immediately available federal funds pursuant to Seller's Wiring Instructions, as a payment toward the Purchase Price. Upon such payment, the Initial Deposit shall be nonrefundable to Buyer except as otherwise expressly set forth in this Agreement.

(ii)     The Additional Deposit shall be paid by Buyer to Seller no later than September 29, 2016, by wire transfer of immediately available federal funds pursuant to Seller's Wiring Instructions, as a payment toward the Purchase Price.  Upon such payment, the Additional Deposit shall become nonrefundable to Buyer except as otherwise expressly set forth in this Agreement.

(iii)     If and when required under Section 19(c), Buyer shall deposit the Second Liquor License Extension Deposit and the Third Liquor License Extension Deposit in escrow with the Escrow Agent in accordance with Section 19(c) by wire transfer of immediately available federal funds pursuant to Escrow Agent's Wiring Instructions.  Upon each such deposit, the Second Liquor License Extension Deposit and the Third Liquor License Extension Deposit shall be nonrefundable to Buyer except as otherwise expressly set forth in this Agreement.

(iv)     At the Closing, only if the Existing Debt Assumption and Release occurs pursuant to Section 20 hereof, Buyer shall receive a credit against the Purchase Price in the amount of the Existing Debt Balance.

(v)     The Closing Payment shall be paid on or prior to the Closing Date by wire transfer of immediately available federal funds to Escrow Agent pursuant to the Escrow Agent's Wiring Instructions, and such Closing Payment shall be paid by Escrow Agent to Seller pursuant to the terms hereof upon Closing.

(b)     Deposit.     The parties acknowledge that Seller will deposit the Initial Deposit and, upon Seller's receipt, the Additional Deposit into the Deposit Account (as such term is defined in the Senior Loan Agreement) in accordance with the Senior Loan Documents and, upon such funds (or portion thereof) being deposited into Borrower's Account (as such term is defined in the Senior Loan Documents), Seller shall have the right to distribute such funds to its direct and indirect owners without any restriction whatsoever (subject, however, to the obligations of Seller to return the Initial Deposit and/or the Additional Deposit to Buyer to the extent expressly required to do so pursuant to the terms of this Agreement).  The Liquor License Extension Deposits shall be placed by Escrow Agent in an interest bearing account and shall be held in accordance with the escrow terms set forth on Exhibit D.  Buyer acknowledges and agrees that, notwithstanding anything to the contrary contained in this Agreement, a failure by Buyer to deliver any Deposit (or any portion thereof) as and when provided in Section 3(a) hereof shall constitute an immediate default by Buyer hereunder, and Seller shall be entitled to exercise all rights and remedies under Section 13(b) hereof.  If the Closing shall occur, the Deposit shall be applied to the Purchase Price at the Closing.

(c)     Allocation of Purchase Price Among Asset Classes.     Buyer and Seller hereby agree that the allocation of the Purchase Price among the Real Property and Personal Property is as set forth on Exhibit L attached hereto for federal, state and local tax purposes. Buyer and Seller shall report the federal, state and local income and other tax consequences of the transactions contemplated by this Agreement and in particular, the information required by Section 1060(b) of the IRC, and shall file all tax returns and related tax documents, in a manner consistent with such allocation, and neither Buyer nor Seller shall take any position inconsistent with such agreed upon allocation of the Purchase Price in any tax return or otherwise.  As set forth in Section 7(a) hereof, at the Closing, Buyer shall pay one hundred percent (100%) of any Sales Taxes allocated to or arising from the sale of the Personal Property and any Intangible Property.  At the written request of Seller, Buyer shall provide written evidence of its remittance of such Sales Taxes to the appropriate Governmental Authority.  Buyer shall indemnify the Seller, Operating Tenant and Seller Indemnified Parties from all Claims resulting from Buyer's failure to pay such Sales Taxes.  This Section 3(c) shall survive the Closing.

SECTION 4.     Property Investigation.

(a)     Access to Property.  Buyer and Buyer's Representatives, at Buyer's sole cost and expense, shall have the right, in accordance with the conditions set forth in this Section 4(a), to inspect and review the physical condition and all other reasonable matters relating to the Property (the "Property Investigation").  Upon Buyer's reasonable request, Seller shall make available promptly after the Effective Date to Buyer and Buyer's Representatives in the Data

Room or at Seller's office or another location selected by Seller in New York City, the Books and Records, Assumed Agreements, the Management Agreement and certain other non-confidential material documents relating to the Property and owned by and, to Seller's Knowledge, in the actual possession of Seller (or Operating Tenant or Manager), including all records in Seller's possession and relating to the physical and financial condition of the Property, plans and specifications, engineering reports, environmental reports, governmental notices, operating statements, Permits, bills for current real estate taxes, water charges and other utilities, surveys and title commitments (but specifically excluding any Excluded Property, any confidential, proprietary or privileged information or materials, and any information or materials prepared by or for Seller, Operating Tenant or Manager for any of their internal analysis or review or by or for prospective buyers or lenders) concerning the Property.

In connection with the Property Investigation, Buyer, at Buyer's sole cost and expense, shall also have the right, subject to this Section 4, to make such non-invasive inspections, investigations and tests as Buyer may elect to make or obtain upon reasonable prior notice to Seller and subject to Seller's right to have a representative of its own choosing present at all such tests, investigations and inspections; provided, that, notwithstanding anything to the contrary contained in this Agreement, Buyer acknowledges and agrees that (i) any on-site inspections and examinations of the Property shall be subject to the rights of Occupants and of Manager and shall be performed during normal business hours in a manner to minimize interference with the operation of the Hotel and shall be coordinated with Seller; (ii) Buyer shall promptly repair (or cause to be repaired) in a good workmanlike manner any damage to the Property or any adjacent property(ies) caused by any actions of Buyer or Buyer's Representatives and shall promptly restore the Property to the condition which existed immediately prior to such damage; (iii) neither Buyer nor any of Buyer's Representatives shall be entitled to conduct inspection activities that involve the disassembly of any building components or the removal of permanent wall coverings or partitions in the interior of any guestroom at the Property; (iv) Buyer shall furnish Seller on or prior to the Effective Date with a certificate of general liability and property damage insurance maintained by Buyer, evidencing single occurrence coverage of at least $2,500,000 (and aggregate coverage of at least $5,000,000), and naming Seller, Operating Tenant, Manager and such other Persons as Seller shall reasonably require as additional insureds; (v) neither Buyer nor any of Buyer's Representatives shall conduct any environmental investigations or testing, other than a standard "Phase I" environmental assessment, of the Property without the prior written consent of Seller, which may be given or withheld in Seller's sole discretion; (vi) if this Agreement is terminated at any time, copies of all such test results and reports shall be given to Seller upon request thereby to Buyer (and Seller shall have the right to retain and use such results and reports in the event Buyer fails to close the purchase); provided that Buyer shall have no obligation to, and shall not, deliver such test results and reports to Seller unless otherwise expressly requested by Seller and, if so requested, Seller reimburses Buyer for Buyer's actual out-of-pocket costs to obtain such test results and reports; (vii) Buyer shall not permit any portion of the Property to have any dangerous conditions established or permitted as a result of any test or investigations conducted by or on behalf of Buyer; and (viii) Buyer shall keep the Property free of any liens, and repair any damage to the Property arising from the inspection of the Property by Buyer or Buyer's Representatives and any acts or omissions of Buyer or Buyer's Representatives. Without limiting the foregoing, Buyer shall cause all adequate safeguards and protections to be provided so as to protect Occupants and the general public from harm or exposure from such tests and inspections. All information learned by Buyer

in connection with the Property Investigation shall be kept confidential in accordance with Section 36 hereof. All Buyer's Representatives shall be promptly paid by Buyer.

(b)     Contact with Hotel Employees.   Prior to the Closing, Buyer shall not interview any Hotel Employees without the prior written consent of Seller, and in the event that Seller provides such consent, then Seller shall have the right, but not the obligation, to be present for any such discussions or meetings.   Notwithstanding the foregoing, subject to obtaining Manager's cooperation, Buyer shall have the right to interview the general manager, the chief operating officer and the chief engineer for the Hotel, with Seller's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.  Seller agrees to use commercially reasonable efforts to coordinate with the Manager to make the foregoing named employees available for interview at such times as Buyer shall reasonably require, but in no event on less than two (2) Business Days prior notice from Buyer to Seller, and Seller shall have the right, but not the obligation, to be present for any such discussions or meetings.

(c)     Contact with Governmental Officials.   Notwithstanding anything to the contrary contained herein, prior to Closing, in no event shall Buyer or any Buyer's Representative be permitted to meet, correspond or otherwise discuss with any Governmental Authority any matter relating to or arising out of the Hotel without the prior written consent of Seller, other than the community board and the Liquor License Authority in connection with Buyer's filing of the Liquor License Application pursuant to this Agreement, the Tax Department pursuant to Section 43 below and customary title, departmental and lien searches, and in the event that Seller provides such consent, then Seller shall have the right, but not the obligation, to be present for any such discussions or meetings.

(d)     Indemnity.  Buyer shall indemnify Seller, Operating Tenant and the Seller Indemnified Parties against and hold Seller, Operating Tenant and the Seller Indemnified Parties harmless from (i) any and all Claims arising out of in any way or resulting from the tests performed on and the inspection of, the Property (whether prior to, on or after the Effective Date), by Buyer or Buyer's Representatives and any negligence, acts or omissions of Buyer or Buyer's Representatives at the Property in connection with the Property Investigation (whether prior to, on or after the Effective Date) and (ii) any other breach by Buyer or Buyer's Representatives of any of its obligations set forth in this Section 4; provided, however, that the indemnity shall not extend to protect Seller from any pre-existing liabilities for matters merely discovered by Buyer (i.e., latent environmental contamination) so long as Buyer's actions do not exacerbate or aggravate any pre-existing liability of Seller.

(e)     Manager. Buyer understands that its rights under this Section 4 are subject to the rights of Manager under the Management Agreement and that, as a practical matter, the exercise of Buyer's rights under this Section 4 will require the cooperation of Manager. Buyer agrees that Seller and Operating Tenant shall have no liability to Buyer by reason of any delay or difficulty in completing its inspections or investigation due to any delay or non-cooperation by Manager.

(f)     Survival.   Buyer's obligations under this Section 4 shall survive the Closing or any termination of this Agreement.

SECTION 5.    Title and Title Insurance.

(a)    Condition of Title.  If the Closing occurs, Seller shall give and Buyer shall accept such title to Seller's interest in the Real Property as Title Company will be willing to approve and insure in accordance with its standard form of owner's title insurance policy and at standard rates, subject only to the Permitted Exceptions.

(b)    Commitment.  Buyer acknowledges and agrees that it has received, prior to the Effective Date, (i) a copy of a title commitment obtained by Seller for an owner's title insurance policy with respect to the Real Property issued by First Nationwide Title Agency, LLC and (ii) a copy of a title commitment obtained by Buyer for an owner's title insurance policy with respect to the Real Property issued by Stewart Title Insurance Company (collectively, the "Existing Commitment") and the Existing Survey.

(c)    Supplemental Title Objections.  Buyer shall cause the Title Company to deliver a copy of each update or continuation to the Existing Commitment, together with true and complete copies of all instruments giving rise to any defects, exceptions or other encumbrances to title to the Property, to Seller simultaneously with the delivery of same to Buyer.  If after the Effective Date, the Title Company shall raise any written additional or supplemental title exceptions (other than Permitted Exceptions), whether on a continuance, by endorsement or otherwise, Buyer shall have the right to send a written statement of objections to title (a "Title Objection Statement") to Seller within five (5) Business Days of Buyer's receipt of the communication from Title Company (but in no event after the Closing Date) objecting to such additional or supplemental title defects, exceptions or other encumbrances which are not Permitted Exceptions (each of which items properly raised in such Title Objection Statement pursuant to this Section 5(c) shall be deemed to be a "Title Objection"), and Seller shall have five (5) Business Days from receipt of such statement(s) (but in no event after the Closing Date) to respond thereto pursuant to Section 5(d) hereof.  Notwithstanding the foregoing, any additional or supplemental exceptions raised by Title Company and not specifically identified in a Title Objection Statement within such five (5) Business Day period shall also be deemed to be a Permitted Exception, and Buyer shall have irrevocably waived its right to raise a Title Objection with respect to such matters.

(d)    Elections Regarding Title Objections.  If Buyer shall deliver a Title Objection Statement within the applicable time period referred to in Section 5(c) hereof, Seller shall have the right, but not the obligation, to attempt to cure any Title Objections set forth therein.  Within five (5) Business Days after receipt of a Title Objection Statement (but in no event after the Closing Date), Seller shall notify Buyer in writing whether Seller elects to attempt to cure any such Title Objections (and shall keep Buyer apprised of Seller's progress).  If Seller elects to attempt to cure any such Title Objections, Seller shall have until the then-scheduled Closing Date to attempt to remove, satisfy or cure such Title Objections, and for this purpose Seller shall be entitled to a reasonable adjournment of the Closing, but in no event shall the adjournment exceed (1) five (5) Business Days for Mandatory Removal Encumbrances that are in liquidated amounts and which may be satisfied solely by the payment of money, (2) ten (10) Business Days following the date such Title Objection (other than Mandatory Removal Encumbrances addressed in clause (1) of this sentence) is removed, satisfied or cured or (3) sixty (60) days in the aggregate.  Subject to Seller's obligation to remove Mandatory Removal

Encumbrances, if Seller elects not to cure any Title Objection, or if Seller is unable on or prior to the Closing Date (including any such adjournment) to effect a cure of any Title Objection that it has elected to attempt to cure, or if Seller does not timely respond to any Title Objection Statement, then Buyer shall elect, by written notice to Seller, within five (5) Business Days after either (1) receipt of written notice from Seller that Seller has elected not to cure any such Title Objections or that Seller is unable to effect a cure of such Title Objections or (2) if Seller failed to timely respond to a Title Objection Notice, after expiration of the five (5) Business Day period following Seller's receipt of such Title Objection Notice, as the case may be (but in no event after the Closing Date), one of the following options:  (i) to accept a conveyance of the Property subject to the Permitted Exceptions and any Title Objection that Seller is unwilling or unable to cure, and without reduction of the Purchase Price, in which case any such Title Objection shall be deemed to be a Permitted Exception; or (ii) to terminate this Agreement by sending written notice thereof to Seller, in which case (y) Buyer shall receive a return of the Deposit and (z) upon the making of such refund, neither Buyer nor Seller shall have any further rights, obligations or liabilities hereunder except to the extent that any obligation or liability set forth herein expressly survives termination of this Agreement; provided, however, if Seller does not timely respond to any Title Objection Statement and Buyer elects to terminate this Agreement pursuant to clause (ii) above, then Seller may elect, by written notice to Buyer given within five (5) Business Days after Seller's receipt of Buyer's notice to terminate, to rescind Buyer's termination of this Agreement and elect to cure such Title Objections in accordance with this Section 5(d)  and, in such event, this Agreement shall remain in full force and effect.  Further, if Buyer elects to terminate this Agreement pursuant to clause (ii) above as a result of Seller electing to cure a Title Objection, but being unable to effect a cure of such Title Objection, then in addition to the return of the Deposit to Buyer, Seller shall reimburse Buyer for any actual out-of-pocket third-party costs incurred by Buyer (as evidenced by paid invoices) in connection with this Agreement and the transaction described herein, in an amount not to exceed the Reimbursable Expenses Cap.  If Buyer shall fail to notify Seller in writing of Buyer's election of the options in clauses (i) or (ii) referred to above in this Section 5(d) within such five (5) Business Day period, Buyer shall be deemed to have elected to accept the conveyance of the Property under clause (i) above.  Notwithstanding anything to the contrary contained herein:  (A) Seller shall be required to remove all Mandatory Removal Encumbrances; (B) Seller shall have no obligation to cure any Title Objection that is not a Mandatory Removal Encumbrance (and Seller's failure to cure any such Title Objection that is not a Mandatory Removal Encumbrance shall in no event constitute a breach by Seller of its obligations under this Agreement and Buyer's sole rights with respect to such failure shall be limited to Buyer's election of the options in clauses (i) or (ii) referred to above in this Section 5(d) and, if applicable, the cost reimbursement described in the immediately preceding sentence); and (C) Buyer shall have no right to raise any Permitted Exception as a Title Objection.

(e)     Right to Use Deposit and Closing Payment to Cure or Discharge Title Objections.  If on the Closing Date the Property continues to be encumbered by any Mandatory Removal Encumbrances or any other Title Objections which Seller in its sole and absolute discretion has elected to cure, pay or discharge, Seller may, in addition to any other methods available to it under this Agreement, in connection with the consummation of the Closing use any portion (or all) of the Deposit and the Closing Payment to satisfy the same, provided that Seller shall simultaneously either deliver to Title Company and Buyer at the Closing instruments in recordable form, sufficient to satisfy such Title Objections of record, together with the cost of

recording or filing such instruments, or arrange with Title Company for the issuance of Title Policy to Buyer free of any such Mandatory Removal Encumbrances or Title Objections.

(f)     <u>Permitted Exceptions</u>.  In addition to the matters deemed "Permitted Exceptions" under <u>Section 5(c)</u> hereof, the following shall constitute "Permitted Exceptions", and, notwithstanding anything to the contrary contained herein, shall not be a "Title Objection":

(i)     real estate taxes, water rents, sewer rents and assessments or installments thereof, which, although a lien on the Closing Date, are not due and payable prior to the Closing Date, subject to adjustment as hereinafter set forth;

(ii)     standard printed exceptions set forth in the standard form of commitment for owner's title insurance in use in the State of New York, to the extent same cannot be omitted by delivery by Seller of the Title Affidavit or the Existing Survey;

(iii)     the occupancy rights of Occupants at the Hotel, as Hotel guests only;

(iv)     any defect, lien or other matter or encumbrance that is caused or created on any portion of the Property by Buyer or its agents or representatives;

(v)     discrepancies, conflicts in boundary lines, shortage in area, encroachments and any other state of facts shown on the Existing Survey or any accurate survey prepared by a licensed surveyor;

(vi)     any and all violations of law or municipal ordinances, orders or requirements issued by the departments of buildings, fire, labor, health or other federal, state, county, municipal or other departments and governmental agencies having jurisdiction against or affecting the Real Property, and any outstanding work orders, received by Seller or its affiliates, managers, agents or contractors that exist as of the Closing Date (collectively, "<u>Violations</u>");

(vii)     those matters set forth on <u>Exhibit E</u> attached hereto;

(viii)     all matters set forth in the Existing Survey or any update or recertification thereto; and

(ix)     if the Existing Debt Assumption and Release occurs at Closing pursuant to <u>Section 20</u> hereof, the Existing Debt Documents, or if the Senior Loan Mortgage is being assigned to Buyer's mortgage lender under <u>Section 5(g)</u> hereof, the Senior Loan Mortgage.

(g)     <u>Assignment of Mortgages</u>.  If the Existing Debt Assumption and Release shall not occur at Closing pursuant to <u>Section 20</u> hereof, then, at the written request of, and at the sole expense of Buyer, Seller agrees to use commercially reasonable efforts to cause the Senior Loan Lender to assign the Senior Loan Mortgage to Buyer's mortgage lender at the Closing pursuant to Senior Mortgage Lender's standard form of assignment documents and in accordance

with all applicable laws. In the event that the Senior Loan Lender shall assign the Senior Loan Mortgage to Buyer's mortgage lender, Seller shall receive, as an adjustment to the Purchase Price at Closing, fifty percent (50%) of any mortgage recording tax savings realized by Buyer as a result of such assignment.

(h)    <u>Violations</u>.  Buyer agrees to purchase the Real Property subject to any and all Violations, or any condition or state of repair or disrepair or other matter or thing, whether or not (A) noted or (B) which, if noted, could result in a Violation being placed on the Real Property. Seller shall have no duty to remove or comply with or repair any condition, matter or thing whether or not noted, which, if noted, could result in a violation being placed on the Real Property.    Seller shall have no duty to remove or comply with or repair any of the aforementioned Violations, or other conditions (subject to Seller's obligations under <u>Section 10(c)</u>), and Buyer shall accept the Real Property subject to all such Violations, the existence of any conditions at the Property which could give rise to such Violations, if any, and any governmental claims arising from the existence of such Violations or conditions, in each case without any abatement of or credit against the Purchase Price.  Notwithstanding the foregoing, Seller shall be responsible for any penalties or fines imposed on or before the Closing in connection with any Violations (or at Seller's option, at Closing, give a credit to Buyer in the amount of such penalties or fines); <u>provided</u>, <u>however</u>, that in no event shall Seller's responsibility to pay (or credit Buyer for) such penalties or fines exceed $150,000 in the aggregate ("<u>Violation Fine Cap Amount</u>").  In no event shall Buyer have the right to terminate this Agreement or extend the Closing Date, or be entitled to a reduction in the Purchase Price, as a result of any penalties or fines imposed on or before the Closing in connection with any Violations that are in excess of the Violation Cap Amount, or as a result of the existence of any Violations or such conditions (subject to Seller's obligations under <u>Section 10(c)</u>).

SECTION 6.    <u>Closing</u>.

(a)    The closing of the transactions described in this Agreement (the "<u>Closing</u>") shall be held through an escrow arrangement with Escrow Agent. The Closing shall take place no later than (i) if the Existing Debt Assumption and Release occurs at the Closing, 4:00 p.m. (New York City time) on the Scheduled Closing Date and (ii) if the Existing Debt Assumption and Release does not occur at the Closing, 2:00 p.m. (New York City time) on the Scheduled Closing Date.  TIME SHALL BE OF THE ESSENCE WITH RESPECT TO BUYER'S AND SELLER'S OBLIGATIONS TO CLOSE AT SUCH TIMES ON THE SCHEDULED CLOSING DATE, SUBJECT TO ANY APPLICABLE CURE OR ADJOURNMENT RIGHTS EXPRESSLY PROVIDED FOR HEREIN.  Without limiting any of Seller's rights and remedies for Buyer's breach of this Agreement, if (x) the Existing Debt Assumption and Release does not occur at Closing pursuant to <u>Section 20</u> hereof, (y) the Closing Payment is not received by Seller by 2:00 p.m. (New York City time) on the Closing Date and (z) Seller nonetheless agrees to proceed with Closing on the Closing Date, then Buyer shall be responsible for any and all additional interest and other costs and expenses incurred in connection with the repayment of the Existing Debt arising as a result of the failure to repay such Existing Debt by 2:00 p.m. (New York City time) on the Closing Date.  For the avoidance of doubt, Seller may elect to accept such late Closing Payment in its sole discretion and if Seller does not so elect, then the failure of Buyer to deliver the Closing Payment by 2:00 p.m. (New

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 55 of 277

York City time) on the Closing Date shall constitute a material default of Buyer's obligations under this Agreement.

(b)     Notwithstanding anything to the contrary contained herein, if the Existing Debt Assumption and Release shall not occur at Closing pursuant to Section 20 hereof, then Seller shall have the right, by delivering written notice to Buyer at least five (5) Business Days prior to the then-scheduled Closing Date (or such shorter period if the Closing Date is adjourned pursuant to another provision of this Agreement and it is not possible or reasonably practicable for Seller to provide notice within five (5) Business Days prior to the then scheduled Closing Date), to extend the Closing Date to a Business Day occurring  on or prior to the then upcoming payment date under the Existing Debt Documents.   In the event that the Closing Date is subsequently adjourned or extended pursuant to this Agreement after the date on which Seller exercises the foregoing extension right, Seller shall again be permitted to exercise its extension right under this Section 6(b) with respect to such adjourned or extended Closing Date.

(c)     Notwithstanding anything to the contrary contained herein, subject to the satisfaction and/or waiver by Buyer and Seller of the conditions to Closing in this Agreement, Buyer may elect to close on a Business Day earlier than the Scheduled Closing Date ("Buyer's Early Closing Date Right") by giving prior written notice to Seller at least thirty-five (35) days (or such shorter period as is acceptable to Seller) prior to such accelerated date of Closing.  If (x) Buyer exercises Buyer's Early Closing Date Right, (y) the Existing Debt Assumption and Release does not occur at Closing and (z) the Scheduled Closing Date occurs on a day other than a Payment Date, then Buyer shall be responsible for any and all Breakage Costs (as such term is defined in the Existing Debt Loan Agreements) and Compensating Interest (as such term is defined in the Existing Debt Loan Agreements) required to be paid by the Existing Debt Borrowers as a result of the payoff (or assignment under Section 5(g)) of the Existing Debt on a day other than a Payment Date.

SECTION 7.     Closing Costs and Adjustments.

(a)     Closing Costs.  Seller shall pay (a) all Transfer Taxes relating to Seller's conveyance of the Real Property, (b) one-half of any escrow fees and expenses for the Escrow Agent and (c) the fees and expenses for its own attorneys, accountants and consultants.  Buyer shall pay (i) all Sales Taxes relating to the Purchase Price allocated to Personal Property and intangible property pursuant to Section 3(c) hereof, (ii) title search fees, (iii) title premiums for the Title Policy, (iv) recording fees for recording the Deed and any other recorded conveyance documents, (v) the cost of any new survey or update or certification that Buyer shall elect to order relating to the Existing Survey, (vi) all costs and expenses incurred by Buyer in connection with its Property Investigation, (vii) subject to Section 13(a), all Existing Debt Fees and all other costs and expenses incurred by Buyer in connection with any financing obtained by Buyer, (viii) any and all termination fees and other costs, expenses and amounts incurred due to, or as a result of, a termination of the Management Agreement by Buyer, (ix) one-half of any escrow fees and expenses for the Escrow Agent and (x) fees and expenses for Buyer's inspectors and for its own attorneys, accountants and consultants.  Without limiting Section 35(c) herein, each party shall pay the cost of its own counsel except as otherwise provided in this Agreement.  Any closing costs not specifically allocated in this Agreement between Buyer and Seller shall be borne and

paid in the manner in which such amounts are customarily allocated in the sale of a hotel in New York City in accordance with standard industry practices in New York City.

(b)  <u>Adjustments</u>.  Unless otherwise provided in this Agreement, adjustments between the parties shall be made as of 12:01 a.m. EST (the "<u>Cutoff Time</u>") on the Closing Date, with the income and expenses for the Property accrued prior to the Cutoff Time being allocated to Seller and the income and expenses accruing on and after the Cutoff Time being allocated to Buyer, all as set forth below.  All of such adjustments and allocations shall be made in immediately available funds at the Closing and shall be shown on the Settlement Statement and the net amount thereof shall be paid by Buyer to Seller or credited to Buyer, as the case may be, at the Closing.  The Settlement Statement shall also show the Deposit and the final Closing Payment.  Seller shall use commercially reasonable efforts to deliver to Buyer a preliminary schedule of adjustments at least five (5) Business Days prior to the Closing Date.  On the day prior to Closing, Seller and Buyer, through their respective employees, agents or representatives, jointly shall make such examinations, audits and inventories of the Hotel as may be necessary to make the adjustments, credits and prorations as set forth in this Section 7 or any other provisions of this Agreement.  Based upon such examinations, audits and inventories, Seller and Buyer jointly shall work in good faith with the Title Company to prepare prior to Closing the final Settlement Statement (but subject to re-adjustment pursuant to <u>Section 7(t)</u>), which shall set forth Seller's and Buyer's reasonable best estimate of the amounts of the items to be adjusted, credited and prorated under this Agreement.  At Closing, the Settlement Statement shall be approved and executed by Seller and Buyer.  Except as otherwise expressly provided in this Agreement, all apportionments and adjustments of expenses shall be made on an accrual basis in accordance with the Uniform System of Accounts for the Lodging Industry (Eleventh Revised Edition, 2014), published by the American Hotel and Lodging Association.  In clarification of the foregoing, Buyer shall receive a credit for any items of expense in this <u>Section 7</u> to the extent the same relates to any period of time prior to the Cutoff Time but is unpaid as of the Cutoff Time in which case Buyer shall be obligated to pay such expense, and Seller shall receive a credit for any of the items of expense in this <u>Section 7</u> hereof which have been paid prior to or at the Closing or will be paid by Seller after the Closing to the extent such payment relates to any period of time after the Cutoff Time.

(c)  <u>Taxes</u>.  All real estate taxes, personal property taxes, business improvement district charges or any other governmental and quasi-governmental taxes and assessments (special or otherwise) of any nature upon the Property levied, assessed or pending for the tax year in which the Closing occurs (but expressly excluding any (i) federal, state, local or foreign income, capital gain, gross receipts, capital stock, franchise, profits, estate or gift tax, (ii) transfer taxes incurred with respect to the transaction contemplated in this Agreement and (iii) any interest, penalties, fees or other amounts due in connection with the late payment or non-payment of any such taxes) shall be adjusted as of the Closing Date and, if no tax bills or assessment statements for such tax year are available, such amounts shall be estimated by Seller on the basis of the tax rates set forth in the most recent available bill and assessments of the Property, with an adjustment between Buyer and Seller promptly after the actual tax bills and assessment statements become available.

(d)  <u>Utilities</u>.  All suppliers of heat, steam, electric power, gas, light, and telephone, if any, and other utilities shall be instructed by Seller or Operating Tenant to read

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 57 of 277

meters or otherwise determine the charges owing for services for the Property prior to the Cutoff Time, which charges shall be paid by Seller.  Buyer shall pay all charges accruing after the Cutoff Time, to the extent assumed (subject to the owner's obligations under the Management Agreement).  If the amount of the charges owing as of the Cutoff Time cannot be reasonably determined, the apportionment shall be based at Closing upon the amount of such charges for the immediately preceding billing period on an equal per diem basis, but shall be readjusted when the amount of such charges is finally determined.  If elected by Seller, in its sole and absolute discretion, Seller shall be given credit, and Buyer shall be charged, for any utility deposits transferred to Buyer by Seller (or Operating Tenant) at the Closing, if any.  Any non-metered frontage charges and sewer rents and credits shall be apportioned as of the Cutoff Time.  A schedule of all utility deposits, if any, is to be delivered by Seller to Buyer prior to the Closing. If there are any utility bonds at the Property in lieu of utility deposits, (i) such utility bonds shall be cancelled by Seller on or prior to the Closing, (ii) Seller shall be entitled to any amounts with respect to such canceled Seller utility bonds, and (iii) Buyer shall be obligated at or prior to Closing to deliver any security to the utility companies that such utility companies may require in-lieu of such canceled Seller utility bonds.  Seller agrees to execute and cause Operating Tenant, in advance of the Closing, any releases or other instruments in forms reasonably acceptable to Seller as reasonably required by the utility companies to release information to Buyer with respect to the utilities servicing the Property.  Seller shall receive a credit for all fuel stored at the Hotel based on Seller's cost for such fuel, based upon a reading obtained by Seller not more than five (5) Business Days prior to the Closing.  The parties' obligations under this Section 7(d) shall survive the Closing.

(e)     Income/Charges.  All income and charges receivable or payable under any of the Assumed Agreements, and any prepayments and receipts thereunder, shall be prorated between Buyer and Seller as of the Cutoff Time; provided, however, subject to Section 7(t) below, Seller and Buyer shall reprorate the amount of credit for any such charges that have not been finally determined as of the Closing Date and pay any deficiency in the original proration to the other party promptly upon receipt of the actual bill for such goods or services.  Seller shall be given credit and Buyer shall be charged, for any contract deposits made by Seller actually transferred to Buyer by Seller (or Operating Tenant) at the Closing.

(f)     Accounts.  All bank accounts, operating accounts and (subject to Section 7(q) below with respect to reserves held in the connection with the Existing Debt) reserve funds of Seller or Operating Tenant as of the Cutoff Time shall remain the property of Seller or Operating Tenant.  All petty cash, cash in cash registers and cash in vending machines shall be transferred to Buyer and Buyer shall give Seller a credit at the Closing for any or all such items.

(g)     Room Rentals.  All accounts receivable of registered guests at the Hotel for the night (the "Cutoff Night") in which the Cutoff Time occurs (the "Guest Ledger") shall be credited to one-half (1/2) to Seller and one-half (1/2) to Buyer, but Seller's share shall be reduced by one-half (1/2) the credit card and travel agent commissions for such night, which commissions shall be paid by Buyer.  All accounts receivable of registered guests at the Hotel who have not checked out and were occupying rooms as of the Cutoff Time for the period prior to the Cutoff Night, shall be allocated to Seller, but Seller's share shall be reduced by applicable credit card and travel agent commissions allocable to Seller for such period, which commissions shall be paid by Buyer.

(h)     <u>Advance Deposits</u>.  All prepaid rentals, room rental deposits, and all other deposits for advance registration, banquets or future services to be provided on and after the Cutoff Time (the "<u>Advance Bookings</u>") shall be credited to Buyer.  All commissions already paid by Seller on account of such Advance Bookings shall be credited to Seller.  Buyer hereby agrees to honor all Advance Bookings.

(i)     <u>Consumables and Inventories</u>.  Seller shall prepare, as of the Cutoff Time, an inventory of the Consumables and Inventories, all of which shall be maintained at normal and customary levels prior to Closing (the "<u>Closing Inventory</u>").  At the Closing, Seller shall receive a credit (at cost) for the Closing Inventory at the Hotel.

(j)     <u>Accounts Receivable</u>.  Except for (i) Advance Bookings, which shall be prorated pursuant to <u>Section 7(h)</u> hereof and (ii) accounts receivable for the Guest Ledger that are allocated pursuant to <u>Section 7(g)</u> hereof, all accounts receivable and credit card claims as of the Cutoff Time shall remain the property of Seller.  Buyer shall have no obligation to collect the accounts receivable of Seller; <u>provided</u>, <u>however</u>, from and after the Closing, Buyer shall reasonably cooperate with Seller to collect such accounts receivables.  Monies received by Buyer from debtors owing such accounts receivable shall be applied to Seller's outstanding invoices to such account debtors in chronological order beginning with the oldest of Seller's invoices, and thereafter, when Seller's account with such account debtor is current, then on behalf of Buyer.

(k)     <u>Accounts Payable</u>.  Except as otherwise prorated pursuant to <u>Section 7(e)</u> hereof, all accounts payable owing as of the Cutoff Time for merchandise, foodstuffs, supplies and other materials and services delivered or rendered to the Hotel prior to the Cutoff Time, together with the cost of repair or service of all Personal Property delivered to a shop for repair or service prior to the Cutoff Time, shall be paid for by Seller at the Closing.  If the amount of accounts payable as of the Cutoff Time cannot be reasonably determined by Seller or the applicable merchants and/or vendors, the apportionment shall be based at Closing upon the amount of such charges for the immediately preceding billing period on an equal per diem basis, but shall be readjusted when the amount of such charges is finally determined.

(l)     <u>Other Taxes</u>. Subject to <u>Section 3(c)</u> hereof, Seller shall be responsible for any Sales Taxes and any other federal or local income, franchise, use, room, occupancy or other tax liability relating to the Hotel for the period up to the Cutoff Time and for the Cutoff Night on account of room rental revenues for which Seller receives an adjustment to the Purchase Price pursuant to <u>Section 7(g)</u> hereof.  Subject to <u>Section 7(c)</u> hereof, Buyer shall be responsible for any Sales Taxes and any other federal or local income, use, room, occupancy, franchise, use, room, occupancy or other tax liability for periods (other than the Cutoff Night) after the Cutoff Time.

(m)     <u>Management Agreement</u>.  Without limiting the terms of the Management Agreement Assignment and Assumption, and without intending to double count any amounts to be pro-rated under <u>Section 7(n)</u> below or any other provision of this <u>Section 7</u>, but subject to <u>Section 44</u> hereof, subject to the Management Agreement being in full force and effect at Closing, fees and other amounts (including "Personnel Costs" (as defined in the Management Agreement)) payable to Manager pursuant to the Management Agreement, and amounts payable by Manager to the "Owner" under the Management Agreement, shall be prorated such that (i) all

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 59 of 277

fees and other amounts payable to Manager which accrue with respect to periods occurring prior to the Closing Date shall be the responsibility of Seller, (ii) all fees and other amounts payable to Manager which accrue with respect to periods occurring from and after (and including) the Closing Date shall be the responsibility of Buyer, (iii) all amounts payable by Manager to Owner pursuant to the Management Agreement which accrue with respect to periods occurring prior to the Closing Date shall be paid to Seller and (iv) all amounts payable by Manager to Owner pursuant to the Management Agreement which accrue with respect to periods occurring from and after (and including) the Closing Date shall be paid to Buyer.

(n)     Employee Costs.  Without intending to double count any amounts to be pro-rated under Section 7(m) above or any other provisions of this Section 7, Seller and Buyer shall pro-rate employee compensation as provided in Section 44 below.

(o)     Permits.  All amounts prepaid, accrued or due and payable under any Permits transferred to Buyer shall be prorated as of the Cutoff Time between Seller and Buyer. Seller shall receive a credit for all deposits made by Seller under the Permits which are transferred to Buyer or which remain on deposit for the benefit of Buyer.

(p)     Gift Certificates.  Buyer shall receive a credit at Closing in the amount of fifty (50%) of the outstanding liabilities reflected on the books and records of the Hotel for all gift certificates sold prior to Closing to the extent such gift certificates have not been utilized prior to the Closing and relate to the period from and after the Closing.

(q)     Existing Debt.  If the Existing Debt Assumption and Release occurs at Closing pursuant to Section 20 hereof, (i) Seller shall (and shall cause each Existing Debt Borrower to) be responsible for all principal required to be paid under the terms of each Existing Debt Note prior to the Cutoff Time, together with all interest accrued under, and any other amounts due and payable under, such Existing Debt prior to the Cutoff Time (excluding any Existing Debt Fees, which shall be the obligation of Buyer) and (ii) Buyer shall be responsible for the payment of all principal required to be paid from and after the Cutoff Time, together with all interest accruing under, and any other amounts due and payable under, each Existing Debt from and after the Cutoff Time.  Further, if Existing Debt Assumption and Release occurs at Closing pursuant to Section 20 hereof, Seller shall be credited for and Buyer shall be charged for all amounts held in reserves, impounds and other accounts maintained in connection with the Existing Debt as of the Cutoff Time, to the extent assigned to Buyer (or its Affiliates).

(r)     Existing Debt First Extension Option Costs.  Buyer and Seller shall be responsible as follows for all Existing Debt First Extension Option Costs that become due and payable as a result of each Existing Debt Borrower's exercising its Existing Debt First Extension Option: (1) if Buyer shall have delivered an Existing Debt Payoff Notice and Seller nonetheless exercises the Existing Debt First Extension Option, and the Closing occurs on or before November 7, 2016 without the occurrence of Existing Debt Assumption and Release, then Seller shall be responsible for 100% of all Existing Debt First Extension Option Costs; or (2) otherwise, (i) if the Closing shall occur on or before the Payment Date occurring in December 2016, then Buyer shall be responsible for 100% of all Existing Debt First Extension Option Costs and (ii) if the Closing shall occur after the Payment Date occurring in December 2016, the Existing Debt First Extension Option Costs shall be adjusted as follows: (x) Seller's portion shall be equal to

the Existing Debt First Extension Option Costs times a fraction, the numerator of which shall be the number of calendar days following (and not including) the Payment Date occurring in December 2016 and ending on the day immediately preceding the Closing Date, and the denominator of which shall be 365, and (y) Buyer's portion shall be equal to the balance of the Existing Debt First Extension Option Costs. At Closing, Seller shall receive a credit from Buyer in the amount of any such Existing Debt First Extension Option Costs incurred by Seller and any other Existing Debt Borrower that Seller is entitled to under this Section 7(r).

(s)     Other Adjustments.  Such other items which have not been addressed above and which are customarily prorated and adjusted in the sale of a hotel in New York City shall be prorated on the Cutoff Time in accordance with standard industry practices in New York City for the sale of a hotel.

(t)     Reconciliation and Final Payment.  Seller and Buyer shall reasonably cooperate after the Closing to make a final determination of the allocations and adjustments required under this Agreement within ninety (90) days after the Closing Date.  Upon the final reconciliation of the allocations and adjustments under this Section 7, any party owing another party any sums hereunder shall promptly pay such party such sums within ten (10) Business Days after the reconciliation of such sums.  For purposes of this Section 7, it is the intent of the parties that, with respect to the Property, Seller shall be entitled to all income and receipts accruing prior to the Cutoff Time (except that Seller shall receive an adjustment to the Purchase Price on account of the Guest Ledger to the extent set forth in Section 7(g)) and shall be responsible for all costs, expenses and liabilities of the Property arising from events occurring before the Cutoff Time, and Buyer shall be entitled to all income and receipts accruing after the Cutoff Time (plus a portion of the income and receipts on account of the Guest Ledger as set forth in Section 7(g)) and shall be responsible for all costs, expenses and liabilities of the Property arising from events occurring after the Cutoff Time.  Such reconciliation shall not be counted towards the Maximum Liability Amount.

(u)     Survival.  This Section 7 shall survive the Closing for nine (9) months after the Closing, except that Sections 7(j), and (l) hereof shall survive the Closing without limitation.

SECTION 8.   Conditions Precedent.

(a)     Buyer's Conditions of Closing.  Buyer's obligations to pay the Purchase Price at the Closing and to otherwise consummate the Closing are subject to the following conditions precedent being satisfied as of the Closing Date (or waived by Buyer):

(i)     Seller and Operating Tenant shall have duly performed all of their material obligations under this Agreement to be performed as of the Closing Date, and shall have delivered to Escrow Agent all documents and other deliverables required by this Agreement, including those required by Section 9(a) hereof;

(ii)    subject to Section 14(b) hereof, all of Seller's representations and warranties set forth in Section 14(a) hereof shall be true and correct in all material respects as of the Closing Date, except where stated to be as of the Effective Date and

except as a result of changes of facts (y) resulting from any actions or omissions of Buyer or (z) other than with respect to the representations set forth in clauses (i), (iii), (v), (vi), (vii), (viii), (ix) and (xxi) of Section 14(a), not caused by a default by Seller or Operating Tenant under this Agreement;

      (iii)    there shall be no (x) litigation, court action or similar proceeding commenced after the date hereof that would reasonably be likely to materially and adversely affect the operations of the Property after the Closing, other than a SI Dispute or (y) court order or injunction issued by a court of competent jurisdiction preventing the sale of the Property to Buyer pursuant to this Agreement; provided, however, if the condition precedent set forth in this clause (iii)(y) is not satisfied as of the then scheduled Closing Date as a result of or in connection with an SI Injunction, then (1) so long as Buyer is not otherwise in material default of its obligations under this Agreement, Buyer shall have the right (but not the obligation) to adjourn the Closing for up to one-hundred twenty (120) days in the aggregate in order to provide additional time for such condition to be satisfied and (2) subject to Section 13(b)(ii) hereof, Seller and Operating Tenant hereby agree to reasonably cooperate with Buyer, at no cost or expense to Seller or Operating Tenant, in connection with Buyer's efforts to contest any such SI Injunction. Further, (A) if there is any litigation, court action or similar proceeding with respect to the matters set forth in clause (1) of the definition of SI Dispute, then Buyer shall have the right to intervene in such SI Dispute and (B) if Buyer brings a separate litigation, court action or similar proceeding against Manager for tortious interference or other claim arising out of Manager's interference with the sale of the Property to Buyer, Seller shall consent to the consolidation of that action with any action referred to in clause (A) above, provided said litigation, court action or similar proceeding are filed in the same court or tribunal;

      (iv)    no union agreements or collective bargaining agreements governing any person employed at the Hotel with respect to their employment at the Hotel have been entered into by Seller, Operating Tenant or Manager which would bind the Hotel after the Closing; and

      (v)    the Liquor License Renewal shall have occurred (subject to Seller's right to adjourn the Closing pursuant to Section 10(e) hereof).

Buyer shall have the right to waive the satisfaction, in whole or in part, of any of the conditions precedent set forth in this Section 8(a), but no waiver shall be effective unless it is in writing and duly executed by Buyer (except that if Buyer does close on the transaction hereunder, then such condition shall be deemed waived). If any of the conditions precedent set forth in this Section 8(a) is not satisfied, or waived by Buyer, Buyer shall have the right to terminate this Agreement, by sending written notice thereof to Seller promptly after Buyer learns of the failure of such condition precedent (but in no event later than the earlier to occur of (x) ten (10) Business Days after Buyer learns of such failure and (y) the Closing Date), and upon delivery of such termination notice this Agreement shall terminate and thereafter neither Buyer nor Seller shall have any further rights, obligations or liabilities hereunder except to the extent that any obligation or liability set forth herein expressly survives termination of this Agreement. If by operation of the immediately preceding sentence, this Agreement shall have been terminated as a

INDEX NO. 655209/2017
RECEIVED NYSCEF: 08/04/2017

result of a failure to satisfy a condition precedent under this <u>Section 8(a)</u>, the Deposit shall be returned to Buyer upon termination of this Agreement; except, notwithstanding anything to the contrary contained herein, but subject to clause (B) in the last sentence of this paragraph, if this Agreement is terminated under <u>Section 8(a)(v)</u> as a result of a Buyer Cause or under <u>Section 8(a)(iii)(y)</u> as a result of or in connection with an SI Injunction, then, in either case, the Initial Deposit and Additional Deposit shall be retained by Seller and, if, and to the extent, delivered to Escrow Agent, the Liquor License Extension Deposits shall be released to Seller. Notwithstanding the foregoing, it is understood and agreed that (A) nothing in this <u>Section 8(a)</u> shall relieve Seller from liability for any breach of this Agreement by Seller and that the provisions of <u>Section 13</u> hereof shall govern and control in the event of a default by Seller under this Agreement and (B) if (1) this Agreement is terminated under <u>Section 8(a)(iii)(y)</u> as a result of or in connection with an SI Injunction, (2) a court of competent jurisdiction determines in a final non-appealable judgment that the SI Injunction was granted because of Seller's and/or Operating Tenant's breach of a written agreement between Seller and/or Operating Tenant, on the one hand, and Manager, on the other hand, that prohibited Seller from selling the Property to Buyer and (3) Buyer is not otherwise in default of its obligations under this Agreement, then the Deposit shall be returned to Buyer within ten (10) days after the date of such non-appealable judgement.

      (b)    <u>Seller's Conditions of Closing</u>.  Seller's obligations to deliver the Deed and to otherwise consummate the Closing are subject to the following conditions precedent being satisfied and subsisting as of the Closing Date (or waived by Seller):

      (i)    Buyer shall not be in default of any of Buyer's material obligations under this Agreement;

      (ii)    Buyer shall have delivered to Seller or Escrow Agent, as the case may be, all funds and documents required by this Agreement, including the Initial Deposit, the Additional Deposit, the Liquor License Extension Deposits and Closing Payment and those documents required by <u>Section 9(b)</u> hereof;

      (iii)    all of Buyer's representations and warranties shall be true and correct in all material respects;

      (iv)    there shall be no court order or injunction issued by a court of competent jurisdiction preventing the sale of the Property to Buyer pursuant to this Agreement; <u>provided</u>, <u>however</u>,  if the condition precedent set forth in this clause (iv) is not satisfied as of the then scheduled Closing Date, then Seller shall have the right (but not the obligation) to adjourn the Closing for up to one-hundred twenty (120) days in the aggregate in order to provide additional time for such condition to be satisfied;

      (v)    the Liquor License Authority shall have issued to Buyer a conditional Liquor License Approval; <u>provided</u>, <u>however</u>, (x) if the condition precedent set forth in this clause (v) is not satisfied as of the then scheduled Closing Date, then Seller shall have the right (but not the obligation) to adjourn the Closing for up to thirty (30) days in the aggregate in order to provide additional time for Buyer to obtain the conditional Liquor License Approval in accordance with <u>Section 19</u> and (y) if the

Manager waives in writing the condition set forth in <u>Section 16.01</u> of the Management Agreement that requires the purchaser of the Hotel to be a Person who can obtain a liquor license, then the condition set forth in this clause (v) shall no longer apply.

Seller shall have the right to waive the satisfaction, in whole or in part, of any of the conditions precedent set forth in this <u>Section 8(b)</u>, but no waiver shall be effective unless it is in writing and duly executed by Seller.  If any condition specified in this <u>Section 8(b)</u> is not timely satisfied or waived by Seller, it shall be deemed to be a material default by Buyer and the provisions of <u>Section 13(b)</u> hereof shall govern and control, <u>provided</u>, <u>however</u>, that (I) subject to the last sentence of this paragraph, a failure of the condition set forth in <u>Section 8(b)(iv)</u> to be satisfied shall only be deemed a default by Buyer under this Agreement if such court order or injunction is an SI Injunction and (II) if the condition specified in <u>Section 8(b)(v)</u> is not satisfied, then the provisions of <u>Section 19(d)(iii)</u> shall apply.  If the condition set forth in <u>Section 8(b)(iv)</u> is not timely satisfied as a result of either (1) a court order or injunction that is not an SI Injunction or (2) an SI Injunction that a court of competent jurisdiction determines in a final non-appealable judgment was granted because of Seller's and/or Operating Tenant's breach of a written agreement between Seller and/or Operating Tenant, on the one hand, and Manager, on the other hand, that prohibited Seller from selling the Property to Buyer, then, in either case, Seller shall have the right to terminate this Agreement by sending written notice thereof to Buyer, and, so long as Buyer is not in default of its obligations under this Agreement, the Deposit shall be returned to Buyer, and thereafter neither Buyer nor Seller shall have any further rights, obligations or liabilities hereunder except to the extent that any obligation or liability set forth herein expressly survives the termination of this Agreement).

SECTION 9.  <u>Closing Deliveries</u>.

(a)  <u>Seller's Closing Deliveries</u>.  At or prior to the Closing, in addition to any other documents or other deliverables required under this Agreement, Seller, at its sole cost and expense, shall execute and acknowledge, if appropriate (and shall cause Operating Tenant, to the extent applicable, to execute and acknowledge, if appropriate), and deliver to Escrow Agent, the following with respect to the Property:

(i)  a deed in the form of <u>Exhibit F</u> (the "<u>Deed</u>");

(ii)  a bill of sale in the form of <u>Exhibit G</u> (the "<u>Bill of Sale</u>");

(iii)  an assignment and assumption in the form of <u>Exhibit H</u> (the "<u>General Assignment</u>") of all of Seller's right, title and interest in and to any Assumed Agreements and any other components of the Property not being transferred to Buyer pursuant to the Deed or Bill of Sale;

(iv)  to the extent they are then in Seller's possession and not posted at the Property, originals (or copies if in Seller's possession, if originals are not in Seller's possession) of all Assumed Agreements, the Management Agreement (so long as to the Management Agreement is in full force and effect at Closing) and Permits issued for or with respect to the Property by Governmental Authorities having jurisdiction, and all plans and specifications covering the Hotel; <u>provided</u>, <u>however</u>, at Seller's election,

Seller may make such items available for pick-up by Buyer at Seller's or its Affiliate's office or at Manager's or its Affiliate's office promptly following Closing;

(v)     to the extent not located at the Hotel, the Closing Inventory;

(vi)     to the extent not previously delivered to Buyer or located at the Hotel, the Books and Records (excluding any of the same described in clause (B) of Section 2(c)(iv) hereof);

(vii)     all Transfer Tax Returns, together with payment of all Transfer Taxes payable in connection with the transfer of the Property to Buyer;

(viii)     an affidavit of Non-Foreign Status of Seller in the form of Exhibit Q;

(ix)     subject to Section 14 hereof and the terms of such written certificate, a written certificate in the form attached hereto as Exhibit O-1;

(x)     a counterpart of the Settlement Statement by PDF;

(xi)     a title affidavit in the form attached hereto as Exhibit N (the "Title Affidavit"), with such changes thereto to reflect any changes in fact or circumstance, receipt of which by Title Company shall permit Title Company to omit from the Title Policy all exceptions for judgments, bankruptcies or other returns against other persons or entities whose names are the same as or similar to that of Seller; provided, however, that Seller's right to update the Title Affidavit attached hereto as Exhibit N to reflect changes in fact or circumstance shall not relieve Seller of any obligations under this Agreement other than as otherwise expressly provided for herein;

(xii)     the Post-Closing Escrow Agreement;

(xiii)     such evidence as shall be reasonably requested by and acceptable to Buyer and the Title Company of the authority of Seller, and of the persons or parties executing this Agreement and all closing documents on behalf of Seller to enter into and consummate this Agreement and to execute and deliver all documents reasonably necessary to consummate the transactions described in this Agreement;

(xiv)     the Operating Lease Termination, together with a termination of the memo thereof in recordable form;

(xv)     so long as the Management Agreement is in full force and effect at Closing, a counterpart of the Management Agreement Assignment and Assumption;

(xvi)     if the Existing Debt Assumption and Release occurs at Closing pursuant to Section 20 hereof, originals (or copies if in Seller's possession, if originals are not in Seller's possession) of all Existing Debt Documents and all documents that are reasonably required by each of the Existing Debt Lenders to be executed by Seller (or an

Existing Debt Borrower and/or Operating Tenant) in connection with the Existing Debt Assumption and Release;

(xvii) provided that Buyer has complied with its obligations under Section 19 hereof and the conditional Liquor License Approval has been issued, to the extent applicable, (w) in connection with a liquidator's permit, an inventory of alcoholic beverages at the Hotel, (x) the originals of the certificates of the Liquor Licenses, (y) a surrender petition in such form as the Liquor License Authority shall reasonably require for the Liquor License and (z) a letter addressed to the Liquor License Authority in such form as Seller shall reasonably require authorizing Buyer's designated liquor license counsel to file the Seller's liquor license surrender petition with the Liquor License Authority;

(xviii) all security codes, lock combinations, keys, card keys, key fobs in its possession to any portion of the Property;

(xix) an assignment in the form of Exhibit S with respect to any right, title and interest that Seller or Operating Tenant may have (if any) in and to the Excluded Property listed on Exhibit P; it being agreed and understood that (A) neither Seller nor Operating Tenant is making, nor has at any time made, any representations or warranties of any kind or character, expressed or implied, with respect to the Excluded Property listed on Exhibit P, including any representations or warranties as to whether Seller or Operating Tenant has any right, title or interest into such Excluded Property listed on Exhibit P and (B) Seller and Operating Tenant have advised Buyer that to Seller's Knowledge they do not own any right, title or interest in the Excluded Property listed on Exhibit P; and

(xx) such other documents, instruments or agreements reasonably required to consummate the Closing pursuant to this Agreement.

For the avoidance of doubt, Buyer and Seller acknowledge and agree that to the extent any of the foregoing items are located at the Hotel or are in Manager's possession or control, such items shall be deemed to have been delivered to Buyer at Closing.

(b) Buyer's Closing Deliveries. At or prior to the Closing, in addition to the Closing Payment and any other documents and deliverables required under this Agreement, Buyer, at its sole cost and expense, shall execute and acknowledge, if appropriate, and deliver to Escrow Agent the following:

(i) the Bill of Sale, the General Assignment and the Transfer Tax Returns;

(ii) counterpart of the Settlement Statement by PDF;

(iii) so long as the Management Agreement is in full force and effect at Closing, a counterpart of the Management Agreement Assignment and Assumption;

(iv) counterpart of the Post-Closing Escrow Agreement;

(v)     such evidence as shall be reasonably requested by and acceptable to Seller and the Title Company of the authority of Buyer and of the persons or parties executing this Agreement and all closing documents on behalf of Buyer to enter into and consummate this Agreement and to execute and deliver all documents reasonably necessary to consummate the transaction described in or contemplated by this Agreement;

(vi)     all Existing Debt Fees and, if the Existing Debt Assumption and Release occurs at Closing pursuant to Section 20 hereof, all documents, instruments, guaranties and other items or funds required by each Existing Debt Lender to cause the Existing Debt Assumption and Release; and

(vii)     a written certificate in the form attached hereto as Exhibit O-2;

(viii)     such other documents, instruments or agreements reasonably required to consummate the Closing pursuant to this Agreement.

(c)     Safety Deposit Boxes.  On the Closing Date, Seller shall deliver to Buyer all keys that are in the actual possession of Seller or Operating Tenant to the safe deposit boxes (other than guest room safes) located at the Hotel, and all receipts and agreements relating to such safe deposit boxes which shall contain the name and room number of each depositor.  On the Closing Date, Seller shall send written notice to guests who have safe deposit boxes at the Hotel, advising such guests of the sale of the Hotel to Buyer and the procedures to be followed pursuant to this Section 9(c) and requesting the removal and verification of the contents thereof within five (5) days after the Closing Date.  All such removals and certifications during such five (5) day period shall be under the supervision of representatives of Buyer and Seller.  At the end of such five (5) day period all safe deposit boxes shall be opened in the presence of representatives of Buyer and Seller and in the presence of the depositor guest; if the depositor is not present, then to the extent permitted by New York law, the guest's safe deposit box shall be opened in the presence only of Buyer and Seller.  In either case the contents of the safe deposit box shall be inventoried and a copy of the inventory retained by Buyer and Seller.  The contents so recorded shall thereafter remain in the hands of Buyer and shall be the responsibility of Buyer and Buyer shall indemnify and hold Seller and Operating Tenant harmless from any Claims resulting from the foregoing, which indemnity shall survive the Closing.

(d)     Baggage.  All baggage checked or left in the care of Seller or Operating Tenant as of the Closing shall (to the extent reasonably determinable by Seller) be listed in an inventory to be prepared in duplicate and signed by Seller and Buyer, and Buyer shall give Seller a copy of the inventory.  Buyer shall be responsible for such baggage after the Cutoff Time and shall indemnify and hold Seller, Operating Tenant and Seller Indemnified Parties harmless from all Claims arising out of, related to or resulting from in any way from the foregoing, which indemnity shall survive the Closing.

SECTION 10.  Seller's Covenants Pending Closing.  Subject to Section 38 hereof, between the Effective Date and the Closing Date, Seller and Operating Tenant, as applicable, shall (and, where applicable, Buyer hereby agrees to):

(a)       Other than Permitted Exceptions, not encumber the Property or enter into any agreements which encumber the Property or create new exceptions to marketable title that are not Permitted Exceptions, nor enter into any agreements extending beyond the Closing Date, in each case, except as specifically permitted by this Agreement; <u>provided</u> <u>that</u> Seller and Operating Tenant shall have the right to enter into (and permit Manager to enter into) Service Contracts so long as any such Service Contract is terminable by Seller, Operating Tenant, Manager or Buyer as of the Closing Date or upon sixty (60) days or less notice, without any penalty with respect to which Buyer has not received a credit at Closing; and <u>further</u> <u>provided</u> <u>that</u> nothing contained herein shall restrict the right of Manager under the Management Agreement to enter into, amend, or otherwise modify any Service Contract to the extent Manager is permitted to do so under the Management Agreement, except that, to the extent that Seller or Operating Tenant has the right under the Management Agreement to consent to or approve such action, neither Seller nor Operating Tenant shall consent to or approve of the same without Buyer's prior written consent, which consent shall not be unreasonably withheld, if such action, if taken by Seller or Operating Tenant, would violate the terms of this <u>Section 10(a)</u>;

(b)       intentionally omitted;

(c)       maintain and operate the Property in the ordinary course of business in a manner generally consistent with Seller's and Operating Tenant's past practices for operating the Hotel, subject to any change in such operations and policies which (i) Seller and/or Operating Tenant reasonably determine is necessary or prudent from time to time as a result of changes in market, economic or other facts, circumstances and conditions or (ii) Manager (on its own and not at the specific direction or request of Seller or Operating Tenant given or made with the specific intention to violate the terms of this <u>Section 10</u>) is permitted to make under the Management Agreement (the "<u>Ordinary Course of Business</u>"); <u>provided</u>, <u>however</u>, nothing contained herein shall require Seller or Operating Tenant to make any capital improvements or alterations to the Property, other than routine maintenance and repairs and replacements of Personal Property consistent with past practices and in accordance with the budget under the Management Agreement;

(d)       maintain in full force and effect substantially all existing insurance coverages related to the Property that are in effect as of the Effective Date or such other policies of insurance offering no significantly less coverage (and in compliance with the requirements of the Existing Debt Documents in all material respects);

(e)       Buyer and Seller hereby acknowledge that the Liquor Licenses currently expire on November 30, 2016.  Seller and Operating Tenant shall use commercially reasonable efforts to obtain the Liquor License Renewal.  Seller shall have the right (but not the obligation) to adjourn the Closing for up to ninety (90) days in the aggregate in order to obtain the Liquor License Renewal.  Buyer shall (and shall cause Buyer's Affiliates to) recuse itself and themselves from the Liquor License Renewal process, unless (i) Manager expressly requests in writing that Buyer or any such Affiliate of Buyer become involved in the Liquor License Renewal process; <u>provided</u>, <u>however</u> that upon any such request from Manager, Buyer shall notify Seller in writing and Buyer shall not commence its involvement in the Liquor License Renewal process unless five (5) Business Days have passed following Buyer's delivery to Seller of such written notice and Manager shall have not rescinded its request of cooperation to Buyer

within such five (5) Business Day period, or (ii) Seller expressly requests in writing that Buyer or any such Affiliate of Buyer become involved in the Liquor License Renewal process and Manager approves Buyer's and/or such Affiliate's cooperation (and, in each such case, Buyer's and such Affiliate's cooperation shall only be permitted to the extent requested or approved by Manager).   If Buyer's involvement the Liquor License Renewal process is permitted in accordance with the prior sentence, then Buyer shall, and shall cause such Affiliates (at no cost to Buyer and its Affiliates so long as Manager has not made the request for Buyer or its Affiliates to cooperate), to reasonably cooperate with Seller, Operating Tenant and Manager in connection with such Liquor License Renewal to the extent so permitted.  Without limiting the foregoing, in the event (y) the Liquor License Renewal does not occur, or if the Liquor Licenses are renewed on terms, conditions and stipulations which are less favorable than the terms, conditions and stipulations governing the Liquor Licenses as of the Effective Date, in either case, as a result any acts taken, directly or indirectly, by Buyer or Buyer's Affiliates to hinder, interfere with, oppose, obstruct or delay the Liquor License Renewal or the Liquor License Renewal process (regardless whether or not the same occurred at the request or direction of Manager) or (z) Buyer or Buyer's Affiliates fail to recuse itself or themselves from the Liquor License Renewal process as required above (each, a "Buyer Cause"), then Buyer shall be in material default of its obligations under this Agreement and the provisions of Section 13(b) hereof shall apply.  Seller acknowledges and agrees that the mere involvement of Buyer in the Liquor License Renewal process following a request by Seller or Manager in accordance with the prior provisions of this Section 10(e) shall not by itself constitute Buyer Cause.  The provisions of this Section 10(e) shall survive the Closing or earlier termination of this Agreement.

(f)       other than in the Ordinary Course of Business and other than Service Contracts entered into in accordance with clause (a) of this Section 10, not amend, modify, extend, renew or terminate any Assumed Agreement or Permits, without Buyer's consent, not to be unreasonably withheld, conditioned or delayed; provided, however, that Seller and Operating Tenant shall use commercially reasonable efforts to obtain a renewal of those certain Permits identified on Schedule 10(f) attached hereto (the "Renewal Permits").  Notwithstanding the foregoing, in no event shall (i) obtaining such renewal of the Renewal Permits be a condition to Buyer's obligation to consummate the transactions described herein, (ii) Buyer have a right to extend the Closing Date on account of the failure of Seller and Operating Tenant to obtain such renewal of the Renewal Permits, (iii) Buyer be entitled to a reduction in the Purchase Price as a result of the failure of Seller and Operating Tenant to obtain such renewal of the Renewal Permits and (iv) Seller or Operating Tenant be in default hereunder as a result of the Renewal Permits not being renewed or renewal of the Renewal Permits to be on terms, conditions and stipulations which are different from the terms, conditions and stipulations governing the Renewal Permits as of the Effective Date.

(g)       not amend, modify, extend, renew or terminate (or permit Mezzanine Loan A Borrower or Mezzanine Loan B Borrower, as applicable, to amend, modify, extend, renew or terminate) any Existing Debt Document in any manner that increases the obligations or potential liability of, or reduces the rights and benefits of Seller or Operating Tenant, or in the case of the Existing Debt Documents, the Mezzanine Loan A Borrower or Mezzanine Loan B Borrower, in each case, other than in a de minimis respect, without Buyer's written consent, which consent shall not be unreasonably withheld, conditioned or delayed, provided, however, (x) other than any Replacement Interest Cap Agreement (as such term is defined in the Existing

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 69 of 277

Debt Loan Agreements) and such other documents executed in connection with the Existing Debt First Extension Option (which Seller shall cause a copy of such documents to be delivered to Buyer promptly after execution thereof), Seller shall cause a copy of any such document to be delivered to Buyer not less than five (5) Business Days prior to the execution thereof and a fully executed copy of same promptly following execution and (y) Buyer and Seller acknowledge and agree that (i) the maturity date under the Existing Debt is scheduled to occur on the Payment Date occurring in December 2016 and (ii) unless the Closing occurs before November 7, 2016, Seller shall, and shall cause Mezzanine Loan A Borrower and Mezzanine Loan B Borrower, to exercise the Existing Debt First Extension Option without obtaining the consent of Buyer and any Extension Debt First Extension Option Costs shall be adjusted pursuant to Section 7(r) hereof.

(h)        not enter into, amend, modify, extend, renew or terminate any brokerage agreement or lease, sublease, license agreement or other occupancy agreement (but specifically excluding Ordinary Course guest reservation and occupancy agreements and arrangements concerning guest room and other Hotel facilities), without in each case obtaining the prior written consent of Buyer, not to be unreasonably withheld, conditioned or delayed; provided that nothing contained herein shall restrict the right of Manager under the Management Agreement to enter into, amend, modify, extend, renew or terminate any brokerage agreement, lease, sublease, license agreement or other occupancy agreement to the extent Manager is permitted to do so under the Management Agreement, except that, to the extent that Seller or Operating Tenant has the right under the Management Agreement to consent to or approve such action, neither Seller nor Operating Tenant shall consent to or approve of the same without Buyer's prior written consent, which consent shall not be unreasonably withheld if Seller and Operating Tenant are not permitted to unreasonably withhold their consent, if such action, if taken by Seller or Operating Tenant, would violate the terms of this Section 10(h);

(i)        not enter into any new Material Labor and Employment Contracts affecting the Property, unless otherwise required by applicable law;

(j)        not initiate, consent to, approve or otherwise take any action with respect to the changing of the zoning presently applicable to all or any part of the Property; provided that nothing contained herein shall restrict the right of Manager under the Management Agreement to initiate, consent to, approve or otherwise take any action with respect to the changing of the zoning presently applicable to all or any part of the Property to the extent Manager is permitted to do so under the Management Agreement, except that, to the extent that Seller or Operating Tenant has the right under the Management Agreement to consent to or approve such action, neither Seller nor Operating Tenant shall consent to or approve of the same without Buyer's prior written consent, which consent shall not be unreasonably withheld if Seller and Operating Tenant are not permitted to unreasonably withhold their consent, if such action, if taken by Seller or Operating Tenant, would violate the terms of this Section 10(j);

(k)        other than to Buyer, not (i) enter into a written agreement to list the Hotel for sale or net lease, (ii) offer to sell or net lease to any independent third parties, or actively solicit any offers from or continue any negotiations commenced prior to the Effective Date with independent third parties to purchase or negotiate for the sale or disposal of the Hotel, or any direct interest in Seller or Operating Tenant, (iii) sell, net lease or otherwise transfer the Hotel or

any portion thereof (including any interest of Seller and/or Operating Tenant (if any) in and to any of the items set forth on Exhibit P attached hereto, but not the interest of Manager or any Affiliate of Manager's in and to such items), or any direct interest in Seller or Operating Tenant or (iv) enter into any contract to do any of the things described in clauses (i), (ii) or (iii) above;

(l)    not make any material capital improvements to the Property, except (i) such alterations or repairs that are made in the Ordinary Course of Business or pursuant to the capital budget delivered to Buyer prior to the Effective Date or (ii) as permitted hereunder, under the Management Agreement, as required by law or in the event of an emergency, in which case, Seller shall use commercially reasonable efforts to provide Buyer written notice thereof or any such alterations (unless set forth in such capital budget);

(m)    use commercially reasonable efforts to cooperate with Buyer (at no cost or expense to Seller, Operating Tenant or Manager) to provide, at Buyer's reasonable request, written notice at Closing of the sale of the Hotel to Buyer to any Person under any Assumed Agreements and Permits, and to reasonably cooperate with Buyer (at no cost or expense to Seller or Operating Tenant), at Buyer's reasonable request, to effect any registrations or filings with any Governmental Authority or other Person, regarding the change in ownership or operation of the Hotel following the Closing;

(n)    other than in the Ordinary Course of Business, not remove any Personal Property included in the sale from the Property (subject to reasonable wear and tear and obsolescence), except as may be required for necessary repair or replacement, and replacement shall be of approximately equal or better quality, utility and quantity as the removed item of Personal Property;

(o)    so long as (1) no Existing Debt Payoff Notice has been delivered by Buyer and Buyer has not otherwise elected to arrange for alternative financing in lieu of the Existing Debt Assumption and Release, (2) Buyer is in compliance in all material respects with Section 20 hereof and (3) the Existing Debt Assumption and Release is intended to occur at Closing, not cause, and cause Mezzanine Loan A Borrower and Mezzanine Loan B Borrower not to cause, an Event of Default (as such term is defined in the Existing Debt Loan Agreement) that would result in the Existing Debt Lenders not permitting the Existing Debt Assumption and Release to occur at Closing; provided, however, that Seller and Operating Tenant shall have no liability to Buyer, and Seller and Operating Tenant shall not be in violation of any of the terms of this Section 10(o), by reason of any actions or inactions of  Buyer or any of Buyer's Affiliates (including André Balazs and Balazs Investors LLC) or any actions or inaction of Manager or Manager's Affiliates which may result in an Event of Default.  Notwithstanding the foregoing, if there is an Event of Default caused by an Existing Debt Borrower that would result in the Existing Debt Lenders not permitting the Existing Debt Assumption and Release to occur at Closing, but the Existing Debt Borrower cures such Event of Default on or prior to the Closing Date and the Existing Debt Assumption and Release is to occur at Closing, then Seller and Operating Tenant shall not be deemed in violation of this Section 10(o);

(p)    not hire or consent to the hiring of the general manager or the financial controller of the Hotel, except with the consent of Buyer, which consent shall not be unreasonably withheld, delayed or conditioned;

(q)     not (x) amend or modify the Management Agreement in any manner that increases the obligations or potential liability of, or reduces the rights and benefits of Seller or Operating Tenant, other than in a de minimis respect, without Buyer's written consent, which consent shall not be unreasonably withheld, conditioned or delayed, (y) terminate the Management Agreement, unless as a result of the fraud, willful misconduct or misappropriation of funds by Manager or any Affiliate of Manager or required by any of the Existing Debt Lenders or (z) in the event the Management Agreement is terminated prior to the Closing, enter into any replacement management agreement with a Person selected by Seller and/or Operating Tenant, unless such replacement management agreement is terminable, without any penalty to Buyer (unless such penalty is credited to Buyer at Closing), at and effective as of the Closing;

(r)     promptly following the receipt of a copy thereof by a Seller Knowledge Party (provided that, if Buyer requests in writing within ten (10) Business Days after any given month for the particular month in question, each Seller Knowledge Party shall (no more than one time per calendar month) inquire via electronic mail from Manager whether Manager received any written copies of any of the following items), Seller and Operating Tenant shall deliver to Buyer copies of (i) any written material agreements executed by Seller or Operating Tenant after the Effective Date that will be binding on Buyer or the Property following the Closing, (ii) any written material agreements executed by Manager or a Manager's Affiliate with respect to the Hotel after the Effective Date, (iii) any written notice of any pending or proposed condemnation, eminent domain or similar proceedings affecting the Property or any part thereof received by Seller or Operating Tenant after the Effective Date, (iv) any written notice, written demand, written order, written decree or written claim regarding (1) the presence of Hazardous Materials in violation of any laws or regulations, (2) non-compliance with Environmental Laws, or (3) liability under any Environmental Laws, in each case, received by Seller or Operating Tenant after the Effective Date, (v) any written notice from any Governmental Authority of any material violation of any of the Permits received by Seller or Operating Tenant after the Effective Date, (vi) any written notices of a material default under a material Service Contract delivered or received by Seller or Operating Tenant after the Effective Date, (vii) any written notice of any material default under the Management Agreement delivered or received by Seller or Operating Tenant after the Effective Date, (viii) any written notice from any of the Existing Debt Lenders asserting a default under the Existing Debt Documents received by Seller or Operating Tenant after the Effective Date, (ix) any written notice from Manager, any union, Hotel Employee, or the NLRB of any strikes, organized work slowdowns, lockouts, picketing or the filing of a representation petition with the NLRB on behalf of Hotel Employees or (x) any written notices and court documents received or delivered by Seller or Operating Tenant relating to any litigation, court action or similar proceeding with respect to the matters set forth in clause (1) of the definition of SI Dispute; provided, however, in no event shall any matter disclosed in any such agreement, consent or notice delivered to Buyer under this Section 10(r) affect Buyer's obligations to close on the Closing Date, give Buyer the right to extend the Closing Date on account thereof, result in a reduction in the Purchase Price or impose any obligation on Seller or Operating Tenant, unless otherwise expressly provided in this Agreement; and

(s)     In the event that Manager fails to perform any obligations that Manager is required to perform under the Management Agreement in connection with the Liquor License Renewal process, the Renewal Permit process or the Debt Assumption and Release, then upon the written request of Buyer, Seller shall deliver a notice to Manager requesting that Manager

perform such obligation; provided, however, (without limiting Buyer's rights under Sections 8(a), 19(c) or 20(h)), in no event shall the failure of Manager to perform or comply with such request give Buyer a right to terminate this Agreement or extend the Closing Date or result in a reduction in the Purchase Price.

SECTION 11. Assignment by Buyer. Buyer shall not directly or indirectly assign its rights under this Agreement without first obtaining Seller's written consent, which consent may be withheld in Seller's sole and absolute discretion; it being agreed that a transfer of any direct or indirect legal, beneficial or other ownership interest in Buyer shall be deemed to be an indirect assignment of Buyer's rights under this Agreement. Notwithstanding the foregoing, Buyer shall have a one (1) time right prior to the Closing to assign Buyer's rights in this Agreement without Seller's consent to (x) an Affiliate of Buyer or (y) a Person in which Buyer or its Affiliates or Andre Balazs or an entity controlled by Andre Balazs is a managing principal and has day-to-day control, so long as (a) Buyer notifies Seller of such assignment (which notice shall contain a certification by Buyer of its ownership of and affiliation with the proposed assignee) at least ten (10) days prior to the Closing and concurrently delivers to Seller a copy of the proposed assignment agreement between the assignor and the assignee, together with an updated organizational chart reflecting all Persons that Control the assignee and such other information as reasonably requested from Seller in order for Seller to perform "KYC" searches on the assignee and the direct and indirect owners of assignee, (b) shall not relieve Buyer from any of its obligations under this Agreement, (c) in case of a direct assignment by Buyer, the assignee shall assume all of Buyer's obligations under this Agreement on a joint and several basis with Buyer, (d) if the Existing Debt Assumption and Release is expected to occur at Closing, then the assignee shall be permitted by the Existing Debt Lenders and (e) the assignee shall be permitted by the Management Agreement. Notwithstanding anything to the contrary contained herein, in no event shall any assignment of this Agreement affect, modify or otherwise limit the rights of Seller to exercise the Set-Off Rights against the initial Buyer hereunder, which shall not be assignable (regardless of whether the underlying act, event or circumstance giving rise to a Set-Off Right was caused by the initial Buyer or any assignee of the initial Buyer. Any direct or indirect assignment made in violation of this Section 11 shall be null and void and shall constitute a default by Buyer.

SECTION 12. Destruction; Condemnation. Notwithstanding the provisions of New York law to the contrary, including Section 5-1311 of the General Obligations Law:

(a)    Minor Loss or Damage. In the event of a Casualty or Condemnation that is not a Major Loss or Damage, this Agreement shall remain in full force and effect, provided Seller shall, at Closing, assign by written instrument or credit, as applicable, to Buyer all of Seller's right, title and interest to any claims and proceeds Seller may have with respect to any unused or unapplied casualty insurance policies or condemnation awards relating to the Property, less in each case (without duplication) any reasonable costs (including reasonable attorneys' fees) incurred by Seller to collect such proceeds and any portion of such proceeds that Seller uses to make temporary or emergency repairs to the Property that Seller deems to be reasonable, and Seller shall assign the proceeds of business interruption insurance, if any, relating to the period after the Closing to Buyer (to the extent not otherwise adjusted pursuant to Section 7 hereof), by written instrument, and Seller shall credit Buyer with the amount of any deductible under Seller's insurance policies with respect to any Casualty.

(b)     Major Loss or Damage.  Unless as a result of any negligence, action(s), or omission(s) of Buyer or any of Buyer's Representatives, in the event of a Major Loss or Damage affecting the Property, Buyer may terminate this Agreement by sending written notice thereof to Seller within ten (10) Business Days after Seller sends Buyer written notice of the occurrence of a Major Loss or Damage (but in no event later than the Closing Date), in which event this Agreement shall terminate upon the giving of such notice and the Deposit shall be returned to Buyer, and thereafter neither Buyer nor Seller shall have any further rights, obligations or liabilities hereunder except to the extent that any obligation or liability set forth herein expressly survives termination of this Agreement.  If Buyer does not elect to terminate this Agreement within such ten (10) Business Day period, then Buyer shall be deemed to have elected to proceed with Closing, in which event Seller shall, at Closing, (x) credit to Buyer the amount of any deductible under Seller's insurance policies with respect to any Casualty, which credit shall not exceed the actual cost to repair the Property, and (y) assign or credit, as applicable, to Buyer all of Seller's right, title and interest to any claims and proceeds Seller may have with respect to any casualty insurance policies or condemnation awards relating to the Property less in each case (without duplication) any reasonable costs (including reasonable out-of-pocket attorneys' fees) incurred by Seller to collect such proceeds and any portion of such proceeds that Seller uses to make temporary or emergency repairs to the Property that Seller deems to be reasonable, and (z) assign the proceeds of business interruption insurance, if any, relating to the period after the Closing to Buyer, by written instrument (to the extent not otherwise adjusted pursuant to Section 7 hereof).

(c)     Definition of "Major Loss or Damage".  For the purposes of this Section 12, "Major Loss or Damage" with respect to the Property refers to the following:

(i)     with respect to a Casualty: loss or damage to the Property or any portion thereof such that (x) the cost of repairing or restoring the Property (or such portion) to a condition substantially identical to that of the Property (or such portion) prior to the event of Casualty would be, in the opinion of an architect or construction consultant selected by Seller and reasonably approved by Buyer (subject to the last sentence of this Section 12(c)(i)), equal to or greater than Ten Million and 00/100 Dollars ($10,000,000.00), (y) twenty percent (20%) or more of the guest rooms in the Hotel shall be rendered inaccessible or unusable for their intended purpose, or (z) a material portion of the food and beverage facilities at the Hotel shall be rendered inaccessible or unusable for their intended purpose for a period of time, in the opinion of such architect or construction consultant selected by Seller and reasonably approved by Buyer (subject to the last sentence of this Section 12(c)(i)), in excess of one (1) year and, in the case of (y) and (z) either due to loss or damage to such guests rooms or due to loss or damage to other areas of the Hotel (including portions of the Hotel required for there to be lawful access to or egress from such guest rooms or food and beverage areas).  If Buyer does not give written notice to Seller, within ten (10) Business Days after Seller notifies Buyer of Seller's choice of architect or construction consultant, of Buyer's reasons for disapproving such architect or construction consultant, then Buyer shall be deemed to have approved such architect or construction consultant selected by Seller.

(ii)     with respect to a Condemnation, any loss or damage to the Property which permanently impairs the current use and operation of the Property in any

material respect, other than a Condemnation of sidewalk, driveway, or any other immaterial portion of the Property outside of the vertical Improvements.

(d)     Seller shall give prompt notice of any Casualty or Condemnation to Buyer upon Seller becoming aware of such Casualty or Condemnation.  Subject to any right Manager may have to settle or adjust claims under the Management Agreement, if this Agreement is not terminated pursuant to this Section 12 as a result of a Major Loss or Damage, Seller hereby agrees not to settle or adjust any claim Seller may have with respect to any casualty insurance or condemnation awards relating to such Major Loss or Damage without Buyer's prior written consent, such consent shall not be unreasonably withheld, conditioned or delayed.

(e)     Upon Closing, full risk of loss with respect to the Property shall pass to Buyer.

SECTION 13. Defaults and Remedies.

(a)     Seller's Pre-Closing Default.  In the event that Seller fails to consummate the transactions contemplated by this Agreement for any reason other than Buyer's default or the permitted termination of this Agreement by Seller or Buyer as herein expressly provided, and such failure is not cured within five (5) Business Days after Seller's receipt from Buyer of written notice of such default (a "Seller EOD"), and so long as Buyer is not in default under its obligations hereunder, Buyer shall be entitled, as its sole remedy, either (i) to terminate this Agreement and to receive the return of the Deposit, together with any actual out-of-pocket third-party costs incurred by Buyer (as evidenced by paid invoices) in connection with this Agreement and the transaction described herein, including the negotiation and preparation of this Agreement, Buyer's due diligence evaluations of the economic feasibility of the proposed transactions and the suitability of the Property for Buyer's intended uses, title and survey costs, and the performance and/or implementation of the proposed transactions under this Agreement, in an aggregate amount (the "Reimbursable Expenses Cap") not to exceed (1) $250,000, plus (2) the actual legal fees and disbursements that are reimbursable to the Existing Debt Lenders for consideration of the Existing Debt Assumption and Release, whereupon no party hereto shall have any further rights, duties, obligations or liabilities under this Agreement except for those rights, duties, obligations and liabilities that are expressly stated to survive the termination of this Agreement, (ii) to enforce specific performance of Seller's obligations under this Agreement or (iii) to waive the failure and proceed to Closing without abatement of the Purchase Price.  Except as otherwise provided in this Section 13(a), Buyer expressly waives its right to seek damages of any kind in the event of any Seller default under this Agreement.  If Buyer does not expressly elect a remedy set forth in clause (i) or clause (ii) above, and Buyer fails to file suit for specific performance against Seller in a court of competent jurisdiction on or before ten (10) Business Days following the Closing Date, Buyer shall be deemed to have elected the remedy set forth in clause (i) above.  No action for specific performance will be construed to require Seller to cure any title defect, cure any untrue representation, cure any physical condition existing at the Property, or cause any third party to take any action with respect to the Property or Seller.  Notwithstanding the foregoing, if a Seller EOD occurs and (x) prior to the date which is forty-five (45) days following the date in which the Closing was scheduled to occur hereunder, Seller sells or transfers the Property to a party not Affiliated with Seller, other than Buyer (a "Third-Party Sale"), (y) the purchase price paid to Seller in connection with such Third-Party Sale is

greater than the Purchase Price and (z) as a result of such Third-Party Sale, specific performance is not an available remedy, then, in addition to Buyer's remedy set forth in clause (i) above, Buyer shall be entitled to recover, as liquidated damages, in full satisfaction of Buyer's claims against Seller hereunder, an amount equal to the positive difference, if any, of (a) the purchase price paid to Seller in connection with such Third-Party Sale over (b) the Purchase Price (the "Third-Party Sale Profit"). Seller and Buyer agree that Buyer's damages resulting from a Third-Party Sale are difficult, if not impossible, to determine and the Third-Party Sale Profit is a fair and reasonable estimate of those damages that Buyer may suffer which has been agreed to in an effort to cause the amount of such damages to be certain. Nothing contained in this Section 13(a) shall limit Buyer's rights against Seller by reason of any indemnity obligations of Seller to Buyer expressly stated in this Agreement to survive the termination of this Agreement or the Closing (but subject, in all cases, to the terms and provisions of Section 14(c) hereof).

      (b)    Buyer's Default.

          (i)    Buyer's Pre-Closing Default. If Buyer (1) defaults in the payment of the Deposit (or any portion thereof) as required hereunder or (2) otherwise defaults or fails to perform when required any of its other obligations pursuant to this Agreement at or prior to Closing for any reason, or, if at or prior to Closing, any one or more of Buyer's representations or warranties are breached in any material respect, and, in each such case, a Seller EOD does not exist and such default or breach under this clause (2) either is not susceptible of being cured or is not cured within five (5) Business Days after Buyer's receipt from Seller of notice of such default or breach, Seller shall be entitled, as its sole and exclusive remedy at law or in equity to terminate this Agreement and retain the Initial Deposit and Additional Deposit and, unless such default is solely related to Buyer's failure to obtain the conditional Liquor License Approval on or prior to the Closing Date, recover the Liquor License Extension Deposits (in each case, as and when the same has been paid to Seller or deposited with Escrow Agent, as the case may be) as liquidated damages (and not as penalty), in full satisfaction of Seller's claims against Buyer hereunder. Notwithstanding the foregoing, if (x) Seller waives, or Buyer cures, any such default or breach under clause (2) of the immediately preceding sentence within such five (5) Business Day period and the Closing occurs, (y) the Existing Debt is paid off (or assigned under Section 5(g)) at Closing and (x) as a result of such default or breach the Closing occurs on a day other than a Payment Date, then (in addition to the Closing Payment paid to Seller at Closing) Buyer shall be responsible for any and all Breakage Costs (as such term is defined in the Existing Debt Loan Agreements) and Compensating Interest (as such term is defined in the Existing Debt Loan Agreements) required to be paid by the Existing Debt Borrowers as a result of the payoff (or assignment under Section 5(g)) the Existing Debt on a day other than a Payment Date. Seller and Buyer agree that Seller's damages resulting from Buyer's default are difficult, if not impossible, to determine and the Deposit is a fair and reasonable estimate of those damages that Seller may suffer which has been agreed to in an effort to cause the amount of such damages to be certain. Nothing contained in this Section 13(b) shall limit Seller's rights against Buyer by reason of any indemnity obligations of Buyer to Seller expressly stated in this Agreement to survive the termination of this Agreement or the Closing, including Buyer's indemnity obligations under Section 13(b)(ii) hereof.

(ii)     Buyer's Indemnification. In addition to the rights and remedies Seller has under Section 13(b)(i), (x) Buyer shall be responsible for and shall indemnify and hold Seller, Operating Tenant and Seller Indemnified Parties harmless from, all Claims and any and all losses arising out of, related to or resulting in any way from (A) any SI Dispute and/or SI Injunction and/or (B) the Liquor License Renewal or the renewal of the Renewal Permits not occurring, or the Liquor Licenses or the Renewal Permits being renewed on terms, conditions and stipulations which are less favorable than the terms, conditions and stipulations governing the Liquor Licenses or the Renewal Permits, as the case may be, as of the Effective Date, in any case, as a result of Buyer Cause, and (y) notwithstanding anything to the contrary contained in Section 31 hereof, any and all amounts owed or payable to Buyer or Buyer's Affiliates in their capacity as a direct or indirect investor in Seller and/or Operating Tenant, as ordered by the judgment of a court of competent jurisdiction, shall be set off and applied to the indemnification and payment obligations of Buyer under this Section 13(b)(ii) and/or Section 46(b)(iv)c. (collectively, the "Set-Off Rights"). The provisions of this Section 13(b)(ii) shall survive the Closing or earlier termination of this Agreement.

(c)     Post-Closing Defaults of Buyer and Seller. Subject to Section 14(c) hereof, if Buyer or Seller defaults under this Agreement after the Closing with respect to any obligation of Buyer or Seller first arising after, and surviving, the Closing, then Buyer (if Seller is the defaulting party) or Seller (if Buyer is the defaulting party) shall have all rights and remedies available to Buyer against Seller, or Seller against Buyer, as applicable, hereunder, and neither Section 13(a) nor 13(b)(i) hereof shall apply.

SECTION 14. Seller's Representations and Warranties.

(a)     Seller hereby represents and warrants to Buyer solely as to the following matters, each of which is so warranted to be true and correct as of the Effective Date (except where stated to be as of the Closing) and shall, as a condition to Buyer's obligations hereunder, but subject to Section 14(b) hereof, be true and correct in all material respects on the Closing Date, except where stated to be as of the Effective Date and except as a result of changes of facts not caused by a default by Seller or Operating Tenant under this Agreement (other than with respect to the representations set forth in clauses (i), (iii), (v), (vi), (vii), (viii), (ix) and (xxi) of Section 14(a)) or resulting from any actions or omissions of Buyer, and shall survive for a period of nine (9) months after the Closing Date (the "Seller's Survival Period"):

(i)     Each of Seller and Operating Tenant is, and at the Closing shall be, a limited liability company duly formed, validly existing and in good standing under the laws of the state of Delaware and duly qualified to transact business in the State of New York.

(ii)     Neither Seller nor Operating Tenant has entered into any presently effective agreement to sell the Property or any portion thereof or interest therein, or entered into any option agreement for the sale of the Property or any portion thereof or interest therein or right of first refusal with respect thereto.

(iii)     Seller is not a "foreign person" as defined in Section 1445 of the IRC.

(iv)     To Seller's Knowledge, except as set forth on <u>Exhibit I</u>, as of the Effective Date, neither Seller nor Operating Tenant is a party to any litigation that will affect the Property or Buyer after Closing.

(v)     Neither Seller nor Operating Tenant requires any consents or approvals from any third party, other than from the Existing Debt Lenders and other than consents or approvals that have been obtained or will be obtained at or before the Closing, with respect to the execution and delivery of this Agreement or with respect to the performance by Seller and Operating Tenant of their respective obligations hereunder.

(vi)     Each of Seller and Operating Tenant has the authority and power to enter into this Agreement and to perform its respective obligations under this Agreement, and this Agreement and, at Closing, when executed, the documents and instruments to be executed by Seller and Operating Tenant on the Closing Date, represents a legally binding obligation of Seller and Operating Tenant, as applicable, enforceable against Seller and Operating Tenant in accordance with its terms in all material respects, except as limited by applicable bankruptcy and other creditors' rights laws of general application and by equitable principles.

(vii)     Seller's and Operating Tenant's execution and delivery of this Agreement and the documents and instruments to be executed and delivered by Seller and Operating Tenant on the Closing Date, and the performance by Seller and Operating Tenant of their respective duties and obligations under this Agreement and such other documents and instruments in accordance with its and their terms, are consistent with and do not violate the organizational documents of Seller and Operating Tenant or any contract or other instrument to which Seller and/or Operating Tenant is a party, or any law, judicial order or judgment or other governmental decree by which Seller or Operating Tenant is bound.

(viii)     The execution and delivery by Seller and Operating Tenant of this Agreement of the documents and instruments to be executed by Seller and Operating Tenant, as applicable, on the Closing Date, and the performance by Seller and Operating Tenant of their respective obligations under this Agreement and such other documents and interests, and of all other acts necessary and appropriate for the consummation of the Closing as contemplated herein, have been duly authorized by all required action of Seller and Operating Tenant, as applicable.

(ix)     Seller has not (x) commenced a voluntary case with respect to it or its assets, or to Seller's Knowledge had entered against it a petition, for relief under any federal bankruptcy act or any similar petition, order or decree under any federal or state law or statute relative to bankruptcy, insolvency or other relief for debtors, (y) caused, suffered or consented to the appointment of a receiver, trustee, administrator, conservator, liquidator, or similar official in any federal, state, or foreign judicial or non-

judicial proceeding, to hold, administer and/or liquidate all or substantially all of its assets, or (z) made a general assignment for the benefit of creditors.

(x)      To Seller's Knowledge, other than the Management Agreement, there are no agreements with brokers entered into by Seller or Operating Tenant and relating to the Property by which Seller, Operating Tenant or the Property is bound with respect to the leasing of any portion of the Property.

(xi)      As of the Effective Date, neither Seller nor Operating Tenant has received written notice of any pending or proposed condemnation, eminent domain or similar proceedings affecting the Property or any part thereof, and to Seller's Knowledge, as of the Effective Date no condemnation, eminent domain or similar proceedings affecting the Property or any part thereof are pending or have been proposed.

(xii)      To Seller's Knowledge, neither Seller nor Operating Tenant is a party to any Service Contracts affecting the Property, except as set forth on Schedule 14(a)(xii), except to the extent entered into after the Effective Date in accordance with the terms of this Agreement or except with respect to servicers that provide services to the Hotel on a one-time or sporadic basis without any obligations to provide continuing services.  To Seller's Knowledge, Seller has heretofore delivered or made available to Buyer a copy, true and complete in all material respects, of each such Service Contract in Seller's or Operating Tenant's possession in effect as of the Effective Date.  To Seller's Knowledge, as of the Effective Date, (x) each Service Contract is in full force and effect, and (y) neither Seller nor Operating Tenant has delivered or received any written notices of a material default under such Service Contracts that have not been cured.

(xiii)      As of the Effective Date, neither Seller nor Operating Tenant nor, to Seller's Knowledge, Manager has entered into any union agreements or collective bargaining agreements governing any person employed at the Property with respect to their employment at the Property.  As of the Effective Date, neither Seller nor Operating Tenant nor, to Seller's Knowledge, Manager has executed any documents agreeing to subject the Hotel to the Industry-Wide Collective Bargaining Agreement between the Hotel Association of New York City, Inc. and the New York Hotel-Motel Trades Council AFL-CIO or obligating Seller or Operating Tenant to negotiate with the New York Hotel-Motel Trades Council AFL-CIO with respect thereto.  Neither Seller nor Operating Tenant has any employees in connection with the Hotel.  All employees that are employed in connection with the Hotel are employed by Manager (or Manager's Affiliate).  Except as set forth on Exhibit I, to Seller's Knowledge, as of the Effective Date, neither Seller nor Operating Tenant has received any written notice of any actions, claims or investigations which remain unresolved and which are related to Labor and Employment Law and Requirements in connection with or related to any Hotel Employee to which Seller or Operating Tenant is a party.

(xiv)      To Seller's Knowledge, as of the Effective Date, other than as set forth in the Existing Commitment, neither Seller nor Operating Tenant has received any written notice, written demand, written order, written decree or written claim regarding (a) the presence of Hazardous Materials in violation of any laws or regulations, (b) non-

compliance with Environmental Laws, or (c) liability under any Environmental Laws, in each case with respect to the Property and in each case which has not been cured, remedied or remediated (since the date of any such notice, demand, order, decree or claims).

(xv)     All material Personal Property relating to the operation of the Hotel is owned or leased by Seller or Operating Tenant (other than Personal Property which is Excluded Property), free and clear of any liens or encumbrances, subject to the Permitted Exceptions.

(xvi)    Except as set forth on Schedule 14(a)(xvi) or Exhibit I, to Seller's Knowledge, as of the Effective Date, neither Seller nor Operating Tenant has received any written notice from any Governmental Authority of any material violation of any of the Permits that has not been dismissed or cured.

(xvii)   There are no space leases, subleases, license agreements or other occupancy agreement with respect to the Hotel other than the Operating Lease, and occupancy agreements and similar arrangements concerning guest rooms and other Hotel facilities.

(xviii)  Seller has delivered (or otherwise made available to Buyer) true, correct and complete copies of the Management Agreement, which, as of the Effective Date, is in full force and effect.  As of the Effective Date, neither Seller nor Operating Tenant has received any written notice of any material default under the Management Agreement that remains uncured.

(xix)    All of the material Existing Debt Documents in effect as of the Effective Date are identified on Schedule 14(a)(xix).  Seller has delivered to Buyer true, correct and complete copies of all material Existing Debt Documents in effect as of the Effective Date.  As of the Effective Date, the Existing Debt Documents are in full force and effect.  As of the Effective Date, no Existing Debt Borrower has received any written notice from any of the Existing Debt Lenders asserting a default under the Existing Debt Documents that remains uncured.  As of the Effective Date, the principal amount outstanding under the Senior Loan Documents is $160,000,000, the principal amount outstanding under the Mezzanine Loan A Documents is $70,000,000 and the principal amount outstanding under the Mezzanine Loan B Documents is $70,000,000. Notwithstanding the foregoing provisions of this Section 14(a)(xix), if the Existing Debt Assumption and Release does not occur at Closing pursuant to Section 20 hereof, then, notwithstanding anything to the contrary contained in this Agreement, the representations under this Section 14(a)(xix) shall be deemed *void ab initio* and shall not be remade at Closing.

(xx)     To Seller's Knowledge, as of the Effective Date, neither Seller, Operating Tenant nor Manager has within the past six (6) months prior to the Effective Date received any written notice from Manager, any union or the NLRB of any strikes, organized work slowdowns, lockouts, picketing or the filing of a representation petition with the NLRB by a union on behalf of Hotel Employees.

(xxi)     With respect to Anti-Money Laundering and Anti-Terrorism Laws, to Seller's Knowledge:

(1)     Neither Seller or, to Seller's Knowledge, Seller's Affiliates, are in violation of any Anti-Money Laundering and Anti-Terrorism Laws.

(2)     Neither Seller or, to Seller's Knowledge, Seller's Affiliates, are acting, directly or indirectly, on behalf of terrorists, terrorist organizations or narcotics traffickers, including those persons or entities that appear on the Annex to the Executive Order or are included on any relevant lists maintained by the Office of Foreign Asset Control of U.S. Department of Treasury, U.S. Department of State, or other U.S. government agencies, all as may be amended from time to time.

(3)     Neither Seller or, to Seller's Knowledge, Seller's Affiliates, in any capacity (A) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Person included in the lists set forth in the preceding paragraph; (B) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order; or (C) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Money Laundering and Anti-Terrorism Laws.

(4)     Neither Seller, nor any Person controlling or controlled by it, is a country, territory, individual or entity named on any Government List, and the monies used in connection with this Agreement and amounts committed with respect thereto, were not and are not derived from any activities that contravene any applicable anti-money laundering or anti-bribery laws and regulations (including funds being derived from any person, entity, country or territory on a Government List or engaged in any unlawful activity defined under Title 18 of the United States Code, Section 1956(c)(7)).

(b)     If Buyer actually determines prior to the Closing Date that any of the representations or warranties of Seller in Section 14(a) hereof were not true when given and Buyer's reasonable estimate for damages for all such breaches by Seller collectively aggregate more than the Damages Threshold, then (i) Buyer shall notify Seller of same within five (5) Business Days after Buyer obtains actual knowledge of information that renders such representations or warranties untrue or incorrect (but in no event later than the Closing Date), which notice shall include Buyer's reasonable estimate of the damages cause by such breach(es), (ii) Seller shall have the right, but not the obligation, upon written notice to Buyer, to cure such breach(es), or provide Buyer with a credit at Closing in an amount equal to the excess of (y) such estimate amount as reasonably agreed to by Buyer and Seller over (z) the Damages Threshold; provided, however, if Seller elects to attempt to cure such breach(es), then Seller shall have until the Closing Date to do so, and for this purpose Seller shall be entitled to a reasonable adjournment of the Closing, but in no event shall the adjournment exceed the earlier to occur of (1) ten (10) Business Days following the date such breach(es) are cured and (2) sixty (60) days in

the aggregate, (iii) in the event that Seller cures such breach(es) or provides Buyer with such a credit, then  Buyer shall be obligated to perform its obligations under this Agreement (including its obligations with respect to the Closing) in accordance with this Agreement notwithstanding such breach(es), and (iv) in the event that Seller does not provide such credit to Buyer at Closing or does not cure such breach(es) on or prior to the Closing Date (including any adjournment), then Seller shall notify Buyer in writing of Seller's inability to cure such breach(es) or election not to provide Buyer with such credit, and Buyer's sole right and exclusive remedy shall be to terminate this Agreement by sending written notice thereof to Seller within five (5) Business Days after Buyer's receipt of the notice referred to in this <u>clause (iv)</u> (but in no event later than the Closing Date), in which event (A) this Agreement shall terminate upon the giving of such termination notice, (B) thereafter neither Buyer or Seller shall have any further rights, obligations or liabilities hereunder except to the extent that any obligation or liability set forth herein expressly survives the termination of this Agreement and (C) the Deposit shall be returned to Buyer.  If Buyer fails to give such written termination notice to Seller within the time period described in <u>clause (iv)</u> above, Buyer shall be deemed to have waived any right or remedy (including any right under this Agreement to terminate this Agreement) by reason of such breach.  Notwithstanding anything to the contrary contained in this Agreement, in no event shall Seller be liable to Buyer for, nor shall Buyer have a right to terminate this Agreement or otherwise be relieved of its Closing obligations hereunder by reason of, (x) facts that contradict a representation or warranty but that are correctly reflected in any documents or materials made available in the Data Room as of 5:00 pm (Eastern Time) on the date which is one (1) Business Day prior to the Effective Date (provided that all documents or materials made available in the Data Room from and after July 21, 2016 are placed in folders identifying the date on which such documents or materials were uploaded to the Data Room), or are otherwise known to Buyer, Buyer's Affiliates (including André Balazs and Balazs Investors LLC) or Buyer's Representatives prior to the Effective Date (Seller acknowledging and agreeing that none of Buyer, Buyer's Affiliates (including André Balazs and Balazs Investors LLC) and Buyer's Representatives shall be deemed to have knowledge of any facts solely by reason of such Person's present affiliation with Seller or Manager, unless such facts are actually known by such Person) or (y) other than with respect to the representations set forth in clauses (i), (iii), (v), (vi), (vii), (viii), (ix) and (xxi) of <u>Section 14(a)</u>, any changes of fact that are not caused by a default by Seller or Operating Tenant under this Agreement.  This <u>Section 14(b)</u> shall survive the Closing.

(c)          Notwithstanding anything to the contrary contained herein, but subject to <u>Sections 14(b)</u> and <u>(d)</u> hereof, Seller shall not have any liability to Buyer or any of Buyer's Affiliates by reason of a breach or default of any representations and warranties by Seller first discovered by Buyer after the Closing or a breach or default of any obligation, including any indemnification obligation of Seller and/or Operating Tenant under this Agreement or any of the documents delivered by Seller and/or Operating Tenant at Closing, of Seller which arises after, and survives, the Closing, unless Buyer shall have given to Seller written notice (a "<u>Warranty Notice</u>") of any breach or default prior to the expiration of Seller's Survival Period (other than in the case of Seller's indemnity pursuant to <u>Section 43</u>), which Warranty Notice shall set forth Buyer's reasonable estimate of actual damages incurred as a result of such breach or default, and Buyer shall have given Seller an opportunity to cure such breach or default within a reasonable period of time after Buyer's Warranty Notice, not to exceed thirty (30) days.  No claim for any breach or default by Seller of any representation or warranty first discovered by Buyer after the Closing and no claim for any breach or default by Seller of any of its obligations, including any

indemnification obligation of Seller and/or Operating Tenant under this Agreement or any of the documents delivered by Seller and/or Operating Tenant at Closing, which arises after, and survives, the Closing, shall be actionable or payable unless the claims made by Buyer for all such breaches and defaults by Seller shall collectively aggregate more than the Damages Threshold, in which event, subject to the following sentence, the full amount that is actionable against Seller shall be an amount equal to the lesser of actual damages and the Maximum Liability Amount. Notwithstanding anything to the contrary contained herein, but subject to Section 14(b), in no event shall the aggregate liability of Seller to Buyer by reason of breaches and defaults of Seller's representations or warranties first discovered after Closing and breaches and defaults of Seller's obligations, including indemnification obligations of Seller and/or Operating Tenant under this Agreement or any of the documents delivered by Seller and/or Operating Tenant at Closing, which arises after, and survives, the Closing, exceed the Maximum Liability Amount, and such liability of Seller shall be further limited to actual damages and shall not include consequential, special or punitive damages. Any litigation or other action with respect to any claim relating to or arising out of any breach or default of any of Seller's representations or warranties first discovered by Buyer after Closing or of any breach or default by Seller of any of its obligations, including any indemnification obligation of Seller and/or Operating Tenant under this Agreement or any of the documents delivered by Seller and/or Operating Tenant at Closing, which arise after, and survive, the Closing, must be commenced within sixty (60) days from the date of the applicable Buyer's Warranty Notice, and if not commenced within such time period, Buyer shall be deemed to have waived its claims for such breach or default. This Section 14(c) shall survive the Closing.

(d)      Notwithstanding any provision of this Agreement to the contrary, Seller shall not have any liability (and Buyer waives its right to bring any action) with respect to any of the Seller representations or warranties contained herein, if (i) prior to the Closing, Buyer or any of Buyer's Affiliates (including André Balazs and Balazs Investors LLC) obtains actual knowledge of information that renders any of the representations and warranties contained herein untrue or incorrect (Seller acknowledging and agreeing that none of Buyer, Buyer's Affiliates (including André Balazs and Balazs Investors LLC) and Buyer's Representatives shall be deemed to have knowledge of any facts solely by reason of such Person's present affiliation with Seller or Manager, unless such facts are actually known by such Person) and Buyer with said knowledge nevertheless consummates the transaction contemplated by this Agreement or (ii) the aggregate amount of damages are less than the Damages Threshold, whether discovered by Buyer prior to Closing under Section 14(b) hereof or after Closing under Section 14(c) hereof. This Section 14(d) shall survive the Closing.

(e)      At the Closing, a portion of the Purchase Price in an amount equal to the Maximum Liability Amount shall be held back in escrow with Escrow Agent (such amount, together with any and all interest earned thereon, shall be referred to herein as the "Post-Closing Escrow Funds") to secure any damages payable by Seller to Buyer pursuant and subject to Section 14(c) hereof and Section 43 hereof. The Post-Closing Escrow Funds shall be held by Escrow Agent in escrow and disbursed in accordance with the terms and provisions of an escrow agreement to be entered into at Closing by and among Seller, Buyer and Escrow Agent in the form attached hereto as Exhibit R (the "Post-Closing Escrow Agreement").

SECTION 15. <u>Buyer's Representations and Warranties</u>.  Buyer hereby represents and warrants to Seller solely as to the following matters, each of which is so warranted to be true and correct as of the Effective Date and shall, as a condition to Seller's obligations hereunder, be true and correct on the Closing Date, and shall survive for a period of nine (9) months after the Closing Date:

(a)     Buyer is, and at the Closing shall be, an entity duly formed, validly existing and in good standing under the laws of its state of organization and at the Closing shall be duly qualified to transact business in the State of New York.  Attached hereto as <u>Schedule 15(a)</u> is a true, correct and complete organizational chart for Buyer as of the Effective Date and as updated at Closing pursuant to <u>Section 11</u> hereof.

(b)     Neither Buyer nor any Affiliate of Buyer requires any consents or approvals from any Affiliate of Buyer, Manager, any Affiliate of Manager or any third party with respect to the execution and delivery of this Agreement by Buyer or with respect to the performance by Buyer of its obligations hereunder, including the purchase of the Property from Seller.

(c)     Buyer has the authority and power to enter into this Agreement and to perform its obligations under this Agreement, and this Agreement and, at Closing, when executed, the documents and instruments to be executed by Buyer on the Closing Date, represent a legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as limited by applicable bankruptcy and other creditors' rights laws of general application and by equitable principles.

(d)     Buyer's execution and delivery of this Agreement and the documents and instruments to be executed and delivered by Buyer on the Closing Date, and the performance by Buyer of its duties and obligations under this Agreement, including the purchase of the Property from Seller, and such other documents and instruments in accordance with its and their terms, are consistent with and do not violate the organizational documents of Buyer, or any contract, agreement or other instrument to which Buyer or any Affiliate of Buyer is a party (including any contract. agreement or other instrument between Buyer or any Affiliate of Buyer and Manager (or any Affiliate or direct or indirect owner, member or shareholder of Manager)), or any law, judicial order or judgment or other governmental decree by which Buyer is bound.

(e)     The execution and delivery of this Agreement and of the documents and instruments required to be executed by Buyer on the Closing Date, and the performance by Buyer of its obligations under this Agreement and such other documents and instruments, and of all other acts necessary and appropriate for the consummation of the Closing, have been duly authorized by all required action of Buyer.

(f)     Buyer is not acquiring the Property with, and does not hold, "plan assets" of any "benefit plan investor" as such terms are defined by Section 3(42) of the Employee Retirement Income Security Act of 1974, as amended.

(g)     Buyer has not (a) commenced a voluntary case with respect to it or its assets, or to Buyer's knowledge had entered against it a petition, for relief under any federal

bankruptcy act or any similar petition, order or decree under any federal or state law or statute relative to bankruptcy, insolvency or other relief for debtors, (b) caused, suffered or consented to the appointment of a receiver, trustee, administrator, conservator, liquidator, or similar official in any federal, state, or foreign judicial or non-judicial proceeding, to hold, administer and/or liquidate all or substantially all of its assets, or (c) made a general assignment for the benefit of creditors.

(h)      Buyer (x) does not have a criminal record, (y) can obtain a liquor license with respect to the Hotel and (z) is not a Competitor (as defined in the Management Agreement).

(i)      As of September 29, 2016 and as of the Closing Date, New Loan Guarantor will satisfy the Minimum Financial Criteria; provided that this representation shall be deemed to be void *ab initio* in the event Buyer shall determine pursuant to Section 20(i) below that it will not pursue the Existing Debt Assumption and Release.

(j)      With respect to Anti-Money Laundering and Anti-Terrorism Laws:

(i)      Neither Buyer or, to Buyer's knowledge, its Affiliates, are in violation of any laws relating to terrorism, money laundering or any Anti-Money Laundering and Anti-Terrorism Laws.

(ii)      Neither Buyer or, to Buyer's knowledge, its Affiliates, are acting, directly or indirectly, on behalf of terrorists, terrorist organizations or narcotics traffickers, including those persons or entities that appear on the Annex to the Executive Order, or are included on any relevant lists maintained by the Office of Foreign Asset Control of U.S. Department of Treasury, U.S. Department of State, or other U.S. government agencies, all as may be amended from time to time.

(iii)      Neither Buyer or, to Buyer's knowledge, its Affiliates, in any capacity (A) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Person included in the lists set forth in the preceding paragraph; (B) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order; or (C) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Money Laundering and Anti-Terrorism Laws.

(iv)      Buyer understands and acknowledges that Seller may become subject to further anti-money laundering regulations, and agrees to promptly execute instruments, provide information, or perform any other acts as may reasonably be requested by Seller, for the purpose of:  (A) carrying out due diligence as may be required by applicable law to establish Buyer's identity and source of funds; (B) maintaining records of such identities and sources of funds, or verifications or certifications as to the same; and (C) taking any other actions as may be required to comply with and remain in compliance with anti-money laundering regulations applicable to Buyer.

(v)     Neither Buyer, nor any Person controlling or controlled by Buyer, is a country, territory, individual or entity named on any Government List, and the monies used in connection with this Agreement and amounts committed with respect thereto, were not and are not derived from any activities that contravene any applicable anti-money laundering or anti-bribery laws and regulations (including funds being derived from any person, entity, country or territory on a Government List or engaged in any unlawful activity defined under Title 18 of the United States Code, Section 1956(c)(7)).

SECTION 16. Disclaimers and Waivers.

(a)     No Reliance on Documents.  Except as expressly stated in this Agreement or any of the documents delivered by Seller or Operating Tenant at the Closing, Seller makes no representation or warranty as to the truth, accuracy or completeness of any materials, data or information delivered by Seller to Buyer in connection with the transactions described in this Agreement.  Buyer acknowledges and agrees that all materials, data and information delivered by Seller to Buyer in connection with the transactions described in this Agreement are provided to Buyer as a convenience only, and that any reliance on or use of such materials, data or information by Buyer shall be at the sole risk of Buyer.  Without limiting the generality of the foregoing provisions, Buyer acknowledges and agrees that (i) any environmental or other report of any nature or kind with respect to the Property which is delivered by Seller to Buyer shall be for general informational purposes only, (ii) Buyer shall not have any right to rely on any such report delivered by Seller to Buyer, but rather will rely on its own inspections and investigations of the Property and any reports commissioned by Buyer, and (iii) neither Seller, nor any Affiliate of Seller nor the person or entity who prepared any such report delivered by Seller to Buyer shall have any liability to Buyer for any inaccuracy in or omission from any such report.

(b)     DISCLAIMERS.  EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT OR ANY OF THE DOCUMENTS DELIVERED BY SELLER OR OPERATING TENANT AT THE CLOSING, IT IS UNDERSTOOD AND AGREED THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE PROPERTY, INCLUDING ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, ANY LIABILITY UNDER THE FEDERAL WARN ACT OR THE NYS WARN ACT, THE COMPLIANCE OF THE PROPERTY WITH LAWS, THE TRUTH, ACCURACY OR COMPLETENESS OF THE DUE DILIGENCE MATERIALS OR ANY OTHER INFORMATION PROVIDED BY OR ON BEHALF OF SELLER TO BUYER, OR ANY OTHER MATTER OR THING REGARDING THE PROPERTY.  BUYER WAIVES, AND SELLER IS RELIEVED FROM, ANY OBLIGATION OR DUTY THAT SELLER MIGHT OTHERWISE HAVE TO DISCLOSE ANY CONDITION, INCLUDING AN ENVIRONMENTAL CONDITION, RELATING TO THE PROPERTY.  EXCEPT AS OTHERWISE EXPRESSLY STATED IN THIS AGREEMENT OR ANY OF THE DOCUMENTS DELIVERED BY SELLER OR OPERATING TENANT AT THE CLOSING,

BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER AND OPERATING TENANT SHALL SELL AND CONVEY TO BUYER AND BUYER SHALL ACCEPT THE PROPERTY "AS IS, WHERE IS, WITH ALL FAULTS."  EXCEPT AS OTHERWISE EXPRESSLY STATED IN THIS AGREEMENT OR ANY OF THE DOCUMENTS DELIVERED BY SELLER OR OPERATING TENANT AT THE CLOSING, BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY (INCLUDING INFORMATION PACKAGES DISTRIBUTED WITH RESPECT TO THE PROPERTY) MADE OR FURNISHED BY OR ON BEHALF OF SELLER, ANY DIRECT OR INDIRECT OWNER OF SELLER, MANAGER OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING.  BUYER REPRESENTS TO SELLER THAT BUYER HAS CONDUCTED, OR WILL CONDUCT PRIOR TO THE CLOSING, SUCH INVESTIGATIONS OF THE PROPERTY, INCLUDING THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS BUYER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE PROPERTY AND THE EXISTENCE OR NONEXISTENCE, OR REMEDIAL ACTION TO BE TAKEN WITH RESPECT TO, ANY HAZARDOUS MATERIALS OR TOXIC SUBSTANCES ON OR DISCHARGED FROM THE PROPERTY, AND WILL RELY SOLELY UPON BUYER'S OWN INVESTIGATIONS AND NOT UPON ANY INFORMATION PROVIDED BY OR ON BEHALF OF SELLER OR ITS AGENTS OR EMPLOYEES WITH RESPECT THERETO, OTHER THAN SUCH REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER (IF ANY) AS ARE EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY OF THE DOCUMENTS DELIVERED BY SELLER OR OPERATING TENANT AT THE CLOSING.  WITHOUT LIMITING AND SUBJECT TO SECTION 14 HEREOF AND THE DOCUMENTS DELIVERED BY SELLER AND OPERATING TENANT AT THE CLOSING, UPON THE OCCURRENCE OF THE CLOSING, BUYER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING CONSTRUCTION DEFECTS AND ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY BUYER'S INVESTIGATIONS, AND BUYER, UPON THE OCCURRENCE OF THE CLOSING, SHALL BE DEEMED TO HAVE RELEASED, ACQUITTED AND DISCHARGED SELLER, OPERATING TENANT AND THE SELLER INDEMNIFIED PARTIES FROM AND AGAINST, AND SHALL BE DEEMED TO HAVE IRREVOCABLY WAIVED AND RELINQUISHED, ANY AND ALL CLAIMS THAT BUYER MIGHT HAVE ASSERTED OR ALLEGED AGAINST SELLER, OPERATING TENANT AND ANY OF THE SELLER INDEMNIFIED PARTIES AT ANY TIME BY REASON OF OR ARISING OUT OF ANY LATENT OR PATENT CONSTRUCTION DEFECTS OR PHYSICAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS (INCLUDING ANY ENVIRONMENTAL LAWS) AND ANY AND ALL OTHER ACTS, OMISSIONS, EVENTS, CIRCUMSTANCES OR MATTERS REGARDING THE PROPERTY.  WITHOUT LIMITING AND SUBJECT TO SECTION 14(a)(xiv) HEREOF AND THE DOCUMENTS DELIVERED BY SELLER AND OPERATING TENANT AT THE CLOSING, BUYER AGREES THAT SHOULD ANY CLEANUP, REMEDIATION OR REMOVAL OF HAZARDOUS MATERIALS OR OTHER ENVIRONMENTAL CONDITIONS ON ANY OF THE PROPERTY BE REQUIRED AFTER

THE CLOSING DATE, SUCH CLEANUP, REMOVAL OR REMEDIATION SHALL BE THE RESPONSIBILITY OF AND SHALL BE PERFORMED AT THE SOLE COST AND EXPENSE OF BUYER.

(c)    BUYER ACKNOWLEDGES THAT SELLER HAS NOT HELD ITSELF OUT AS ENGAGED IN THE PRACTICE OF LAW OR ACCOUNTING, AND BUYER HAS NOT ESTABLISHED, DIRECTLY OR INDIRECTLY, AN ATTORNEY-CLIENT OR ACCOUNTANT-CLIENT RELATIONSHIP WITH SELLER, OPERATING TENANT OR ANY OF THE SELLER INDEMNIFIED PARTIES.  IT IS UNDERSTOOD AND AGREED THAT ANY REPRESENTATIONS OR STATEMENTS MADE BY SELLER, OPERATING TENANT OR ANY OF THE SELLER INDEMNIFIED PARTIES REGARDING LEGAL OR TAX CONSEQUENCES OF ANY OF THE TRANSACTIONS DESCRIBED IN THIS AGREEMENT OR ANY OF THE DOCUMENTS DELIVERED BY SELLER OR OPERATING TENANT AT THE CLOSING MAY NOT BE USED OR RELIED UPON BY BUYER.  BUYER REPRESENTS THAT IT HAS EITHER OBTAINED LEGAL COUNSEL AND TAX ADVICE PRIOR TO ENTERING INTO THIS AGREEMENT OR IT HAS ITSELF DEEMED IT UNNECESSARY TO SEEK SUCH ADVICE.  SELLER SHALL NOT BE HELD RESPONSIBLE FOR ANY FAILURE OF BUYER TO SEEK AND OBTAIN LEGAL AND TAX ADVICE.

(d)    Condition of Delivery.  Seller has no obligation to deliver the Property in a "broom clean" condition, and at Closing Seller may leave in the Property all items of personal property and equipment, partitions and debris as are now there present and as would accumulate in the normal course of operating and maintaining the Property.

(e)    RELEASE.  WITHOUT LIMITING THE PROVISIONS OF SECTION 16(a), 16(b) OR 16(c) HEREOF AND OTHERWISE NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, BUYER, FOR ITSELF AND ITS AGENTS, AFFILIATES, SUCCESSORS AND ASSIGNS, HEREBY RELEASES, ACQUITS AND FOREVER DISCHARGES SELLER, OPERATING TENANT AND THE SELLER INDEMNIFIED PARTIES FROM ANY AND ALL CLAIMS THAT BUYER HAS OR MAY HAVE IN THE FUTURE, ARISING FROM OR RELATING TO (i) ANY DEFECTS (PATENT OR LATENT), ERRORS OR OMISSIONS IN THE DESIGN OR CONSTRUCTION OF THE PROPERTY WHETHER AS A RESULT OF NEGLIGENCE OR OTHERWISE, (ii) ANY LIABILITY UNDER THE FEDERAL WARN ACT OR THE NYS WARN ACT, OR (iii) ANY OTHER CONDITIONS INCLUDING ENVIRONMENTAL AND OTHER PHYSICAL CONDITIONS, AFFECTING THE PROPERTY WHETHER AS A RESULT OF NEGLIGENCE OR OTHERWISE, INCLUDING ANY CLAIM FOR INDEMNIFICATION OR CONTRIBUTION ARISING UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT (42 U.S.C. SECTION 9601, ET SEQ.) OR ANY OTHER FEDERAL, STATE OR LOCAL STATUTE, RULE OR ORDINANCE RELATING TO LIABILITY OF PROPERTY OWNERS FOR ENVIRONMENTAL MATTERS, WHETHER ARISING BASED ON EVENTS THAT OCCURRED BEFORE, DURING, OR AFTER SELLER'S PERIOD AS OWNER OF THE PROPERTY AND WHETHER BASED ON THEORIES OF INDEMNIFICATION, CONTRIBUTION OR OTHERWISE.  THE RELEASE SET FORTH IN THIS SECTION 16(e) SPECIFICALLY INCLUDES ANY CLAIMS UNDER ANY ENVIRONMENTAL LAWS OF ANY

GOVERNMENTAL AUTHORITY, OR UNDER THE AMERICANS WITH DISABILITIES ACT OF 1990, AS ANY OF THOSE LAWS MAY BE AMENDED FROM TIME TO TIME AND ANY REGULATIONS, ORDERS, RULES OF PROCEDURES OR GUIDELINES PROMULGATED IN CONNECTION WITH SUCH LAWS, REGARDLESS OF WHETHER THEY ARE IN EXISTENCE ON THE EFFECTIVE DATE.  BUYER ACKNOWLEDGES THAT BUYER HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL OF BUYER'S SELECTION AND BUYER IS GRANTING THIS RELEASE OF ITS OWN VOLITION AND AFTER CONSULTATION WITH BUYER'S COUNSEL. NOTWITHSTANDING THE FOREGOING, THE RELEASE SET FORTH IN THIS SECTION 16(e) DOES NOT APPLY TO THE REPRESENTATIONS OF SELLER EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY INDEMNITY OR WARRANTY EXPRESSLY MADE BY SELLER IN THIS AGREEMENT OR ANY DOCUMENT DELIVERED BY SELLER AT CLOSING.  BUYER ACKNOWLEDGES THAT BUYER HAS CAREFULLY REVIEWED THIS SECTION 16(e) AND DISCUSSED ITS SIGNIFICANCE WITH BUYER'S LEGAL COUNSEL AND THAT THE PROVISIONS OF THIS SECTION 16(e) ARE A MATERIAL PART OF THIS AGREEMENT.

(f)    Effect and Survival of Disclaimers.  Seller and Buyer acknowledge that the negotiated amount of the Purchase Price has taken into account that the Property is being sold subject to the provisions of this Section 16.  The provisions of this Section 16 shall survive the Closing.

SECTION 17. Notices.  Any notice, request or other communication required or otherwise given pursuant to this Agreement shall be given in writing by (a) personal delivery, or (b) reputable overnight delivery service with proof of delivery, or (c) email sent to the intended addressee at the address set forth below, or to such other address or to the attention of such other Person as the addressee shall have designated on no less than three (3) Business Days' written notice sent in accordance herewith, and shall be deemed to have been given either at the time of receipt or refusal (or inability to deliver because of changed address of which no notice has been received) or, in the case of email, as of the date of the email transmission, provided that an original of such email is also sent on the following Business Day to the intended addressee by means described in clauses (a) or (b) above.  Notices may be given by a party's counsel on behalf of such party as if such party had given such notice itself.  Unless changed in accordance with the preceding sentence, the addresses for notices given pursuant to this Agreement shall be as follows:

If to Seller:              Greenfield Partners, LLC
                           2 Post Road West
                           Westport, Connecticut  06880
                           Attn:  Barry P. Marcus
                           email: marcusb@greenfieldpartners.com

                           and:

                           Dune Real Estate Partners LP
                           640 Fifth Avenue, 17th Floor
                           New York, NY 10019

Attn:  Russell Gimelstob
email: russell.gimestob@drep.com

and:

Dune Real Estate Partners LP
640 Fifth Avenue, 17th Floor
New York, NY 10019
Attn:  General Counsel and
        Chief Investment Officer
email: legal@drep.com and cio@drep.com

With a copy to:         Kaye Scholer LLP
250 West 55th Street
New York, New York  10019
Attn:  Jeffrey H. Kapner, Esq.
email: jkapner@kayescholer.com

If to Buyer:         Andre Balazs Properties, LLC
23 East 4th Street
New York, New York 10003
Attn: André Balazs
email: andre.balazs@hotelsab.com

with a copy to:         Andre Balazs Properties, LLC
23 East 4th Street
New York, New York 10003
Attn: Zachary Bayman
email: zachary.bayman@hotelsab.com

and

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attn: Steven Simkin, Esq.
email: ssimkin@paulweiss.com

If to Title Company:         Stewart Title Insurance Company- Title Associates
825 Third Avenue, 30th Floor
New York, New York 10022
Attn: Kristin V. Bellouny
email: kristin.bellouny@stewart.com

and

First Nationwide Title Agency, LLC
50 Charles Lindbergh Blvd
Suite 600
Uniondale, New York 11553
Attn:  Jesse Iadanza, Esq. and Allison Luskoff, Esq.
email:  jiadanza@firstnationwidetitle.com
        aluskoff@firstnationwidetitle.com

If to Escrow Agent:          Old Republic National Title Insurance Company
                             400 Post Avenue, Suite 310
                             Westbury, NY 11590
                             Attention: Paul P. Reisman
                                 Vice President & New York State Counsel
                             Telephone: 516-478-5880
                             email: preisman@oldrepublictitle.com

SECTION 18. <u>Management Agreement</u>. So long as the Management Agreement is in full force and effect, on or before the date that is thirty (30) days prior to the Scheduled Closing Date (or to such earlier date on which the Closing is scheduled to occur as a result of Buyer's exercise of its right to accelerate the Closing pursuant to <u>Section 6(c)</u>), Seller shall send a notice of the assignment of the Management Agreement to Manager in the form attached hereto as <u>Exhibit M-2</u>).  In the event that the Closing is adjourned pursuant to this Agreement, then Seller shall have the right to deliver an adjournment notice to Manager in form and substance reasonably acceptable to Seller.  All such notices to Manager shall be delivered in accordance with the notice provisions set forth in Section 18.01 of the Management Agreement, or otherwise requested by Seller.

SECTION 19. <u>Liquor License(s)</u>.

(a)    Buyer agrees and acknowledges that (1) Seller, Operating Tenant and Manager are co-licensees on one or more liquor licenses which currently permits the sale and service of certain alcoholic beverages at the Hotel (collectively, the "<u>Liquor Licenses</u>"), (2) the Liquor Licenses are not transferable and are specifically excluded from the sale to Buyer pursuant to <u>Section 2(e)</u> hereof and (3) Buyer shall be solely responsible, at its sole cost and expense, to obtain Liquor License Approval on or before the Closing Date.  In connection therewith, Buyer hereby agrees, at Buyer's sole cost and expense, to (i) prepare and file an application for an endorsement to the Liquor Licenses removing Seller and Operating Tenant and replacing Seller with Buyer (or at Buyer's option, (1) substituting Buyer for Seller and (2) substituting Buyer's Operating Tenant for Operating Tenant) (such application, together with any application for a new license as described in <u>clause (iii)</u> below, the "<u>Liquor License Application</u>") no later than October 14, 2016 (the "<u>Liquor License Application Submittal Deadline</u>") and deliver to the Liquor License Authority, together with the Liquor License Application, all other documents and information as the Liquor License Authority may reasonably require or request in connection with such Liquor License Application, (ii) use good faith efforts to promptly pursue the Liquor License Application and obtain Liquor License Approval on or before the Closing Date, (iii) correct and re-submit any deficiencies noted by the

Liquor License Authority in connection with Buyer's Liquor License Application promptly after notification from the Liquor License Authority of such deficiency (including preparing and filing a 30-day notice to the local community board and with Manager an application with the Liquor License Authority for new licenses to serve alcoholic beverages at the Hotel, together with an application for a liquidator's permit for the sale of any existing inventory of alcoholic beverages to Buyer if the Liquor License Authority advises Seller and/or Buyer that Buyer is not eligible for an endorsement of the Liquor Licenses as described above) and (iv) keep Seller reasonably informed with respect to its progress in connection with its pursuit of Liquor License Application and Liquor License Approval, including providing Seller with a copy of any correspondence from the Liquor License Authority with respect to the Liquor License Application and/or Liquor License Approval no later than three (3) Business Days after receipt of such correspondence. Seller agrees (and agrees to cause Operating Tenant) to reasonably cooperate and use good faith efforts to assist Buyer (provided that Seller shall have no obligation to incur any expense other than the fees of its own attorneys') in connection with the Buyer's pursuit of Liquor License Application and Liquor License Approval, including, upon the written request of Buyer, deliver a notice to Manager requesting Manager's assistance with the Liquor License Approval; provided, however, (without limiting Buyer's rights under Section 19(c)) in no event shall the failure of Manager to assist or comply with such request give Buyer a right to terminate this Agreement or extend the Closing Date or result in a reduction in the Purchase Price.

(b)      Seller makes no representation or warranty hereunder with respect to the Liquor License or as to whether Buyer will be able to obtain Liquor License Approval.

(c)      Buyer shall have the right to adjourn the Scheduled Closing Date in connection with obtaining the conditional Liquor License Approval in the following manner:

(i)      If (A) Buyer has not received the conditional Liquor License Approval by January 24, 2017, (B) Buyer is pursuing in good faith and with reasonable diligence the Liquor License Application and Liquor License Approval pursuant to this Section 19 and is in compliance with its obligations under this Section 19 (including the submission of the Liquor License Application on or before the Liquor License Application Submittal Deadline), (C) Buyer is not in material breach or default of any provision of this Agreement, (D) Buyer delivers to Seller a written notice of adjournment (the "First Liquor License Extension Notice") by January 24, 2017 confirming the facts in the preceding clauses (A), (B) and (C), then Buyer shall have the one-time right to adjourn the Closing Date to April 3, 2017 in order to provide additional time for Buyer to obtain the conditional Liquor License Approval in accordance with this Section 19 (the "First Liquor License Extension Option").  For the avoidance of doubt, the First Liquor License Extension Option covers the same sixty (60) day period as the Existing Debt Assumption Extension Option and it is the intent of the parties hereto that if Buyer is entitled to exercise one or both of them, (y) they be exercised concurrently and (z) in no event shall the maximum number of days under the First Liquor License Extension Option and the Existing Debt Assumption Extension Option exceed sixty (60) days in the aggregate.

(ii)      If (A) Buyer exercises the First Liquor License Extension Option in accordance with Section 19(c)(i) and/or the Existing Debt Assumption Extension

64

Option in accordance with Section 20(h), (B) Buyer has not received the conditional Liquor License Approval by March 27, 2017, (C) Buyer is pursuing in good faith and with reasonable diligence the Liquor License Application and Liquor License Approval pursuant to this Section 19 and is in compliance with its obligations under this Section 19, (D) Buyer is not in material breach or default of any provision of this Agreement, (E) Buyer delivers to Seller a written notice of adjournment (the "Second Liquor License Extension Notice") by March 27, 2017 confirming the facts in the preceding clauses (A), (B), (C) and (D), and (F) concurrently with the delivery of the Second Liquor License Extension Notice, Buyer delivers the Second Liquor License Extension Deposit to Escrow Agent in accordance with Section 3(a)(iii) hereof, then Buyer shall have the one-time right to adjourn the Closing Date to May 3, 2017 in order to provide additional time for Buyer to obtain the conditional Liquor License Approval in accordance with this Section 19 (the "Second Liquor License Extension Option").

(iii)     If (A) Buyer exercises the Second Liquor License Extension Option in accordance with Section 19(c)(ii), (B) Buyer has not received the conditional Liquor License Approval by April 26, 2017, (C) Buyer is pursuing in good faith and with reasonable diligence the Liquor License Application and Liquor License Approval pursuant to this Section 19 and is in compliance with its obligations under this Section 19, (D) Buyer is not in material breach or default of any provision of this Agreement, (E) Buyer delivers to Seller a written notice of adjournment (the "Third Liquor License Extension Notice") by April 26, 2017 confirming the facts in the preceding clauses (A), (B), (C) and (D), and (F) concurrently with the delivery of the Third Liquor License Extension Notice, Buyer delivers the Third Liquor License Extension Deposit to Escrow Agent in accordance with Section 3(a)(iii) hereof, then Buyer shall have the one-time right to adjourn the Closing Date to June 2, 2017 in order to provide additional time for Buyer to obtain the conditional Liquor License Approval in accordance with this Section 19.

(iv)     Notwithstanding anything to the contrary contained in this Section 19(c), if Buyer exercises its right under this Section 19(c) to adjourn the Closing Date, and subsequently receives the conditional Liquor License Approval prior to the then scheduled Closing Date as so adjourned pursuant to this Section 19(c), then, subject to any other extension or adjournment right expressly given to Buyer or Seller under this Agreement (including the Existing Debt Assumption Extension Option pursuant to Section 20(h) hereof), the Closing Date shall be the date which is the earlier to occur of (1) ten (10) Business Days following the date on which the conditional Liquor License Approval is obtained and (2) the then scheduled-Closing Date as so adjourned pursuant to this Section 19(c).

(d)     Notwithstanding anything to the contrary contained in this Agreement, (i) obtaining the conditional Liquor License Approval on or prior to the Closing Date shall not be a condition to Buyer's obligation to consummate the transactions described herein, (ii) except as set forth in Section 19(c), Buyer shall have no right to extend the Closing Date on account of Buyer's failure to obtain the conditional Liquor License Approval on the Scheduled Closing Date and (iii) Buyer's failure to obtain conditional Liquor License Approval shall be a material default of Buyer's obligations hereunder and the provisions of Section 13(b) hereof shall apply,

provided, however, if Seller elects to terminate this Agreement pursuant to Section 13(b) hereof and Buyer is not otherwise in default or breach of any other provision of this Agreement, then Seller shall be entitled to retain the Initial Deposit and the Additional Deposit and, to the extent deposited with Escrow Agent, Buyer shall be entitled to a return of the Liquor License Extension Deposits.

(e)     Nothing contained herein shall limit Buyer's or Seller's obligations with respect to the Liquor License Renewal pursuant to Section 10(e) hereof.

(f)     This Section 19 shall survive the Closing.

SECTION 20. Existing Debt Assumption.

(a)     Buyer shall have the right to assume the Existing Debt at Closing pursuant to this Section 20.  If Buyer elects to assume the Existing Debt at Closing pursuant to this Section 20, then, at Closing, (i) the applicable Buyer's Existing Debt Assumption SPE Entity shall assume the Existing Debt, (ii) the Existing Debt Pledge Agreements shall be terminated and the Existing Debt Pledged Interests shall be returned to the applicable Existing Debt Borrower and (iii) the Existing Debt Guarantors shall be released from all liability under the Existing Debt Guarantees and all other Existing Debt Documents for acts, events, conditions, or circumstances occurring or arising from and after the Closing Date, except to the extent such acts, events conditions or circumstances are the proximate result of acts, events, conditions, or circumstances that existed prior to the Closing Date, pursuant to release documents reasonably acceptable to Existing Debt Guarantors (collectively, the foregoing (i), (ii) and (iii) referred to herein as "Existing Debt Assumption  and Release").  On or prior to September 29, 2016, and provided that Buyer shall have not previously determined pursuant to Section 20(i) below that it will not pursue the Existing Debt Assumption and Release, Buyer shall identify one or more creditworthy Persons that satisfy the Minimum Financial Criteria and which (x) as of the Closing, will Control Buyer's Existing Debt Assumption SPE Entities and/or own a direct or indirect interest in Buyer's Existing Debt Assumption SPE Entities, which Buyer will offer to the Existing Debt Lenders to provide replacement guaranties and indemnities in accordance with clause (e)(ii) of Section 7.4 of each of the Existing Debt Loan Agreements as part of the Existing Debt Assumption and Release and (y) will not result in a violation of Section 11 hereof (the "New Loan Guarantor").

(b)     Buyer hereby acknowledges that it has reviewed the Existing Debt Loan Agreements and agrees to use good faith efforts to promptly satisfy all conditions that each of the Existing Debt Lender, any Servicer and/or the Rating Agencies (as defined in the Existing Debt Loan Agreements) may require in order to cause the Existing Debt Assumption and Release, including the conditions and requirements set forth in Section 7.4 of each of the Existing Debt Loan Agreements (collectively, the "Existing Debt Assumption Requirements").  Without limiting the foregoing, Buyer hereby agrees (i) to cooperate with all reasonable requests made by or on behalf of each of the Existing Debt Lenders, any Servicer and/or any Rating Agencies for information regarding Buyer, New Loan Guarantor and their respective direct and indirect owners (including providing all financial statements, organizational documents, background information regarding direct and indirect owners of Buyer and other information and documents reasonably requested by each of the Existing Debt Lenders, any Servicer and/or any Rating

Agencies and/or required to be provided under the Existing Debt Assumption Requirements), (ii) to execute (and to cause the Buyer's Existing Debt Assumption SPE Entities to execute) all documentation reasonably requested by the Existing Debt Lenders, any Servicer and/or the Rating Agencies and/or required to be executed under the Existing Debt Assumption Requirements, (iii) subject to Section 13(a), to pay all Existing Debt Fees, including the fees and expenses referred to in clauses (b)(ii) and (d) of Section 7.4 of each of the Existing Debt Loan Agreements and (iv) cause the New Loan Guarantor, or such other creditworthy Persons that satisfy the Minimum Financial Criteria and which, as of the Closing, will Control Buyer's Existing Debt Assumption SPE Entities and/or own a direct or indirect interest in Buyer's Existing Debt Assumption SPE Entities, not result in a violation of Section 11 hereof, and are otherwise acceptable to each of the Existing Debt Lenders and the Rating Agencies, to enter into replacement guaranties and indemnities in accordance with clause (e)(ii) of Section 7.4 of each of the Existing Debt Loan Agreements. Seller agrees (and agrees to cause Mezzanine Loan A Borrower and Mezzanine Loan B Borrower) to reasonably cooperate and use good faith efforts to assist Buyer (provided that Seller shall have no obligation to incur any expense other than the fees of its own attorneys') in connection with the Existing Debt Assumption and Release; provided, however, without limiting Section 10(s) hereof, Seller and Operating Tenant shall have no obligation to cause Manager to execute and deliver a new or replacement Subordination of Management Agreement (as such term is defined in the Senior Loan Agreement) and replacement Assignments of Management Agreement as such term is defined in the Mezzanine Loan A Loan Agreement and Mezzanine Loan B Loan Agreement) or any other document required to be signed by Manager pursuant to the Existing Debt Loan Agreements, and the failure of Manager to do so shall not give Buyer a right to adjourn the Closing or a right to terminate this Agreement.

(c)    Without limiting Buyer's obligations under Section 20(b) hereof, Buyer shall, at its sole cost and expense, on or before October 14, 2016 (the "Existing Debt Assumption Application Submittal Deadline") submit to Seller one or more complete applications required by each of the Existing Debt Lenders to obtain the Existing Debt Assumption and Release, together with all documents and information required in connection therewith (collectively, the "Existing Debt Assumption Application"). As part of the Existing Debt Assumption Application, Buyer shall prepare and deliver to Seller on or before the Existing Debt Assumption Application Submittal Deadline a written notice setting forth the terms of the transfer of the Property to Buyer pursuant to this Agreement (the "Existing Debt Assumption Notice"), together with (x) all such information concerning the transfer, Buyer and the New Loan Guarantor as each of the Existing Debt Lenders shall reasonably require in evaluating an initial extension of credit, which information shall include a fully executed copy of this Agreement and all amendments and assignments thereto, as well as the sources and uses of funds or closing or settlement statement relating to the transfer to the extent available to Buyer and (y) a payment of a non-refundable processing fee in the amount of $25,000 for each of the Existing Debt Lenders. Upon Seller's receipt of (i) the Existing Debt Assumption Application (including the Existing Debt Assumption Notice) and all information submitted therewith in accordance with this Section 20(c) and (ii) the $25,000 processing fee to each of the Existing Debt Lenders, Seller shall submit same to the applicable Existing Debt Lender. Buyer acknowledges and agrees that Buyer is solely responsible for the preparation of the Existing Debt Assumption Application (including the Existing Debt Assumption Notice), the collection of all materials, documents, certificates, financial statements, signatures, and other items required to be submitted in connection with the

Existing Debt Assumption Application, other than any required information regarding the Property or the Seller that the Existing Debt Lenders reasonably require Seller to provide.

(d)  Buyer shall (and shall cause any New Loan Guarantor to) use its good faith efforts to promptly satisfy and comply with the Existing Debt Assumption Requirements and any and all other assumption guidelines of an Existing Debt Lender in connection with the Existing Debt Assumption and Release; provided that such requirements are consistent with the terms of the Existing Loan Documents or are otherwise customary and reasonable for assumptions of similar loans.  Buyer shall be responsible, at its sole cost and expense, for correcting and re-submitting any deficiencies noted by Seller, any of the Existing Debt Lenders or Servicer in connection with the Existing Debt Assumption Application (including the Existing Debt Assumption Notice) no later than three (3) Business Days after notification from such Existing Debt Lender or Servicer of such deficiency.  Buyer shall provide Seller with a copy of any correspondence from any of the Existing Debt Lenders or Servicer with respect to the Existing Debt Assumption Application, the Existing Debt Lenders Assumption Approval and/or the Existing Debt Assumption and Release no later than three (3) Business Days after receipt of such correspondence from such Existing Debt Lender or Servicer.  Buyer agrees promptly to (and shall cause any New Loan Guarantor promptly to) deliver to each of the Existing Debt Lenders all documents and information required by the Existing Debt Documents, and such other information or documentation as any of the Existing Debt Lenders or Servicer may reasonably request, including financial statements, income tax returns and other financial information for Buyer and any New Loan Guarantor.

(e)  Subject to Section 13(a), Buyer shall pay all Existing Debt Fees when due, whether before, at or after the Closing and whether or not the Closing occurs, imposed or charged by any of the Existing Debt Lenders, Servicer, the Rating Agencies and their respective counsel in connection with the Existing Debt Assumption Application and the Existing Debt Assumption and Release, and Seller shall have no obligation to pay any Existing Debt Fees.

(f)  If the Existing Debt Assumption and Release occurs at Closing pursuant to this Section 20, at Closing, Buyer shall be responsible for (i) replacing (and increasing to the extent required by any of the Existing Debt Lenders) all reserves, impounds and other accounts required to be maintained in connection with the Existing Debt, to the extent such existing reserves, impounds and other accounts are not assigned to Buyer and (ii) funding any additional reserves, impounds or accounts required by the Existing Debt Lenders in connection with the Existing Debt.

(g)  Notwithstanding anything to the contrary contained in this Agreement (but without limiting Section 10(o) of this Agreement), (i) neither obtaining the Existing Debt Lenders Assumption Approval, nor the occurrence of the Existing Debt Assumption and Release on the Closing Date, shall be a condition to Buyer's obligation to consummate the transactions described herein and (ii) except as expressly provided in subsection (h) of this Section 20 below, Buyer shall have no right to extend the Closing Date on account of Buyer's failure to obtain the Existing Debt Lenders Assumption Approval or the failure of the Existing Debt Assumption and Release to occur on the Closing Date.

(h)      If (1) Buyer has not delivered the Existing Debt Payoff Notice, (2) Buyer has not received the Existing Debt Lenders Assumption Approval (including Existing Debt Lenders' approval of the New Loan Guarantor as an Approved Replacement Guarantor (as such term is defined in the Existing Debt Documents) by January 24, 2017, (3) Buyer is pursuing in good faith and with reasonable diligence the Existing Debt Assumption Application and Existing Debt Assumption and Release and is in compliance with its obligations under this Section 20 (including the submission of the Existing Debt Assumption Application on or before the Existing Debt Assumption Application Submittal Deadline), (4) Buyer is not in material breach or default of any provision of this Agreement and (5) Buyer delivers to Seller a written notice of adjournment by January 24, 2017 confirming the facts in the preceding clauses (1), (2), (3) and (4), then Buyer shall have the one-time right to adjourn the Closing Date to April 3, 2017 solely in order to provide additional time for Buyer to obtain such approval (or, at Buyer's election, to arrange for alternative financing in lieu of the Existing Debt Assumption and Release) (the "Existing Debt Assumption Extension Option").   Notwithstanding the foregoing, if Buyer exercises its right under this Section 20(h) to adjourn the Closing Date, and subsequently receives the Existing Debt Lenders Assumption Approval (including Existing Debt Lenders' approval of the New Loan Guarantor), then, subject to any other extension or adjournment right expressly given to Buyer or Seller under this Agreement (including any extension right relating to the Liquor License Approval previously exercised pursuant to Section 19(c) hereof), the Closing Date shall be the date which is the earlier to occur of (i) ten (10) Business Days following the date on which the Existing Debt Lenders' Assumption Approval is received (or if such day is not a Business Day, then the first Business Day thereafter) and (ii) April 3, 2017.  For the avoidance of doubt, the Existing Debt Assumption Extension Option covers the same sixty (60) day period as the First Liquor License Extension Option and it is the intent of the parties hereto that if Buyer is entitled to exercise one or both of them, (y) they be exercised concurrently and (z) in no event shall the maximum number of days under the First Liquor License Extension Option and the Existing Debt Assumption Extension Option exceed sixty (60) days in the aggregate.

(i)      Notwithstanding anything to the contrary contained in this Section 20, Buyer may elect not to pursue the Existing Debt Assumption and Release by written notice to Seller delivered at any time on or before November 7, 2016 (the "Existing Debt Payoff Notice"). If Buyer delivers an Existing Debt Payoff Notice, then, other than with respect to Seller's and Buyer's obligations under Section 20(e), Buyer and Seller shall not be bound by this Section 20 and none of the foregoing provisions in this Section 20 (other than Section 20(e)) shall apply, and the Existing Debt shall be paid off (or assigned under Section 5(g)) in full at Closing; provided, however, the delivery of the Existing Debt Payoff Notice and/or the payoff (or assignment under Section 5(g)) of the Existing Debt at Closing shall in no way (a) affect Buyer's obligations to close on the Closing Date, (b) give Buyer the right to extend the Closing Date on account thereof or (c) result in a reduction in the Purchase Price.

(j)      Survival.  The provisions of clauses (e) and (f) of this Section 20 shall survive the Closing or termination of this Agreement.

SECTION 21. Survival.  The delivery of the Deed by Seller shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed

hereunder, except those obligations of Seller and other matters that are expressly stated in this Agreement to survive the Closing.

SECTION 22. <u>Broker</u>.  Seller represents and warrants to Buyer that Seller has not engaged or dealt with any broker or finder in connection with this Agreement or the sale contemplated by this Agreement.  Buyer hereby represents and warrants to Seller that Buyer has not engaged or dealt with any broker or finder in connection with this Agreement or the sale contemplated by this Agreement.  If the foregoing representations by either party are untrue, the party whose representation is untrue shall indemnify the other party against all Claims, suffered by the indemnified party as a result of the failure of such representation to be true.  This <u>Section 22</u> shall survive the Closing or, if Closing does not occur, the termination of this Agreement.

SECTION 23. <u>Pre-Closing Tax Year Contests</u>.

(a)    <u>Tax Certiorari Proceedings</u>.  Seller and/or Operating Tenant may have filed or joined, and may hereafter file, applications for the reduction of the assessed valuation of the Property for tax years ending prior to the Closing Date, and may have caused or may hereafter cause tax certiorari proceedings to be instituted to review such assessed valuations. Each of Seller and/or Operating Tenant shall have the sole right to prosecute, compromise and/or settle such proceedings with counsel of its own choosing prior to and after the Closing Date, and Seller and/or Operating Tenant shall be entitled to one hundred percent (100%) of any refunds, abatements or credits awarded in any such proceedings or as a result of any compromise or settlement with respect thereto; it being agreed that Buyer shall have no interest in any such refunds, abatements or credits.

(b)    <u>Closing Tax Year Contests</u>.  Seller and/or Operating Tenant may have filed, and may hereafter file applications for the reduction of the assessed valuation of the Property with respect to the 2016/2017 tax years and may hereafter cause certiorari proceedings to be instituted to review such assessed valuations.  Each of Seller and/or Operating Tenant shall have the sole right to prosecute, compromise and/or settle such applicable proceedings with counsel of its own choosing prior to and after the Closing Date; <u>provided</u>, <u>however</u>, neither Seller nor Operating Tenant shall withdraw, compromise or settle such proceedings without Buyer's consent, which consent shall not be unreasonably withheld or delayed.  Any refunds, abatements or credits awarded in such proceedings (or any contest by Buyer as permitted below), or as a result of any compromise or settlement with respect thereto, shall be first used to reimburse Seller and/or Operating Tenant and/or Buyer for its out-of-pocket cost and expenses (including attorneys' fees) incurred in connection with such proceedings, compromise and/or settlement, and the remainder of such refunds, abatements and credits shall be prorated between Seller and Buyer as of the Cutoff Time.  Seller or Buyer shall promptly pay to the other the amount necessary to effect such proration.  If Buyer receives an abatement or credit for such tax years, Buyer shall promptly pay to Seller the amount necessary to effect such proration. Notwithstanding the foregoing, if (x) Buyer desires to contest any taxes for such taxable period and Seller has not commenced any proceeding to contest any such taxes for such taxable period, Buyer shall provide written notice to Seller that Buyer will contest such taxes, unless Seller elects to contest such taxes by written notice to Buyer within ten (10) days after such notice and (y) any refunds, abatements or credits awarded in connect with Buyer's contest of such taxes

shall be adjusted in the same manner as set forth in this Section 23(b). Seller and/or Operating Tenant shall provide such cooperation in connection therewith as Buyer shall reasonably require.

(c)    Cooperation.    Buyer shall reasonably cooperate with Seller and/or Operating Tenant, and execute and deliver any documents and instruments reasonably requested by Seller and/or Operating Tenant in connection with any contest, audit or judicial or administrative proceeding relating to any tax certiorari contest referred to in Section 23(a) or (b) hereof.

(d)    Survival.    This Section 23 shall survive the Closing.

SECTION 24. Date for Performance; Time of the Essence.    Any reference in this Agreement to a period of days that does not expressly refer to Business Days is a reference to a period measured in calendar days.  If the time period by which any right, option or election provided under this Agreement must be exercised, or by which any act required hereunder must be performed, or by which the Closing must be held, expires on a Saturday, Sunday or any other day that is not a Business Day, then such time period will be automatically extended through the close of business on the next following Business Day.  **SUBJECT TO ANY APPLICABLE CURE OR ADJOURNMENT RIGHTS EXPRESSLY PROVIDED FOR HEREIN, TIME SHALL BE OF THE ESSENCE WITH RESPECT TO ALL DATES, TIMES AND TIME PERIODS PROVIDED IN THIS AGREEMENT, WHETHER SUCH TIME PERIODS ARE PRIOR TO, ON, AT OR AFTER THE CLOSING.**  This Section 24 shall survive the Closing.

SECTION 25. Severability.    In the event any provision or portion of this Agreement is held by any court of competent jurisdiction to be invalid or unenforceable, such holding will not affect the remainder hereof, and the remaining provisions shall continue in full force and effect to the same extent as would have been the case had such invalid or unenforceable provision or portion never been a part of this Agreement.  This Section 25 shall survive the Closing.

SECTION 26. Successors and Assigns.    The terms "Seller" and "Buyer" as used in this Agreement shall include their respective successors and permitted assigns.

SECTION 27. Construction.

(a)    The use in this Agreement of the words "herein", "hereunder", "hereinabove", "hereinafter", and words of similar import shall be deemed to refer to this entire Agreement, unless expressly stated to the contrary.  The use in this Agreement of the words "such as" "include", "including" and words of similar import shall be construed as if followed by the phrase "without limitation" and shall not be deemed to limit the generality of the term or clause to which it has reference, whether or not non-limiting language is used.

(b)    This Agreement shall not be interpreted or construed more strictly against one party or the other merely by virtue of the fact that it was drafted by counsel to Seller or Buyer, it being hereby acknowledged and agreed that Seller and Buyer have both contributed materially and substantially to the negotiations and drafting of this Agreement.

(c)    Any pronoun referring to Seller, Buyer or a third party shall be read in such number and gender as the context may require.

SECTION 28. <u>Entire Agreement</u>.    This Agreement constitutes the entire agreement between Seller and Buyer relating to the Property and supersedes and cancels all prior agreements, letters of intent, expressions of interest and understandings, whether oral or written, relating to the subject matter hereof (including the Confidentiality Agreement), except as specifically agreed in writing to the contrary, and shall become a binding and enforceable agreement between Seller and Buyer upon the execution and delivery of this Agreement by all parties hereto.

SECTION 29. <u>Amendment</u>.  No amendment of or modification to this Agreement of any kind whatsoever shall be made or claimed by Seller or Buyer, and no notice of any extension (except as provided herein), change, modification or amendment made or claimed by Seller or Buyer shall have any force or be of any effect whatsoever, unless the same is in writing and signed by the party against whom enforcement is sought.

SECTION 30. <u>Applicable Law</u>.    This Agreement, and all questions of interpretation hereof and all controversies hereunder shall be construed in accordance with and governed by the laws of the State of New York (without reference to principles of conflict of laws).

SECTION 31. <u>Relationship of the Parties</u>. The relationship between Seller and Buyer is entirely at arms'-length, and nothing contained in this Agreement shall be construed or interpreted as creating a partnership or joint venture between Seller and Buyer.  The parties hereto acknowledge and agree that this Agreement and the terms hereof shall not serve in any way to amend, modify or limit any of the rights and/or duties (fiduciary or otherwise) of Andre Balazs, any of his Affiliates or any other Affiliates of the Buyer in their capacities as a direct or indirect investor in Seller and/or Manager or as an officer or director of Manager or any Affiliate of Manager.  In addition, and notwithstanding anything to the contrary set forth in this Agreement, Seller hereby agrees on its own behalf, and on behalf of it direct and indirect owners and subsidiaries, that neither Andre Balazs, any of his Affiliates nor any other Affiliates of the Buyer, in their capacities as a direct or indirect investor in Seller and/or Manager or as an officer or director of Manager or any Affiliate of Manager, shall be liable to Seller or such owners or subsidiaries for any acts taken by Buyer in accordance with its rights, duties or obligations under this Agreement, except as otherwise provided in <u>Section 10(e)</u> hereof.    Further, and notwithstanding anything to the contrary set forth in this Agreement, Buyer hereby agrees on its own behalf, and on behalf of its Affiliates, that none of Seller, Operating Tenant, Greenfield Hotels PL, LLC, Greenfield Hotels, LLC, Dune Real Estate Fund LP, Dune Real Estate Parallel Fund LP, Buck 13th Street LLC or any of their respective Affiliates, shall be liable to Buyer or any of Buyer's Affiliates for any acts taken by Seller or Operating Tenant in accordance with its rights, duties or obligations under this Agreement.  Notwithstanding the foregoing, nothing contained herein shall (x) in any way limit Seller's rights and remedies under <u>Section 13(b)</u> against Buyer in connection with any breach or default by Buyer under this Agreement or Seller's rights against Buyer or Buyer's Affiliates by reason of any indemnity obligations of Buyer to Seller under <u>Section 10(e)</u> hereof or (y) in any way limit Buyer's rights and remedies

under <u>Section 13(a)</u> against Seller in connection with any breach or default by Seller under this Agreement.

SECTION 32. <u>Incorporation by Reference; References</u>.   All documents, instruments, schedules and other matters attached to this Agreement as exhibits and schedules and referred to in the text of this Agreement are specifically made a part of this Agreement and incorporated herein by reference.  All references in this Agreement to sections, schedules and exhibits are to the sections, schedules and exhibits of and to this Agreement unless otherwise expressly noted.

SECTION 33. <u>Captions</u>.   Captions are used in this Agreement solely for convenience of reference and shall neither be considered a part of this Agreement nor affect the construction to be given any of its provisions.

SECTION 34. <u>Counterparts</u>.  This Agreement or its signature pages may be executed in any number of original counterparts, all of which evidence only one agreement and only one full and complete copy of which need be produced for any purpose.  A "PDF" or other electronic image of a signature will have the same legal effect for the purpose of establishing the execution of this Agreement as an originally drawn signature.

SECTION 35. <u>Waiver of Trial By Jury; Venue and Jurisdiction; Litigation Costs</u>.

(a)     SELLER AND BUYER HEREBY EXPRESSLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY CLAIM, ACTION, PROCEEDING OR COUNTERCLAIM BY SELLER OR BUYER AGAINST EACH OTHER ON ANY MATTERS ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

(b)     Each of Seller and Buyer hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of and agrees that venue shall be proper in any New York State or Federal Court sitting in New York County, New York, in any action or proceeding arising out of or relating to or connected with this Agreement, or for recognition or enforcement of any judgment.  Each of Seller and Buyer hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding shall be heard and determined in such courts.  Each of Seller and Buyer agrees that a final judgment in any such action or proceeding will be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ANY PARTY ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY NEW YORK STATE OR FEDERAL COURT SITTING IN NEW YORK COUNTY, NEW YORK, AND EACH PARTY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO (1) THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING AND (2) THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING (INCLUDING ANY OBJECTION OF OR RELATING TO FORUM NON-CONVENIENS).

(c)     In the event that any litigation or any other action to enforce the provisions of this Agreement, the substantially prevailing party in such litigation or such action shall be

entitled to be reimbursed by the other party for the substantially prevailing party's reasonable out-of-pocket costs and expenses (including reasonable counsel fees and court costs). Buyer shall be obligated to pay all reasonable out-of-pocket costs and expenses (including reasonable counsel fees and court costs) of Seller in connection with a bankruptcy, receivership, or similar judicial proceeding involving Buyer in which Seller is compelled to take any action to protect its interest in this Agreement.

(d)     Notwithstanding anything set forth to the contrary herein, neither Seller nor Buyer shall be liable to the other for consequential, special, indirect or punitive damages.

(e)     The provisions of this <u>Section 35</u> shall survive the Closing or any termination of this Agreement.

SECTION 36. <u>Confidentiality</u>.  Buyer shall (and shall cause its Affiliates and Buyer's Representatives to) keep all non-public information concerning the Property, Seller and this Agreement in confidence in accordance with the terms of the Confidentiality Agreement. Neither Seller nor Buyer shall release or permit to be released any press release or other similar communication relating to the transaction contemplated by this Agreement either before or after Closing without the prior written consent of the other party, such approval not to be unreasonably withheld.  The provisions of this <u>Section 36</u> shall survive the Closing or any termination of this Agreement.

SECTION 37. <u>No Third Party Beneficiary</u>.  The provisions of this Agreement and of the documents to be executed and delivered at the Closing are and will be for the benefit of Seller and Buyer, and their respective heirs, successors and permitted assigns, only and are not for the benefit of any third party (including Title Company), and accordingly no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at the Closing.

SECTION 38. <u>No Imputation to Seller of Acts/Knowledge of Manager/Enforcement of Management Agreement</u>.

(a)     Notwithstanding anything to the contrary in this Agreement, (i) no act (or failure to act) by Buyer, Buyer's Affiliates (including André Balazs and Balazs Investors LLC), Manager or Manager's Affiliates (regardless of whether or not permitted under the Management Agreement) shall be deemed to be the act (or failure to act) of Seller or Operating Tenant solely by reason of the fact that Buyer, Buyer's Affiliates (including André Balazs and Balazs Investors LLC), Manager and/or Manager's Affiliates took such action or failed to take such action (it being agreed, however, that, with respect to Manager and/or Manager's Affiliates, if Seller specifically directed Manager and/or Manager's Affiliates to take such act (or to so fail to act), then the same shall be deemed the act (or failure to act) of Seller), (ii) no notice received by Buyer, Buyer's Affiliates (including André Balazs and Balazs Investors LLC), Manager or Manager's Affiliates shall be deemed to have been received by Seller or Operating Tenant, unless and until actually received by Seller or Operating Tenant, (iii) no item in the possession or control of Buyer, Buyer's Affiliates (including André Balazs and Balazs Investors LLC), Manager or Manager's Affiliates shall be deemed to be in the possession or control of Seller or Operating Tenant solely by reason of Buyer, Buyer's Affiliates (including André Balazs and

Balazs Investors LLC), Manager or Manager's Affiliates' possession or control of such item, and (iv) no information or state of facts known to Buyer, Buyer's Affiliates (including André Balazs and Balazs Investors LLC), Manager or Manager's Affiliates or of which Buyer, Buyer's Affiliates (including André Balazs and Balazs Investors LLC), Manager or Manager's Affiliates is aware of shall be deemed to be known by Seller (or be deemed to be within Seller's Knowledge) solely by reason of Buyer, Buyer's Affiliates (including André Balazs and Balazs Investors LLC), Manager or Manager's Affiliates knowledge or awareness of such information or state of facts.

(b)     Notwithstanding anything to the contrary contained in this Agreement, but without limiting Section 10(s) hereof, Buyer hereby acknowledges and agrees that Seller and Operating Tenant shall have no obligation under this Agreement or otherwise to (i) cause Manager or Manager's Affiliates to act (or refrain from acting), regardless of whether or not Manager or Manager's Affiliates are obligated to act (or not act) under the Management Agreement or (ii) enforce (or refrain from enforcing) any of Seller or Operating Tenant's rights under the Management Agreement.   Further, Seller and Operating Tenant shall in no way be deemed to be in default or breach of any obligation under this Agreement, or have any liability to Buyer or any of Buyer's Affiliates, as a result of (x) any act (or failure to act) by Manager or Manager's Affiliates (regardless of whether or not permitted under the Management Agreement), any failure of the Seller or Operating Tenant to comply with the terms of Section 10 due to the failure or non-cooperation of Manager, unless Seller or Operating Tenant specifically direct Manager or Manager's Affiliates to take such act (or to so fail to act) in violation of the terms of this Agreement and (y) exercising or enforcing any of Seller's or Operating Tenant's rights or remedies against Manager under the Management Agreement, including, subject to Section 10(q) hereof, any termination of the Management Agreement in accordance with the terms thereof. Except as expressly permitted under Section 8(a), in no event shall it be a condition to Buyer's obligation to consummate the transactions described herein, nor shall Buyer have any right to terminate this Agreement, to extend the Closing Date or to a reduction in the Purchase Price, as a result of any disputes or litigation arising out of or relating to the Management Agreement  or, except as a result of a Seller's default under Section 10(q), as a result of the Management Agreement not being in full force and effect at the time of the Closing.

(c)     This Section 38 shall survive the Closing or any termination of this Agreement.

SECTION 39. Exculpation.

(a)     Notwithstanding anything to the contrary contained in this Agreement, no Seller Indemnified Parties shall have any personal obligation or liability hereunder, and Buyer shall not seek to assert any Claim or enforce any of Buyer's rights hereunder against any of the Seller Indemnified Parties.  Without limiting the generality of the foregoing provisions of this Section 39(a), Buyer hereby unconditionally and irrevocably waives any and all claims and causes of action of any nature whatsoever it may now or hereafter have against Seller Indemnified Parties, and hereby unconditionally and irrevocably releases and discharges Seller Indemnified Parties from any and all liability whatsoever which may now or hereafter accrue in favor of Buyer against Seller Indemnified Parties, in connection with or arising out of this Agreement or the transactions contemplated hereby.

(b)     Seller agrees that it does not have and will not have any claims or causes of action against any disclosed or undisclosed officer, director, employee, member, trustee, shareholder, partner, principal, parent, subsidiary or other affiliate of Buyer (collectively, "Buyer's Affiliates"), arising out of or in connection with this Agreement or the transactions contemplated hereby.  Without limiting the generality of the foregoing provisions of this Section 39(b), Seller hereby unconditionally and irrevocably waives any and all claims and causes of action of any nature whatsoever it may now or hereafter have against Buyer's Affiliates, and hereby unconditionally and irrevocably releases and discharges Buyer's Affiliates from any and all liability whatsoever which may now or hereafter accrue in favor of Seller against Buyer's Affiliates, in connection with or arising out of this Agreement or the transactions contemplated hereby.

(c)     This Section 39 shall survive the Closing or any termination of this Agreement.

SECTION 40. No Recordation.  No party shall record this Agreement or any memorandum, notice or affidavit hereof, or any other similar document.  Should Buyer ever record or attempt to record this Agreement or a memorandum, notice or affidavit hereof, or any other similar document, then notwithstanding anything herein to the contrary, the recordation or attempt at recordation shall constitute a default by Buyer and, in addition to the other remedies provided for in this Agreement and under applicable law, Seller shall have the express right to terminate this Agreement by filing a notice of termination in any office in which the memorandum, notice, affidavit, or other document was recorded.  This Section 40 shall survive the Closing or any termination of this Agreement.

SECTION 41. Further Assurances.  From the Effective Date until the Closing or termination of this Agreement, subject to the terms of this Agreement, Seller and Buyer agree that they will each take such steps and execute such documents as may be reasonably required by the other party or parties to carry out the intent and purpose of this Agreement.  After the Closing, Seller and Buyer shall use commercially reasonable efforts (at no cost or expense to such party, other than any de minimis cost or expense or any cost or expense which the requesting party agrees in writing to reimburse) to do the following: (a) execute, acknowledge and deliver any and all additional papers, documents and other assurances which are consistent with the terms of this Agreement and reasonably requested by the other party, (b) perform any and all acts and things reasonably necessary in connection with the performance of its obligations hereunder to carry out the intent of the parties hereto and (c) address any reasonable requests either may have in connection with any legal requirement, tax audit, tax return or other reporting obligations. This Section 41 shall survive the Closing.

SECTION 42. Waiver.  The failure to enforce any particular provision of this Agreement on any particular occasion shall not be deemed a waiver by any party of any of its rights hereunder, nor shall it be deemed to be a waiver of subsequent or continuing breaches of that provision, unless such waiver be expressed in a writing signed by the party to be bound.

SECTION 43. Bulk Sales.  Seller and Buyer hereby waive compliance with the bulk sales or similar laws of the State of New York and any other relevant jurisdiction, including the Bulk Sales notice requirements under the tax laws of each such jurisdiction.  Nothing

contained in this Section 43 shall prohibit Buyer from notifying the State of New York Department of Taxation and Finance (the "Tax Department") of a pending bulk sale by filing Form AU-196.10 (Notification of Sale, Transfer, or Assignment in Bulk) so long as such filing is submitted to the Tax Department no earlier than two (2) days prior to the Closing Date; provided, however, Buyer hereby acknowledges and agrees that (i) the Closing shall not be extended or adjourned because of such filing or as a result of the Tax Department's response to, or failure to respond to, Buyer's notice and (ii) except as otherwise provided in Section 14(e), no portion of the Purchase Price shall be withheld, deducted, held back or held in escrow as a result of Buyer providing such notice. Seller agrees to indemnify Buyer for any New York State sales tax liability relating to the operations of the Hotel for the period up to the Cutoff Time. This Section 43 shall survive the Closing.

SECTION 44. Employees Seller and Buyer hereby agree as follows:

(a)      General. Buyer and Seller will, and will advise Manager to, comply with the NYC Displaced Building Service Workers Protection Act (Section 22-505 of the NYC Administrative Code) with respect to the Hotel Employees covered thereunder. Any liability for payment of any and all wages, salaries and benefits, including accrued vacation pay, sick leave, bonuses, COBRA rights, and other benefits accrued or earned by and due to Hotel Employees, together with F.I.C.A., unemployment and other taxes and benefits due with respect to such Hotel Employees, shall be prorated as of the Cutoff Time. Buyer and Seller agree that they will prepare and file all of the tax returns and related documents, and take all relevant actions relating to payroll withholding and reporting with respect to the Hotel Employees in accordance with the so-called "Alternative Procedure" of Revenue Procedure 2004-53, 2004-2 C.B. 320 (Aug. 18, 2004).

(b)      Seller Employee Matters.

(i)      Subject to the terms of the Management Agreement, Section 38 and Section 44(b)(iii), Seller or Manager shall be solely responsible and liable for any and all unlawful labor and employment acts or practices, severance, notice or termination pay and any liabilities to the extent the same arise from employment actions occurring prior to the Cutoff Time, and Seller agrees to indemnify Buyer and Buyer's Affiliates with respect to any Claims suffered or otherwise incurred by Buyer in connection with any such conduct, including any failure to comply with the Federal WARN Act and/or the NYS WARN Act prior to the Cutoff Time.

(ii)      After the Cutoff Time, neither Seller nor Operating Tenant shall be responsible for (and shall have no liability for) any severance obligations with respect to any Hotel Employees terminated by Manager (or any of Manager's Affiliates) or Buyer (or any of Buyer's Affiliates).

(iii)      Notwithstanding anything to the contrary contained in Section 44(b)(i), neither Seller nor Operating Tenant shall be responsible or liable for, and neither Seller or Operating Tenant have any obligation to indemnify Buyer or Buyer's Affiliates pursuant to this Section 44(b) in connection with any of the following: (1) any action or inaction of Manager or Manager's Affiliates outside of the ordinary course of business

(unless Seller or Operating Tenant specifically direct Manager or Manager's Affiliates to take such act or inaction in violation of the terms of this Agreement), (2) any matter that Buyer or any of Buyer's Affiliates is aware of as of the Effective Date, (3) any matter caused by Buyer or its Affiliate with the intent to hinder or interfere with the Closing or the ordinary course of business at the Property and (4) any matter that would otherwise be the responsibility or liability of Buyer or Buyer's Affiliates or Manager or Manager's Affiliates under Section 44(c) but for the intentional action of Buyer or its Affiliate.

(c)    Buyer Employee Matters.

(i)    Buyer shall use commercially reasonable efforts to continue to employ or cause Manager (or its Affiliates) to continue to employ a sufficient number of employees of Manager (or its Affiliates) at the Hotel on substantially the same terms as the terms of employment applicable to the employees as of the Closing Date to ensure that the sale transaction contemplated by this Agreement does not trigger any notice or other requirements of the Federal WARN Act and the NYS WARN Act. Nothing contained in this Section 44(c) shall restrict the Buyer from taking any action after the Closing with respect to the Hotel Employees to the extent such action would not result in either (x) a violation of the Federal WARN Act or the NYS WARN Act or (y) in any liability to Seller, Operating Tenant and/or the Seller Indemnified Parties.

(ii)    Buyer or Manager (but not Seller or Operating Tenant) shall be solely responsible and liable for any and all unlawful labor and employment acts or practices, severance, notice or termination pay and any liabilities to the extent the same arise from employment actions occurring after the Cutoff Time.

(iii)    Prior to the Cutoff Time, Buyer shall not be responsible for (and shall have no liability for) any severance obligations with respect to any Hotel Employees terminated by Manager (or any of Manager's Affiliates).

(iv)    Buyer shall indemnify Seller, Operating Tenant and Seller Indemnified Parties with respect to any Claims suffered or otherwise incurred by Seller, Operating Tenant and/or the Seller Indemnified Parties with respect to any failure by Buyer or any of its Affiliates, or Manager or any of its Affiliates to (x) comply with the provisions of this Section 44(c), including any failure to comply with the Federal WARN Act and/or the NYS WARN Act following the Closing and (y) to continue to employ or cause Manager (or its Affiliates) to continue to employ a sufficient number of employees of Manager (or its Affiliates) at the Hotel on substantially the same terms as the terms of employment applicable to the employees as of the Closing Date to ensure that the sale transaction contemplated by this Agreement does not trigger any notice or other requirements of the Federal WARN Act and the NYS WARN Act.

(d)    Survival. This Section 44 shall survive the Closing.

SECTION 45. 1031 Exchange. Seller acknowledges that Buyer may wish to consummate one or more tax-deferred exchanges pursuant to Internal Revenue Code Section 1031 rules and regulations, at no out-of-pocket cost, expense or liability to Seller, including,

without limitation, one (1) or more reverse exchange transactions; provided, however, Buyer shall only have the right to consummate such exchange under Internal Revenue Code Section 1031 if such exchange is permitted under and consummated in compliance with the Management Agreement and Existing Debt Documents (if the Existing Debt Assumption and Release occurs at Closing pursuant to Section 20 hereof).  In furtherance of the foregoing, Seller hereby agrees to reasonably cooperate with Buyer, at Buyer's sole expense, to accommodate such an exchange, provided that (i) Seller shall incur no liabilities or costs or expenses in connection with Buyer's exchange (other than de minimis costs and expenses incurred by Seller to review the customary exchange documents), (ii) the Closing Date shall not be delayed or adjourned by reason of any exchange, nor shall the consummation or accomplishment of any exchange be a condition precedent or condition subsequent to Buyer's obligations under this Agreement; (iii) Seller shall not be required to acquire or hold title to any real property for purposes of consummating any such exchange; (iv) Seller shall not be required to take an assignment of the purchase agreement for the replacement property; (v) Buyer shall pay any additional costs that would not otherwise have been incurred by Seller had the Buyer not consummated the sale through an exchange under Internal Revenue Code Section 1031 (other than de minimis costs and expenses incurred by Seller to review the customary exchange documents); and (vi) no such assignment or substitution by Buyer shall release Buyer from any of its acknowledgements, representations, warranties, indemnification obligations or liabilities under this Agreement.  Buyer shall fully indemnify, defend and hold the Seller and Seller's Indemnified Parties harmless from all liabilities, costs, losses, damages,  claims, proceedings, causes of action  and expenses (including reasonable attorneys' fees, expenses, and disbursements) of any kind or nature whatsoever arising out of, connected with, or in any manner related to such exchange, and such obligation shall survive the Closing (other than any de minimis costs and expenses incurred by Seller to review the customary exchange documents).  Seller shall not by this Agreement or acquiescence to any exchange (a) have its rights under this Agreement affected or diminished in any manner or (b) be responsible for compliance with, or be deemed to have warranted to Buyer that such exchange in fact complies with, Internal Revenue Code Section 1031.  Buyer agrees that if Buyer wishes to make such election, it must do so at least five (5) Business Days prior to the Closing Date.  The provisions of this Section 45 shall survive Closing.

SECTION 46. Alternative Structure.

(a)     Buyer has requested and Seller has agreed that if Buyer shall have delivered written notice (the "Alternative Structure Notice") to Seller at least thirty (30) days prior to the then scheduled Closing Date requesting that concurrently with the consummation of the Closing, then the Alternative Structure (as defined below) shall be implemented in accordance with this Section 46 so long as (i) Buyer in not in default under this Agreement and (ii) if the Existing Debt Assumption and Release is occurring at Closing, each of the Existing Debt Lenders have delivered an Alternative Structure Confirmation at least ten (10) Business Days prior to Closing.

(b)     In the event that Buyer delivers an Alternative Structure Notice in accordance with Section 46(a), Seller agrees to reasonably cooperate with Buyer to implement the following structure concurrently with the Closing (the "Alternative Structure"):

(i)        Seller shall distribute 100% of its beneficial ownership interest in the Owner's Property (the "Beneficial Interest") to New York Standard Mezz I LLC, which, in turn, shall immediately distribute the Beneficial Interest to New York Standard Mezz II LLC, which, in turn, shall immediately distribute the Beneficial Interest to Owner JV, which in turn shall immediately distribute an undivided interest in the Beneficial Interest to the Owner JV Interest Holders pro rata in accordance with the relative interest distributable to each Owner JV Interest Holder pursuant to the distribution waterfall provisions of the operating agreement of Owner JV; and, furthermore, ABG Member shall immediately distribute the undivided interest in the Beneficial Interest it receives to AB Green, and which, in turn, shall immediately distribute the undivided interest in the Beneficial Interest it receives to each of the AB Green Interest Holders pro rata in accordance with the relative interest distributable to each AB Green Interest Holder pursuant to the distribution waterfall provisions of the operating agreement of AB Green (collectively, the "Owner Distribution"; each Person that receives all or a portion of the Beneficial Interests as a result of the Owner Distribution being a "Beneficial Owner"), such that each Beneficial Owner ultimately will receive its applicable undivided interest in the  Beneficial Interest.

(ii)       Immediately following the Owner Distribution, each Beneficial Owner that ultimately receives an undivided interest in the Beneficial Interest (other than (a) Buck, unless Buck agrees in writing and (b) Buyer) will sell its respective undivided interest in the Beneficial Interest to Buyer at Closing (in each case for consideration equal to the product of (x) the Purchase Price allocable to Owner's Property times (y) such Beneficial Owner's percentage of the undivided interests in the Beneficial Interest (collectively, the "Owner Disposition").

(iii)      Notwithstanding the consummation of the Owner Distribution and Owner Disposition,  (A) Buyer and each other Beneficial Owner that ultimately receives an undivided interest in the Beneficial Interest (other than Buck, unless Buck agrees in writing) shall direct Seller to (y) directly convey the Owner's Property to Buyer pursuant to the Deed and the other conveyance documents contemplated in this Agreement, including Section 9 and (z) execute and deliver at Closing one or more instruments or documents reasonably necessary or advisable to evidence and carry out the Alternative Structure and (B) Operating Tenant shall directly convey all of the Operating Tenant Owned Property (including, subject to the Management Agreement being in full force and effect at Closing, the Management Agreement) to Buyer or, if so directed by Buyer in writing at least ten (10) Business Days prior to the Closing, to Buyer's Operating Tenant.  In no event shall any instruments or documents executed and deliver for the purposes of evidencing and carrying out the Alternative Structure add or increase any obligations, liabilities, costs or expenses of Seller, Operating Tenant or any Beneficial Owner (other than Buyer or any Affiliate thereof) that ultimately received an interest in the Beneficial Interest or decrease any rights or benefits afforded Seller, Operating Tenant or any Beneficial Owner that ultimately received an interest in the Beneficial Interest under this Agreement or otherwise.

(iv)      Notwithstanding Seller's agreement to cooperate with Buyer in connection with implementing the Alternative Structure, Buyer hereby acknowledges and agrees that:

       a.     Seller shall have no obligation to cause Buck to agree to the Alternative Structure or to cause Buck to execute any documents or take any action in connection therewith, and that the failure of Buck to so agree, to execute any document or take any such actions shall in no way (a) affect Buyer's obligations to close on the Closing Date, (b) give Buyer the right to extend the Closing Date on account thereof or (c) result in a reduction in the Purchase Price;

    b.  Buyer has requested that Seller agree to implement the Alternative Structure as an accommodation to Buyer, and that Seller has agreed to reasonably cooperate with Buyer so long as (x) Buyer complies with the terms of this Section 46, (y) Seller, Operating Tenant and any Beneficial Owner (other than Buyer and its Affiliates) shall incur no obligations, liabilities, costs or expenses in connection with the Alternative Structure (including any additional taxes, interest, penalties or attorneys' fees)  and (z) the Closing Date shall not be delayed or adjourned by reason of the implementation of the Alternative Structure, nor shall the consummation or accomplishment of the Alternative Structure be a condition to Buyer's obligations under this Agreement.  Further, Seller shall not by this Agreement or acquiescence to any Alternative Structure (1) have its rights under this Agreement affected or diminished in any manner or (2) be deemed to have represented or warranted to Buyer that the Alternative Structure or the implementation thereof complies with any provisions of the IRC or other applicable law, or that the implementation of the Alternative Structure achieves any specific tax treatment, result or consequence.  Notwithstanding anything to the contrary contained herein, if (A) Buyer fails to comply with the terms of this Section 46 or (B) if there is a change in law or circumstance that Seller reasonably determines in good faith would reasonably be likely to result in the Alternative Structure adversely affecting or diminishing in any non- de minimis manner Seller's rights under this Agreement or in Seller, Operating Tenant and any Beneficial Owner (other than Buyer and its Affiliates) incurring non-de minimis obligations, liabilities, costs or expenses in connection with the Alternative Structure, then, in either case, (I) Seller shall no longer be required to cooperate with Buyer hereunder or accommodate the Alternative Structure, (II) this Section 46 shall no longer apply and shall be deemed null and void and (III) Seller's failure to cooperate with or accommodate  the Alternative Structure shall in no way affect Buyer's obligations to close on the Closing Date, give Buyer the right to extend the Closing Date on account thereof or result in a reduction in the Purchase Price and Buyer shall be required to consummate the purchase of the

Property in accordance with this Agreement as if this <u>Section 46</u> was never a part of this Agreement.

c.     Buyer shall fully indemnify, defend and hold Seller, Seller's Indemnified Parties and each Beneficial Owner harmless from all Claims and any and all losses of any kind or nature whatsoever arising out of, connected with, or in any manner related to the Alternative Structure or the implementation thereof, including any additional taxes, interest, penalties and attorney fees, and any Claim made, asserted or brought by Buck or any Affiliate of Buck, Manager or any Affiliate of Manager, or the U.S. Internal Revenue Service or any state or local authority (including as a result of an audit) arising out of, related to or resulting in any way from the Alternative Structure or the implementation thereof.

(c)     In the event the Alternative Structure is implemented in accordance with <u>Section 46</u>, all Beneficial Owners agree to report the transactions contemplated by this Agreement in accordance with the Alternative Structure for U.S. federal, state and local income tax and New York State and City sales tax purposes, but not for any other tax purposes (including any transfer tax purposes).

(d)     This <u>Section 46(b)(iv)</u> shall survive the Closing or earlier termination of this Agreement.

[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, Buyer and Seller have executed this Agreement as of the Effective Date.

Buyer:

HOTELSAB GREEN, LLC,
a Delaware limited liability company

By: _____

Name: Andre Balazs
Title President and CEO

[SIGNATURES CONTINUED ON FOLLOWING PAGES]

Seller:

**AB GREEN GANSEVOORT, LLC**, a Delaware limited liability company

By:  New York Standard Mezz I LLC, a Delaware limited liability company, its sole member

By:  New York Standard Mezz II LLC, a Delaware limited liability company, its sole member

By:  New York Standard Owner JV LLC, a Delaware limited liability company, its sole member

By:  AB Green Gansevoort Member, LLC, a Delaware limited liability company, its co-managing member

By:  AB Green, LLC, a Delaware limited liability company, its sole member

By:  Greenfield Hotels LLC, a Delaware limited liability company, its managing member

By: _____
Name: Barry P. Marcus
Title: Senior Vice President

By:  Greenfield Hotels PL LLC, a Delaware limited liability company, its managing member

By: _____
Name: Barry P. Marcus
Title: Senior Vice President

By:  Dune Real Estate Fund LP, a Delaware limited partnership, its co-managing member

By:  Dune Real Estate Partners LLC, its general partner

By: _____
Name:
Title:

By:  DREF Standard Real Estate Investment Trust, a Maryland real estate investment trust, its co-managing member

By: _____
Name:
Title:

[SIGNATURES CONTINUED ON FOLLOWING PAGES]

63666358

Seller:

**AB GREEN GANSEVOORT, LLC**, a Delaware limited liability company

By: New York Standard Mezz I LLC, a Delaware limited liability
company, its sole member

    By: New York Standard Mezz II LLC, a Delaware limited liability
company, its sole member

        By: New York Standard Owner JV LLC, a Delaware limited
liability company, its sole member

            By: AB Green Gansevoort Member, LLC, a Delaware
limited liability company, its co-managing member

                By: AB Green, LLC, a Delaware limited liability
company, its sole member

                    By: Greenfield Hotels LLC, a Delaware limited
liability company, its managing member

                        By: _____
Name: Barry P. Marcus
Title: Senior Vice President

                    By: Greenfield Hotels PL LLC, a Delaware
limited liability company, its managing
member

                        By: _____
Name: Barry P. Marcus
Title: Senior Vice President

        By: Dune Real Estate Fund LP, a Delaware limited
partnership, its co-managing member

            By: Dune Real Estate Partners LLC, its general
partner

                By: _____
Name: MICHAEL D. SHERMAN
Title: GENERAL COUNSEL

        By: DREF Standard Real Estate Investment Trust, a
Maryland real estate investment trust, its co-managing
member

            By: _____
Name: MICHAEL D. SHERMAN
Title: GENERAL COUNSEL

[SIGNATURES CONTINUED ON FOLLOWING PAGES]

63666358

The Operating Tenant is joining in the execution of this Agreement solely for the purpose set forth in <u>Section 2(d)</u>, the representations relating to Operating Tenant set forth in <u>Section 14(a)</u> of this Agreement and the covenants of Operating Tenant set forth in <u>Section 10</u> of this Agreement.

<u>Operating Tenant:</u>

**ABG STANDARD OPERATOR, LLC,** a Delaware limited liability company

By: New York Standard Operator Mezz I LLC, a Delaware limited liability company, its sole member

    By: New York Standard Operator Mezz II LLC, a Delaware limited liability company, its sole member

        By: New York Standard Operator JV LLC, a Delaware limited liability company, its sole member

            By: AB Green Gansevoort TRS, LLC, a Delaware limited liability company, its co-managing member

                By: AB Green Gansevoort Member, LLC, a Delaware limited liability company, its sole member

                    By: AB Green, LLC, a Delaware limited liability company, its sole member

                        By: Greenfield Hotels LLC, a Delaware limited liability company, its managing member

By: _____
Name: Barry P. Marcus
Title: Senior Vice President

                        By: Greenfield Hotels PL LLC, a Delaware limited liability company, its managing member

By: _____
Name: Barry P. Marcus
Title: Senior Vice President

            By: Dune Real Estate Fund LP, a Delaware limited partnership, its co-managing member

                By: Dune Real Estate Partners LLC, its general partner

By: _____
Name:
Title:

            By: DREF Standard TRS, LLC, a Delaware limited liability company, its co-managing member

By: _____
Name:
Title:

[SIGNATURES CONTINUED ON FOLLOWING PAGES]

The Operating Tenant is joining in the execution of this Agreement solely for the purpose set forth in <u>Section 2(d)</u>, the representations relating to Operating Tenant set forth in <u>Section 14(a)</u> of this Agreement and the covenants of Operating Tenant set forth in <u>Section 10</u> of this Agreement.

<u>Operating Tenant</u>:

**ABG STANDARD OPERATOR, LLC**, a Delaware limited liability company

By:  New York Standard Operator Mezz I LLC, a Delaware limited liability company, its sole member

    By:  New York Standard Operator Mezz II LLC, a Delaware limited liability company, its sole member

        By:  New York Standard Operator JV LLC, a Delaware limited liability company, its sole member

            By:  AB Green Gansevoort TRS, LLC, a Delaware limited liability company, its co-managing member

                By:  AB Green Gansevoort Member, LLC, a Delaware limited liability company, its sole member

                    By:  AB Green, LLC, a Delaware limited liability company, its sole member

                        By:  Greenfield Hotels LLC, a Delaware limited liability company, its managing member

                            By: _____
                                Name: Barry P. Marcus
                                Title: Senior Vice President

                        By:  Greenfield Hotels PL LLC, a Delaware limited liability company, its managing member

                            By: _____
                                Name: Barry P. Marcus
                                Title: Senior Vice President

            By:  Dune Real Estate Fund LP, a Delaware limited partnership, its co-managing member

                By:  Dune Real Estate Partners LLC, its general partner

                    By: _____
                      Name: MICHAEL D. SHERMAN
                      Title: GENERAL COUNSEL

            By:  DREF Standard TRS, LLC, a Delaware limited liability company, its co-managing member

                By: _____
                Name: MICHAEL D. SHERMAN
                Title: GENERAL COUNSEL

[SIGNATURES CONTINUED ON FOLLOWING PAGES]

63666358

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 115 of 277

ESCROW AGENT HAS EXECUTED THIS AGREEMENT TO ACKNOWLEDGE ITS AGREEMENT TO HOLD THE LIQUOR LICENSE EXTENSION DEPOSITS, AND THE INTEREST EARNED THEREON, IN ACCORDANCE WITH <u>EXHIBIT D</u> HEREOF AND SHALL DISBURSE THE LIQUOR LICENSE EXTENSION DEPOSITS, AND THE INTEREST EARNED THEREON, PURSUANT TO THE PROVISIONS OF THIS AGREEMENT.

**OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY**

By: _____
Name: PAUL Reisman
Title: V P /NYS Counsel

**Exhibit A**

**Legal Description**

All that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County, and State of New York, and being more particularly described as follows:

BEGINNING at a point on the south side of West Thirteenth Street, distant one hundred feet easterly from the corner formed by the intersection of the southerly side of West Thirteenth Street with the easterly side of Tenth Avenue;

RUNNING THENCE southerly and parallel with the easterly side of Tenth Avenue fifty-one feet eight and one-quarter inches;

RUNNING THENCE westerly parallel with the southerly side of West Thirteenth Street twenty-one feet three inches;

THENCE RUNNING southerly along a line, which on its easterly side forms an angle of eighty-nine degrees forty-seven minutes forty seconds with the last mentioned course, fifty-one feet six and three-quarter inches to the centerline of the block;

THENCE RUNNING easterly and along the said centerline of the block one hundred twenty-one feet one inch more or less to a point distant one hundred feet west from the westerly side of Washington Street;

THENCE in a southerly direction, parallel with said westerly side of Washington Street, a distance of 103 feet 03 inches to the northerly side of Little West Twelfth Street;

THENCE in an easterly direction along the northerly side of Little West Twelfth Street, a distance of 100 feet 00 inches to a point where said side meets the easterly side of Washington Street;

THENCE in a northerly direction along the westerly side of Washington Street a distance of 206 feet 6 inches to the southerly side of West Thirteenth Street;

THENCE in an easterly direction and along the southerly side of West Thirteenth Street a distance of 200 feet 00 inches to the point or place of BEGINNING.

**Exhibit B**

**Excluded Agreements**

1.      Operating Lease.

2.      The purchase and sale agreement pursuant to which Seller acquired the Property and any documents delivered in connection therewith.

3.      Any Non-Assumed Service Contracts.

4.      The following contracts:

| Contractor | Service |
|---|---|
| Blue Rock Technologies, LLC | IT Support |
| Blue Rock Technologies, LLC | Hosting Services |
| American Express Travel Related Services Company, Inc | Business Development Services |
| Avero, LLC | "Slingshot" Software Subscription |
| ASAPP, Inc. | Guest Interaction Software |
| Bizly, Inc. | Event and Conference Booking |
| Black Frame Corp. | U.S. Public Relations |
| Brew PR, LLC | Public Relations |
| Business Ink, Co. | Payroll Services |
| Celopay, LLC | Online Payment Services |
| Cendyn | CRM Cloud Services |
| Coyle Hospitality Group | Guest Experience Evaluation Program |
| Concur | Travel Expense Services |
| Connectwise | Software |
| Conecta2you | Consulting – Brazil Sales |
| Delphi | Sales System |
| Data Plus, Inc | Accounting Software |
| HelmsBriscoe | Meeting and Conference Resources |
| Integrated Decisions and Systems, Inc. | Revenue Optimization Software |
| Kissmetrics / Space Pencil, Inc. | Analytics Services |
| MComm | Interactive TV Software |
| Nestle | Supplier Agreement |
| Opera | PMS System |

| | |
|---|---|
| PR Consulting Inc. | U.S. Publicity and Public Relations |
| National Employer's Counsel, Inc. dba PeopleSystems | Employer Assistance |
| Nina Clemente | Consulting Chef |
| Rachel Sardelich | Consulting - Australia |
| Sabre Hospitality Solutions | Consulting and Web Development Services |
| Scott & Co Consulting Limited | UK and Europe Public Relations |
| Sixpoint Brewery | Standard Branded beer |
| Synxis, a business division of Sabre Inc. | Reservation Management System |
| Sterling | Background check provider |
| The Ultimate Software Group Inc. | Software Support |
| TripAdvisor LLC | Building Listing Services |
| TripCraft | One Night Standard App Services |
| TravelClick | Reservation Capabilities; Business Intelligence; Websites and Social Media; Media Advertise |
| TransitCenter, Inc. | Employee Transit Passes |
| Trendset Solutions | IT Support Services |
| Venga Inc. | POS Integration |

**Exhibit C-1**

**<u>Escrow Agent's Wiring Instructions</u>**

Wire to:                          JP Morgan
                                  10 South Dearborn, Floor 34
                                  Chicago, IL 60603
                                  P-312-732-2219

Name of Acct:                     Old Republic National Title Insurance Co.
                                  400 Post Avenue, Suite 310
                                  Westbury, New York 11590

Account Number:                   838-190676

ABA Number:                       021000021

Reference:                        The Standard High Line Hotel located at 848 Washington Street,
                                  New York, New York 10014  (Title No.  FNW FN-10626-NY)

.

**Exhibit C-2**

**<u>Seller's Wiring Instructions</u>**

Account #: 483011477414
ABA#: 026009593
Account Name: ABG Standard Operator LLC Depository Account
Bank: Bank of America
Address: 767 5th Ave, New York, NY 10153

**Exhibit D**

**Escrow Terms**

Escrow Agent agrees to hold in escrow the Liquor License Extension Deposits delivered to Escrow Agent pursuant to this Agreement upon the following terms and conditions:

(a)     The Liquor License Extension Deposits shall be invested in an interest bearing money market account with Citibank, N.A., New York, New York, and Escrow Agent shall not commingle the Liquor License Extension Deposits with any funds of Escrow Agent or others.  All interest earned on the Liquor License Extension Deposits shall accrue in favor of Buyer and shall be credited against the Purchase Price at Closing except in the case of a release of the Liquor License Extension Deposits by Escrow Agent to Seller following a termination of this Agreement in which case, all accrued interest shall be released to Seller by Escrow Agent along with the Liquor License Extension Deposits.  An executed form W-9 must be provided concurrently with acceptance of the Liquor License Extension Deposits by Escrow Agent; failure to provide the W-9 as required by this paragraph will stay Escrow Agent's obligation to invest the Liquor License Extension Deposits in an interest bearing account.

(b)     Escrow Agent shall deliver the Liquor License Extension Deposits (or the applicable portion thereof) to Seller or to Buyer, as the case may be, on the following conditions:

(i) To Seller, upon the consummation of the Closing.

(ii) To Seller, upon receipt of written demand therefore, which demand shall be signed by Seller and shall state that Seller is entitled to the Liquor License Extension Deposits (or applicable portion thereof) in accordance with this Agreement; provided, however, that Escrow Agent shall not honor such demand until at least ten (10) Business Days after the date on which Escrow Agent shall have delivered a copy of such demand to Buyer, nor thereafter if Escrow Agent shall have received a notice of objection from Buyer given in accordance with the provisions of clauses (c) and (d) of this Exhibit D within such ten (10) Business Day period.

(iii)To Buyer, upon receipt of written demand therefore, which demand shall be signed by Buyer and shall state that Buyer is entitled to the Liquor License Extension Deposits (or applicable portion thereof) in accordance with this Agreement; provided, however, Escrow Agent shall not honor such demand until at least ten (10) Business Days after the date on which Escrow Agent shall have delivered a copy of such demand to Seller, nor thereafter if Escrow Agent shall have received a notice of objection from Seller given in accordance with the provisions of clauses (c) and (d) of this Exhibit D within such ten (10) Business Day period.

INDEX NO. 655209/2017
RECEIVED NYSCEF: 08/04/2017

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 122 of 277

(c)     Any notice to or demand upon Escrow Agent shall be in writing and shall be sufficient only if received by Escrow Agent at its address, and in the manner, set forth in Section 17 of this Agreement, and within the applicable time periods set forth herein, if any.

(d)     Upon receipt of a demand for the Liquor License Extension Deposits made by Seller or Buyer under clauses (b)(ii) or (iii) of this Exhibit D, Escrow Agent shall promptly deliver a copy thereof to the other party.  The other party shall have the right to object to the delivery of the Liquor License Extension Deposits by delivering to Escrow Agent notice of objection within ten (10) Business Days after the date Escrow Agent delivers such copy to the other party, but not thereafter.  Upon receipt of such notice of objection, Escrow Agent shall promptly deliver a copy thereof to the other party.

(e)     If (i) Escrow Agent shall have received a notice of objection as provided for in clause (d) of this Exhibit D within the time therein prescribed or (ii) any other disagreement or dispute shall arise between the parties or any other persons resulting in adverse claims and demands being made for the Liquor License Extension Deposits, whether or not litigation has been instituted, then and in any such event, Escrow Agent shall refuse to comply with any claims or demands on it, and shall continue to hold the Liquor License Extension Deposits until Escrow Agent receives either (y) a written notice signed by both parties directing the disbursement of the Liquor License Extension Deposits, or (z) an unappealable final order of a court of competent jurisdiction, entered in an action, suit or proceeding in which Seller and Buyer are parties, directing the disbursement of the Liquor License Extension Deposits, in either of which events Escrow Agent shall then disburse the Liquor License Extension Deposits in accordance with such direction.  Escrow Agent shall not be or become liable in any way or to any person for its refusal to comply with any such claims and demands unless and until it has received such direction.  Upon compliance with such direction, Escrow Agent shall be released of and from all liability hereunder.

(f)     Notwithstanding the foregoing, Escrow Agent shall have the right following one or more of the circumstances described in clauses (e)(i) or (ii) of this Exhibit D, on notice to the parties, to deposit the Liquor License Extension Deposits with a court of competent jurisdiction.  Upon the taking by Escrow Agent of such action, Escrow Agent shall be released of and from all liability hereunder.

(g)     Escrow Agent shall not have any duties or responsibilities, except those set forth in this Exhibit D and shall not incur any liability (i) in acting upon any signature, notice, demand, request, waiver, consent, receipt or other paper or document believed by Escrow Agent to be genuine and Escrow Agent may assume that any person purporting to give it any notice on behalf of any party in accordance with the provisions hereof has been duly authorized to do so, or (ii) in otherwise acting or failing to act under this Exhibit D except in the case of Escrow Agent's gross negligence or willful misconduct.

(h)     Seller and Buyer acknowledge that Escrow Agent is acting solely as stakeholder at the request of Seller and Buyer and for their convenience, that Escrow Agent shall not be deemed to be the agent of either of the parties, and that Escrow Agent shall not be liable to either of the parties, except for its gross negligence or willful misconduct.

(i) Seller and Buyer hereby jointly and severally agree to indemnify Escrow Agent for, and to hold it harmless against, any loss, liability, damage or expense incurred by it arising out of or in connection with Escrow Agent's entering into and/or performing its obligations under this Agreement so long as such loss, liability, damage or expense does not arise out of Escrow Agent's gross negligence or willful misconduct.

(j) The party who receives the Liquor License Extension Deposits shall pay all income tax on all interest earned on the Liquor License Extension Deposits and Escrow Agent shall report all such interest to such party.  Buyer's tax identification number is as follows:  14-1852125.  Seller's tax identification number is as follows: 20-1166495.

The provisions of this Exhibit D shall survive the Closing or earlier termination of this Agreement.

**Exhibit E**

**Specified Permitted Exceptions**

1.    Survey made by Earl B. Lovell – S.P. Belcher, Inc., dated June 13, 2011, last updated on April 29, 2016 shows:

    a.    Fence and movable planted boxes encroach 8 feet 11 inches more of less onto Washington Street.

    b.    Concrete return in the northwesterly portion of premises encroaches 0 feet 1 ¼ inches onto premises adjoining on the west.

    c.    Elevated Railroad (High Line) structure is located within the premises. Elevated Railroad structures are located within and outside the easement area and non-railroad structures are located within the easement area.

    d.    Steps and canopy in the southerly portion of the premises, not located.

    e.    Canopy in the easterly portion of the premises, not located.

    f.    Location of iron columns supporting overhead (high line) railroad structure shown therein.

2.    Terms, covenants, conditions, reservations and easements contained in the agreement made between New York State Realty and Terminal Company and The New York Central Railroad Company, dated 6/8/1932 and recorded 6/10/1932 in Liber 3836 Cp. 226, and, with regard thereto:

    a.    FOR INFORMATION ONLY: Modification and amendment contained Indenture dated 7/3/1964, between Despatch Shops, Inc. and The New York Central Railroad Company, and recorded on 7/8/1964 in Liber 5285 Page 443;

    b.    Grant of Easement from Despatch Shops, Inc. to Consolidated Rail Corporation, dated 3/22/1977 and recorded April 12, 1977 in Reel 397 Page 265;

    c.    Deed from Robert W. Blanchette, Richard C. Bond and John H. McArthur as Trustees of the Property of Penn Central Transportation Company to Consolidated Rail Corporation, dated 3/30/1976 and recorded 12/15/1978 in Reel 463 Page 1563; and

    d.    Deed from Despatch Shops, Inc. to Consolidated Rail Corporation, recorded 12/15/1978 in Reel 463 Page 1624.

    e.    Deed made between Consolidated Rail Corporation and New York Central Lines LLC dated as of 6/1/1999 and recorded 3/17/2000 in Reel 3067 Page 1110.

        ■    Correction Deed made between Consolidated Rail Corporation and New York Central Lines LLC dated as of 8/24/2004 and recorded 1/28/2005 as CRFN 2005000056400.

3.  Terms, covenants and conditions of the Agreement made among Isidore R. Isaacs, Harry Greens and 32 Tenth Ave. Realty Corp., dated 3/18/1946 and recorded 4/3/1946 in Liber 4422 Cp. 474.

4.  Terms, covenants and conditions of easements set forth in Deed dated 3/29/1977 made by Despatch Shops, Inc. to Washington Refrigeration Corp., and recorded on 4/7/1977 in Reel 396 page 1727.

5.  Variations between Tax Map and record description.

6.  Zoning Lot Development Agreement made by and between 55 Little West 12 Street Corp. and AB Green Gansevoort LLC, as Nominee, dated January 7, 2005 and recorded February 2, 2005 as CRFN 2005000067016.

7.  Declaration of Zoning Lot Restrictions made by and between AB Green Gansevoort, LLC, as Nominee, and 55 Little West 12 Street Corp. dated January 7, 2005 and recorded March 29, 2005 as CRFN 2005000180764, and, with regard thereto:

   a.  Waiver of Declaration of Zoning Lot Restrictions and Subordination of Mortgage made by Manufacturers and Traders Trust Company dated January 7, 2005 and recorded March 29, 2005 as CRFN 2005000180767; and

   b.  Waiver of Declaration of Zoning Lot Restrictions and Subordination of Mortgage made by GHC NY Corp. dated January 7, 2005 and recorded March 29, 2005 as CRFN 2005000180768.

8.  Lot Line Window Restrictive Declaration made by Barry Marcus dated December 8, 2006 and recorded December 12, 2006 as CRFN 2006000682108, and, with respect thereto for information purposes only:

   a.  Preliminary Certification of Parties in Interest recorded March 29, 2005 as CRFN 2005000180763;

   b.  Certificate of Parties in Interest recorded May 12, 2006 as CRFN 2006000265876; and

   c.  Zoning Lot Description and Ownership Statement recorded May 12, 2006 as CRFN 2006000265877

9.  Quitclaim Deed dated as of November 4, 2005, recorded December 1, 2005 in CRFN 2005000664404 made between CSX Transportation, Inc., as Grantor and The City of New York, as Grantee whereby Grantor grants, conveys, releases and quitclaims unto Grantee all right, title and interest of Grantor in and to certain portion of Grantor's railroad rights-of-way and real property, operating or non-operating, including any permanent easements for rail carriage railroad use and purposes.

10.  The Existing Debt Documents (if the Existing Debt Lenders Assumption and Release occurs at Closing).

**Exhibit F**

**Form of Deed**

|-Bargain and Sale Deed without Covenant against Grantor's Acts--Individual or Corporation (single sheet)

**CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT - THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.**

_____

This **INDENTURE**, made the ___ day of _____, 201_

**BETWEEN**

**AB GREEN GANSEVOORT, LLC**, a Delaware limited liability company

party of the first part, and

**[_____], a _____ _____**

party of the second part,

**WITNESSETH**, that the party of the first part, in consideration of Ten Dollars and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, described on Exhibit A hereto:

TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

T AX M AP
D ESIGNAT
ION

Dist.:

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvements and will apply the same first to the payment of the cost of the improvement before using any part of the

Manhattan total of the same for any other purpose.

Sec. :

Blk.:

Lot(s):

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

**IN WITNESS WHEREOF**, the party of the first part has duly executed this deed the day and year first above written.

                    **AB GREEN GANSEVOORT, LLC**, a
                    Delaware limited liability company

        By: _____
                    Name:
                    Title:

63666358                        Exhibit F - 2

STATE OF NEW YORK, COUNTY OF

On the        day of            in the year 201_,
before me, the undersigned, personally
appeared                          persona
lly to me known to me or proved to me on the
basis of satisfactory evidence to be the person
whose name is subscribed to the within
instrument and acknowledged to me that
he/she executed the same in his/her capacity,
and that by his/her signature on the
instrument, the person, or the entity upon
behalf of which the person acted, executed
the instrument.

STATE OF NEW YORK, COUNTY OF

On the        day of            in the year 201_,
before me, the undersigned, personally
appeared                            persona
lly to me known to me or proved to me on the
basis of satisfactory evidence to be the person
whose name is subscribed to the within
instrument and acknowledged to me that
he/she executed the same in his/her capacity,
and that by his/her signature on the
instrument, the person, or the entity upon
behalf of which the person acted, executed
the instrument.

OUTSIDE NEW YORK STATE:

STATE OF        , COUNTY OF

On the        day of        in the year 201_,
before me, the undersigned, personally
appeared                          persona
lly to me known to me or proved to me on the
basis of satisfactory evidence to be the person
whose name is subscribed to the within
instrument and acknowledged to me that
he/she executed the same in his/her capacity,
and that by his/her signature on the
instrument, the person, or the entity upon
behalf of which the person acted, executed
the instrument.

_____

*(insert city or political subdivision and state
or county or other place acknowledgment
taken).*

OUTSIDE NEW YORK STATE:

STATE OF          , COUNTY OF

On the        day of        in the year 201_,
before me, the undersigned, personally
appeared                            personal
ly to me known to me or proved to me on the
basis of satisfactory evidence to be the person
whose name is subscribed to the within
instrument and acknowledged to me that
he/she executed the same in his/her capacity,
and that by his/her signature on the
instrument, the person, or the entity upon
behalf of which the person acted, executed
the instrument.

_____ *(insert
city or political subdivision and state or
county or other place acknowledgment
taken).*

BARGAIN AND SALE DEED
WITHOUT COVENANT AGAINST GRANTOR'S
ACT

TITLE
NO. _____

                                        SECTION:
                                        BLOCK:
                                        LOT:
TO                                      COUNTY OR TOWN:
                                        TAX BILLING ADDRESS:


_____, a _____ _____


                                        RECORD AND RETURN BY MAIL

                                        _____
                                        _____
                                        _____
                                        _____

**Exhibit G**

**Form of Bill of Sale**

This **BILL OF SALE** (this "Bill of Sale") is executed as of _____, 201_ by AB GREEN GANSEVOORT, LLC, a Delaware limited liability company ("Seller"), and ABG STANDARD OPERATOR, LLC, a Delaware limited liability company ("Operating Tenant") in favor of [_____], a _____ _____ ("Buyer").

**RECITALS:**

**WHEREAS**, pursuant to that certain Purchase and Sale Agreement, dated as of _____ __, 2016 (as same may have been or may hereafter be assigned, amended, modified or otherwise supplemented, collectively, the "Contract"; all capitalized terms used but not defined herein shall have the meaning ascribed to them in the Contract), between Seller and Buyer, Seller has agreed to sell and Buyer has agreed to purchase, among other things, The Standard High Line Hotel, located at 856 Washington Street, New York, NY and the other Property as set forth in the Contract; and

**WHEREAS**, pursuant to the Contract, the Closing for the Property is occurring on the date hereof, and Seller and Operating Tenant are required to convey, assign and otherwise transfer the Specified Personal Property (as hereinafter defined) to Buyer at Closing.

**NOW**, **THEREFORE**, in consideration of the foregoing premises, and of other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Seller and Buyer agree as follows:

1.       **Transfer of Property**.  Seller and Operating Tenant hereby grant, sell, assign, convey and transfer to Buyer, and Buyer hereby purchases and accepts from Seller and Operating Tenant, all of their respective right, title and interest in and to all tangible personal property upon the Land or within the Hotel constituting part of the Property, including without limitation, all Personal Property, Consumables and Inventories and other items of personal property (excluding cash) used in connection with the operation of the Land and Hotel (collectively, the "Specified Personal Property"), excluding, however, all Excluded Property.

2.       **Further Assurances**.  Promptly upon request of the other party, Buyer, Seller and Operating Tenant shall each execute and deliver to the others such further assurances and take such further actions as may be reasonably required or appropriate to perfect the transfer of the Personal Property and otherwise carry out the intent and purpose of this Bill of Sale.

3.       **THIS BILL OF SALE IS MADE ON AN "AS-IS, WHERE-IS, WITH ALL FAULTS" BASIS, WITHOUT RECOURSE AND WITHOUT ANY REPRESENTATION OR WARRANTY (EXPRESS OR IMPLIED) WHATSOEVER EXCEPT AS MAY EXPRESSLY BE SET FORTH IN THE CONTRACT.**

5.       **Binding Effect and Assignment**.  This Bill of Sale shall be binding upon Seller, Operating Tenant and their respective successors and assigns, and shall inure to the benefit of Buyer and its successors and assigns.

6.  **Governing Law**.  This Bill of Sale shall be governed by and construed in accordance with the laws of the State of New York (without reference to conflicts of laws principles).

7.  **Counterparts**.  This Bill of Sale may be executed in counterparts, each of which shall constitute an original, but all of which shall collectively constitute one instrument.

(*Signatures appear on following page*)

**IN WITNESS WHEREOF**, Seller and Operating Tenant have executed this Bill of Sale as of the date first above written.

> **AB GREEN GANSEVOORT, LLC**, a Delaware limited liability company
>
> By: _____
>     Name:
>     Title:

[signatures continue on the following page]

**ABG STANDARD OPERATOR, LLC**, a Delaware limited liability company

By: _____

    Name:

    Title:

## Exhibit H

### Form of General Assignment

### GENERAL ASSIGNMENT AND ASSUMPTION AGREEMENT

This **GENERAL ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "Assignment"), made and entered into as of this _____ day of _____, 201_, by and among AB GREEN GANSEVOORT, LLC, a Delaware limited liability company ("Assignor"), ABG STANDARD OPERATOR, LLC, a Delaware limited liability company ("Operating Tenant") and [_____], a _____ _____ ("Assignee").

W I T N E S S E T H:

**WHEREAS**, pursuant to that certain Purchase and Sale Agreement, dated as of _____ __, 2016 (as same may have been or may hereafter be assigned, amended, modified or otherwise supplemented, collectively, the "Contract"; all capitalized terms used but not defined herein shall have the meaning ascribed to them in the Contract), between Assignor and Assignee, Assignor has agreed to sell and Assignee has agreed to purchase, among other things, The Standard High Line Hotel, located at 848 Washington Street, New York, NY and the other Property as set forth in the Contract; and

**WHEREAS**, pursuant to the Contract, the Closing for the Property is occurring on the date hereof, and Assignor and Operating Tenant are required to assign, and Assignee is required to accept, the Assigned Interests (as hereinafter defined) at Closing, and subject to the conditions hereinafter set forth.

**NOW THEREFORE**, in consideration of the premises and of the mutual conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      Assignor and Operating Tenant hereby convey, grant, bargain, sell, transfer, set over, assign, release, deliver and confirm to Assignee, and Assignee hereby accepts, all of Assignor's and Operating Tenant's respective right, title and interest in and to all assignable (a) Permits relating to the Property, (b) contracts and agreements relating to the Property as listed on Schedule 1 attached hereto (the "Assumed Hotel Contracts and Agreements"), and (c) the other components of the Property (other than the Land, Improvements and Personal Property) (together with such Permits and the Assumed Hotel Contracts and Agreements, but excluding the Excluded Property, the "Assigned Interests").  Subject to Sections 14(c), 14(d) and 38 of the Contract, Assignor and Operating Tenant hereby agree to defend, indemnify and hold harmless Assignee from all loss, expense (including reasonable counsel fees and disbursements), damage, and liability resulting from any and all claims of whatever nature (including for bodily injury, wrongful death, or property damage) against Assignee and/or relating to the performance or the failure or refusal to perform or observe any and all of the obligations of Assignor and Operating Tenant with respect to the Assigned Interests relating to the period prior to the date hereof.

2.      Assignee hereby (i) expressly assumes the obligation for the performance of any and all of the obligations of Assignor and Operating Tenant with respect to the Assigned

Interests relating to the period on and after the date hereof (the "Indemnified Matters") and (ii) agrees to defend, indemnify, and hold harmless Assignor and Operating Tenant from all loss, expense (including reasonable counsel fees and disbursements), damage, and liability resulting from any and all claims of whatever nature (including for bodily injury, wrongful death, or property damage) against Assignor, Operating Tenant and/or relating to the Indemnified Matters based on causes of action which arise or accrue on or after the date hereof.

3.      This Assignment shall survive the Closing and shall inure to the benefit of all parties hereto and their respective heirs, successors and assigns.

4.      This Assignment may be executed in counterparts, each of which shall constitute an original, but all of which shall collectively constitute one instrument.

5.      This Assignment, and all questions of interpretation hereof and all controversies hereunder shall be construed in accordance with and governed by the laws of the State of New York (without reference to principles of conflict of laws).

6.      This Assignment is made without representation, warranty (express or implied) or recourse of any kind, except as may be provided herein or as set forth in the Contract.

7.      Assignor and Operating Tenant hereby covenants that it will, at any time and from time to time upon written request therefor, at Assignee's sole expense and without the assumption of any additional liability therefor, execute and deliver to Assignee, and its successors and assigns, any new or confirmatory instruments and take such further acts as Assignee may reasonably request to fully evidence the assignment contained herein and to enable Assignee, and its successors and assigns, to fully realize and enjoy the rights and interests assigned hereby.

*(Signatures appear on following page)*

IN WITNESS WHEREOF, the parties have executed this Assignment as of the day and year first above written.

**AB GREEN GANSEVOORT, LLC**, a Delaware limited liability company

By: _____
    Name:
    Title:

[signatures continue on the following page]

**ABG STANDARD OPERATOR, LLC**, a Delaware limited liability company

By: _____
    Name:
    Title:

[signatures continue on the following page]

Buyer:

[_____]

By:    _____
Name:
Title:

**Schedule 1**

**Assumed Hotel Contracts and Agreements**[1]

---

[1]    Exclude Excluded Agreements.

# Exhibit I

## Litigation

| Date Filed | Named Party / Case Name | Nature of Claim | Other | Status | Person Reporting | Date Updated |
|---|---|---|---|---|---|---|
| Deal Name | | | | | | |
| Standard, High Line | Rubinald Pronk vs. The Standard Hotel, HotelsAB, LLC, Andre Balazs Properties | 9.28.12 Personal injury; claimant alleges property negligent in maintenance of Le Bain pool which he claims caused him to cut his foot | GL Insured / Excess Carier is monitoring | Filed motion for summary judgment | Richard Freire @ Hoey, King & Epstein | 7.6.16 |
| Standard, High Line | Marco Kamiel v. AB Green LLC, HotelsAB,LLC, Standard International Management LLC | 10.2.10 Personal injury; claimant alleges glass placed on urinal fell, cutting his index finger | GL Insured | In Discovery | Richard Freire @ Hoey, King & Epstein | 7.6.16 |
| Standard, High Line | Marco Snieder v. AB Green Gavensvoort, LLC & ABG Standard Operator LLC | 2.23.13 Claimant claims negligence by Hotel after fight with another hotel guest | GL Insured | In Discovery | Richard Freire @ Hoey, King & Epstein | 7.6.16 |
| Standard, High Line | Carl Nestonborg v. Standard International Mgmt, et al Gavensvoort LLC, ABG | 10.11.14 Personal injury; claimant alleges sink fell and cut him | GL Insured | In Discovery | Vanessa Campagna @ Cartafalsia, Slattery, Turpin & Lenoff | 7.6.16 |
| Standard, High Line | State of New York Office of Attorney General and Standard, High Line | 3.25.16 Investigation of Standard International (Property Manager) with respect to discriminatory practices by the Hotel in Standard International's admissions policies | No | Letter agreement signed by Standard International with respect to Standard International's ongoing reporting obligations | Getnick & Getnick | 7.6.16 |
| Standard, High Line | Damell Grant v. The Standard Hotel | 2.26.16 Former employee discrimination complaint with NYS Division of Human Rights | No | Response filed | Carolyn Richmond @ Fox Rothschild | 7.6.16 |

63666358

Exhibit I - 1

## **Exhibit J**

Intentionally Omitted

## Exhibit K

## Form of Termination of Operating Lease

### VOLUNTARY TERMINATION AGREEMENT

This Voluntary Termination Agreement (this "Agreement"), dated as of [_____], 201_, is entered into between AB GREEN GANSEVOORT, LLC, a Delaware limited liability company ("**Owner**"), and ABG STANDARD OPERATOR, LLC, a Delaware limited liability company ("**Operator**").

W I T N E S S E T H

**WHEREAS**, pursuant to that certain Lease Agreement dated September 15, 2008 between Owner and Operator, as amended by (i) that certain First Amendment to Lease Agreement, dated as of January 31, 2011, (ii) that certain Second Amendment to Lease Agreement, dated as of July 7, 2014, and (iii) that certain Third Amendment to Lease Agreement, dated as of January 6, 2015 (as so amended, and as the same may have been further amended, modified or supplemented, the "**Operating Lease**"), Owner leased to Operator certain property better known as The Standard Hotel located at 848 Washington Street, New York, New York 10014 (the "**Hotel**");

WHEREAS, concurrently with the execution of this Agreement, the Hotel is being sold; and

WHEREAS, Owner and Operator desire to voluntarily terminate the Operating Lease pursuant to this Agreement.

**NOW, THEREFORE,** in consideration of the premises and mutual covenants set forth herein and for other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

The Operating Lease is hereby mutually terminated by Owner and Operator, effective as of the date hereof.

[Remainder of Page Intentionally Blank; Signatures to Follow]

IN WITNESS WHEREOF, the parties have executed this Voluntary Termination Agreement as of the date above first written.

OWNER:

**AB GREEN GANSEVOORT, LLC**, a Delaware limited liability company

By: _____
      Name:
      Title:

[signatures continue on the following page]

OPERATOR:

**ABG STANDARD OPERATOR, LLC**, a Delaware limited
liability company

By: _____

    Name:

    Title:

**Exhibit L**

**Allocation of Purchase Price Among Asset Classes**

| Asset Class | Allocated Amount of the Purchase Price |
|---|---|
| **Real Property** | **$376,000,000** |
| **Personal Property** | **$14,000,000** |
| **Total** | **$390,000,000** |

**Exhibit M-1**

**Form Management Agreement Assignment and Assumption**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

   This **ASSIGNMENT AND ASSUMPTION OF MANAGEMENT AGREEMENT** (this "Agreement") is made as of _____ ___, 201_ by **ABG STANDARD OPERATOR LLC**, a Delaware limited liability company ("Assignor"), and **[_____]**, a [_____] ("Assignee").

**RECITALS**

   WHEREAS, pursuant to that certain Hotel Management Agreement dated December 30, 2005 between AB Green Gansevoort, LLC ("Seller") and Hotels AB, LLC ("Hotels AB"), as assigned by Seller to Assignor pursuant to that certain Assignment and Assumption of Management Agreement dated August 22, 2008, by and between Seller and Assignor, as amended pursuant to that certain letter agreement dated May 19, 2011, by and between Hotels AB and Assignor, as further assigned by Hotels AB to Standard High Line Management, LLC ("Manager") pursuant to that certain Assignment and Assumption of Hotel Management Agreement dated August 30, 2013 by and between Hotels AB and Manager (as so assigned, amended and supplemented, and as the same may have been amended, modified or supplemented, the "Management Agreement");

   WHEREAS, Seller and Assignee are parties to that certain Purchase and Sale Agreement dated [_____ ___], 2016 (as the same may have been or may hereafter be amended, modified, or supplemented from time to time, the "PSA"; capitalized terms shall have the meaning set forth in the PSA) pursuant to which Seller is selling the Hotel to Assignee; and

   WHEREAS, in connection and concurrently with such sale, pursuant to Section 16.01 of the Management Agreement, Assignor wishes to assign, transfer and convey to Assignee, and Assignee wishes to assume, all of Assignor's right, title and interest in, to and under the Management Agreement with respect to the Hotel pursuant to the terms and conditions set forth herein from and after the date hereof (the "Assignment").

   NOW, THEREFORE, in consideration of the above and the mutual promises contained in this Agreement, the receipt and sufficiency of which are acknowledged, the parties hereto agree as follows:

   (a)  In accordance with Section 16.01 of the Management Agreement and subject to the terms of the PSA, Assignor hereby assigns, transfers and conveys to Assignee all of the Assignor's right, title and interest in, to and under the Management Agreement to Assignee with respect to the Hotel from and after the date hereof.  For the avoidance of doubt, Assignor is not assigning to Assignee, and hereby reserves to itself, any claim that Assignor may have against Manager relating to any period prior to the date hereof.

   (b)  Assignee hereby (i) expressly assumes the obligation for the performance of any and all of the obligations of Assignor with respect to the Management Agreement relating to the

period on and after the date hereof (the "Indemnified Matters") and (ii) agrees to defend, indemnify, and hold harmless Seller and Assignor from all loss, expense (including reasonable counsel fees and disbursements), damage, and liability resulting from any and all claims of whatever nature (including for bodily injury, wrongful death, or property damage) against Assignor and/or relating to the Indemnified Matters based on causes of action which arise or accrue on or after the date hereof.

(c)     Subject to Sections 14(c), 14(d) and 38 of the PSA, Assignor hereby agrees to defend, indemnify, and hold harmless Assignee from all loss, expense (including reasonable counsel fees and disbursements), damage, and liability resulting from any and all claims of whatever nature (including for bodily injury, wrongful death, or property damage) against Assignee relating to the obligations of Assignor with respect to the Management Agreement which arose or accrued prior to the date hereof; provided, however, in no event shall Assignor be responsible or liable for, and Assignor shall have no obligation to indemnify Assignee under this clause (c) in connection with any of the following: (1) any action or inaction of Manager or Manager's Affiliates in breach of the Management Agreement, (2) any matter caused by Assignee or its Affiliate with the intent to hinder or interfere with the ordinary course of business at the Property, (3) any matter that would otherwise be the responsibility or liability of Assignee or Assignee's Affiliates or Manager or Manager's Affiliates under the Management Agreement but for the intentional action of Assignee or its Affiliate to influence such matter occurring prior to the date hereof for the purpose of being covered under Assignor's indemnification obligations under this clause (c) and (4) any matter arising out of Buyer Cause.

(d)     This Assignment shall be binding upon and inure to the benefit of the parties, and their respective heirs, executors, administrators, successors and assigns.

(e)     This Assignment shall survive the Closing and shall inure to the benefit of all parties hereto and their respective heirs, successors and assigns.

(f)     This Assignment may be executed in counterparts, each of which shall constitute an original, but all of which shall collectively constitute one instrument.  An electronic image of a signature (e.g., via PDF file) will have the same legal effect for the purpose of establishing the execution of this Agreement as an originally drawn signature.

(g)     This Assignment shall be governed by the laws of the State of New York.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed this Agreement as a sealed instrument as of the date above first written.

**ABG STANDARD OPERATOR, LLC**, a Delaware limited liability company

By: _____

      Name:

      Title:

[signatures continue on the following page]

[_____], a [_____]

By: _____
    Name:
    Title:

[signatures continue on the following page]

## Exhibit M-2

## Form Assignment of Management Agreement Notice

### ABG STANDARD OPERATOR LLC
c/o Greenfield Partners, LLC
2 Post Road West
Westport, Connecticut 06880

[_____ ___], 201_

Via Federal Express (Overnight Delivery)[2]

Standard High Line Management, LLC
The Puck Building
295 Lafayette Street, 7th Floor
New York, New York 10012
Attention: Mr. André Balazs

Standard High Line Management, LLC
c/o Standard International Management, LLC
23 East 4th Street, 5th Floor
New York, New York 10003
Attention: Mr. Amar Lalvani

Dear Sir or Madam:

Reference is hereby made to that certain Hotel Management Agreement dated December 30, 2005 between AB Green Gansevoort, LLC ("Seller") and Hotels AB, LLC ("Hotels AB"), as assigned by Seller to ABG Standard Operator LLC ("Operating Tenant") pursuant to that certain Assignment and Assumption of Management Agreement dated August 22, 2008, by and between Seller and Operating Tenant, as amended pursuant to that certain letter agreement dated May 19, 2011, by and between Hotels AB and Operating Tenant, as further assigned by Hotels AB to Standard High Line Management, LLC ("Manager") pursuant to that certain Assignment and Assumption of Hotel Management Agreement dated August 30, 2013 by and between Hotels AB and Manager (as so assigned and amended, and as same may have otherwise been amended, modified or supplemented, the "Management Agreement"; all capitalized terms used but not defined herein shall have the meaning set forth in the Management Agreement).

Pursuant to that certain Purchase and Sale Agreement dated [_____ ___], 2016 between [_____] ("Buyer") and Seller (as may have been or may hereafter be amended, modified or otherwise supplemented, the "PSA"), Seller is selling the Hotel to Buyer.

---

[2]     Address to be confirmed.

This letter (this "Assignment Notice") shall serve as the written notice to Manager required pursuant to Section 16.01 of the Management Agreement that Operating Tenant wishes to assign its interest in the Management Agreement to Buyer effective as of the closing of the sale contemplated by the PSA (the "Sale").  The Sale is anticipated to close on [_____], 201_.  Operating Tenant shall have the right to revoke this Assignment Notice at any time and for any reason (or no reason) by sending a revocation notice to Manager, and upon Manager's receipt of such revocation notice, this Assignment Notice shall be null and void.  Further the failure of the Sale or the assignment to occur shall not constitute a default by Operating Tenant under the Management Agreement or be deemed to be a waiver of the right of Operating Tenant to deliver another notice pursuant to Section 16.01 of the Management Agreement.

Additionally, in connection with the Sale, Manager is hereby advised to comply with the NYC Displaced Building Service Workers Protection Act (Section 22-505 of the NYC Administrative Code) with respect to the employees of the Hotel covered thereunder.

[Signature Page Follows]

Sincerely,

**ABG STANDARD OPERATOR, LLC**, a Delaware limited liability company

By: _____
     Name:
     Title:


cc:    Standard International Management, LLC
       23 East 4th Street, 5th Floor
       New York, New York 10003
       Attention: General Counsel

       Skadden, Arps, Slate, Meagher & Flom LLP
       Four Times Square
       New York, New York 10036
       Attention: Benjamin F. Needell, Esq.
       Facsimile: (917) 777-2600

**EXHIBIT N**

**Form of Title Affidavit**

**TITLE AFFIDAVIT**
(New York City)

| | | |
|---|---|---|
| STATE OF NEW YORK | } | TITLE NO.: FN-10626-NY |
| | } ss: | |
| COUNTY OF _____ | } | DATE: _____, 201_ |

The undersigned, being duly sworn, deposes and says:

1. That I am the _____ of AB Green Gansevoort, LLC ("Owner"), grantor executing the deed of the property known as 848 Washington Street, New York, NY (Block 645 Lot 11) to _____.

2. There are no tenants in possession of said premises.

3. To Owner's knowledge, no work has been done upon the above premises by the City of New York nor has any demand been made by the City of New York for any such work that may result in charges by the New York City Department of Rent and Housing Maintenance, Emergency Services or the New York City Department for Environmental Protection, in each case, for water tap closings or any related work.

4. That your deponent(s) and/or Owner (has/have) not been known by any other name(s), married or single, during the past ten years.

5. That Owner is the same entity who acquired title to the premises herein by deed from GHC NY Corp., dated 5/27/2004 and recorded on 7/5/2004 in CRFN 2004000415361 in the Office of the New York City Register, New York County.

That the undersigned has the actual authority to make this affidavit on behalf of Owner, to induce Old Republic National Title Insurance Company and Stewart Title Insurance Company to insure title free and clear of the aforesaid, knowing that it will rely on the truth of the statements herein made.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**AB GREEN GANSEVOORT, LLC**, a Delaware limited liability company

By: New York Standard Mezz I LLC, a Delaware limited liability company, its sole member

By: New York Standard Mezz II LLC, a Delaware limited liability company, its sole member

By: New York Standard Owner JV LLC, a Delaware limited liability company, its sole member

By: AB Green Gansevoort Member, LLC, a Delaware limited liability company, its co-managing member

By: AB Green, LLC, a Delaware limited liability company, its sole member

By: Greenfield Hotels LLC, a Delaware limited liability company, its managing member

By: _____
Name: Barry P. Marcus
Title: Senior Vice President

By: Greenfield Hotels PL LLC, a Delaware limited liability company, its managing member

By: _____
Name: Barry P. Marcus
Title: Senior Vice President

By: Dune Real Estate Fund LP, a Delaware limited partnership, its co-managing member

By: Dune Real Estate Partners LLC, its general partner

By: _____
Name:
Title:

By: DREF Standard Real Estate Investment Trust, a Maryland real estate investment trust, its co-managing member

Exhibit N - 2

By: _____

      Name:

      Title:

Sworn to before me this _____ day of _____, 20___.

_____

Notary Public

Exhibit N - 3

**EXHIBIT O-1**

**Seller Rep Certificate**

**SELLER'S CERTIFICATE OF REPRESENTATIONS AND WARRANTIES**

Pursuant to the Purchase and Sale Agreement dated as of [____], by and between **AB Green Gansevoort, LLC**, a Delaware limited liability company ("Seller") and **[_____]** ("Buyer") (as the same may have been amended, modified or supplemented, the "Agreement"), and to induce Buyer to complete Closing (as defined in the Agreement), Seller does hereby certify to Buyer that, except as set forth on Exhibit A attached hereto, the representations and warranties of Seller made in the Agreement are true and continue to be correct in all material respects as of the date hereof, except where stated to be as of the Effective Date (as defined in the Agreement) and except as a result of changes of facts (y) resulting from any actions or omissions of Buyer or (z) other than with respect to the representations set forth in clauses (i), (iii), (v), (vi), (vii), (viii), (ix) and (xxi) of Section 14(a), not caused by a default by Seller or Operating Tenant under this Agreement.

The representations and warranties of Seller in the Agreement, as further certified pursuant to this Certificate, shall survive Closing in accordance with, and subject to, the terms and conditions of the Agreement (including Sections 14(b), 14(c),14(d) and 38 thereof).

[NO FURTHER TEXT ON THIS PAGE]

**SELLER**:

**AB GREEN GANSEVOORT, LLC**, a
Delaware limited liability company

By: _____
Name:
Title:

## **EXHIBIT A**

Exceptions

## EXHIBIT O-2

**Buyer Rep Certificate**

## BUYER'S CERTIFICATE OF REPRESENTATIONS AND WARRANTIES

Pursuant to the Purchase and Sale Agreement dated as of [_____], by and between **AB Green Gansevoort, LLC**, a Delaware limited liability company ("Seller") and [_____] ("Buyer") (as the same may have been amended, modified or supplemented, the "Agreement"), and to induce Seller to complete Closing (as defined in the Agreement), Buyer does hereby certify to Seller that the representations and warranties of Buyer made in the Agreement are true and continue to be correct in all material respects as of the date hereof.

The representations and warranties of Buyer in the Agreement, as further certified pursuant to this Certificate, shall survive Closing in accordance with, and subject to, the terms and conditions of the Agreement.

[NO FURTHER TEXT ON THIS PAGE]

**BUYER**:

[_____],          a
[_____]

By: _____
Name:
Title:

**EXHIBIT P**

**Additional Excluded Property**

1.      The following trademarks and/or service marks: Le Bain, Top of the Standard, TOTS, Living Room, Standard Grill, Shop at the Standard, Standard Sounds, Standard Biergarten, Standard Beer Garden, Standard Brauhaus, Standard Bar, Biergarten, Pendragon design logo, Maid design logo, One Night Standard, The Standard Classes, Standard Time, The Standard Plaza, The Standard Ice Rink, Creperie, Balazs Locust Farm products, Standard Culture, Standard Talks;

2.      Employee Handbook, Forms, Policies, Training Materials;

3.      Menus, Recipes, Wine Lists, Drink Lists;

4.      Photographs, images, videos, picture books, and all advertisements, marketing and promotional material of the Hotel (both digital and in paper form);

5.      Branded events (e.g., Oyster Bash, Standard Talks, Standard Sounds, Standard Bingo, Songs from a Room, Annie O Music Series);

6.      Forms of contracts (e.g., sales, events, barters, offer letters, severance agreements, confidentiality agreements, consulting agreement, service agreements, photography releases, location agreements, partnership agreements, construction forms, performance agreements, contest terms and conditions);

7.      OSE, Consumable Supplies & FF&E with Standard Branding (e.g., coasters, check presenters, keys, notepads, beer cans, Nude Audio speakers);

8.      All Permits that are non-transferable (liquor, health, music, etc)

9.      André Balazs Rosé;

10.     Signage, internal and external, displaying any of the trademarks and/or service marks indicated in item (1) above;

11.     Play lists and other musical programming;

12.     All Standard branded and related merchandise sold in the shop, mini-bars or otherwise in the hotel, included Warby Parker, Quicksilver, Harry's and all other branding partnerships;

13.     Robes, slippers and other Standard branded bathroom amenities;

14.     All Employee files and other paperwork (including I-9s and Wage Sheets);

15.     Server data, emails, correspondence;

16.     The Standard ice rink and related equipment (Zamboni);

17.     Branded videos in the elevators;

18.     Sales and Marketing Plan; and

19.     Group Sales contracts and clients with respect to other hotels, but specifically excluding any contracts effective for any period of time after the Closing

<u>**EXHIBIT Q**</u>

**TRANSFEROR'S CERTIFICATION OF NON-FOREIGN STATUS**

Section 1445 of the Internal Revenue Code provides that a transferee of a United States real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform _____, a Delaware limited liability company ("**Transferee**"), that withholding of tax is not required upon the disposition of a United States real property interest by _____, a Delaware _____ ("**Transferor**"), the _____ of _____, a Delaware limited liability company, Transferor hereby certifies the following:

1. The Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Code and the Income Tax Regulations promulgated thereunder);

2. The Transferor is not a disregarded entity as defined in Section 1.1445-2(b)(2)(iii) of the Income Tax Regulations issued under the Internal Revenue Code;

3. The Transferor's U.S. employer identification number is _____; and

4. The Transferor's office address is _____.

The Transferor understands that this Certification may be disclosed to the Internal Revenue Service by the Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalty of perjury I declare that I have examined this Certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of the Transferor.

Date: _____, 201_

**TRANSFEROR:**

By: _____
    Name: _____
    Title: _____

## EXHIBIT R

## POST-CLOSING ESCROW AGREEMENT

This **POST-CLOSING ESCROW AGREEMENT** (this "Agreement") is made and entered into this [●] day of [●], 201__, by and among **OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY** ("Escrow Holder"), **AB GREEN GANSEVOORT, LLC**, a Delaware limited liability company ( "Seller"), and [_____] ("Buyer").

## RECITALS

**WHEREAS**, Seller and Buyer have entered into that certain Purchase and Sale Agreement dated as of [●], 2016 (as the same may have been amended, modified or otherwise supplemented, the "Purchase Agreement," all capitalized terms used but not defined herein shall have the meanings set forth in the Purchase Agreement), pursuant to which Seller has agreed to sell, and Buyer has agreed to buy, the Property in accordance with the terms and conditions contained herein; and

**WHEREAS**, the Closing has occurred as of the date hereof, but as required pursuant to Section 14(e) of the Purchase Agreement and as a material inducement for Buyer to consummate the Closing, Buyer, Seller and Escrow Holder have agreed to execute and deliver this Agreement.

**NOW THEREFORE**, in consideration of the premises and of the mutual conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.     Establishment of Escrow.  As a condition precedent to the Closing, Seller has concurrently with the execution and delivery of this Agreement, deposited with Escrow Holder an amount equal to $10,000,000 (such amount, together with any and all interest earned thereon, the "Post-Closing Escrow Funds").  By execution of this Agreement, Escrow Holder hereby acknowledges receipt of the Post-Closing Escrow Funds, which Post-Closing Escrow Funds shall be deposited into an interest-bearing account to be held and disbursed by Escrow Holder in accordance with the terms hereof.  All interest earned on the Post-Closing Escrow Funds shall accrue and inure to the benefit of Seller.  Neither Seller nor Buyer shall have any right to request a disbursement of any portion of the Post-Closing Escrow Funds except in strict accordance with this Agreement.  Notwithstanding anything to the contrary contained herein or in the Purchase Agreement, in no event shall Seller be required to make any additional deposit(s) with Escrow Holder.

2.     Disbursement of the Post-Closing Escrow Funds.

    A.    The Post-Closing Escrow Funds shall be held in escrow to secure, subject to Sections 14(c), 14(d) and 38 of the Purchase Agreement, Seller's obligations with respect to breaches or defaults of any Seller's representations and warranties first discovered by Buyer after the Closing or a breach or default of any obligation, including an indemnification obligation of

Seller and/or Operating Tenant under the Purchase Agreement or any of the documents delivered by Seller and/or Operating Tenant at Closing, of Seller which arises after, and survives, the Closing. In the event that after Closing but before the expiration of Seller's Survival Period, Buyer delivers to Escrow Holder and Seller one or more Warranty Notices, which Warranty Notices shall certify Buyer's good faith reasonable estimate of actual damages incurred as a result of such breaches or defaults (the "Claim Amount"), Escrow Holder shall retain in escrow a portion of the Post-Closing Escrow Funds equal to the Claim Amount until all of the claims which gave rise to such Warranty Notices have been (i) settled pursuant to a written settlement agreement entered into between Buyer and Seller, in which case the Claim Amount shall be disbursed in accordance with the instructions set forth in such settlement agreement or (ii) adjudicated pursuant to a final non-appealable judgment with respect thereto rendered by a court of competent jurisdiction, in which case, the Claim Amount shall be disbursed in accordance with such final non-appealable judgment.

B.      Subject to Section 2C below, at any time on or after [●], 2017[3] (the "Release Trigger Date"), upon Seller delivering a written request to Escrow Holder, Escrow Holder shall, within one (1) Business Day, disburse to Seller the then balance of the Post-Closing Escrow Funds then being held by Escrow Holder; provided, however, if before the Release Trigger Date, Buyer has delivered one or more Warranty Notices to Escrow Holder and Seller and the claims which gave rise to such Warranty Notice(s) are still outstanding, then Escrow Holder shall continue to hold in escrow the amount of aggregate Claim Amounts set forth in such Warranty Notice(s) which are then outstanding.

C.      Notwithstanding anything to the contrary contained in Section 2B, if the Pre-Closing Tax Liability Cut-off Date (as defined below) has not occurred by the Release Trigger Date, then the following shall apply:

(i)      At any time on or after the Release Trigger Date, upon Seller delivering a written request to Escrow Holder, Escrow Holder shall, within one (1) Business Day, disburse to Seller the Post-Closing Escrow Funds that would otherwise be returned to Seller pursuant to Section 2B. above, less a portion of the Post-Closing Escrow Funds in an amount equal to the Pre-Closing Tax Liability Holdback Amount (as defined below), which portion shall continue to be held back in escrow solely for the purpose of securing Seller's indemnification obligations under Section 43 of the Purchase Agreement and for no other reasons. In no event shall the failure of the Pre-Closing Tax Liability Cut-off Date to occur prior to the Release Trigger Date extend the Survival Period or Buyer's right to deliver a Warranty Notice after the Release Trigger Date with respect to any matters other than the indemnification obligation of Seller under Section 43 of the Purchase Agreement.

(ii)      At any time on or after the Pre-Closing Tax Liability Cutoff Date (as defined below), upon Seller delivering a written request to Escrow Holder that the Pre-Closing Tax Liability Cutoff Date has occurred, Escrow Holder shall, within one (1) Business Day, disburse to Seller the Pre-Closing Tax Liability Holdback Amount;

_____

[3] Date that is 9 months after the Closing Date.

<u>provided</u>, <u>however</u>, if before the Release Trigger Date, Buyer has delivered one or more Warranty Notices to Escrow Holder and Seller and the claims which gave rise to such Warranty Notice(s) are still outstanding, then Escrow Holder shall continue to hold in escrow the amount of aggregate Claim Amounts set forth in such Warranty Notice(s) which are then outstanding in accordance with Section 2A; and

(iii)     For purposes of this <u>Section 2C</u>, the following terms shall have the following meaning:

(1)     "<u>Pre-Closing Tax Liability Holdback Amount</u>" shall mean the lesser of (x) $500,000 and (y) an amount equal to the excess of (a) $10,000,000 minus (b) the aggregate Claim Amounts set forth in Warranty Notice(s) delivered to Escrow Holder and Seller pursuant to this Agreement.

(2)     "<u>Pre-Closing Tax Liability Cut-off Date</u>" shall mean the date which is the earlier to occur of (a) the failure of Buyer to notify the New York State Department of Taxation and Finance (the "Tax Department") by filing Form AU-196.10 (Notification of Sale, Transfer or Assignment in Bulk) within two (2) Business Days after the Closing Date, (b) the receipt by Buyer or Seller from the Tax Department of Form AU-197.1 (Purchaser's and/or Escrow Agent's Release – Bulk Sale) stating that Seller has no outstanding liability for pre-Closing sales tax or that Seller does not have any unpaid pre-Closing sales taxes and that an additional review or audit is not necessary, (c) five (5) Business Days following the receipt by Buyer or Seller of notification from the Tax Department of the amount of Pre-Closing sales tax due from Seller and (d) the date which is twelve (12) months after the delivery to the Tax Department of Form AU-196.10, or if as of such twelve (12) month date an audit by the Tax Department in respect to the pre-closing sales tax is pending, then the date such audit is completed.

(iv)     For the avoidance of doubt, if the Pre-Closing Tax Liability Cut-off Date shall occur prior to the Release Trigger Date, then this Section 2C. shall not apply and shall be null and void.

3.     <u>Interest</u>.    Any interest earned on the Post-Closing Escrow Funds shall be reinvested and become part of the applicable Post-Closing Escrow Funds.    Seller shall be responsible for the payment of all income tax due on such interest.

4.     <u>Escrow Holder</u>.

A.     <u>General</u>.   Escrow Holder shall act as escrow agent and hold and disburse the Post-Closing Escrow Funds pursuant to the terms and conditions of this Agreement.

B.     <u>Limited Duties</u>.   Escrow Holder undertakes to perform only such duties as are expressly set forth in this Agreement.   Escrow Holder shall incur no liability whatsoever to

Seller or Buyer except for its own willful misconduct or gross negligence in its capacity as escrow agent; provided, however Escrow Holder shall not disburse any portion of the Post-Closing Escrow Funds except in strict accordance with this Agreement.

      C.    Resignation.  Escrow Holder may resign and be discharged from its duties or obligations hereunder by giving notice of such resignation to Seller and Buyer specifying a date upon which such resignation shall take effect, whereupon a successor escrow agent shall be appointed by Buyer and shall be reasonably acceptable to Seller.  Escrow Holder shall deliver the Post-Closing Escrow Funds to any successor escrow agent so appointed.

      D.    Indemnification.  Seller and Buyer hereby jointly and severally agree to indemnify Escrow Holder for, and to hold it harmless against, any loss, liability, damage or expense incurred without gross negligence or willful misconduct on the part of Escrow Holder arising out of or in connection with its entering into and/or performing under this Agreement.

      E.    Interpleader.  In the event of conflicting instructions to Escrow Holder, or if Escrow Holder is named or joined in any lawsuit relating to this Agreement or the Post-Closing Escrow Funds, Escrow Holder is hereby additionally authorized and empowered, at Escrow Holder's option, to deliver the Post-Closing Escrow Funds in interpleader to a court of competent jurisdiction, whereupon Escrow Holder shall be released from any further obligations or liabilities under this Agreement.

      F.    Seller and Buyer acknowledge and agree that Escrow Agent shall have no liability in the event of the failure or insolvency of the depository bank or other institution in which the Post-Closing Escrow Funds are held.

      G.    Seller and Buyer acknowledge that the Escrow Agent has no obligation to deposit said funds unless and until the parties hereto supply the Escrow Agent with their taxpayer identification number, or such other information as is required to open the account or provide appropriate reporting information in connection with the account, including a fully executed W-9 form.

    5.    Notices.  Any notices, communications or other deliveries required to be sent under this Agreement shall be delivered in accordance with Section 17 of the Purchase Agreement.

    6.    Governing Law.  This Agreement, and all questions of interpretation hereof and all controversies hereunder shall be construed in accordance with and governed by the laws of the State of New York (without reference to principles of conflict of laws).

    7.    Captions.  Captions are used in this Agreement solely for convenience of reference and shall neither be considered a part of this Agreement nor affect the construction to be given any of its provisions.

    8.    Counterparts; Electronic Signatures.  This Agreement or its signature pages may be executed in any number of original counterparts, all of which evidence only one agreement and only one full and complete copy of which need be produced for any purpose.  A facsimile or other electronic image of a signature will have the same legal effect for the purpose of

establishing the execution of this Agreement as an originally drawn signature.

9.    <u>Severability</u>.  In the event any provision or portion of this Agreement is held by any court of competent jurisdiction to be invalid or unenforceable, such holding will not affect the remainder hereof, and the remaining provisions shall continue in full force and effect to the same extent as would have been the case had such invalid or unenforceable provision or portion never been a part of this Agreement.

10.    <u>No Waiver</u>.  The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement. Any waiver must be in writing.

11.    <u>Waiver of Jury Trial; Venue</u>.

(a)    SELLER, BUYER AND ESCROW HOLDER HEREBY EXPRESSLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY CLAIM, ACTION, PROCEEDING OR COUNTERCLAIM BY ANY SELLER, BUYER OR ESCROW HOLDER AGAINST ANY OTHER ON ANY MATTERS ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

(b)    Buyer, Seller and Escrow Holder hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of and agree that venue shall be proper in any New York State or Federal Court sitting in New York County, New York, in any action or proceeding arising out of or relating to or connected with this Agreement, or for recognition or enforcement of any judgment.  Buyer, Seller and Escrow Holder hereby irrevocably and unconditionally agree that all claims in respect of any such action or proceeding shall be heard and determined in such courts.  Buyer, Seller and Escrow Holder agrees that a final judgment in any such action or proceeding will be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ANY PARTY ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY NEW YORK STATE OR FEDERAL COURT SITTING IN NEW YORK COUNTY, NEW YORK, AND EACH PARTY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO (1) THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING AND (2) THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING (INCLUDING ANY OBJECTION OF OR RELATING TO FORUM NON-CONVENIENS).

12.    <u>Date for Performance</u>.  If the time period by which any right, notice, option or election provided under this Agreement must be exercised, or by which any act required hereunder must be performed, expires on a Saturday, Sunday or legal or bank holiday, then such time period will be automatically extended through the close of business on the next following business day.

13.    <u>No Third Party Beneficiary</u>.  The provisions of this Agreement are and will be for the benefit of Seller, Buyer and Escrow Holder only and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement.

INDEX NO. 655209/2017

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 169 of 277

RECEIVED NYSCEF: 08/04/2017

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

63666358   Exhibit R - 6

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 170 of 277

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed as of the date first written above.

                             **SELLER**:

                             **AB GREEN GANSEVOORT, LLC**, a Delaware limited liability company

            By: _____

                   Name:
                   Title:

            [signatures continue on following page]

**BUYER**:

[_____]

By: _____
Name:
Title:

**ESCROW HOLDER:**

**OLD REPUBLIC NATIONAL TITLE INSURANCE
COMPANY**

**By:** _____
      **Name:**
      **Title:**

## EXHIBIT S

Form of Excluded Property Assignment

## ASSIGNMENT AGREEMENT

This **ASSIGNMENT AGREEMENT** (this "Assignment"), is given this \_\_\_\_\_ day of _____, 201\_, from AB GREEN GANSEVOORT, LLC, a Delaware limited liability company ("Seller") and ABG STANDARD OPERATOR, LLC, a Delaware limited liability company ("Operating Tenant", and together with Seller, collectively, "Assignor") to [_____], a _____ _____ ("Assignee").

W I T N E S S E T H:

**WHEREAS**, pursuant to that certain Purchase and Sale Agreement, dated as of _____ \_\_, 201\_ (as same may have been or may hereafter be assigned, amended, modified or otherwise supplemented, collectively, the "Contract"; all capitalized terms used but not defined herein shall have the meaning ascribed to them in the Contract), between Seller and Assignee, Seller has agreed to sell and Buyer has agreed to purchase, among other things, The Standard High Line Hotel, located at 848 Washington Street, New York, NY and the other Property as set forth in the Contract; and

**WHEREAS**, pursuant to the Contract, the Closing for the Property is occurring on the date hereof, and Assignor have agreed to assign to Assignee (without any representation or warranty whatsoever) any right, title and interest Assignor may have (if any) in and to the Excluded Property listed on Schedule 1 attached hereto, subject to the conditions hereinafter set forth.

**NOW THEREFORE**, in consideration of the premises and of the mutual conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby agree as follows:

1.    Assignor hereby assigns to Assignee any of Assignor's right, title and interest in and to the Excluded Property listed on Schedule 1 attached hereto.

2.    This Assignment shall survive the Closing and shall inure to the benefit of all parties hereto and their respective heirs, successors and assigns.

4.    This Assignment may be executed in counterparts, each of which shall constitute an original, but all of which shall collectively constitute one instrument.

5.    This Assignment, and all questions of interpretation hereof and all controversies hereunder shall be construed in accordance with and governed by the laws of the State of New York (without reference to principles of conflict of laws).

6.    This Assignment is made without any representation, warranty (express or implied) or recourse of any kind, including any representation or warranty as to whether Seller or Operating Tenant have any right, title or interest in or to the Excluded Property listed on

63666358

INDEX NO. 655209/2017
RECEIVED NYSCEF: 08/04/2017

<u>Schedule 1</u>; it being agreed and understood that Assignor has advised Assignee that to Seller's Knowledge, Assignor does not own any right, title or interest in the Excluded Property listed on <u>Schedule 1</u>.

*(Signatures appear on following page)*

63666358

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 175 of 277

IN WITNESS WHEREOF, Assignor has executed this Assignment as of the day and year first above written.

**AB GREEN GANSEVOORT, LLC**, a Delaware limited liability company

By: _____
      Name:
      Title:

[signatures continue on the following page]

63666358

**ABG STANDARD OPERATOR, LLC**, a Delaware limited liability company

By: _____

    Name:

    Title:

63666358

## **Schedule 1**

1. The following trademarks and/or service marks: Le Bain, Top of the Standard, TOTS, Living Room, Standard Grill, Shop at the Standard, Standard Sounds, Standard Biergarten, Standard Beer Garden, Standard Brauhaus, Standard Bar, Biergarten, Pendragon design logo, Maid design logo, One Night Standard, The Standard Classes, Standard Time, The Standard Plaza, The Standard Ice Rink, Creperie, Balazs Locust Farm products, Standard Culture, Standard Talks;

2. Employee Handbook, Forms, Policies, Training Materials;

3. Menus, Recipes, Wine Lists, Drink Lists;

4. Photographs, images, videos, picture books, and all advertisements, marketing and promotional material of the Hotel (both digital and in paper form);

5. Branded events (e.g., Oyster Bash, Standard Talks, Standard Sounds, Standard Bingo, Songs from a Room, Annie O Music Series);

6. Forms of contracts (e.g., sales, events, barters, offer letters, severance agreements, confidentiality agreements, consulting agreement, service agreements, photography releases, location agreements, partnership agreements, construction forms, performance agreements, contest terms and conditions);

7. OSE, Consumable Supplies & FF&E with Standard Branding (e.g., coasters, check presenters, keys, notepads, beer cans, Nude Audio speakers);

8. All Permits that are non-transferable (liquor, health, music, etc)

9. André Balazs Rosé;

10. Signage, internal and external, displaying any of the trademarks and/or service marks indicated in item (1) above;

11. Play lists and other musical programming;

12. All Standard branded and related merchandise sold in the shop, mini-bars or otherwise in the hotel, included Warby Parker, Quicksilver, Harry's and all other branding partnerships;

13. Robes, slippers and other Standard branded bathroom amenities;

14. All Employee files and other paperwork (including I-9s and Wage Sheets);

15. Server data, emails, correspondence;

16. The Standard ice rink and related equipment (Zamboni);

17. Branded videos in the elevators;

63520636

18. Sales and Marketing Plan; and

19. Group Sales contracts and clients with respect to other hotels, but specifically excluding any contracts effective for any period of time after the Closing

Schedule 10(f)

**List Of Renewal Permits**

Health Department
Sidewalk Café
Cabaret
Public Assembly

Schedule 14(a)(xii)

**List of Service Contracts**

| Contractor | Service |
|---|---|
| 111 Eighth Parking LLC | Parking Garage |
| Accardi Companies | Gas Booster Annual Maintenance |
| ADT Security Services, Inc. | Electronic Security System |
| A&L Cesspool & Recycling | Dosing System |
| American Society of Composers, Authors and Publishers | Music Licensing |
| American Society of Composers, Authors and Publishers | Music Licensing |
| Americold, Inc. | Refrigeration & Maintenance |
| Americold, Inc. | Refrigeration Service |
| APC Sales and Service Corporation | Uninterruptible Power Supply |
| Atlantic /De Lange Landen Financial Services | Copier Lease |
| Atlantic/ De Lange Landen Financial Services | Copier Lease |
| Beautified Inc. | Beauty and Wellness Services |
| Birch Street Systems, Inc. | Electronic Procurement System |
| BMI | Music licensing |
| Booking.com | Travel sales and marketing services |
| Cashworx | ATM Machine |
| Chase Paymentech | Credit Card Processer |
| Design Communications LLC (DCI) | Internet Support Services |
| Fujitec America Inc. | Elevator Maintenance |
| Fire Service, Inc. | Fire Alarm Maintenance |
| Five Star Carting, Inc. | Waste Removal |
| Formula 1 Cleaner Corp | Valet laundry service -linens, uniforms, garments |
| Friends of the High Line | Donation Collection |
| Garda CL Atlantic, Inc. | Armored Car Service |
| Healthy Vending New York | Cafeteria Vending Machine |
| Iron Mountain | Off-site Storage |
| InteliTap, LLC | Beer Pouring Tracking System |
| Johnson Controls, Inc. | Building Management System Maintenance |

63666358

| | |
|---|---|
| Johnson Controls, Inc. | Chiller Maintenance |
| Lunchbox Fund | Charitable Organization |
| Manitowoc Finance | Ice Machines Lease |
| Mass Communication | Ethernet Services |
| Meyerson Associates, Inc. | Security Services |
| Micros Retail System, Inc. | Point of Sale System Maintenance |
| Mr & Mrs Smith | Travel and Marketing Services |
| Natural Water Inc. | Water filtration and cooler system rental |
| Natural Wireless | Wireless Internet Service |
| Newmarket | Support for Reservations Connector to MICROS |
| NYC Photobooth, Inc. | Photobooth Lease |
| Oliver Peoples, Inc. | Exclusive Eyeglass Distributor Agreement |
| Onity, Inc. | Extended Warranty |
| Onyx Payments | TA Commission Processing |
| OpenTable, Inc. | Online Restaurant Reservations |
| OSA Financial, Inc. (now Cashworx) | ATM Placement Agreement |
| Padded Wagon | Storage |
| PAETEC Communications, Inc.(now Windstream) | Phone & Internet Service |
| Pitney Bowes Global Financial Services, Inc. | Postage Meter Lease |
| Playlister | Background Music System |
| PureHD | HD Television Services |
| Ready to Roll | Car Service |
| Red Book Connect, LLC | F&B Staff Schedule Management |
| RFP Express Inc | Internet Lodging Program |
| Rink Management Services Corporation | Outdoor Seasonal Ice Rink |
| Rudox Engine and Equipment Company | Generator Maintenance |
| S.J. Energy Partners, Inc. | Natural Gas & Electric Supply |
| Saxony Ice Co, a division of Arctic Glacier, Inc. | Ice Machine Lease |
| SESAC LLC | Music License |
| Singer NY LLC | Preferred Customer Agreement |
| Sodexo Operations LLC | Employee Food Service |
| Tablet, Inc. | Inventory Management |
| TimePayment Corp | Water Filtration System Rental |
| TimePro | Time Keeping System |

| Titan Exterminating Corp | Extermination and pest management services |
|---|---|
| Tower Water, a division of Tower Cleaning Plus, Inc. | Cooling Tower Cleaning |
| Tyco Integrated Security | Fire and Alarm Monitoring |
| United Hood Cleaning | Hood Cleaning |
| USA Technologies | Credit card processor Le Bain Vending Machine |
| W&M Sprinkler-NYC, LLC | Inspection of Sprinkler System |
| Windstream | Conference Calling |
| White Plains Coat & Apron Co., Inc. | Linen Supply |
| Various Consortia Travel Agencies | Travel Agents |

[*Note, there are many additional 1099s and vendors that are not under contract]



Schedule 14(a)(xvi)

Violations

1.          Any violations disclosed in the municipal searches ran by Stewart Title Insurance Company and First Nationwide Title Agency, LLC prior to the Effective Date, including the Fire Department Violation # E454847.

2.          Any violations disclosed in that certain email from Info2@statesofcontrol.com on July 26, 2016 to representatives of Manager and others relating to the Liquor Licenses.

63666358

<u>Schedule 14(a)(xix)</u>

Existing Debt Documents

## A.  MORTGAGE LOAN DOCUMENTS

1.  Loan Agreement made by Senior Loan Lender, Seller and Operating Tenant dated December 9, 2014.

2.  $160,000,000 Amended, Restated and Consolidated Promissory Note made by Seller and Senior Loan Lender dated December 9, 2014.

3.  Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, and Security Agreement made by Seller, Operating Tenant and Senior Loan Lender dated December 9, 2014.

4.  Section 255 Affidavit in connection with Amended, Restated and Consolidated Mortgage, Assignment of Leases, and Rents and Security Agreement dated December 9, 2014.

5.  Assignment of Leases and Rents made by Seller and Operating Tenant to Senior Loan Lender dated December 9, 2014.

6.  Section 255 Affidavit in connection with Assignment of Leases and Rents dated December 9, 2014.

7.  UCC Financing Statement naming Seller and Operating Tenant, as debtors, and Senior Loan Lender, as secured party.

8.  UCC Financing Statement naming Seller and Operating Tenant, as debtor, and Senior Loan Lender, as secured party.

9.  Assignment of Agreements, Licenses, Permits and Contracts made by Seller and Operating Tenant to Senior Loan Lender dated December 9, 2014.

10.  Assignment and Subordination of Management Agreement and Consent of Manager made by Seller and Operating Tenant to Senior Loan Lender and consented and agreed to by Manager dated December 9, 2014.

11.  Operating Lease Subordination Agreement made by and between Senior Loan Lender and Operating Tenant and accepted and agreed to by Seller dated December 9, 2014.

12.  Cash Management Agreement made by and among Seller, Operating Tenant, Senior Loan Lender and Wells Fargo Bank, N.A. ("<u>Wells</u>") dated December 9, 2014.

63666358

13. Deposit Account Control Agreement made by and among Seller, Operating Tenant, Senior Loan Lender and Bank of America, N.A., as depository bank, dated January 7, 2015.

14. Guaranty Agreement made by Existing Debt Guarantors for the benefit of Senior Loan Lender dated December 9, 2014.

15. Environmental Indemnity Agreement made by Seller, Operating Tenant and Existing Debt Guarantors in favor of Senior Loan Lender dated December 9, 2014.

16. Collateral Assignment of Interest Rate Cap Agreement made by Seller, in favor of Senior Loan Lender and acknowledged by Commonwealth Bank of Australia ("Bank of Australia") dated December 9, 2014.

17. Rate Cap Confirmation made by Bank of Australia and confirmed by Seller dated December 9, 2014.

18. Post Closing Letter made by Seller and Operating Tenant and acknowledged and agreed to by Senior Loan Lender dated December 9, 2014.

**B.    SENIOR MEZZANINE LOAN DOCUMENTS**

19. Mezzanine Loan A Loan Agreement made by and between Mezzanine Loan A Borrower and Mezzanine Loan A Lender dated December 9, 2014.

20. $70,000,000 Promissory Note (Mezzanine Loan A) made by Mezzanine Loan A Borrower to the order of Mezzanine Loan A Lender dated December 9, 2014.

21. Pledge and Security Agreement (Mezzanine Loan A) made by Mezzanine Loan A Borrower for the benefit of Mezzanine Loan A Lender dated December 9, 2014.

22. Acknowledgement of Pledge (Mezzanine Loan A) made by Seller and Operating Tenant to Mezzanine Loan A Lender dated December 9, 2014.

23. Membership Interest Certificate evidencing 100% LLC Interest in Seller held by New York Standard Mezz I LLC with Equity Interest Power in blank dated December 9, 2014.

24. Membership Interest Certificate evidencing 100% LLC Interest in Operating Tenant held by New York Standard Operator Mezz I LLC with Equity Interest Power in blank dated December 9, 2014.

25. UCC-1 Financing Statement naming Mezzanine Loan A Borrower, as debtor, and Mezzanine Loan A Lender, as secured party.

26. Guaranty Agreement (Mezzanine Loan A) made by Existing Debt Guarantors for the benefit of Mezzanine Loan A Lender dated December 9, 2014.

INDEX NO. 655209/2017
Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 186 of 277
RECEIVED NYSCEF: 08/04/2017

27. Environmental Indemnity Agreement (Mezzanine Loan A) made by Mezzanine Loan A Borrower and Existing Debt Guarantors in favor of Mezzanine Loan A Lender dated December 9, 2014.

28. Subordination of Management Agreement and Consent of Manager (Mezzanine Loan A) made by Mezzanine Loan A Borrower, Seller and Operating Tenant to Mezzanine Loan A Lender and consented and agreed to by Manager dated December 9, 2014.

29. Mezzanine Loan A Operating Lessee Consent Agreement made by and between Mezzanine Loan A Lender and Operating Tenant and accepted and agreed to by Mezzanine Loan A Borrower dated December 9, 2014.

30. Collateral Assignment of Interest Rate Cap Agreement made by Mezzanine Loan A Borrower, in favor of Mezzanine Loan A Lender and acknowledged by Bank of Australia dated December 9, 2014.

31. Rate Cap Confirmation made by Bank of Australia and confirmed by Mezzanine Loan A Borrower dated December 9, 2014.

32. Post Closing Letter made by Mezzanine Loan A Borrower and acknowledged and agreed to by Mezzanine Loan A Lender dated December 9, 2014.

## C.   JUNIOR MEZZANINE LOAN DOCUMENTS

33. Mezzanine Loan B Loan Agreement made by and between Mezzanine Loan B Borrower and Mezzanine Loan B Lender dated December 9, 2014.

34. $70,000,000 Promissory Note (Mezzanine Loan B) made by Mezzanine Loan B Borrower to the order of Mezzanine Loan B Lender dated December 9, 2014.

35. Pledge and Security Agreement (Mezzanine Loan B) made by Mezzanine Loan B Borrower for the benefit of Mezzanine Loan B Lender dated December 9, 2014.

36. Acknowledgement of Pledge (Mezzanine Loan B) made by Mezzanine Loan A Borrower to Mezzanine Loan B Lender dated December 9, 2014.

37. Membership Interest Certificate evidencing 100% LLC Interest in New York Standard Mezz I LLC held by New York Standard Mezz II LLC with Equity Interest Power in blank dated December 9, 2014.

38. Membership Certificate evidencing 100% LLC Interest in New York Standard Operator Mezz I LLC held by New York Standard Operator Mezz II LLC with Equity Interest Power in blank dated December 9, 2014.

39. UCC-1 Financing Statement naming Mezzanine Loan B Borrower, as debtor, and Mezzanine Loan B Lender, as secured party.

40.    Guaranty Agreement (Mezzanine Loan B) made by Existing Debt Guarantors for the benefit of Mezzanine Loan B Lender dated December 9, 2014.

41.    Environmental Indemnity Agreement (Mezzanine Loan B) made by Mezzanine Loan B Borrower and Existing Debt Guarantors in favor of Mezzanine Loan B Lender dated December 9, 2014.

42.    Subordination of Management Agreement and Consent of Manager (Mezzanine Loan B) made by Mezzanine Loan B Borrower, Mezzanine Loan A Borrower, Seller and Operating Tenant to Mezzanine Loan B Lender and consented and agreed to by Manager dated December 9, 2014.

43.    Mezzanine Loan B Operating Lessee Consent Agreement made by and between Mezzanine Loan B Lender and Operating Tenant dated December 9, 2014.

44.    Collateral Assignment of Interest Rate Cap Agreement made by Mezzanine Loan B Borrower, in favor of Mezzanine Loan B Lender and acknowledged by Bank of Australia dated December 9, 2014.

45.    Rate Cap Confirmation made by Bank of Australia and confirmed by Mezzanine Loan B Borrower dated December 9, 2014.

46.    Post Closing Letter made by Mezzanine Loan B Lender and acknowledged and agreed to by Mezzanine Loan B Lender dated December 9, 2014.

**D.    OTHER DOCUMENTS**

47.    Flex Letter made by Lender and accepted and agreed to by Seller, Operating Tenant, Mezzanine Loan A Borrower and Mezzanine Loan B Borrower dated December 9, 2014.

48.    Waiver of Flex Letter made by Bank of America, N.A. (as predecessor in interest to Senior Loan Lender, Mezzanine Loan A Lender and Mezzanine Loan B Lender) dated July 20, 2015.

**E.    LOAN AMENDMENT AND ASSIGNMENT DOCUMENTS**

49.    First Amendment to Loan Agreement made by Seller, Operating Tenant, and Senior Loan Lender ("First Amendment to Mortgage Loan") dated July 31, 2015.

50.    First Amendment to Mezzanine Loan A Loan Agreement made by Mezzanine Loan A Borrower and Mezzanine Loan A Lender ("First Amendment to Senior Mezz Loan") dated July 31, 2015.

51.    Note Splitter Agreement made by Mezzanine Loan A Borrower and Mezzanine Loan A Lender dated July 31, 2015.

52.     $40,000,000 Replacement Promissory Note A-1 (Mezzanine Loan A) made by Mezzanine Loan A Borrower to the order of Mezzanine Loan A Lender dated July 31, 2015.

53.     $30,000,000 Replacement Promissory Note A-2 (Mezzanine Loan A) made by Mezzanine Loan A Borrower to the order of Mezzanine Loan A Lender dated July 31, 2015.

54.     Voided $70,000,000 Promissory Note (Mezzanine Loan A) made by Mezzanine Loan A Borrower to the order of Mezzanine Loan A Lender.

55.     Assignment and Assumption Agreement (Mezzanine Loan B) made by Bank of America, N.A. (as predecessor in interest to Mezzanine Loan B Lender) and Mezzanine Loan B Lender dated January 6, 2015.

56.     Consent made by Mezzanine Loan B Lender dated July 27, 2015.

57.     Notice re "Mortgage Loan in the original principal amount of $160,000,000 (the "Loan") relating to the Standard Hotel in New York City (the "Property")" made by Bank of America, N.A. (as predecessor in interest to Senior Loan Lender) and Senior Loan Lender dated August 11, 2015.

58.     "Notice to Borrower and Guarantor of Mezzanine A Loan Assignment" made by Bank of America, N.A. (as predecessor in interest to Mezzanine Loan A Lender) and Mezzanine Loan A Lender dated July 31, 2015.

59.     Notice re "The Mezzanine Loan B Loan Agreement, dated December 9, 2014 (the "Mezz B Loan Agreement"), between Borrower and Bank of America, N.A. ("Lender")" made by Mezzanine Loan B Lender dated January 13, 2015.

Schedule 15(a)

Buyer's Organizational Chart

**HotelsAB Green Ownership Chart**



# EXHIBIT B

**HOTELSAB GREEN, LLC**
**c/o Andre Balazs Properties**
**23 East 4th Street, 5th Floor**
**New York, New York 10003**

September 16, 2016

Reignwood Europe Holdings SARL
39, Avenue John F. Kennedy
L-1855 Luxembourg

Re: The High Line Building, 848 Washington Street, New York, New York (the
"Property")

        Pursuant to that certain Purchase and Sale Agreement (the "PSA"), dated as of
August 16, 2016, between AB Green Gansevoort, LLC ("Seller") and HotelsAB Green,
LLC ("Buyer"), an entity wholly-owned by Andre Balazs ("AB"), Buyer agreed to
purchase the Property from Seller, subject to the terms and conditions of the PSA. Buyer
has provided a complete and accurate copy of the PSA to you. The principal terms of the
PSA include the following:

- Purchase Price: $390,000,000

- Initial Deposit: $5,000,000, which has already been paid by Buyer to
  Seller. The Initial Deposit is nonrefundable to Buyer except as otherwise
  expressly set forth in the PSA.

- Additional Deposit: $10,000,000. The PSA requires that the Additional
  Deposit be paid to Seller no later than September 29, 2016. The
  Additional Deposit is nonrefundable to Buyer except as otherwise
  expressly set forth in the PSA.

- Scheduled Closing Date: January 31, 2017 is the outside date, though
  Buyer intends to close on or before December 30, 2016 subject to receipt
  of the Existing Debt Assumption and the Liquor License Approval (each
  hereinafter defined). The outside date is subject to limited adjournment
  for specified reasons set forth in the PSA, including by Buyer if it
  encounters delays in obtaining the Existing Debt Assumption or Liquor
  License Approval (certain of the adjournment rights each require the
  payment of an additional $5,000,000 deposit (such deposits collectively,
  the "Extension Deposits")).

- Existing Debt Assumption and Release: Buyer presently intends to
  assume the existing non-recourse $160,000,000 mortgage, $70,000,000

senior mezzanine and $70,000,000 junior mezzanine debt encumbering the Property (collectively, the "Existing Debt"). In connection therewith (but subject to Section 5),

- ○ on or prior to September 29, 2016, Buyer must identify one or more individuals and/or entities that satisfy the guarantor Minimum Financial Criteria (defined below) and which as of the closing of the transaction will own an interest in the Property, which Buyer will offer as a replacement "bad act" guarantor and environmental indemnitor under the Existing Debt from and after the closing of the acquisition of the Property. "Minimum Financial Criteria" is defined as a minimum Net Worth (as defined in the loan documents evidencing the Existing Debt) of not less than $40,000,000 (excluding any equity interest in the Property) and (ii) Liquidity (as defined in the loan documents evidencing the Existing Debt) of not less than $10,000,000; and

- ○ on or prior to October 14, 2016, Buyer must submit to Seller (for submission to the lenders) complete applications for the Existing Debt assumption, together with all documents and information required in connection therewith, including such information concerning the transfer, Buyer and the proposed replacement "bad act" guarantor(s) and environmental indemnitor(s) as the lenders may reasonably require, together with a processing fee in the amount of $25,000 for each loan (the "Existing Debt Assumption Application").

- • Liquor License Application: Subject to Section 5, on or prior to October 14, 2016, Buyer must file an application with the New York State Liquor Authority (the "NYSLA") to obtain new liquor licenses for the Property or for an endorsement to the existing liquor licenses for the Property replacing Seller with Buyer as a co-licensee (the "Liquor License Application"). The Liquor License Application will require some disclosure (and related diligence by the NYSLA) regarding each future owner of an interest in the Property.

The following provisions of this letter (this "Letter Agreement") set forth the material terms pursuant to which Reignwood Europe Holdings SARL, directly and/or indirectly through one more affiliates (collectively, "Investor"), has agreed to invest with Buyer in connection with Buyer's acquisition of the Property pursuant to the PSA. The parties intend this Letter Agreement to be a legally binding expression of their agreement, and it is expressly understood and agreed that this Letter Agreement is binding on the parties and their respective affiliates, successor and assigns.

1.    [Intentionally Omitted]

2.     Subject to Section 5, prior to the time on September 29, 2016 when the
$10 million Additional Deposit is due and payable under the PSA, Investor shall fund to
Seller the sum of $10 million by wire transfer of immediately available federal funds and
otherwise in accordance with the PSA in respect of the Additional Deposit (the "Initial
Investor Investment"), to be held and disbursed by Seller in accordance with the PSA.
Investor acknowledges that pursuant to the PSA the Additional Deposit (as well as the
Initial Deposit) is non-refundable to Buyer except as otherwise expressly provided in the
PSA. Buyer agrees to return the Initial Investor Investment (together with any interest
accrued thereon under the PSA) to Investor to the extent Seller returns the Additional
Deposit to Buyer. In consideration of the Initial Investor Investment, (i) Buyer
acknowledges and agrees that upon the funding of the Initial Investor Investment Buyer
will own the "buyer" interest under the PSA for the joint benefit of Buyer and Investor
and (ii) buyer shall cause the PSA to be assigned to the joint venture as soon as the joint
venture has been formed and the JVA (hereinafter defined) executed by the parties.

3.     Investor shall (a) from time to time upon request of Buyer's liquor license
counsel provide such information as may reasonably be requested by such counsel in
order to prepare, complete and process the Liquor License Application and (b) provide
evidence that Investor satisfies the Minimum Financial Criteria, which will be available
for submission to the Existing Debt lender. Buyer is permitted to (i) identify and
represent in writing to Seller that (x) Investor satisfies the Minimum Financial Criteria
and that (y) as of the closing of the transactions contemplated by the PSA, Investor will
own an indirect interest in the Property, and in each party that will be a borrower under
the Existing Debt upon consummation of the Existing Debt Assumption and Release, (ii)
offer Investor as a replacement "bad act" guarantor and environmental indemnitor under
the Existing Debt from and after the closing of the transactions contemplated by the PSA
(subject to indemnification in the JVA as detailed below) and (iii) identify Investor's
potential role in the transaction in the Existing Debt Assumption Application and/or
Liquor License Application.

4.     Buyer has advised Investor that following the acquisition of the Property
by the joint venture, Buyer intends to convert the upper floors of the hotel (but not the
hotel guest rooms on such upper floors, which guestrooms may be reconfigured and
renovated but will remain part of and operated as part of the hotel) as a private club. The
cost of performing the capital improvements and other renovation work necessary to
effectuate such conversion at the Property (collectively, the "Club Conversion") has not
yet been determined and will be subject to agreement of the parties. The parties currently
anticipate obtaining financing to fund all costs of the Club Conversion but, to the extent
that they do not obtain sufficient financing to fund all such costs, each of Investor and
AB shall contribute equity capital to the joint venture to fund of such costs (subject to the
right of AB to borrow such funds from Investor as set forth in Section 8). Buyer and
Investor have discussed a preliminary strategy to include in the private club concept a
possible combination of the club at the Property with similar private clubs to be
developed at the Chiltern Firehouse, the Wentworth Golf Club, the Chateau Marmont, a
soon-to-be-opened private club at 10 Trinity Place in London and possible other assets to
be purchased or leased or already owned in whole or in part by AB or the Investor and

3



their respective affiliates. These initial additional club locations might be purchased, leased, or controlled through a structure that would require them to pay a license fee to a private club ownership venture to be formed by Buyer and Investor or their respective affiliates. The private club ownership venture would own the rights to the name of the club, and all intellectual property rights associated with it, and license the name and other intellectual property to the individual properties at rates to be jointly determined. The private club ownership venture would be initially owned 60% by Investor and 40% by AB, with the intention of selling minority stakes to strategic investors/members, as may be mutually agreed upon. Investor requires as a condition of its investment in the Property that the joint venture terminate the Standard International management agreement as of the closing on the acquisition of the Property (in accordance with any requirements relating to termination set forth in such management agreement). Upon such termination, all services (day to day management, marketing, sales, etc) with respect to the private club and the hotel shall be provided by HotelsAB, LLC ("HotelsAB"). The management entity would pass through all actual costs to the private club ownership venture which, in turn, would charge the individual properties separately for services or as part of the licensing fee, as may be mutually determined. The pass-through costs from the management entity to the private club entity would include a reasonable direct personal salary for AB.

5. Investor shall have until October 13, 2016 to complete its due diligence investigation of the opportunity and Buyer agrees to provide any information reasonably available to Buyer to assist in such investigation. If for any reason Investor is not satisfied (in Investor's sole discretion) with the results of its diligence investigations or its underwriting of the transaction and prior to October 13, 2016 gives notice to such effect to AB, then thereafter so long as the PSA remains in full force and effect the parties shall work diligently and in good faith to secure a replacement investor acceptable to AB to fund the equity capital required to consummate the transaction and that will cause an affiliate of such replacement investor that meets the Minimum Financial Criteria to be the replacement "bad act" guarantor and environmental indemnitor under the Existing Debt from and after the closing of the transactions contemplated by the PSA and, subject to the provisions of Section 6 requiring that Investor reimburse AB and AB reimburse Investor in certain circumstances, and provided that Investor shall have timely made the Initial Investor Investment, Investor's interest in the joint venture will be converted to a passive interest as provided in Section 6 below. Investor and Buyer acknowledge that if Investor determines pursuant to this Section 5 that it does not intend to proceed and its interest is converted to a passive interest, it may be the case that AB and Investor will not be able find a suitable replacement investor and/or be able to perform its obligations under the PSA, and in such case the Initial Deposit and the Additional Deposit would be forfeited to Seller.

6. Investor will provide 90% and AB will provide 10%, on an ongoing/current basis as equity is required prior to or at the closing under the PSA, of all of the equity required to consummate the transaction including, without limitation, the Extension Deposits (to the extent applicable) and third-party costs borne by either party in connection with the joint venture, the acquisition or the financing incurred from and

ACTIVE/87907513.12

after September 17, 2016 (and the JVA (as defined below) shall provide that from and after execution thereof each shall reimburse the other from time to time so that each party has borne its pro rata share of required funds consistent with the foregoing); provided, however, that if AB's 10% share of such equity exceeds $10 million, then AB shall have the right to borrow such excess required equity from Investor pursuant to Section 8. Notwithstanding the foregoing, (x) each of AB and Investor (and not the joint venture) shall be responsible for all out-of-pocket costs incurred by such party (including, without limitation, legal fees such that AB shall bear all legal fees incurred in connection with the negotiation of the PSA) prior to September 17, 2016, other than the Initial Deposit, and (y) AB and not the joint venture shall be solely responsible for the Teague Fee (collectively, "Excluded Costs"). Buyer and Investor acknowledge and agree that while the material terms of Investor's investment with Buyer and in the Property have been agreed to and are set forth herein, the specific structure and complete terms of Investor's investment with Buyer and in the Property have not yet been determined or agreed upon, that the same will be dependent upon the requirements of the Existing Debt lenders and NYSLA. Investor nonetheless agrees that whether or not Investor executes and delivers the JVA as contemplated by Section 7 below, the Initial Investor Investment shall be non-refundable except as otherwise set forth in this Letter Agreement. Notwithstanding anything to the contrary set forth in this Letter Agreement, if Investor determines in good faith pursuant to its diligence investigations or otherwise that either (i) there is a deficiency in the physical condition of the roof, structural elements or building systems or there are material issues with respect to environmental conditions or contamination at or under the Property which, in the aggregate, could reasonably be expected to cost in excess of $10 million to remedy, which is not disclosed in any of the property condition reports or environmental reports (the "Existing Condition Reports") provided by Buyer to Investor prior to the date hereof, and AB does not promptly provide assurances to Investor reasonably acceptable to Investor that AB will reasonably promptly remedy such material deficiency or environmental contamination, with AB to pay the cost thereof in excess of $10 million and the joint venture to pay the cost that is less than $10 million, (ii) there is a material title or survey issue affecting the Property that was not reflected in the title report and property survey (the "Existing Title Report and Survey") delivered to Investor and that would entitle Buyer to terminate the PSA or (iii) Investor's financial due diligence of the operating statements of the Hotel for the period between January 1 and June 30 (inclusive) of calendar year 2016 reveals that the aggregate net operating income of the Hotel during such period is lower by 10% or more than what was reported in such operating statements (each of the foregoing items (i), (ii) and (iii) are an "Adverse Diligence Discovery"), then (x) if Investor determines that there is an Adverse Diligence Discovery and gives notice thereof to AB prior to September 29, 2016, then Investor shall have no obligation to make the Initial Investor Investment or (y) if Investor determines that there is an Adverse Diligence Discovery on or after September 29, 2016 but on or before October 13, 2016, then unless AB promptly provides assurances to Investor reasonably satisfactory to Investor that (I) AB will fully remedy such issues, with AB to pay the cost thereof in excess of $10 million and the joint venture to pay the cost that is less than $10 million with respect to any physical condition or title related issues as set forth in clause (i) or (ii) above or (II) AB shall pay to the joint venture an amount equal to the portion of the net operating income shortfall above the 10% discrepancy for each of

the first 3 full years after closing, and the joint venture will have an offset right against
management fees if AB fails to pay, Investor may terminate this Letter Agreement and
AB promptly shall reimburse Investor for the Initial Investor Investment. In addition to
the foregoing, Investor shall have until 6:00 pm Eastern time on September 19 (with
respect to the Existing Title Report and Survey) and 6:00 pm Eastern time on September
21 (with respect to the Existing Condition Reports), time being of the essence, to
terminate this Letter Agreement (and thus its obligation to make the Initial Investor
Investment) solely if Investor identifies any Adverse Diligence Discovery set forth in the
Existing Title Report and Survey or the Existing Condition Reports, as applicable, unless
AB promptly provides assurances to Investor reasonably satisfactory to Investor that AB
will fully remedy such Adverse Diligence Discovery, with AB to pay the cost thereof in
excess of $10 million and the joint venture to pay the cost that is less than $10 million. If
the closing on the acquisition of the Property does not occur solely as a result of AB's
material default under this Letter Agreement or the JVA, then AB promptly shall
reimburse Investor for any loss of the Initial Investor Investment and for any third party
out-of-pocket costs incurred by Investor in connection with this Letter Agreement and the
contemplated transaction. If the closing on the acquisition of the Property does not occur
solely as a result of Investor's material default under this Letter Agreement or the JVA,
or if Investor shall after funding the Initial Investor Investment determine pursuant to
Section 5 that it is not satisfied with its diligence investigations (other than with respect
to an Adverse Diligence Discovery as set forth above) or underwriting and has elected
not to provide further equity needed for closing, then Investor promptly shall reimburse
AB for any loss of AB's Initial Deposit and for any third party out-of-pocket costs
incurred by AB in connection with the transaction. Subject to the foregoing provisions of
this Section 6, and provided that Investor shall have timely made the Initial Investor
Investment, if Investor timely gives notice to AB pursuant to Section 5 that it is not
satisfied with its diligence investigations or underwriting, then Investor shall remain as a
passive investor without any governance rights (including no rights to approve any
Mutual Decisions (defined below)) for the amount of capital funded by Investor
(including legal fees and any other out-of-pocket costs or expenses incurred by Investor
in connection with this Letter Agreement and the transaction), and AB and other
investors shall have the right but not the obligation to redeem Investor prior to closing by
paying the Investor the full amount of such capital funded by Investor.

7.     The parties agree to cooperate in good faith to negotiate and, subject to
Sections 5 and 6, execute and deliver a definitive joint venture agreement (the "JVA") on
or before October 13, 2016. The JVA shall reflect the express terms and provisions of
this Letter Agreement, and such other terms and conditions as are otherwise reasonably
necessary under the circumstances or otherwise agreed in good faith between the parties
(all of the foregoing, collectively, the "JV Standard"). For the avoidance of doubt,
cooperation by the parties shall include cooperating with the requirements of the Existing
Debt lenders and NYSLA.

8.     In addition to the terms and conditions set forth in the foregoing
provisions of this Letter Agreement, the material terms of the JVA shall be as follows:

* AB will invest at or prior to the closing of the acquisition of the Property, on an ongoing/current basis as equity is required prior to or at the closing under the PSA, cash in an amount equal to 10% of all of the equity required to consummate the transaction, including amounts already funded for the Initial Deposit and AB's out-of-pocket costs incurred in connection with the transaction (including, without limitation, legal fees, travel expenses, but in all events excluding Excluded Costs (which shall be paid by AB or Investor, as applicable, as set forth above)), and Investor shall invest at or prior to the closing of the acquisition of the Property, on an ongoing/current basis as equity is required prior to or at the closing under the PSA, cash in an amount equal to 90% of all of the equity required to consummate the transaction (other than Excluded Costs). Investor acknowledges that a portion of AB's capital investment may be in the form of a "rollover" of AB's existing equity in Seller as provided in the PSA as long as such rollover structure does not have an adverse economic or tax impact on Investor (other than de minimis) relative to a cash equity funding by AB. AB anticipates that approximately $100 million of equity will be required for closing (including payment or reimbursement of AB's and Investor's out-of-pocket costs incurred in connection with the transaction) such that AB's 10% equity investment will translate to an approximately $10 million investment.

* In addition to a pro rata share of the joint venture based on AB's invested equity, AB may be issued up to an additional 15% subordinated capital interest in the joint venture (i.e. such subordinated capital would be repaid to AB after repayment to Investor and AB of actual funded cash equity), as and when provided below, based on the following. The issuance of such interests shall be structured in a tax efficient manner to be mutually agreed prior to the closing.

  o A 5% subordinated capital interest upon the closing on the acquisition of the Property by the joint venture.

  o An additional 10% potential subordinated capital interest in connection with Club Conversion, as follows:

    * 3%, which will vest if and when substantial completion (to be defined in the JVA) of the Club Conversion occurs consistent in all material respects with (i) the schedule therefor approved by Investor and (ii) the final budget therefor approved by Investor (in each case subject to force majeure (to be defined in the JVA)), and the opening of the Club for business.
    * If the foregoing 3% subordinated capital interest vests, then an additional 3% subordinated capital interest will vest if and when annual EBITDA for the entire Property,

ACTIVE/87907513.12

including the Club (determined in accordance with the pro forma financial statements previously presented to Investor) for any two consecutive years following substantial completion of the Club and the opening of the Club for business exceeds $45 million per year; provided, however, that if such EBITDA requirement is not met for two consecutive years within five years after substantial completion of the Club and the opening of the Club for business, then such 3% subordinated capital interest will not vest.

- If the foregoing second 3% subordinated capital interest vests, then an additional 4% subordinated capital interest will vest if and when annual EBITDA for the entire Property, including the Club (determined in accordance with the pro forma financial statements previously presented to Investor) for any three consecutive years following substantial completion of the Club and the opening of the Club for business exceeds $45 million per year; provided, however, that if such EBITDA requirement is not met for three consecutive years within five years after substantial completion of the Club and the opening of the Club for business, then such 4% subordinated capital interest will not vest.

The parties acknowledge that the business plans and operating budgets for the operation of the Property are intended not to unreasonably interfere with the achievement of the foregoing requirements for AB to be issued up to an additional 15% subordinated capital interest in the joint venture. At such time as any of the foregoing subordinated capital interests are vested in AB, his proportionate share of operating cash flow from the joint venture shall reflect such vested interests. For example, if the foregoing 5% subordinated capital interest upon closing of the transaction and the 3% subordinated capital interest pursuant to the first bullet above have vested in AB, then AB shall be entitled to receive 18% (i.e. his 10% pari passu funded capital interest plus his 5% and 3% vested subordinated capital interests) of operating cash flow of the joint venture.

o  Net Cash Flow from the Property in any calendar year from and after closing, up to the amount of the Baseline Net Cash Flow, shall be distributed to the parties based on their capital interests in the joint venture, including any subordinated capital interest vested in AB at the time in question pursuant to the foregoing provisions. In addition, if Net Cash Flow from the Property in any calendar year exceeds the Baseline Net Cash Flow, then 50% of such excess




shall be distributable to AB (with the balance distributed pro rata to the parties based on their capital interests in the joint venture including, in the case of AB, any subordinated capital interest as and when vested), but in no event will AB's aggregate distributable share of Net Cash Flow exceed 25% of the total Net Cash Flow from the Property. Any additional Net Cash Flow distributable to AB pursuant to the immediately preceding sentence (i.e., in excess of AB's pro rata share based on AB's capital interest then vested) shall not be distributed to AB, but instead placed in reserve to fund AB's share of any capital required pursuant to the last sentence in the first paragraph of Section 4 above. If the Existing Debt is refinanced or if the joint venture obtains additional financing such that the joint venture's interest expense is different from interest expense on the Existing Debt, then the parties shall cooperate to agree on an equitable adjustment to the foregoing net cash flow provisions to reflect such different interest expense.

○ "Net Cash Flow" for a calendar year means EBITDA for the entire Property (including the Club) during the calendar year in question as shown in the audited financial statements for the Property for such calendar year *less* the contributions to be made to the FF&E Reserve for such calendar year and *less* debt service payable in during such calendar year. "Baseline Net Cash Flow" means EBITDA for the entire Property during calendar year 2016 as shown in the audited financial statements for the Property for 2016 *less* the contributions to be made to the FF&E Reserve for 2016 and *less* debt service payable in 2016.

▪ Equity capital requirements of the joint venture after the closing on the acquisition of the Property will be funded pro rata based on the parties respective capital interest in the joint venture (including, in the case of AB, any vested subordinated capital interest). AB will be protected from dilution due to further capital investments by being able to borrow on a non-recourse basis from Investor at an interest rate equal to the best achievable bank (or other institutional lending source) borrowing cost of Investor, which borrowing shall be secured by AB's interest in the joint venture and which borrowing with interest will be repaid out of distributions to AB under the joint venture.

▪ Upon termination of the management agreement with Standard International for any portion of the Property (which Investor requires as a condition of its investment in the Property and which the joint venture shall do in connection with closing consistent with the requirements of the Standard International management agreement), HotelsAB will be engaged to manage the entire Property, and will be entitled to receive a

9

management fee of 4% of gross revenues for the portion managed by HotelsAB, which management agreement will have a term of twenty-five (25) years, will be non-terminable other than for (i) failure of customary performance tests and for material defaults (in each case subject to customary cure rights), (ii) malfeasance, (iii) upon a change of control of HotelsAB or the death or permanent disability of Andre Balazs such that he cannot fulfill his duties in connection with the management and operation of the Property, and (iv) upon any sale mutually agreed by AB and Investor solely with the payment of a termination fee (which termination fee shall be $15 million during the first 15 years of the term and $10 million during the last 10 years of the term). Otherwise, such management agreement shall be consistent in all material respects with the existing management agreement with Standard International as in effect on the date of this Letter Agreement. If a portion of the Property is leased to a third party, the management fee will be earned on the rental income received by the joint venture and not the gross revenues of the lessee. AB represents to Investor that HotelsAB is not barred from managing or operating the Property pursuant to the noncompete agreement currently in effect between AB and Standard International; provided, that the foregoing shall not be deemed to limit the indemnity of AB provided for in the following bullet point section except as expressly set forth therein. Investor acknowledges that it shall have no approval rights over the employees involved in the management of the Property by HotelsAB, if applicable, with the exception of the chief financial officer of the hotel and the general manager of the hotel (for which Investor's approval shall be required). In addition to the foregoing, Investor shall have the right to approve the senior operating and financial executives (such as a general manager and chief financial officer, to the extent applicable) of the club.

■ AB will be the operating member of the joint venture, with the authority to bind the joint venture on all matters, subject to Investor's right to approve any Mutual Decision. The joint venture shall indemnify AB, Investor and their respective affiliates in respect of any claims asserted by Standard International as a result of any actions taken by the joint venture relating to the Standard International management agreement, including the payment of all legal fees and other out-of-pockets costs of the joint venture, each party and their affiliates in connection with any such claim; provided, that if a court finds in a final non-appealable judgment that AB committed a breach of fiduciary duty to Standard International or breached any noncompete agreement in favor of Standard International, then AB and not the joint venture shall be responsible to satisfy such judgment (but for the avoidance of doubt, AB shall have no obligation to reimburse the joint venture for the legal fees and other costs of such litigation). Investor shall have the right to reasonably approve material decisions relating to such litigation and otherwise to reasonably participate in such litigation (including commenting on pleadings and participating in settlement and

ACTIVE/87907513.12

other material discussions relating thereto), and shall be kept reasonably informed with respect to developments in such litigation. Subject to the foregoing, in no event will Investor have any right to bind the joint venture without AB's approval. It is understood that all material decisions relating to any Mutual Decision shall be subject to the mutual approval of AB and Investor. Either Investor or AB shall have the right to propose matters for consideration by the members relating to Mutual Decisions. "Mutual Decisions" shall mean: (i) adoption of (and modifications in excess of thresholds agreed to by Investor) all annual business plans and annual operating and capital budgets (including, without limitation, reasonable approval over the level of detail provided in such business plans and budgets and the backup therefor), (ii) causing or consenting to any of the events that would constitute the bankruptcy of the joint venture or any subsidiary thereof, (iv) dissolving the joint venture or any subsidiary thereof, (v) causing the joint venture to admit any new member of issue a new class or classes of common or preferred equity interests in the joint venture, other than following a capital contribution default by Investor, (vi) developing, renovating, rehabilitating or constructing any material improvements upon or renovations to the Property except in accordance with plans and specifications and a capital budget therefor approved by Investor, (vii) the operation of the food and beverage, hotel and private club components thereof in a manner that is inconsistent with any approved budget or business plan (subject to customary overrun flexibility agreed to by Investor in the JVA), (viii) the structure of the hotel and private club operations, (ix) material commercial contracts (including the service provided or supplier thereunder and the form thereof), (x) any refinancing or new financing of the Property, (xi) the sale of the Property or any beneficial ownership interests therein, (xii) any management agreement or franchise agreement with respect to all or any material portion of the Property, including the counterparty to and the form thereof, or any amendment or termination of any such management agreement or franchise agreement, other than the termination of the Standard International management agreement and the engagement of AB Hotels to manage Property and the private club in accordance with this Letter Agreement), (xiii) any lease or operating agreement with a third party for the operation of any material portion of the Property, or (xiv) any contract with or payment to any member or any affiliate.

• The parties may engage or invest in any outside business venture or activity, including those that might be in direct or indirect competition with the joint venture. Neither the joint venture nor any member thereof will have any right to ventures or activities that another member is permitted to invest or engage in or to the income or proceeds derived therefrom. Notwithstanding the foregoing, without Investor's consent, (i) as long as AB and Reignwood are partners in the ownership entity for the private club, neither AB nor its affiliates will hold any ownership interest

11



in or operate or manage any private club regardless of location and (ii) so long as AB and Reignwood are both members of the joint venture, neither AB nor its affiliates will own an interest in or operate or manage any hotel within six blocks of the Property. If AB or Reignwood or any of their respective affiliates proposes to own an interest in or operate or manage a hotel in China, such party will use reasonable good faith efforts to give Investor or AB and their respective affiliates, as applicable, the first right to invest with the proposing party in such opportunity; provided that in the parties are unable, using good faith efforts, to agree upon the terms and conditions upon which non-proposing party and its affiliates may participate in such opportunity, then the proposing party and its affiliates may pursue such opportunity without the non-proposing party and its affiliates. No member will have any fiduciary duties to the joint venture or any of the other members other than respect to the proper handling of funds of the joint venture.

- Creditworthy affiliates of each member shall indemnify and agree to reimburse Investor for (x) subject to clause (y) below, such indemnifying member's pro rata share of liability with respect to the environmental indemnity agreements (to the extent not covered by insurance proceeds) and non-recourse carveout guaranties under the Existing Debt and (y) such indemnifying member's actions which improperly cause liability under any such indemnity agreement (to the extent not covered by insurance proceeds) or guaranty provided, however that if Investor or its affiliate takes actions without the approval of AB which causes liability under any such indemnity agreement (to the extent not covered by insurance proceeds) or guaranty, then Investor must indemnify, defend and hold harmless the joint venture and AB from such liability, including all costs and expenses incurred relating thereto (to the extent not covered by insurance proceeds). Any amount paid by Investor pursuant to the immediately preceding sentence and any amount paid by AB (or its affiliate) pursuant to clause (y) above shall not be deemed to be a loan or capital contribution to the joint venture and shall not be reimbursed by the joint venture.

- Investor and AB may mutually agree to initiate a sale of the hotel following a lockout period that expires on the seventh anniversary of the closing on the acquisition of the Property. The parties agree that any such sale of the Property will be subject to a ROFO in favor of AB (as agreed to in the JVA, but with a closing date no earlier than six months after the date on which Investor proposes a sale of the Property)

- Subject to compliance with the requirement of the next sentence, none of the members shall be permitted to transfer their direct interests in the joint venture. In addition, no direct or indirect interests in any member may be transferred if such transfer (individually or as part of a series of transfers)




will result in a change of control of such member (and in the case of AB, the death or permanent disability of Andre Balazs such that he cannot fulfill his duties in connection with the management and operation of the joint venture shall be deemed a change of control for this purpose).

9. If the parties shall not have agreed and entered into the JVA on or before October 13, 2016, then either AB or Investor shall have the right to submit such disagreement over the form of the JVA to arbitration (with simultaneous notice to the other party). Such arbitration shall be conducted by an arbitrator to be mutually agreed within 10 business days after the execution of this Letter Agreement (provided that if the parties shall fail to agree upon an arbitrator who agrees to serve in such capacity during such 10 business day period, then either party may request that the American Arbitration Association shall appoint an individual arbitrator within five (5) business days after receipt of such dispute submission, which individual shall (i) not be an affiliate of either party or have any business relationship with either party, (ii) be an individual attorney of a major law firm whose principal office is located in New York City and (iii) be an expert in real estate joint venture agreements in respect of institutional commercial properties in New York City with not less than fifteen (15) years' professional experience in such area)). Within ten (10) business days after the appointment of the arbitrator, the parties shall meet in person with the arbitrator and exchange copies of the proposed JVA, clearly identifying the portion(s) thereof that is(are) in dispute. The arbitrator shall within five (5) business days of such exchange (a) decide whether the proposed versions of the disputed portion(s) of the JVA submitted by AB (on the one hand) or the proposed versions of the disputed portion(s) of the JVA submitted by Investor (on the other hand), taken as a whole, most satisfies the JV Standard (for the avoidance of doubt, the arbitrator shall have no authority to select some disputed language proposed by AB and other disputed language proposed by Investor, but rather shall choose only one party's proposed version of all disputed portions of the JVA), (b) having decided which proposed version of the disputed portions of the JVA best satisfies the JV Standard, order the parties to enter into the JVA reflecting the same, and (c) order the party who did not prevail to pay the costs of the prevailing party in such arbitration. The arbitrator's authority is exclusively limited to those actions and decisions referenced in the preceding sentence. Any such order may be entered as judgment in any court in New York County, New York by either party hereto, and the parties hereto hereby agree to be bound by any such orders, and subject to such jurisdiction, and agree to be bound to specifically perform its obligations hereunder.

10. Investor represents and warrants to AB that (a) Investor has a tangible net worth and liquidity that is not less than the Minimum Financial Criteria and (b) Investor and its parent company and/or any of their respective affiliates have sufficient assets to enable Investor (and/or its parent company or any their respective affiliates) to perform the obligations of Investor under this Letter Agreement, including providing all equity required in connection with the closing and the renovation of the Property.

11. This Letter Agreement and the transactions contemplated herein will be kept confidential by the parties, provided that either party may disclose the same (a) to



direct and indirect shareholders and members and its and their respective counsel, consultants, accountants and employees (but it must inform such persons to maintain similar confidentiality with respect to the same and will be responsible for any breach thereof by such persons), (b) to extent required by law to be disclosed and upon prior notice to the other party, (c) in any arbitration or other proceedings between the parties, and (d) with the prior written consent of the other party.

12.    Each of the parties hereto hereby acknowledges and agrees that this Letter Agreement is for good and valuable independent consideration received in full. Upon execution by the parties of the JVA, this Letter Agreement shall automatically be deemed replaced in full, effective ab initio, unless this Letter Agreement is otherwise expressly stated to separately survive in the JVA.

13.    Each party hereto represents that it dealt with no brokers, finders or like parties who might be entitled to claim a commission or other fee in connection with the negotiation of this Letter Agreement or the anticipated JVA, other than Teresa Teague, who shall be paid a fee (the "Teague Fee") by AB pursuant to a separate agreement between AB (or an affiliate) and Teresa Teague (or an affiliate), a complete and accurate copy of which agreement has been provided by Buyer to Investor. Each party hereto hereby indemnifies the other party hereto from and against any such person claiming any such commission or fee on behalf of such indemnifying party, and AB hereby indemnifies Investor with respect to the Teague Fee including, without limitation, from and against any claim brought by Teresa Teague relating to the Teague Fee.

14.    This Letter Agreement may not be assigned by either party hereto without the prior written consent of the other party.

15.    Time is of the essence with respect to all dates and deadlines set forth in this Letter Agreement.

16.    This Letter Agreement shall be construed in accordance with the laws of the state of New York, without regard to conflicts of laws principles. Subject to Section 8 above, any action or proceeding arising out of this letter agreement (other than as required above to be arbitrated) shall, unless agreed otherwise by the parties, be resolved exclusively in the New York State courts located in New York County, or the United States District Court for the Southern District of New York. Each party consents to the jurisdiction of such New York courts in any action or legal proceeding and waives any objection to the laying of venue of any such civil action or legal proceeding in such New York courts. In the event of any litigation or other enforcement proceeding arising out of this Agreement, the substantially prevailing party shall be entitled to reasonable attorneys' fees and costs.

17.    Each of AB and Investor irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the other party or any affiliate of the foregoing in any way relating to this Letter Agreement or the transactions relating hereto or thereto, in any forum other than the courts of the State of

ACTIVE/87907513.12



New York sitting in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive, may include injunctive relief, and may be enforced in other jurisdictions within or outside the United States by suit on the judgment or in any other manner provided by law. Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Letter Agreement in any New York State or federal court, as set forth in the first sentence herein. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

18.     This Letter Agreement may be executed and delivered (including by electronic or facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. It is expressly understood and agreed that this Letter Agreement, including without limitation the obligation to enter into the JVA, is binding on the parties hereto and their respective affiliates, successors and assigns. This Letter Agreement may be amended, or the terms and/or conditions waived, only if such amendment or waiver is in writing and signed by the parties hereto.

Sincerely,

HOTELS AB GREEN, LLC

By:

Name: Andre Balazs
Title: President and CEO

Accepted and Agreed:

REIGNWOOD EUROPE HOLDINGS SARL

15

ACTIVE/87907513.12

By:_____
      Name:
      Title:



ACTIVE/87907513.12

INDEX NO. 655209/2017
RECEIVED NYSCEF: 08/04/2017

# EXHIBIT C

*Goodwin Draft 11.1.16*

THE MEMBERSHIP INTERESTS DESCRIBED IN AND/OR REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR REGISTERED OR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH MEMBERSHIP INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED OR HYPOTHECATED, UNLESS QUALIFIED OR REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED.  ANY TRANSFER OF THE UNITS IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS, AND CONDITIONS, WHICH ARE SET FORTH HEREIN.

---

## LIMITED LIABILITY COMPANY AGREEMENT

### OF

### [AB RW HL HOLDINGS][1]

a Delaware limited liability company

As of [_____, 2016]

---

[1] All entity names are merely placeholders and may be modify as desired by the parties]

# **TABLE OF CONTENTS**

**Page**

Article I GENERAL PROVISIONS .......................................................................................... 1

    Section 1.1   Organization ....................................................................................... 1
    Section 1.2   Business of the Company ................................................................... 1
    Section 1.3   Management ....................................................................................... 2
    Section 1.4   Principal Place of Business ............................................................... 2
    Section 1.5   Qualification in Other Jurisdictions ................................................. 2
    Section 1.6   Continuation ...................................................................................... 2
    Section 1.7   Term ................................................................................................... 2
    Section 1.8   Property Acquisition ......................................................................... 2

Article II DEFINITIONS ........................................................................................................... 2

    Section 2.1   Definitions ......................................................................................... 2

Article III CAPITAL CONTRIBUTIONS ................................................................................. 13

    Section 3.1   Initial Contributions ......................................................................... 13
    Section 3.2   Property Improvement Contributions ............................................... 13
    Section 3.3   Additional Capital Contributions ..................................................... 14
    Section 3.4   Deemed Subordinated Capital Contributions .................................. 14
    Section 3.5   No Third Party Rights ....................................................................... 15
    Section 3.6   Limitations ........................................................................................ 15
    Section 3.7   Failure to Contribute Capital ........................................................... 15
    Section 3.8   Guaranties ......................................................................................... 17

Article IV CAPITAL ACCOUNTS, ALLOCATIONS OF INCOME AND LOSS .......................... 20

    Section 4.1   Capital Accounts .............................................................................. 20
    Section 4.2   [Allocation of Net Income ................................................................ 20
    Section 4.3   Allocation of Net Loss ..................................................................... 21
    Section 4.4   Loss Limitation ................................................................................. 21
    Section 4.5   Minimum Gain Chargebacks and Non-Recourse Deductions ................ 21
    Section 4.6   Qualified Income Offset ................................................................... 21
    Section 4.7   Curative Allocations ......................................................................... 22
    Section 4.8   Special Income Allocation ............................................................... 22
    Section 4.9   Code Section 704(b) and 514(c)(9)(E) Allocations .............................. 22
    Section 4.10  Distributions of Nonrecourse Liability Proceeds ............................ 22
    Section 4.11  Allocation of Debt ........................................................................... 23
    Section 4.12  Other Allocation Provisions ............................................................ 23
    Section 4.13  No Deficit Restoration by Members ................................................. 23

Article V DISTRIBUTIONS. ................................................................................................... 23

    Section 5.1   Maintenance of Reserves .................................................................. 23
    Section 5.2   Payment of Special Loans and Member Loans ................................ 23
    Section 5.3   Distributions of Cash Flow and Capital Proceeds ........................... 24
    Section 5.4   Distributions Upon Liquidation ....................................................... 25
    Section 5.5   Withholding ...................................................................................... 25

Article VI POWERS AND DUTIES ........................................................................................ 25

    Section 6.1   Management ...................................................................................... 25

ACTIVE/87979073.5

Section 6.2     Limitation of Liability ..................................................................33
Section 6.3     Related Party Transactions .........................................................35
Section 6.4     Compensation of Members .........................................................35
Section 6.5     Employees ..................................................................................35

Article VII LIABILITIES OF MEMBERS ...................................................................35

Article VIII TRANSFER OF COMPANY INTEREST ..................................................35
Section 8.1     Transfer by the Members ...........................................................35
Section 8.2     Members .....................................................................................37
Section 8.3     [Right of First Offer ...................................................................39

Article IX Books/ReCORDS, Business Plan AND BUDGET, REPORTING AND
ACCOUNTING MATTERS .......................................................................................40
Section 9.1     Fiscal Year ..................................................................................40
Section 9.2     Maintenance of Records .............................................................40
Section 9.3     Required Plans, Budgets, Reports & Bank Accounts.............40
Section 9.4     Reporting.....................................................................................42
Section 9.5     AB as Tax Matters Partner .........................................................43
Section 9.6     Taxation as a Partnership ...........................................................43
Section 9.7     Tax Elections ..............................................................................43

Article X DISSOLUTION AND EVENTS OF DEFAULT .........................................43
Section 10.1    Dissolution..................................................................................43
Section 10.2    Events of Default .......................................................................43
Section 10.3    Remedies ...................................................................................44

Article XI MISCELLANEOUS ..................................................................................45
Section 11.1    Notices .......................................................................................45
Section 11.2    Interpretation ..............................................................................46
Section 11.3    Counterparts ..............................................................................46
Section 11.4    No Partition .................................................................................46
Section 11.5    Attorneys' Fees ..........................................................................47
Section 11.6    Severability.................................................................................47
Section 11.7    Binding on Successors ...............................................................47
Section 11.8    Confidentiality.............................................................................47
Section 11.9    Suretyship ..................................................................................47
Section 11.10   No Confidentiality Regarding Tax Treatment ............................47
Section 11.11   Representations and Warranties of AB.......................................47
Section 11.12   Representations and Warranties of Investor...............................48
Section 11.13   Brokerage Commissions ............................................................48
Section 11.14   Legal Representation ..................................................................48
Section 11.16   Time is of the Essence ...............................................................49
Section 11.17   No Certificated Interests ............................................................49
Section 11.18   No State Law Partnership............................................................49

ACTIVE/87979073.5

EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Members and Proportionate Shares |
| Exhibit B | - | Baseline 2016 Calendar Year Net Cash Flow |
| Exhibit C | - | Description of Club Conversion Plans |
| Exhibit D | - | Form of Promissory Note for Member/Default/Special/Guaranty Loans |
| Exhibit E | - | Strategic Plan |
| Exhibit F | - | Form of Funding Notice |
| [Exhibit G | - | Form of Hotel Management Agreement] |
| Exhibit H-1 | - | Representations and Warranties of AB |
| Exhibit H-2 | - | Representations and Warranties of Investor |
| Exhibit I | - | Property Improvement Budget |
| Exhibit J | - | Form of Cross Indemnity Agreement |

ACTIVE/87979073.5

## LIMITED LIABILITY COMPANY AGREEMENT

### of

### [AB RW HL HOLDINGS LLC]

This Limited Liability Company Agreement (this "**Agreement**")[2] is made as of the [___] day of [_____], 2016 (the "**Effective Date**"), by and between [Reignwood Entity], a [_____] with a principal place of business at the address set forth in Exhibit A (the "**Investor**"), and [AB Entity], a [_____], with a principal place of business at the address set forth in Exhibit A ("**AB**"). Investor and AB, together with any additional parties as and when admitted to the Company (as defined below) as members shall be individually a "**Member**" and collectively, the "**Members.**" Each Member, in consideration of the agreements of the other Members contained herein, agree as follows[3]:

### ARTICLE I
### GENERAL PROVISIONS

Section 1.1   Organization.  The Company has been formed by the filing of its Certificate of Formation (as defined in the Act) with the Delaware Secretary of State pursuant to the Act.  The original Certificate of Formation states that the registered agent and registered office of the Company in Delaware are [Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801].  **[Note to Draft ("NTD"): to be confirmed]** Subject to the limitations set forth in this Agreement, the Certificate of Formation may be restated or amended by the mutual agreement of the Members or by any person designated pursuant to Section 6.1.3 as an "authorized person" within the meaning of the Act.  The Certificate of Formation, as so amended from time to time, is referred to herein as the "**LLC Certificate.**"  The Operating Member shall deliver a copy of the LLC Certificate and any amendments thereto to any Member who so requests.

Section 1.2   Business of the Company.  The business of the Company shall be to hold the entirety of the membership interest in [AB RW HL Hotel Mezzanine I LLC], a Delaware limited liability company ("**HL Mezz I**"), and indirectly the membership interests in [AB RW HL Mezzanine II LLC], a Delaware limited liability company ("**HL Mezz II**"), and [AB RW HL Hotel LLC], a Delaware limited liability company ("**Hotel Owner**"), to act as the member and member-manager of HL Mezz I, and through HL Mezz I to act as the member and manager of HL Mezz II, and through HL Mezz II to act as the member and manager of Hotel Owner, and through HL Mezz I, HL Mezz II and Hotel Owner, to acquire, invest in, own, manage, operate, develop, subdivide, improve, finance, lease, sell and otherwise deal with the Property and the Hotel located thereon.  Subject to the terms and conditions of this Agreement, the Company shall, from time to time, directly or indirectly, obtain licenses, enter into operating agreements, and develop, operate, improve, finance, refinance, manage, and sell or convey the Property and the Hotel located thereon, and otherwise deal with the Property and the Hotel for the benefit of the Company and engage in any and all activities necessary, appropriate or useful in furtherance of any of the foregoing.  Subject to the terms and conditions of this Agreement, the Company may directly or indirectly be a partner or member of any partnership or limited liability company

---

[2] Note: This draft does not reflect or address a possible parallel joint venture structure to minimize exposure to NY's Unincorporated Business Tax
[3] Note:  This Agreement does not address the potential Club Management Company business. The Club Management Company would be a separate venture between Reignwood & AB

engaged in any business enterprise or any aspect of any business enterprise which it has the power to conduct on its own, as long as the Company has a majority interest in ownership and voting rights of such partnership or limited liability company. **[NTD: Modify as necessary to reflect structure of Subsidiaries as well as an operating lease structure]**

Section 1.3    <u>Management</u>.  The management of the Company shall be vested as more particularly set forth in <u>Section 6.1</u> below.

Section 1.4    <u>Principal Place of Business</u>.  The principal office and place of business of the Company shall initially be c/o [INSERT AB OFFICES].  After giving notice to the Members, the Operating Member may change the principal office or place of business of the Company at any time and may cause the Company to establish other offices or places of business in various jurisdictions and appoint agents for service of process in such jurisdictions.

Section 1.5    <u>Qualification in Other Jurisdictions</u>.  The Operating Member shall cause the Company to be qualified or registered under applicable laws of any jurisdiction in which the Company transacts business and shall be authorized to execute, deliver and file any certificates and documents necessary to effect such qualification or registration.

Section 1.6    <u>Continuation</u>.  Upon the occurrence of a Terminating Event with respect to a Member, the other Member or Members may elect to continue the business of the Company by unanimous written consent given within thirty (30) days following notice to such other Member or Members of the Terminating Event.  Moreover, if the Member with respect to which there has occurred a Terminating Event is the Operating Member, the Company shall continue its business and Investor shall assume the duties and obligations of Operating Member.

Section 1.7    <u>Term</u>.  The term of the Company commenced as of the date of the filing of the LLC Certificate in the office of the Secretary of State of the State of Delaware and shall continue until dissolved pursuant to the provisions of this Agreement or by operation of law.

Section 1.8    <u>Property Acquisition</u>.  As more particularly set forth in <u>Section 6.1.3</u>, the Members agree and acknowledge that the acquisition of the Property and the closing of the transactions contemplated by the Purchase Agreement, including, but not limited to the assumption of the Existing Debt and the granting of any election, approval or waiver under the Purchase Agreement requires the Approval of the Members.  Concurrently with the execution and delivery of this Agreement, AB shall cause the Purchase Agreement to be assigned to the Company or a designated Subsidiary as Approved by Investor.  [*Note to Reignwood: Discuss implications if Seller defaults and/or there is a failure of a closing condition under the PSA, but one of the Members still desires to move forward with the acquisition of the Property, while the other does not – should either Member have the right to pursue the acquisition independent of the other in such scenario?]*

## ARTICLE II
## DEFINITIONS

Section 2.1    <u>Definitions</u>.  The following terms shall have the meanings indicated or referred to below, inclusive of their singular and plural forms except where the context requires otherwise.

"**AB**" shall have the meaning set forth in the opening paragraph.

2

"**AB Affiliate Agreement**" shall have the meaning set forth in Section 6.1.3.

"**AB Event of Default**" shall have the meaning set forth in Section 8.2.2.

"**AB ROFO Default**" shall have the meaning set forth in Section 8.3.

"**Acquisition Closing**" shall mean the closing of the acquisition of the Property by the Hotel Owner and the consummation of the transactions contemplated by the Purchase Agreement, including the assumption of the Existing Debt.

"**Act**" shall mean the Delaware Limited Liability Company Act, 6 Del. c. Sec. 18-101, et. seq. (as amended from time to time).

"**Additional Capital Contribution**" shall have the meaning set forth in Section 3.3.

"**Adjusted Capital Account**" shall have the meaning set forth in Section 4.4.

"**Affiliate**" shall mean, with respect to any person or entity, (i) any person or entity who is a member of the immediate or extended family of any natural person, (ii) any entity which owns or controls (i.e., which owns directly or indirectly, 50% or more of the beneficial interest in or otherwise has the right or power of any means to control), is owned or controlled by or which is under common ownership or control with a person or entity and (iii) any other person who is an officer, director, trustee, member or employee of or partner in, a person or entity referred to in the preceding clause (ii).

"**Agreement**" shall have the meaning set forth in the opening paragraph.

"**Approval**" or "**Approve**" (and any reasonable variation thereof) means with respect to any Member, the written consent of such Member to the matter presented.  Any Approval required or permitted herein by a Member may be granted or withheld in the sole and absolute discretion of the Member unless the Approval must, by its terms, be reasonable or commercially reasonable.  Use of the term "commercially reasonable", "reasonable" or "reasonably" in connection with the term "**Approval**", "**Approve**" or any variation thereof or with the term "satisfactory" means that such Approval may not be withheld, conditioned or delayed unreasonably

"**Asset**" means any real property or tangible and intangible personal property acquired and held by Company or any Subsidiary, including, without limitation, all direct or indirect rights and interests in the Property.  The term "**Assets**" shall refer collectively to all such property held by Company or any Subsidiary.

"**Authorized Financing**" means any debt financing, including the assumption of the Existing Debt, with a Third Party entered into by the Company or any Subsidiary and Approved by the Members.

"**Balazs**" means Mr. André Balazs, an individual.

"**Balazs Parties**" shall have the meaning set forth in Section 6.2.2.

"**Bankruptcy/Dissolution Event**" with respect to a Person, means the commencement or occurrence of any of the following with respect to such Person:  (a) a case under any

ACTIVE/87979073.5

applicable federal or state bankruptcy law or other similar law; (b) the appointment of a trustee, receiver, liquidator, sequestrator, custodian or any similar official for such Person or any of its material assets; (c) an attachment, execution or other judicial seizure of any of such Person's material assets; (d) a general assignment for the benefit of creditors; (e) dissolution or liquidation; or (f) insolvency; *provided, however*, that an event described in clause (a), (b) or (c) shall not be included if the same is (i) involuntary and not at any time consented to (and, without limitation, was not filed, instituted, initiated, caused or consented to by such Person, either directly or through or with its Affiliates or in collusion with any Person), (ii) contested within thirty (30) days of commencement and thereafter diligently and continuously contested, and (iii) dismissed or set aside, as the case may be, within ninety (90) days of commencement.

"**Baseline Net Cash Flow**" shall mean the Cash Flow for the Property during calendar year 2016 [as shown on Exhibit B attached hereto]. **[NTD: Need to discuss the mechanics of obtaining the audited 2016 financials for purposes of establishing 2016 Baseline Net Cash Flow; once the actual cash flow amount is known, such amount should be added to Exhibit B]**

"**Bonus Cash Flow**" shall have the meaning set forth in Section 5.3.1(i)(b).

"**Broker**" shall have the meaning set forth in Section 11.13.

"**Budget**" means an annual operating budget for the Property, which may include, without limitation, capital improvements to the extent the same are not covered in the Property Improvement Budget for the Property.

"**Budgeted Capital Contributions**" shall have the meaning set forth in Section 3.2.

"**Business Day**" means any day excluding a Saturday, Sunday and any other day during which shall be in the State of New York, a legal holiday or a day on which the banking institutions are authorized by law or executive action to close. *[Note to Reignwood: Do we need to carve-out any of the formally recognized holidays in the UK, Hong Kong and/or China?]*

"**Business Plan**" means the Budget and the annual operating and strategic plan for the Property and the Company as more particularly set forth in Section 9.3.1(ii), as the same may be replaced or modified from time to time in accordance with this Agreement.

"**Calendar Quarter**" means each period of three calendar months commencing on January 1, April 1, July 1, and October 1.

"**Capital Account**" shall have the meaning set forth in Section 4.1.

"**Capital Proceeds**" means the gross receipts of the Company (or any Subsidiary) in connection with a Capital Transaction of the Company (or any Subsidiary) (and, if in connection with the liquidation of the Company, any other Assets available for distribution) following deduction of the following, to the extent paid out of such proceeds: (i) any reasonable expenses incurred in connection with the transaction giving rise to such proceeds or paid out of such proceeds (including fees, costs and expenses such as points, loan fees, rate lock fees, interest rate protections, brokerage fees and all legal fees and expenses), (ii) any amounts set aside for the establishment or replenishment of the reasonable reserves as permitted under this Agreement or as required pursuant to such Capital Transaction, and (iii) payment of any

ACTIVE/87979073.5

amounts payable pursuant to any Authorized Financing.  Any balance in a reserve set aside pursuant to clause (ii) above remaining after the payment of sums necessary to satisfy the purpose for which such reserve was created shall be released from such reserves to the Company and thereupon shall be deemed Capital Proceeds.

"**Capital Transaction**" means the sale, financing, refinancing, total or partial destruction, condemnation or other recapitalization or disposition of the Property or any other substantial Asset or Assets of the Company.

"**Carveout Guaranty**" shall have the meaning set forth in Section 3.8.1.

"**Company Minimum Gain**" shall have the meaning set forth in Section 4.5.

"**Contributing Member**" shall have the meaning set forth in Section 3.7.3.

"**Contribution Shortfall**" shall have the meaning set forth in Section 3.7.3.

"**Creditworthy Affiliate**" means (i) with respect to AB, [_____] and (ii) with respect to Investor, [_____].  *[**Note to Reignwood: Discuss indemnity from AB and related requirements for credit** support and consider whether there should be any ongoing net worth and/or liquidity tests*]

"**Cross-Indemnity and Reimbursement Agreement**" means that certain Cross-Indemnity and Reimbursement Agreement by and among AB, Investor, [Insert AB's Creditworthy Affiliate] and [Insert RW's Creditworthy Affiliate] in the form attached hereto as Exhibit [___].

"**Cash Flow**" shall mean, for any Fiscal Year (or portion thereof), EBITDA for the Property less (i) debt service payments made on any Authorized Financing, and (ii) any amounts actually funded to the FF&E Reserve (as defined in the Hotel Management Agreement). The Members agree and acknowledge that in the event the debt service payable under any Authorized Financing that replaces the Existing Debt is greater in a material respect than the debt service payable under the Existing Debt, then the Members shall in good faith consider modifications to the determination of Cash Flow for purposes of Section 5.3.1 in connection with such Authorized Financing.  *[**Note to Reignwood: Confirm you are okay with a process of determining Cash Flow so that quarterly payments of Cash Flow can be made, but subject to an annual true-up based on audited financials]*[**NTD: Confirm FF&E Reserve is defined term in HMA or modify as necessary**].

"**Club Conversion**" means substantial completion and opening of the private members club located on the upper floors of the Hotel [in accordance with the schedule Approved by Investor][prior to _____, 20__] and in accordance with the Property Improvement Budget and the Strategic Plan [, as more particularly described on Exhibit C attached hereto] except to the extent that any delays are the result of a Force Majeure Event that was not caused by AB or any Related Party and AB promptly notifies Investor in writing (and not later than five (5) Business Days) of the commencement of the Force Majeure Event impacting the Hotel that will result in a delay on the completion of the Club Conversion.] *[**Note to Reignwood: Discuss timing for commencement of Club Project and whether there should be an outside date for completion of the Club Project].* [**NTD: Is there a written summary of the Club components or other project plans/details that could be attached to further clarify the scope of the work and description of the club?**]

"**Club Conversion Project**" shall have meaning set forth in Section 6.1.3(xxxvii).

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Company**" shall mean [AB RW HL Holdings LLC], a Delaware limited liability company. [*Note to Reignwood: Discuss naming protocols*]

"**Contributions**" means the aggregate of each Member's capital contributions actually made to the Company pursuant to Article III.  Contributions shall not include any Guaranty Loans,  Default Loans, Member Loans or Special Loans made by a Member under Article III or any Subordinated Deemed Capital Contribution.

"**Default Loan**" shall have the meaning set forth in Section 3.7.2.

"**Defaulting Member**" shall have the meaning set forth in Section 3.7.2.

["**Default Loan Rate**" means eighteen percent (18%) per annum.] *[Note to Reignwood – Confirm interest rate applicable to Default Loans (loans made to fund Mandatory Capital Contributions)]*

"**Deficiency**" shall have the meaning set forth in Section 3.7.2.

"**Distribution Cap**" shall have the meaning set forth in Section 5.3.1(ii).

"**EBITDA**" means EBITDA as defined in the Uniform System.  *[Note to Reignwood: Please confirm use of Uniform System definition for EBITDA]*

"**EBITDA Threshold**" shall have the meaning set forth in the definition of Two-Year EBITDA Hurdle.

"**Effective Date**" shall have the meaning set forth in the opening paragraph.

"**Entity**" means any general partnership, limited partnership, corporation, limited liability company, limited liability partnership, joint venture, trust, business trust, cooperative or association or other comparable business entity.

"**Events of Default**" shall have the meaning set forth in Section 10.2.

"**Existing Debt**" means the existing $160,000,000 mortgage loan, the $70,000,000 senior mezzanine loan and the $70,000,000 junior mezzanine loan, all as particularly described in the Purchase Agreement.

"**Fair Market Value**" shall have the meaning set forth in Section 8.2.3.

"**Fiscal Year**" means a calendar year commencing on January 1 and ending on December 31 of such calendar year.

"**Force Majeure Event**" any one or more of the following events or circumstances that, alone or in combination, affect the Club Conversion Project at the Property: (i) fire, earthquake, hurricane, tornado, flood, storm or other casualty; (ii) epidemics, quarantine restrictions or other public health restrictions or advisories; (iii) strikes, lockouts, or other labor interruptions not caused by the acts or omissions of AB and any Related Party; (iv) war, rebellion, riots, acts of

ACTIVE/87979073.5

terrorism, or other civil unrest or commotion; (v) embargoes, lack of materials, water, power or telephone transmissions necessary for the work required in connection with the Club Conversion Project at the Property; or (vi) any other event beyond the reasonable control of the party claiming the existence of such Force Majeure Event, but in all instances excluding the financial inability of either party to perform or otherwise meet its obligations and excluding any general economic and/or market factors, including changes in the economy or availability of financing from third party sources.

"**Funding Notice**" means a written notice from either Member to the other Member, substantially in the form attached as Exhibit F, requesting each Member to fund Contributions pursuant to Article III.

"**Goodwin**" shall have the meaning set forth in Section 11.14.1.

"**Guarantor**" shall have the meaning set forth in Section 3.8.1.

"**Guaranty Loan**" shall have the meaning set forth in Section 3.8.2(iii).

"**HL Mezz I**" shall have the meaning set forth in Section 1.2.

"**HL Mezz II**" shall have the meaning set forth in Section 1.2.

"**Hotel**" shall mean that certain hotel, private members' club (if and when the Club Conversion is completed) and related facilities and amenities, including but not limited to, food and beverage outlets, located on the Property.

"**Hotel Management Agreement**" shall mean the hotel management agreement entered into or to be entered into between Hotel Owner and Hotel Manager, with respect to the management and operation of the Hotel and the Property, [in the form attached hereto as Exhibit G].

"**Hotel Manager**" shall mean [*insert AB Management Company Entity*].  ***[Note to Reignwood:  This draft of JV assumes the Hotel Manager is an entity controlled by Andre]***

"**Hotel Owner**" shall have the meaning set forth in Section 1.2.

"**Immediate Family**" means with respect to any individual, such individual's spouse, parents, brothers, sisters, children (natural or adopted), stepchildren, nieces, nephews, grandchildren, but not other members of the individual's extended family.

"**Initial Business Plan**" shall have the meaning set forth in Section 9.3.1(ii).

"**Initial Capital Contribution**" shall have the meaning set forth in Section 3.1.

"**Initial Capital Investment**" shall have the meaning set forth in Section 3.1.

"**Invested Capital Proportionate Share**" means the ratio (expressed as a percentage) resulting at the time in question from dividing the aggregate amount all of an individual Member's Contributions by the total amount of all Contributions made by all of the Members as of the date in question.

ACTIVE/87979073.5

"**Investor**" means shall have the meaning set forth in the opening paragraph or any permitted successor or assign thereof.

"**Judgment**" shall have the meaning set forth in Section 6.2.2.

"**Legal Successor**" means the legal representative, heir, successor or assign of any Person who is legally incompetent or has died.

"**Letter Agreement**" means that certain Letter Agreement made by and between Hotels AB Green LLC and Reignwood Europe Holdings SARL, dated as of September 16, 2016, as amended.

"**Liabilities**" shall have the meaning set forth in Section 6.2.2.

"**LLC Certificate**" shall have the meaning set forth in Section 1.1.

"**Lockout Period**" means the period commencing on the Acquisition Closing and expiring on the seventh (7th) anniversary thereof.

"**Mandatory Capital Contributions**" shall have the meaning set forth in Section 3.2.

"**Member**" or "**Members**" shall have the meaning set forth in the introductory statement.

"**Member Loan**" shall have the meaning set forth in Section 3.7.1.

"**Member Loan Rate**" an interest rate equal to the lowest interest rate available to Investor from a nationally recognized banking association or other institutional lender making loans in the United States for a 5-year unsecured loan.  *[Note to Reignwood: Discuss mechanics for identifying the "Default Interest and whether there is any existing or active line of credit that may be a good reference point as the "borrowing cost" of Reignwood]*

"**Membership Value**" means the amount, as of any date and as to any Member, that the Member would have been entitled to receive had the Company sold all of the Assets for their Fair Market Value on such date, paid all outstanding liabilities (taking into account any applicable prepayment penalties or yield maintenance charges), provided reasonable reserves for non-liquidated, non-contingent liabilities and reasonably foreseeable and quantifiable contingent liabilities, and distributed Capital Proceeds and Cash Flow to the Members in accordance with Section 5.3 and otherwise as required under this Agreement (without retaining from distribution reserves pursuant to Section 5.1 except as provided in this paragraph).  For the purposes of the determination of the Capital Proceeds and Cash Flow that would be distributable in the event of such an imputed sale, (a) the expenses that would have been incurred by the Company in connection with the sale of the Property giving rise to such proceeds shall be deemed to be ___ percent [__%] of the Property's Fair Market Value (including an imputed commission and any transfer tax), (b) [$500,000] or such lesser amount as is then known to be sufficient for such purposes shall be deemed set aside for liquidation costs and reserves and (c) the sale would be deemed for all cash consideration with retirement in full of any Authorized Financing (including any then applicable prepayment penalties or yield maintenance charges actually paid in connection with the payment of any Authorized Financing).  Upon the establishment of the Fair Market Value of the Assets, the determination of the correlative Membership Values shall be made by the Members in conjunction with independent, outside accountants, which determination shall be made reasonably, in good faith

and in a fashion strictly consistent with the applicable provisions of this Agreement. **[*Note to Reignwood: Confirm mechanics of determination of Membership Value and Closing Costs*]**

"**Minimum Equity Amount**" shall have the meaning set forth in Section 3.1.

"**Mutual Decisions**" shall have the meaning set forth in Section 6.1.3.

"**Net Operating Income**" means, for any period, the amount by which [Gross Revenues] exceed [Operating Expenses] less any amounts allocated to the [FF&E Reserve], in each instance, as such term is defined in the Hotel Management Agreement.  **[NTD: Confirm defined terms and cross reference to NOI calculation under HMA will work]**

"**Non-Contributing Member**" shall have the meaning set forth in Section 3.7.3.

"**Non-Defaulting Member**" shall have the meaning set forth in Section 3.7.2.

"**Notices**" shall have the meaning set forth in Section 11.1.

"**Offering Member**" shall have the meaning set forth in Section 6.1.5.

"**Operating Account**" means an account maintained by Operating Member on behalf of the Company and the Subsidiaries with a federally insured bank selected by Operating Member (and reasonably Approved by Investor) into which funds are deposited from the revenues of any Subsidiary and from which operating and other authorized expenses of the Company or a Subsidiary are paid.

"**Operating Member**" means AB, or its successor in accordance with and subject to the terms of Section 6.1.

"**Outside Closing Date**" shall have the meaning set forth in Section 8.3.

"**Overpayment**" shall have the meaning set forth in Section 3.8.3(i).

"**Paul Weiss**" shall have the meaning set forth in Section 11.14.2.

"**Performance Standard**" shall have the meaning set forth in Section 6.1.1(i).

"**Person**" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person where the context so permits.

"**Preservation Costs**" means (a) all debt service payments required under any Authorized Financing, taxes, assessments, water, sewer or other similar rents, utilities, insurance premiums, permit and licensing fees and charge payable by the Company, any Subsidiary or the Property, (b) all Working Capital Shortfalls, and (c) expenditures necessary on an emergency basis to avoid imminent material damage to the Hotel or imminent injury to persons or property, whether or not provided for or within the amounts provided for in the Initial Business Plan or the then applicable Business Plan, as may reasonably be required to avoid or mitigate such damage or injury.

"**Property**" means, the real property and the improvements now or hereafter located thereon, having an address of 848 Washington Street, New York, NY.

"**Property Improvement Budget**" means that certain property improvement budget and capital plan for the Property attached hereto as Exhibit I, as the same may be modified pursuant to the terms of this Agreement.

"**Proportionate Share**" means, (A) initially 10% with respect to AB and 90% with respect to Investor, (B) from and after the Acquisition Closing, 15% with respect to AB, and 85% with respect to Investor; (C) upon the occurrence of the Club Conversion, 18% with respect to AB and 82% with respect to Investor, (D) if and only if the Club Conversion occurs, then upon the satisfaction of the Two-Year EBITDA Hurdle, 21% with respect to AB and 79% with respect to Investor and (E) if and only if the Two-Year EBITDA Hurdle is satisfied, then upon the satisfaction of the Three-Year EBITDA Hurdle, 25% with respect to AB and 75% to the Investor.

"**Proposed Business Plan**" shall have the meaning set forth in Section 9.3.1.

"**Purchase Agreement**" means that certain Purchase and Sale Agreement by and between AB Green Gansevoort, LLC, as Seller, and HOTELSAB Green, LLC, as Buyer, dated as of August 16, 2016 [and as assigned to Hotel Owner.]

"**Qualified Appraiser**" means an appraiser who is not an Affiliate of any Member and has not been an employee of any Member or any Affiliate of any Member at any time, who is qualified to appraise the Assets and is a member of the Appraisal Institute (or any successor association or body of comparable standing if such Appraisal Institute is not then in existence) and who has held his or her certificate as an M.A.I. or its equivalent for a period of not fewer than 10 years, and has been actively engaged in the appraisal of hotels immediately preceding his or her appointment under this Agreement.

"**Receiving Member**" shall have the meaning set forth in Section 5.3.1(iii).

"**Regulatory Allocations**" shall have the meaning set forth in Section 4.7.

"**Related Party**" means with respect to any Person, (i) any Person who directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with such Person, (ii) any Person who is a member of the Immediate Family of such Person, or (iii) any Person in which such Person or one or more members of the Immediate Family of such Person has a fifteen percent (15%) or more beneficial interest (whether an initial, residual or contingent interest) or as to which such Person serves as a trustee or general partner or in a similar fiduciary capacity. A Person shall be deemed to control a Person if it and/or any member of the Immediate Family of such Person owns, directly or indirectly, at least five percent (5%) of the beneficial interest in such Person (whether an initial, residual or contingent interest) or otherwise has the power to direct the management, operations or business of such Person. The term "**beneficial owner**" is to be determined in accordance with Rule 13d-3 promulgated by the SEC under the Securities Exchange Act of 1934.

"**Reserved Cash Flow**" shall have the meaning set forth in Section 5.3.1(ii).

"**Restricted Area**" means the area identified on Exhibit [__] to the Hotel Management Agreement. [**NTD: Map to identify 6 block radius around Property**]

"**Right of First Look**" shall have the meaning set forth in Section 6.1.5.

"**ROFO**" shall have the meaning set forth in Section 8.3.

ACTIVE/87979073.5

"**ROFO Notice**" shall have meaning set forth in Section 8.3.

**Special Loan**" shall have the meaning set forth in Section 3.7.3.

["**Special Loan Rate**" means twelve percent (12%) per annum.] *[Note to Reignwood – Confirm interest rate applicable to Special Loans (loans made to fund Additional Capital Contributions, but not Mandatory Capital Contributions]*

"**Standard International**" means Standard International Management and any of its Affiliates, officers, director, investors, shareholders, members, partners or employees.  [**NTD: Confirm Corporate Name**.]

"**Standard Litigation**" shall have the meaning set forth in Section 6.2.2.

"**Strategic Plan**" means the strategic business plan setting forth the goals and objectives for the Company, the Subsidiaries and the Property attached hereto as Exhibit E, as the same may be amended from time to time with the Approval of both Members pursuant to Section 6.3 or the Approval of a Business Plan. [**NTD:  Confirm parties have a preliminary business plan and strategy that can be attached**]

"**Subsidiary**" means, at any time, any Entity that is directly or indirectly majority or wholly-owned and controlled by the Company in accordance with this Agreement.

"**Subordinated Deemed Capital Contribution**" shall have the meaning set forth in Section 3.4

"**Target Price**" shall have the meaning set forth in Section 8.3.3.

"**Terminating Event**" means any of the following:

(a)     For a natural person: death; any disabling mental or physical condition which prevents such person from carrying on business activities and which continues for an uninterrupted period of more than three months; entry of an order adjudicating such person incompetent by a court of competent jurisdiction; appointment of a conservator; or execution of a certificate diagnosing such person's incompetency by each of such person's physician and two additional independent consulting physicians, each licensed to practice medicine in the state of such person's residence.

(b)     For an Entity other than a natural person: filing of a certificate of dissolution or its equivalent for any corporation; dissolution of a partnership; termination of a trust; distribution of a trust estate's entire interest in the Company; or the dissolution, termination or bankruptcy of any other entity that is a Member, whether voluntary or involuntary (unless dismissed within ninety (90) days; provided that a tax termination of an Entity shall not alone be a Terminating Event.

(c)     For any Member: withdrawal, resignation or Transfer in contravention of this Agreement; or filing with respect to such Member for relief under Title 11 of the United States Code or similar debtor protection laws or an assignment for the benefit of creditors, which would include an involuntary filing not dismissed within ninety (90) days.

"**Terminated Member**" shall have the meaning set forth in Section 8.2.1.

ACTIVE/87979073.5

"**Third Party**" means any Person who is not a Member, or a Related Party of any Member and who is acting at arms-length to the Company, any Subsidiary and the Members.

"**Three-Year EBITDA Hurdle**" means, provided that the Two-Year EBITDA Hurdle has been satisfied,  the Property's EBITDA from operations for a third consecutive year during the period of the first five years following the Club Conversion is greater than the EBITDA Threshold (i.e., three consecutive years with EBITDA in excess of the EBITDA Threshold); provided however, if the Property operations do not result in EBITDA in excess of the EBITDA Threshold for three consecutive years during the first five years after the Club Conversion, then the Three-Year EBITDA Hurdle shall be deemed unsatisfied and there shall be no adjustment to the Member's Proportionate Shares and AB's Subordinated Deemed Capital Contribution shall not increase as more particularly set forth in Section 3.4.  *[Note to Reignwood: Consider whether EBITDA should be replaced with the definition of Cash Flow?  Also need to discuss implications if Club Conversion is not Completed in a timely manner- would the EBITDA threshold also need to be adjusted?]  NOTE, EDITDA does NOT include any deduction for debt service or reserves]*

"**Transfer**" shall have the meaning set forth in Section 8.1.1.

"**Transaction Costs**"[4] means those out-of-pocket expenses identified on a schedule Approved by the Members as of the date of this Agreement that were first incurred from and after September 17, 2016 and paid to Third Parties in connection with the performance of due diligence activities related to the Property and/or the Hotel, the formation of the Company and any Subsidiaries, the negotiation and preparation of this Agreement, the preparation and/or negotiation of any loan documents or any loan assumption, the assignment of the Purchase Agreement, the filing of applicable applications and the pursuant of all applicable licenses and permits, and achieving the Members' conditions to closing on the acquisition of the Property. Except as otherwise set forth herein, if the closing on the acquisition of the Property does not occur as contemplated by this Agreement, the Investor and AB shall each be responsible for the Transaction Costs in accordance with their Proportionate Share.  If the closing on the acquisition of the Property occurs as contemplated by this Agreement, Investor and AB shall reconcile the Transaction Costs incurred and paid from and after September 17, 2016 by each party prior to the closing such that each party is deemed to have contributed an amount equal to its Proportionate Share of Transaction Costs to the Company in accordance with Section 3.1 below.  Notwithstanding the foregoing, if the Acquisition Closing does not occur solely as a result of AB's default under this Agreement or any event of default by the "Buyer" under the Purchase Agreement arising out of the acts or omissions of AB, then AB promptly shall reimburse Investor for any loss of the Additional Deposit (as defined in the Purchase Agreement) or any other amounts funded by Investor (or its Affiliate) and for any third party out-of-pocket costs incurred by Investor in connection with this Agreement, the Letter Agreement and the transactions contemplated thereby.  If the Acquisition Closing does not occur solely as a result of Investor's default under this Agreement or any event of default by the "Buyer" under the Purchase Agreement arising out of the acts or omissions of Investor, then Investor promptly shall reimburse AB for any loss of the Initial Deposit (as defined in the Purchase Agreement) and for any third party out-of-pocket costs incurred by AB in connection with the this Agreement, the Letter Agreement or the transactions contemplated thereby (but excluding any amounts payable to the Broker and amounts incurred by AB prior to September 17, 2016 in connection with the Purchase Agreement, the Letter Agreement, this Agreement or the transactions contemplated thereby). *[Note to Reignwood – The description of transaction costs is*

---

[4] .

*currently structured as set forth in the Letter Agreement; discuss how the cost of negotiating the JV is to be treated – whether as a shared expense or an expense borne by each party individually.  Also discuss whether expenses are to be prorated and paid on a current basis or if all expenses will be reconciled at the closing of the acquisition of the Property]*

"**Treasury Regulations**" means the Income Tax Regulations and Procedure and Administration Regulations promulgated under the Code, as amended from time to time.

"**Two-Year EBITDA Hurdle**" means that the EBITDA from operations for any two consecutive years during the period of the first five years following the Club Conversion is greater than Forty-Five Million Dollars ($45,000,000) (the "**EBIDTA Threshold**") for each of the two applicable consecutive years; provided however, if the Property's operation do not result in EBITDA in excess of the EBITDA Threshold for two consecutive years during the first five years after the Club Conversion, then the Two-Year EBITDA Hurdle shall be deemed unsatisfied and there shall be no adjustment to the Member's Proportionate Shares and AB's Subordinated Deemed Capital Contribution shall not increase.  *[Note to Reignwood: Consider whether EBITDA should be replaced with the definition of Cash Flow?  See prior question regarding adjustment to EBITDA Threshold] NOTE, EDITDA does NOT include any deduction for debt service or reserve*]

"**Uniform System**" means the Uniform System of Accounts for the Lodging Industry, 11th Revised Edition.

"**Working Capital Shortfall**" means the amount of additional working capital required for the sole purpose of funding operating expenses of the Property, the Subsidiary, and the Company pursuant to, and to the extent of such amounts as set forth in, the Initial Business Plan Budget or the then applicable Business Plan.

## ARTICLE III CAPITAL CONTRIBUTIONS

Section 3.1    Initial Contributions.  Each Member shall make Contributions to the Company on the date of the Acquisition Closing in an amount equal to its Proportionate Share of: (i) the equity portion of the funds due from the Company (or any Subsidiary) as shown on the final settlement statement for the acquisition of the Property as of the date of execution, (ii) any Transaction Costs incurred by the Members or their Affiliates, (iii) any costs payable by the Company or any Subsidiary at closing or projected to be payable following the closing in connection with any Authorized Financing and (iv) an initial working capital fund for the Company or any Subsidiary in an amount set forth on the Transaction Costs' schedule Approved by the Members (collectively, the "**Initial Capital Investment**").  Each Member's Proportionate Share of the Initial Capital Investment is herein referred to as the "**Initial Capital Contribution**".  If AB's share of the Initial Capital Investment exceeds Ten Million Dollars ($10,000,000) (the "**Minimum Equity Amount**"), then at AB's election, AB may request Investor to lend to AB such amounts in excess of the Minimum Equity Amount and such loan shall upon the same terms as a Member Loan as more particularly described below. [*Note to Reignwood: Is AB required to fund at least $10M in equity or is Reignwood okay if Andre elects to fund else and borrow his share of the equity?*]

Section 3.2    Property Improvement Contributions.  After the Effective Date, each of the Members shall be obligated to contribute its Proportionate Share of the costs described in the Property Improvement Budget to be invested as equity in accordance with the terms of this

ACTIVE/87979073.5

Agreement or any capital contributions Approved by the Members as part of the then applicable Business Plan (collectively, "**Budgeted Capital Contributions**", together with the Initial Capital Contributions, the "**Mandatory Capital Contributions**").  Each Member shall deliver its Proportionate Share of Budgeted Capital Contribution to the Company's Operating Account, in immediately available U.S. Federal funds, within ten (10) Business Days after receipt of written notice from the Operating Member, and if Operating Member does not request such funds, Investor shall have the right to make such request in accordance with the Property Improvement Budget and the Strategic Plan. *[Note to Reignwood: Confirm that "budgeted capital contributions" as well as capital contributions set forth in an approved business plan should be treated as "Mandatory Capital"]*

Section 3.3    Additional Capital Contributions.  In addition to the Mandatory Capital Contributions made pursuant to Sections 3.1 or 3.2, if the Company needs additional capital to fund (a) costs and expenses set forth in the then applicable Business Plan for the Property, (b) Preservation Costs, or (c)  a shortfall in connection with a refinancing of any Authorized Financing as approved by the Members pursuant to Section 6.1.2, then either Member shall have the right to issue a notice (a "**Funding Notice**") substantially in the form attached hereto as Exhibit F setting forth the amount of capital being requested and a general description of the purpose for such funds, each Member's contribution amount, the date such funds are required to be paid to the Company (which date shall be no earlier than ten (10) Business Days following the date of the Funding Notice) and such other documentation and information as reasonably requested by the Member not sending the Funding Notice.  Each contribution under this Section 3.3 is herein called an "**Additional Capital Contribution**".

Section 3.4    Deemed Subordinated Capital Contributions.   In addition, to the foregoing, AB shall be deemed to have made capital contributions (without actually having to make any contribution of cash) to the Company in the following amounts if and only if the following occur (collectively such amounts, the "**Subordinated Deemed Capital Contribution**"):  [*Note to Reignwood: Confirm business deal is that AB's subordinated capital interest is only based on the initial capital contributions and not all mandatory capital contributions – if you went with the later, his subordinated capital interest would increase]*

(i)    upon the consummation of the Acquisition Closing, an amount equal to five percent (5%) of the Initial Capital Investment;

(ii)    upon the Club Conversion, an amount equal to an additional three percent (3%) of the Initial Capital Investment;

(iii)    if and only if the Club Conversion occurs, then upon the satisfaction of the Two-Year EBITDA Hurdle, an amount equal to an additional three percent (3%) of the Initial Capital Investment; and

(iv)    if and only if the Two-Year EBITDA Hurdle is satisfied, then upon the satisfaction of the Three-Year EBITDA Hurdle, an amount equal to an additional four percent (4%) of the Initial Capital Investment.

In no event shall the aggregate amount of AB's Subordinated Deemed Capital Contribution exceed fifteen percent (15%) of the Initial Capital Investment.

ACTIVE/87979073.5

Section 3.5   <u>No Third Party Rights</u>.  Any obligations or rights of the Company or the Members to make or require any Contribution under this <u>Article III</u> shall not result in the grant of any rights to or confer any benefits upon any Person who is not a Member.

Section 3.6   <u>Limitations</u>.  Except as set forth in this <u>Article III</u>, no Member shall be entitled or required to make any Contributions to the Company and no Member shall have the right or authority to demand another Member make any Contributions.  No Member shall have any liability for the repayment of the Contribution of any other Member (other than as set forth in <u>Section 3.7</u>), and each Member shall look only to the assets of the Company for return of its Contributions.

Section 3.7   <u>Failure to Contribute Capital</u>.

Section 3.7.1   If in connection with any Mandatory Capital Contribution or Additional Capital Contribution in excess of the Minimum Equity Amount, AB notifies Investor in writing prior to the outside date by which such Mandatory Capital Contribution or Additional Capital Contribution is due pursuant to the terms of <u>Sections 3.2</u> or <u>3.3</u> that AB is not prepared to fund its share of any such Mandatory Capital Contribution or Additional Capital Contribution, then, at AB's election, AB may request Investor to provide a loan to AB (such loan, a "**Member Loan**") for AB's portion of such Mandatory Capital Contribution or Additional Capital Contribution.  The Member Loan shall bear interest at the Member Loan Rate, compounded quarterly, but not more than the maximum amount allowable under applicable law, shall be payable on demand from Investor (but shall mature no event later than the earlier to occur of the sale or liquidation of the AB's interest in the Company or five (5) years after the date of such advance) and shall otherwise be on the terms and conditions set forth in <u>Exhibit D</u>.  A Member Loan shall be prepayable, in whole or in part, at any time or from time to time without pre-payment penalty or premium.  Any such Member Loan shall be secured solely by all of AB's membership interests and rights in the Company, including, without limitation, AB's rights to distributions under <u>Article V</u>.  All distributions which would otherwise be made to AB shall be paid instead to Investor until the outstanding amount of principal and interest on a Member Loan has been paid in full.  AB hereby grants a security interest in all of its interests, rights and privileges in the Company to Investor and AB hereby appoints, for the duration of the Member Loan, Investor, and any of its respective officers, as its attorney-in-fact coupled with an interest with full power to prepare and execute any documents, instruments and agreements, including, but not limited to, any note evidencing the Member Loan and such Uniform Commercial Code Financing Statements, continuation statements, and other security instruments as may be appropriate to perfect and continue its security interest in favor of Investor.  All payments in respect of a Member Loan shall be applied first to interest and then to principal.  If more than one Member Loan to AB is outstanding, the same shall be paid on a pro rata basis, based on the relative proportions of the Member Loan balances.  Any distributions to which AB would otherwise be entitled but that are instead paid to Investor in repayment of a Member Loan shall be deemed to have first been distributed to AB and then paid by AB to Investor in repayment of such Member Loan.  If AB does not notify Investor in writing of its election to have any such any Mandatory Capital Contribution or Additional Capital Contribution structured as a Member Loan prior to the outside date by which such contribution is required to be have been made to the Company pursuant to the terms of <u>Sections 3.2</u> or <u>3.3</u>, and AB does not otherwise contribute to the Company such Mandatory Capital Contribution or Additional Capital Contribution by the date required, then AB shall be deemed to have not made such Mandatory Capital Contribution or Additional Capital Contribution.

ACTIVE/87979073.5

Section 3.7.2  Failure to Contribute Mandatory Capital Contributions.  If a Member (the "**Defaulting Member**") fails to make its share of any Mandatory Capital Contribution that such Member is obligated to make under Sections 3.1 or 3.2 within the time required hereunder, or in the case of AB, fails to elect pursuant to Section 3.7.1, if applicable, to have such Mandatory Capital Contribution funded as a Member Loan, then such Member shall be deemed to be in material default under this Agreement, the Non-Defaulting Member shall have all rights and remedies as set forth in Section 10.3 and the portion thereof not contributed by the Defaulting Member will be referred to herein as a "**Deficiency**."  In the event of a Deficiency, if the other Member has timely made its share of such Mandatory Capital Contribution (a "**Non-Defaulting Member**"), then the Non-Defaulting Member may, within twenty (20) days after the date the Deficiency was required to be contributed by the Defaulting Member, (a) revoke its share of such contribution, in which event such Mandatory Capital Contribution shall be deemed cancelled and the Non-Defaulting Member's contribution shall be refunded to it, but the Defaulting Member shall not be released of its liability for damages resulting from its failure to contribute its share of the same, or (b) advance all or a portion of such Deficiency to the Company by depositing the same into the Operating Account of the Company, and treat the amount of the Deficiency advanced by the Non-Defaulting Member as a "**Default Loan**" to the Defaulting Member pursuant to Section 3.7.2(i) below.  If the Non-Defaulting Member does not deposit the Deficiency into the Company's Operating Account prior to the aforementioned twenty (20) day period, then it shall be deemed to have elected to proceed under clause (a) above and the Company shall promptly refund the entire applicable amount to the Non-Defaulting Member.  **[*Note to Reignwood:  Discuss implications if AB fails to fund Mandatory Capital Contributions.  We have provided for a Default Loan but also wanted to discuss if Reignwood should have the right to fund the Deficiency as equity that would result in a dilution (whether straight or punitive) of AB's proportionate share (but not his Subordinated Capital Interest).  See also Section 10.3 regarding the remedies and loss of rights upon a failure to fund Mandatory Capital Contributions.  On a separate but related note, if AB fails to fund either Mandatory or Additional Capital and there are funds from Bonus Cash Flow (see Section 5.3.1 below) that have been held in reserves and not paid to AB, should Reignwood have the right to apply such funds to any failure by AB to fund either Mandatory or Additional Capital without AB's approval?*]**

(i)    Default Loan Terms.  If a Non-Defaulting Member proceeds with a Default Loan to the Non-Contributing Member pursuant to this subsection, then such Member Loan shall bear interest at the Default Loan Rate, compounded quarterly, but not more than the maximum amount allowable under applicable law, shall be payable on demand from the Non-Defaulting Member (but shall mature no event later than the earlier to occur of the sale or liquidation of the Non-Defaulting Member's interest in the Company or five (5) years after the date of such advance) and shall otherwise be on the terms and conditions set forth in Exhibit D.  A Default Loan shall be prepayable, in whole or in part, at any time or from time to time without pre-payment penalty or premium.  Any such Default Loan shall be secured solely by the Defaulting Member's interests, rights and privileges in the Company, including, without limitation, such Defaulting Member's rights to distributions under Article V.  All distributions which would otherwise be made to the Defaulting Member to whom a Default Loan has been made shall be paid instead to the Non-Defaulting Member that made such Member Loan until the outstanding amount of principal and interest on a Default Loan has been paid in full.  The Defaulting Member hereby grants a security interest in its interests, rights and privileges in the Company to the Non-Defaulting Member and the Defaulting Member hereby appoints, for the duration of the Default Loan, the Non-Defaulting Member, and any of its respective officers, as its attorney-in-fact coupled with an interest with full power to prepare and

16

execute any documents, instruments and agreements, including, but not limited to, any note evidencing the Member Loan and such Uniform Commercial Code Financing Statements, continuation statements, and other security instruments as may be appropriate to perfect and continue its security interest in favor of the Non-Defaulting Member. All payments in respect of a Default Loan shall be applied first to interest and then to principal. If more than one Default Loan to a Member is outstanding, the same shall be paid on a pro rata basis, based on the relative proportions of the Default Loan balances. Any distributions to which a Defaulting Member would otherwise be entitled but that are instead paid to a Non-Defaulting Member in repayment of a Default Loan shall be deemed to have first been distributed to the Defaulting Member and then paid by the Defaulting Member to the Non-Defaulting Member in repayment of such Default Loan.

(ii)    Non-Exclusive Remedy. The rights of the Company and its Members pursuant to this Section 3.7.2 are not exclusive and shall not be deemed to waive any other right or remedy of the Company or any Member under this Agreement, at law or in equity, against any Defaulting Members for failure to make any Mandatory Capital Contribution required under Sections 3.1 and/or 3.2.

Section 3.7.3    Failure to Contribute Additional Capital Contributions. If a Member (the "**Non-Contributing Member**") has not contributed its Proportionate Share of any Additional Capital Contribution (the "**Contribution Shortfall**") by the date that is ten (10) Business Days after delivery of a Funding Notice, or in the case of AB, has not elected pursuant to Section 3.7.1, to have such Additional Capital Contribution funded as a Member Loan from Investor to AB, then the other Member (the "**Contributing Member**") shall have the option (a) to revoke its share of such contribution, in which event such contribution shall be deemed cancelled and Contributing Member's share of such contribution shall be refunded to it, *[Note to Reignwood: As noted above, discuss whether Reignwood should have the right to contribute the Contribution Shortfall as equity and dilute AB (typically any dilution for failing to fund Additional Capital Contributions would not be punitive]* or (b) to fund all or portion of such Contribution Shortfall as a loan to the Non-Contributing Member (a "**Special Loan**") as more particularly set forth below. If the Contributing Member declines within twenty (20) days after the Non-Contributing Member was to make the applicable Additional Capital Contribution to deposit the Contribution Shortfall into the Operating Account, then it shall be deemed to have elected to proceed under clause (a) above and the Company shall promptly refund the entire applicable amount to the Contributing Member. If the Contributing Member elects to deposit such contribution shortfall as a Special Loan to the Company, then then such Special Loan shall bear interest at the Special Loan Rate, compounded quarterly, but not more than the maximum amount allowable under applicable law. Any Special Loan shall be subject to the same terms and conditions of a Member Loan and the terms of Exhibit D and shall be paid prior to distributions to the Members pursuant to Article V as more particularly set forth therein. *[Note to Reignwood: See comment below regarding Excess Cash that is reserved under Section 5.3 – Should RW have the right to draw against the reserved funds if AB does not fund Additional Capital?]*

Section 3.8    Guaranties.

Section 3.8.1    Provision of Guaranty. Either Member or an Affiliate thereof, on a case by case basis, may provide any customary so-called "nonrecourse carveout" guaranties including, without limitation, indemnification with respect to environmental matters, required by a lender in connection with any Authorized Financing (each a "**Carveout Guaranty**") for the

17

benefit of the Company and any Subsidiary.  Any Member providing any Carveout Guaranty shall do so without additional compensation.  In connection with either providing a Carveout Guaranty, the other Member shall cause its Creditworthy Affiliate to execute and deliver a Cross-Indemnity and Reimbursement Agreement with respect to the obligations set forth in such Carveout Guaranty.  Any Member providing a Carveout Guaranty or a Cross-Indemnity and Reimbursement Agreement is referred to herein as a "**Guarantor**".  The Members agree and acknowledge that Investor or an Affiliate of Investor shall provide the Carveout Guaranties in connection with the Existing Debt.

Section 3.8.2     Control of Claims made against Guaranty.

(i)     If demand is made on the Company or any Guarantor for payment or performance under any Carveout Guaranty, the Person receiving the demand shall immediately forward copies of such demand to each Member and the other Guarantors of the same or a related obligation, if any.  No Guarantor shall be required to resist or dispute enforcement of its Carveout Guaranty.  However, Investor may, by notice to the other Members, elect to control all negotiations and legal proceedings involving the Carveout Guaranty in accordance with this Section 3.8. Investor agrees to act reasonably in exercising such control and may expend reasonable amounts for fees and other costs in such proceedings.  The Company shall promptly reimburse such fees and costs to Investor upon demand; if it is unable to do so, however, such fees and costs shall be shared as provided in this Section 3.8.

(ii)     If Investor elects to control such negotiations and legal proceedings, the other Member(s) and Guarantors agree to cooperate with Investor and not to pay or compromise any demand by the holder of such Carveout Guaranty without Investor's Approval.  The Members agree that any defense to enforcement of a Carveout Guaranty, when control over the legal proceedings is held by Investor, will be advocated on behalf of all of the Guarantors, and no Guarantor will take a position in such proceedings that is inconsistent with the position taken by Investor.  However, no Guarantor will thereby be deemed to have waived any rights against any other Guarantor or any of its Affiliates under this Agreement.

(iii)     Without limiting the rights under the Cross-Indemnity and Reimbursement Agreement, any payment made in compliance with this Section 3.8 by or on behalf of a Guarantor and not reimbursed to such Guarantor by the Company, pursuant to the Cross-Indemnity and Reimbursement Agreement or otherwise, shall be deemed to be a loan to the Member that is an Affiliate of the Creditworthy Guarantor that did not fulfill its obligations (the "**Defaulting Cross-Indemnitor**") on the date such payment is made equal to the sum of the amount paid plus all reasonable expenses incurred by such Guarantor in negotiating or defending against the enforcement of such Carveout Guaranty ("**Guaranty Loan**").  Each Guaranty Loan shall (1) bear interest at the [***Member Loan Rate or Special Loan Rate***], compounded quarterly but not more than the maximum amount allowable under applicable law, and (2) otherwise subject to the same terms and conditions of a member loan and the terms as set forth on Exhibit D and shall be paid prior to distributions to the Members pursuant to Article V or more particularly set forth therein..  ***[Note to Reignwood: Confirm interest rate on a Guaranty Loan; also discuss implications for AB if it fails to pay its share – Should AB be removed as a Managing Operating Member?]***

Section 3.8.3     Allocation of Liability.

(i)        The liability under any Guaranty or Cross-Indemnity and Reimbursement Agreement made by a Member or its Affiliate shall be apportioned between the Members, in accordance with their respective Proportionate Shares, subject to Section Section 3.8.3(ii) or Section **Error! Reference source not found.**.  However, if distributions have been made pursuant to Sections 5.3.1(b) or 5.3.2(ii) prior to the time any payment under a Guaranty is made as provided herein, then liability under the Guaranty shall be apportioned between the Members in proportion to such distributions which were made and in the reverse order in which they were made.  To the extent a Guarantor pays more than its share of liability calculated as set forth above (an "**Overpayment**"), such Overpayment shall be paid to the Guarantor by the other Guarantors who have not paid their respective shares of liability until such Overpayment, plus interest as provided herein, is repaid in full.  The foregoing apportionment shall apply whether Guaranties are made by the Members or their Affiliates, and each Member agrees to cause its Affiliates who are Guarantors to abide by the provisions of this Section 3.8.3(i).  To the extent a Guarantor does not pay its share of an Overpayment within ten (10) Business Days after receiving notice of its obligation to do so, such Guarantor (or the Member with which it is Affiliated, if such Guarantor is not a Member) shall be deemed to have committed an Event of Default under Section **Error! Reference source not found.**, with no further cure period.  The obligation to pay a share of an Overpayment is not an obligation to contribute capital.  Each executed Cross-Indemnity and Reimbursement Agreement shall be consistent with the terms of this Section 3.8.3(i).

(ii)        Notwithstanding the provisions of Section 3.8.3(i), (A) each Guarantor (and any Member who is an Affiliate of such Guarantor) (x) shall be fully responsible for any liability under a Guaranty that arises from or relates to a breach by such Guarantor (or an Affiliate of such Guarantor) of obligations in the applicable Guaranty, this Agreement or any Authorized Financing, and (y) must indemnify, defend and hold harmless any other Guarantor, the Company and the other Member from such liability, including all costs and expenses incurred relating thereto, (B) any amount paid by such Guarantor or any of its Affiliates on account of liability under clause (x) above shall not be deemed to be a loan or capital contribution to the Company and shall not be reimbursed by the Company, and (C) no such payment shall be taken into account in determining whether such Guarantor made an Overpayment.

(iii)        Any amount due from a Guarantor or a Member to another Guarantor or Member under this Section 3.8.3(iii) which is not paid on demand shall bear interest at the Guaranty Loan Rate under applicable law from the date of demand until paid in full.  Any interest so paid shall reduce, on a dollar-for-dollar basis, the amount of interest the Company is required to pay pursuant to this Section Section 3.8.3(ii) with respect to the same amount. If any amount due pursuant to this Section Section 3.8.3(ii) is not paid on demand, the Company shall deliver to the creditor Member or Guarantor all distributions and other amounts which would otherwise have been made and/or paid to the Member that is obligated under this Section Section 3.8.3(ii); provided, however, this provision shall not limit the remedies of the creditor Member or Affiliate.  Any amounts so distributed shall be deemed to have been distributed or paid to the debtor Member and applied in repayment of amounts due to the creditor Member.

Section 3.8.4        Terms of Guaranty. Unless otherwise approved by each of the Members, all loan documents entered into in connection with an Authorized Financing shall

ACTIVE/87979073.5

provide that if a Member or an Affiliate thereof acquires the membership interest of the other Member pursuant to the terms of this Agreement or otherwise, then (a) the related Authorized Financing shall not be subject to acceleration or payment of any assumption fees in connection with such acquisition and (b) the applicable lender under the Authorized Financing shall release the transferring Member and any Affiliate Guarantor from any liability under any Carveout Guaranty given by such transferring Member and its Affiliate accruing from and after the date of such transfer and, if required by the lender as a condition precedent to such release, such Carveout Guaranty is assumed (or a comparable replacement Carveout Guaranty is provided) by a substitute guarantor with net worth and liquidity comparable to the net worth and liquidity of the prior guarantor thereunder.

## ARTICLE IV
## CAPITAL ACCOUNTS, ALLOCATIONS OF INCOME AND LOSS[5]

Section 4.1    Capital Accounts.  A separate capital account (each a "**Capital Account**") shall be maintained for each Member in accordance with the rules of Section 1.704-1(b)(2)(iv) of the Treasury Regulations and this Section 4.1 shall be interpreted and applied in a manner consistent therewith.  Whenever the Company would be permitted to adjust the Capital Accounts of the Members pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(0) to reflect revaluations of Company property, the Company may so adjust the Capital Accounts of the Members.  In the event that the Capital Accounts of the Members are adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(0) to reflect revaluations of Company property, (i) the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain or loss, as computed for book purposes, with respect to such property, (ii) the Members' distributive shares of depreciation, depletion, amortization and gain or loss, as computed for tax purposes, with respect to such property shall be determined so as to take account of the variation between the adjusted tax basis and book value of such property in the same manner as under Code Section 704(c), and (iii) the amount of upward and/or downward adjustments to the book value of the Company property shall be treated as income, gain, deduction and/or loss for purposes of applying the allocation provisions of this Article IV.  In the event that Code Section 704(c) applies to Company property, the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain and loss, as computed for book purposes, with respect to such property.

Section 4.2    [Allocation of Net Income.  Subject to Sections 4.5 through 4.9, net income for any fiscal year or portion thereof shall be allocated among the Members in the following order and priority:

(a)    First, to the Members until the aggregate allocations of net income to each Member pursuant to this Section 4.2(a) for all fiscal years or portions thereof are equal to the aggregate allocations of net loss to each Member pursuant to Section 4.4 for all fiscal years or portions thereof; in the reverse order of, and in proportion to, the prior allocations of net loss to the Members pursuant to Section 4.4; and

(b)    Thereafter, to the Members, pro rata in accordance with their Proportionate Shares.]  [**Note to GP Tax:  Please confirm this section applies and**

---

[5] Subject to review by tax counsel.

ACTIVE/87979073.5

**works with the concepts of Proportionate Share and the subordinated capital interests**]

Section 4.3    Allocation of Net Loss.  Subject to Sections 4.4 through 4.9, net loss for any fiscal year or portion thereof shall be allocated among the Members in accordance with their Proportionate Shares.

Section 4.4    Loss Limitation.  Net loss allocated pursuant to Section 4.3 shall not exceed the maximum amount of net loss that can be allocated without causing or increasing a deficit balance in a Member's Adjusted Capital Account.  A Member's "**Adjusted Capital Account**" balance means such Member's Capital Account balance increased by such Member's obligation to restore a deficit balance in its Capital Account, including any deemed obligation pursuant to the penultimate sentences of Treasury Regulations Section 1.704-2(g)(1) and 1.7042(i)(5), and decreased by the amounts described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6).  In the event that one but not both of the Members would have a deficit balance in its Adjusted Capital Account as a consequence of an allocation of net loss pursuant to Section 4.3 in excess of the amount, if any, permitted under the first sentence of this Section 4.4, the limitation set forth in this Section 4.4 shall be applied by allocating 100% of the remaining net loss to the other Member until the Adjusted Capital Account of such other Member is zero.

Section 4.5    Minimum Gain Chargebacks and Non-Recourse Deductions.  Company Minimum Gain.  Notwithstanding any other provisions of this Agreement, in the event there is a net decrease in Company Minimum Gain during a fiscal year, the Members shall be allocated items of income and gain in accordance with Treasury Regulations Section 1.704-2(f).  For purposes of this Agreement, the term "**Company Minimum Gain**" means "**Partnership Minimum Gain**" as set forth in Treasury Regulations Section 1.7042(b)(2), and any Member's share of Company Minimum Gain shall be determined in accordance with Treasury Regulations Section 1.704-2(g)(1).  This Section 4.5 is intended to comply with the minimum gain charge-back requirement of Treasury Regulations Section 1.704-2(f) and shall be interpreted and applied in a manner consistent therewith.

Section 4.5.1    Nonrecourse Deductions.  Notwithstanding any other provision of this Agreement, non-recourse deductions shall be allocated to the Members, pari passu, in proportion to their Proportionate Shares.  "**Non-recourse deductions**" shall have the meaning set forth in Treasury Regulations Section 1.704-2(b)(1).

Section 4.5.2    Partner Nonrecourse Debt.  Notwithstanding any other provisions of this Agreement, to the extent required by Treasury Regulations Section 1.704-2(i), any items of income, gain, loss or deduction of the Company that are attributable to a nonrecourse debt of the Company that constitutes "**partner nonrecourse debt**" as defined in Treasury Regulations Section 1.704-2(b)(4) (including chargebacks of partner nonrecourse debt minimum gain) shall be allocated in accordance with the provisions of Treasury Regulations Section 1.704-2(i).  This Section 4.5.2 is intended to satisfy the requirements of Treasury Regulations Section 1.704-2(i) (including the partner nonrecourse debt minimum gain chargeback requirements) and shall be interpreted and applied in a manner consistent therewith.

Section 4.6    Qualified Income Offset.  Any Member who unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) that causes a deficit balance in its Capital Account (in excess of any

deemed deficit restoration obligation pursuant to Treasury Regulations Sections 1.704-2(g)(1) and (i)(5), and adjusted as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)) shall be allocated items of income and gain in an amount and a manner sufficient to eliminate, to the extent required by the Treasury Regulations, such deficit balance as quickly as possible. This Section 4.6 is intended to comply with the alternate test for economic effect set forth in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted and applied in a manner consistent therewith.

Section 4.7    Curative Allocations. The allocations set forth in Sections 4.5 and 4.6 (the "**Regulatory Allocations**") are intended to comply with the requirements of Treasury Regulations Sections 1.704-1(b) and 1.704-2. Notwithstanding any other provisions of this Article IV (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account as provided for in the following two sentences. Income, gain, loss and deduction shall be reallocated to the extent that such reallocation causes the net aggregate amount of allocations of income, gain, deduction and loss to each Member to be equal to or more closely approximate the net aggregate amount of such items that would have been allocated to each such Member if the Regulatory Allocations had not occurred; provided, however, that such reallocations shall be made only if and to the extent they are consistent with the requirements of Code Section 514(c)(9)(E) and Treasury Regulations Section 1.514(c)-2. This Section 4.7 shall be interpreted and applied in such a manner and to such extent as is reasonably necessary to eliminate, as quickly as possible but consistent with the requirements of Code Section 514(c)(9)(E), permanent economic distortions that would otherwise occur as a consequence of the Regulatory Allocations in the absence of this Section 4.7.

Section 4.8    Special Income Allocation. Notwithstanding any other provision of this Article IV (except Sections 4.5 through 4.7), in the year in which the Company liquidates (within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g)), items of gross income and gain shall be allocated to AB and items of gross loss and deduction shall be allocated to Investor to the extent necessary to cause the aggregate amount of net distributions under Article V with respect to each Member to be equal to or more closely approximate the aggregate net distributions that each such Member would have received pursuant to Article V if this Agreement did not contain Section 5.4; provided, however, that gross items of loss and deduction shall not be allocated to Investor pursuant to this Section 4.8 to the extent they would cause or increase a deficit balance in Investor's Adjusted Capital Account.

Section 4.9    Code Section 704(b) and 514(c)(9)(E) Allocations. The allocation provisions contained in this Article IV are intended to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder, and shall be interpreted and applied in a manner consistent therewith. Further, it is the intention of the Members that this Agreement provide for allocations to comply with the requirements of Code Section 514(c)(9)(E) and the Treasury Regulations promulgated thereunder, and the Members agree that any provision of this Article IV that is reasonably subject to different interpretations shall be interpreted in a manner that comports with the foregoing intention. The Members further agree to make such amendments or changes to this Agreement as are reasonably requested by Investor in good faith and consistent with the understanding of the parties, to effectuate such intent, provided that such modifications will not materially and adversely affect the aggregate amount or timing of payment of fees, distributions of Cash Flow, Capital Proceeds and liquidation proceeds or the allocation of profits and losses to either Member without such Member's prior written consent.

Section 4.10    Distributions of Nonrecourse Liability Proceeds. If, during a fiscal year, the Company makes a distribution to any Member that is allocable to the proceeds of any

ACTIVE/87979073.5

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 234 of 277

nonrecourse liability of the Company that is allocable to an increase in Company Minimum Gain pursuant to Treasury Regulations Section 1.704-2(h), then the Company shall elect, to the extent permitted by Treasury Regulations Section 1.704-2(h)(3), to treat such distribution as a distribution that is not allocable to an increase in Company Minimum Gain.

Section 4.11    Allocation of Debt.  For purposes of allocating excess nonrecourse liabilities among the Members pursuant to Treasury Regulations Section 1.752-3(a)(3), AB's interest in Company profits shall be 100% and Investor's interest in profits shall be 0%.

Section 4.12    Other Allocation Provisions.  Any elections or other decisions relating to the allocations of Company items of income, gain, loss, deduction or credit shall be made by Investor in any manner that reasonably reflects the purpose and intention of this Agreement.

Section 4.13    No Deficit Restoration by Members.  No Member shall be required to contribute capital to the Company to restore a deficit balance in its Capital Account upon liquidation or otherwise.

## ARTICLE V
## DISTRIBUTIONS.

Section 5.1    Maintenance of Reserves.

Section 5.1.1    Reserves -- General.  The Company shall maintain such reserves as mutually agreed upon by Investor and AB as part of the Business Plan which amounts shall be appropriate in light of customary industry standards and potential opportunities and obligations of the Company to meet the anticipated cash needs and obligations of the Property and the Company or any Subsidiary, including, without limitation, any reasonably anticipated contingent liabilities of the Company or any Subsidiary or as may be required pursuant to any Authorized Financing.

Section 5.1.2    Prohibited Distributions.  Notwithstanding any provision of this Agreement to the contrary, the Members shall not make any distributions prohibited by the terms of the Act, as prohibited by any loan documents under any Authorized Financing or as prohibited by any other Applicable Law.

Section 5.2    Payment of Member Loans, Default Loans and Special Loans and Guaranty Loans.  The Operating Member, no later than thirty (30) days following the start of a new Calendar Quarter (subject to the true-up set forth in Section 5.3.1) and promptly following any Capital Transaction, shall calculate the Cash Flow and Capital Proceeds (if applicable) of the Company, if any, and shall pay the same to the Members, as applicable, first in repayment of all outstanding Guaranty Loans, then in repayment of all outstanding Special Loans, then in repayment of all outstanding Default Loans and then in repayment of all outstanding Member Loans.  Payments shall be applied first to interest due on Guaranty Loans, then to the outstanding principal on Guaranty Loans, then to interest due on Special Loans, then to the outstanding principal on Special Loans, then to interest due on Default Loans, then to the outstanding principal on Default Loans, then to interest due on Member Loans and then to the outstanding principal on Member Loans.  Payment shall be made to each Member having Guaranty Loans, Special Loans, Default Loans and Member Loans in proportion to the outstanding balance of all Guaranty Loans, Special Loans, Default Loans and Member Loans then outstanding held by each Member.  No actual distribution shall be made under the remaining provisions of this Article or otherwise under this Agreement until all interest and

ACTIVE/87979073.5

principal on the Guaranty Loans, Special Loans, Default Loans and Member Loans have been paid in full.

Section 5.3     Distributions of Cash Flow and Capital Proceeds.

Section 5.3.1     Distributions of Cash Flow.

(i)     The Operating Member shall, no later than thirty (30) days following the start of a new Calendar Quarter, calculate the Cash Flow of the Company for the prior Calendar Quarter, if any, and, subject to Sections 5.1, 5.2 and 5.4 and the last sentence of this Section 5.3, distribute the same to the Members as provided below: *[Note to Reignwood: Confirm quarterly distributions subject to a true-up upon receipt of Annual Audit and updated NOI calculations is acceptable]*

(a)     First, all Cash Flow up to the amount of the Baseline Net Cash Flow (prorated on a Calendar Quarter basis), to the Members in accordance with their Proportionate Shares; and

(b)     Then, with respect to any Cash Flow that exceeds the Baseline Net Cash Flow (as prorated for a Calendar Quarter basis) (such amount, the "**Bonus Cash Flow**") (X) fifty percent (50%) of such Bonus Cash Flow to AB, and (Y) fifty percent (50%) of such Bonus Cash Flow to the Members in accordance with their Proportionate Shares until (1) AB has received, in the aggregate after the distributions made to AB under clause (a) above and this clause (b) an amount equal to twenty-five percent (25%) of all Cash Flow for such Fiscal Year (as prorated on a Calendar Quarter basis), and then (2) any remaining Cash Flow to Investor.

(ii)     Notwithstanding anything to the contrary contained in clause (b) above, any Bonus Cash Flow that is payable to AB shall not be distributed to AB, but instead shall held by the Company in a reserve account for use by AB to fund Additional Capital Contributions that may be needed in the future pursuant to the terms of this Agreement (such amount, the "**Reserved Cash Flow**").  Any Reserved Cash Flow that has not been used to fund Additional Capital Contributions due from AB shall be distributed to AB following the sale of the Property or the Assets of the Company and/or the dissolution of the Company. *[Note to Reignwood: If funds are held in the Reserve, is AB permitted to elect to not contribute such funds if an additional capital contribution is required or are the funds to be automatically released?]* **[NTD: Goodwin Tax to confirm whether additional language is needed to clarify the treatment of the Reserved Cash Flow as distribution actually received, but then "returned" to the Company to be held in escrow]**

(iii)     The quarterly distributions of Cash Flow made pursuant to this Section 5.3.1 shall be subject to an annual reconciliation following the completion of an annual financial and accounting audit of the Property and the Company.  In the event such audit reveals that the distributions made (or deemed made) to the Members hereunder resulted in the underpayment of Cash Flow to one Member and an overpayment of Cash Flow to the other Member, then the Member receiving the overpayment of distributions of Cash Flow (in such instance, the "**Receiving Member**"), shall promptly, and not later than fifteen (15) days after such determination of overpayment of Cash Flow, pay such excess amount to the other Member.  If any

Receiving Member fails to pay such excess amount to the other Member, then such excess amount shall be withheld from all future distributions of Cash Flow or Capital Proceeds (provided that such Receiving Member shall be deemed to have received such distribution) until such time that the entirety of the excess payments have been fully reconciled.  **[*Note to Reignwood: Confirm reconciliation concept and process are acceptable*]**

Section 5.3.2    Distributions of Capital Proceeds.  The Operating Member shall, promptly following any Capital Transaction, calculate the Capital Proceeds of the Company, if any, and, subject to Sections 5.1, 5.2 and 5.4 and the last sentence of this Section 5.3, distribute the same to the Members as provided below:

(i)    First, one hundred percent (100%) to the Members in proportion to their Invested Capital Proportionate Share until such time that each of Investor and AB have received distributions under this Article V equal to their respective Contributions;

(ii)    Second, one hundred percent (100%) to AB, until such time that AB has received distributions under this Article V equal to the value of the Subordinated Deemed Capital Contribution; and

(iii)    Third, one hundred percent (100%) to the Members in proportion to their Proportionate Shares;

All distributions made pursuant to this Section 5.3 shall be calculated taking into account all prior distributions made under this Section 5.3.

Section 5.4    Distributions Upon Liquidation.  [In the event the Company (or a Member's interest therein) is "liquidated" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g), then any distributions shall be made pursuant to this Section 5.4 to the Members (or such Member, as appropriate), in accordance with their (or its, as appropriate) positive Capital Account balances in compliance with Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2).] **[NTD: Goodwin Tax to confirm]**

Section 5.5    Withholding.  [If the Company is required by law or regulation to pay or to withhold and pay to any taxing or other governmental authority any amount arising as a result of a Member's interest in the Company, then the Company shall be entitled to pay such amount and the amount so paid (other than payments made from funds withheld upon a distribution that are accounted for as a distribution) shall for all purposes of this Agreement be treated as a recourse loan by the Company to such Member.  Any such loans shall bear interest from the date of such payment by the Company until repaid at the Member Loan Rate and shall be repaid to the Company from any distributions payable to such Member.  A Member may prepay any such loan at any time.] **[NTD:  Goodwin Tax to confirm]**

## ARTICLE VI
## POWERS AND DUTIES

Section 6.1    Management.

Section 6.1.1    Managing Member.  The management and control of the Company shall be vested in the Members, which shall be responsible for the establishment of policy and operating procedures respecting the business affairs of the Company and with

ACTIVE/87979073.5

respect to the Company as the direct or indirect owner of any Subsidiary.  Subject to the provisions of this <u>Section 6.1</u> (including, without limitation, <u>Section 6.1.3</u>), the Members shall (and do hereby) delegate responsibility for the day-to-day management of the business of the Company, including (but not limited to) oversight of the performance of the Subsidiaries and the Property, to a managing member of the Company (such Member, the **"Operating Member"**). AB shall be the initial Operating Member; provided, however, that if an AB Event of Default occurs, without limiting the terms of <u>Section 10.3</u>, Investor shall have the right to remove AB as the Operating Member, whereupon AB shall cease to be the Operating Member and Investor or its designee shall become the Operating Member.  Subject to the terms and limitations set forth in this Agreement, the Operating Member may exercise all of the rights and powers granted to a "Manager" of a limited liability company under the Act.  Any action taken by the Operating Member in accordance with the terms of this Agreement shall constitute the act of and serve to bind the Company.

(i)    <u>Performance Standard of Manager</u>.  Within the resources available to the Company, Operating Member shall manage the business and affairs of the Company utilizing the effort, care and skill generally expected of limited liability company managers of companies investing (directly or indirectly) in [upper-upscale boutique lifestyle] [***Note to Reignwood: Confirm hotel classification***] hotels and private member clubs comparable in size, use, quality, location, target-market and value to the Property, employing sound business practices and taking such steps as are necessary or appropriate in the reasonable judgment of Operating Member to maintain and enhance the value and profitability of the Property, using its diligent efforts to carry out the applicable Business Plan and such Mutual Decisions Approved by the Members with respect to the Property (collectively, the "**Performance Standard**").  Operating Member acknowledges that it will participate in the preparation of and thoroughly review each Business Plan and agrees that it will diligently utilize its skills and experience to implement each Business Plan in a timely and cost effective manner.  Notwithstanding anything to the contrary in this Agreement,  Operating Member shall not fail to meet the Performance Standard or breach this Agreement (and no Event of Default shall be deemed to occur) by reason of its failure to take any action to the extent such failure is caused by an election by Investor to not provide any Approval or make any decision required in order to take such action to the extent Approval of Investor is expressly required under this Agreement in each instance, in order for Operating Member to meet the Performance Standard.

(ii)    <u>Authority and Duties of Manager</u>.  Except as set forth in <u>Section 9.3.2</u>, Operating Member shall not expend any Company or any Subsidiary funds (or its own funds in expectation of reimbursement) that are not authorized by the then applicable Business Plan without the prior Approval of the Members.  Subject to the limitations in this Agreement, including, but not limited to the Mutual Decisions that require the Approval of both Members, Operating Member shall, subject in each instance to the terms of the then applicable Business Plan, have the right, authority and obligation to:

(a)    Collect all amounts owed to the Company and any Subsidiaries;

(b)    Cause the Company and any Subsidiaries, to the extent they have available funds, to pay all real and personal property taxes, loans, professional and service contract fees, insurance premiums and other operating expenses as the same

become due and payable; coordinate the monthly reporting efforts by all Third Party service providers including, Hotel Manager;

(c) Maintain the books and records of the Company and each Subsidiary and prepare and deliver to Investor the reports described in Section 9.4;

(d) Cause the Company and each Subsidiary to comply with the provisions (including reporting requirements) of each loan document applicable to an Authorized Financing, lease or other agreement to which the Company or a Subsidiary is a party or which affects the Property or its operation;

(e) Open and maintain an Operating Account for the Property and promptly deposit all funds of every kind and nature received in respect of the Property into the appropriate Operating Account.  Operating Member shall authorize signatories for each Operating Account, although a Person designated by Investor shall always be a signatory on each Operating Account and all other Company or Subsidiary bank accounts, with authority to deposit and withdraw on its signature alone.  In no event shall any Operating Account be co-mingled with any accounts of any other party.   All signatories for Company or any Subsidiary bank accounts shall be bonded; **[Note to Reignwood:  Should Reignwood's co-signature be required for draws above a certain Dollar amount?]**

(f) Without duplication of Hotel Manager's obligations under the Hotel Management Agreement, deliver to all Members, promptly upon the receipt or sending thereof, copies of all material notices, certificates, reports and communications between the Company or any Subsidiary and any other party, including: (a) any governmental authorities, (b) any Person providing insurance for the Property (including personal injury notifications and correspondence), (c) any tenant, service provider or vendor regarding actual or alleged defaults, and (d) any lender under an Authorized Financing;

(g) Subject to the delegation to Hotel Manager certain obligations under the Hotel Management Agreement, perform normal business functions necessary for the day-to-day operation of the Property, the Company and each Subsidiary, and take such other actions and execute such other agreements and documents in connection therewith as Operating Member deems reasonably necessary or desirable in its good faith professional discretion, so long as the same are consistent with this Agreement and the Business Plans and the amount of such contract or agreement is Twenty-Five Thousand Dollars ($25,000) or less; **[Note to Reignwood:  Confirm threshold amount]**

(h) Institute, prosecute, defend and settle at the expense of the Company or a Subsidiary any legal or administrative actions or proceedings (including any insurance claims) on behalf of or against the Company or a Subsidiary if the amount in controversy is Twenty-Five Thousand Dollars ($25,000) or less; **[Note to Reignwood: Confirm threshold amount]**

(i) Without duplication of Hotel Manager's obligations under the Hotel Management Agreement, negotiate with governmental authorities to obtain any zoning variances, entitlements, governmental approvals, building permits and other permits and licenses (including liquor licenses) as are necessary for the operation, development or

ACTIVE/87979073.5

renovation of the Property as Approved by the Members as a Mutual Decision or as otherwise expressly set forth in the then applicable Business Plan;

(iii)    Negotiate and enter into such contracts and agreement expressly set forth in the then applicable Business Plan or such contracts or agreements that involve, or could reasonably be expected to involve, costs to the Company or any Subsidiary of Twenty-Five Thousand Dollars ($25,000) or less in the aggregate under such contract or agreement and where such agreement is terminable by the Company or a Subsidiary on not more than thirty (30) days' prior written notice without payment of any termination fee or penalty; **[Note to Reignwood: Confirm threshold amount]**

(j)    Perform the following asset management functions: (a)  oversee all leasing efforts (if any) in accordance with the then applicable Business Plan; (b) coordinate the monthly reporting efforts by all Third Party service providers including, Hotel Manager; (c) supervise the accounting and audit process; and (d) when the sale of the Property is Approved as provided herein, manage such sale (unless Investor elects in its sole discretion to manage such sale), including the production of disclosure schedules for sale documentation; and ***[Note to Reignwood:  Is it your expectation that the Hotel Manager will coordinate leasing at the property or would that be handled by the JV?]***

(k)    Perform the other obligations of Manager which are required in this Agreement or expressly Approved by the Members in connection with Approval of any Mutual Decision.

Manager shall perform all of the duties described above both with respect to the Company and, acting for the Company as the sole member of each Subsidiary, provided that all Mutual Decisions and all other decisions with respect to any Subsidiary shall be made by applying the provisions of this Agreement as if such Subsidiary was the Company making the decisions directly.

Section 6.1.2    Meetings.  The Member shall meet at least once each quarter (unless such meeting shall be waived by both Members) or on the written request of any Member upon three (3) Business Days' notice to all Members, including with respect to any proposed action that is a Mutual Decision.

Section 6.1.3    Mutual Approvals.  Notwithstanding any other provision of this Agreement, the mutual written Approval of the Members is required for any of the following actions (which may be proposed at any time by either of the Members) by the Company or any Subsidiary (but to the extent that any such action is expressly required to be taken by the Hotel Owner under the provisions of the Hotel Management Agreement or any other Agreement or Contract entered into by the Company or any subsidiary on the one hand, and AB or any of its Affiliates on the other (an "**AB Affiliate Agreement**"), then such approval of both Members shall not be required and Investor shall have the sole right to cause the Company to cause the Hotel Owner to take or not take such action as required under the Hotel Management Agreement or such AB Affiliate Agreement) **[Note to Draft: Discuss other decisions under HMA and possible JV modifications – such as budget approvals]** (individually, and collectively, "**Mutual Decisions**"):

(i)    Amending or modifying this Agreement;

ACTIVE/87979073.5

FILED: NEW YORK COUNTY CLERK 08/04/2017 02:21 PM

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 240 of 277

(ii)     amending or modifying the Purchase Agreement or making any election, granting any consent or granting any waiver under the Purchase Agreement; or upon the satisfaction of the applicable conditions precedent in favor of the "Buyer" under the Purchase Agreement, and the election to proceed with the consummation of the transactions contemplated by the Purchase Agreement, including the assumption of the Existing Debt;

(iii)     authorizing any agreement, transaction or action on behalf of the Company or any Subsidiary that is unrelated to its purpose as set forth in Section 1.2 of this Agreement or as set forth in any Subsidiary's limited liability company agreement;

(iv)     except as expressly permitted by Section 8.1.1, issuing any additional membership interests in the Company or admitting a Person as a member to the Company or causing any Subsidiary to issue a membership interest in such Subsidiary or admitting a Person as a Member of such subsidiary;

(v)     authorizing or effecting or causing a merger or consolidation of the Company or any Subsidiary with or into one or more other entities;

(vi)     doing any act in contravention of this Agreement which would make it impossible or impractical to carry on the Strategic Plan of the Company, or alter the primary purpose of the Company;

(vii)     any modification or amendment of the Strategic Plan and/or Property Improvement Budget.

(viii)     approving or modifying the Business Plan for the Company;

(ix)     causing the Hotel Owner to enter into any contract that involves, or could reasonably be expected to involve, more than Twenty-Five Thousand Dollars ($25,000) in the aggregate or is not terminable on thirty (30) days or less notice without payment of a termination fee or penalty except as expressly set forth in the then applicable Business Plan or as expressly permitted under the Hotel Management Agreement; [*Note to Reignwood: Confirm threshold*]

(x)     acquiring or causing the Hotel Owner (or any other Subsidiary) to acquire any real property that is adjacent to the Property or otherwise or granting any easements or any other encumbrances on or against the Property or any portion thereof;

(xi)     Entering into, renewing, terminating, or modifying any property management agreement, franchise license agreement, brand affiliation, asset management agreement, development management agreement, construction contract or other similar agreement except to the extent expressly set forth in the then applicable Business Plan;

(xii)     Except as expressly authorized by Section 6.3.1 contracting with any Affiliate of either Member;

(xiii)     Causing the Hotel Owner to sell, exchange or transfer the Property or any interest therein or market or promote the Property for sale or engaging any Third Party to do the same;   [*Note to Reignwood: Discuss lockout period and*

ACTIVE/87979073.5

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 241 of 277

**terms of Right of First Offer (see Section 8.3) *and whether it should be included since any sale of the property requires joint approval]***

(xiv)    guaranteeing, or causing the Company or any Subsidiary to guaranty, the debt of another Person;

(xv)    causing the Hotel Owner or any other Subsidiary to cross-collateralize or cross-default the Property with another property or properties;

(xvi)    causing the Hotel Owner enter into any lease of any portion of the Property except to the extent expressly contemplated in the then applicable Business Plan (and entered into on the terms expressly Approved in such Business Plan);

(xvii)    the development and modification of leasing parameters for the Property;

(xviii)    establishing, or causing the Hotel Owner to establish, any reserves for the Property (except as otherwise provided in Section 5.1.1 of this Agreement or in Section ___ of the Hotel Management Agreement);  **[NTD: Add cross-reference to FF&E reserve provision in HMA]**

(xix)    taking any material action in connection with the prosecution or defense of any litigation or other claim with respect to the Company, the Hotel Owner or the Property that involves, or could reasonably be expected to involve, more than $25,000;  [***Note to Reignwood: Confirm threshold amount***]

(xx)    undertaking capital improvement projects or development projects or any design, market studies, permitting or other activities with respect to any such capital improvement projects or development projects other than as expressly provided in and in accordance with the then applicable Business Plan (and subject to the express terms Approved in such Business Plan);  [***Note to Reignwood: Discuss Club renovation and approval mechanics, including budget and design and rights of AB to reallocate between line items***]

(xxi)    determining insurance requirements and implementing the insurance program for the Company and the Property;

(xxii)    prosecution of any insurance claim that involves, or could reasonably be expected to involve, more than twenty-five thousand dollars ($25,000);  [***Note to Reignwood: Confirm threshold amount***]

(xxiii)    discretionary distributions by the Company to the Members;

(xxiv)    Authorizing the formation of any Subsidiary, and Approval of all documents used in connection therewith, including, but not limited to, any operating agreement, limited liability company agreement, partnership agreement or bylaws;

(xxv)    causing the Company or any Subsidiary to incur debt financing or re-financing or execute or issue mortgages, deeds of trust, pledges, security interests, notes, or other evidence of or security for indebtedness, other than ordinary course trade

indebtedness incurred by the Hotel Owner in the ordinary course of business consistent with the then applicable Business Plan and the Hotel Management Agreement;

(xxvi)   Making monetary decisions or material non-monetary decisions under any loan documents, including (A) exercising any extension option under any loan documents applicable to any Authorized Financing, (B) electing to prepay any Authorized Financing or (C) consenting to any substitution, modification or release of collateral for any Authorized Financing;   **[Note to Reignwood:  Discuss implications if mutual agreement is not reached with respect to the loan documents.]**

(xxvii)  Subject to the delegation to Hotel Manager of certain obligations under the Hotel Management Agreement approving or implementing any budget for the operating expenses of the Company or the operating expenses of the Property or any Subsidiary that are not expressly set forth in the then applicable Business Plan, or incur any expenditure that is inconsistent with a budget for such operating expenses of the Company or such operating expenses of the Property or the Subsidiaries that has been Approved by the Members;

(xxviii) approving the accountants, auditor or legal counsel for the Company or any Subsidiary or the termination or replacement of the accountants, auditors or legal counsel for the Company or Subsidiary, except to the extent the appointment or dismissal of legal counsel is as the discretion of Operating Member pursuant to Section 6.1.1(ii)(h);   **[Note to Reignwood:  Do you want to have any accountants pre-approved?]**

(xxix)   changing the Company's or any Subsidiary's accounting method, either for financial or tax reporting purposes or making or recurring any material tax election;

(xxx)    causing the Company or any Subsidiary to take any action to initiate or otherwise cause a Bankruptcy/Dissolution Event with respect to the Company or any Subsidiary or to acquiesce in any action taken by a Third Party (including, without limitation, any action to seek an order, judgment or decree) seeking to initiate or otherwise cause a Bankruptcy/Dissolution Event with respect to the Company or any Subsidiary (the term "acquiesce" in this context includes but is not limited to the failure to file a petition or motion to vacate or discharge any such order, judgment or decree or other third party action within thirty (30) days after the entry of the order, judgment or decree); provided, however, if Investor determines that Operating Member is acquiescing in any action taken by a third party seeking to initiate or otherwise cause a Bankruptcy/Dissolution Event with respect to the Company or any Subsidiary, then Investor shall have the right to cause the Company to take such actions as it determines in good faith may be required in order not to acquiesce in such action taken by such Third Party;

(xxxi)   establishing or modifying the operation of the food and beverage outlets at the Hotel or the private Member's club (if any) at the Property in any manner except as expressly set forth in the then applicable Business Plan or as expressly Approved by Investor pursuant to the Hotel Management Agreement;

ACTIVE/87979073.5

(xxxii)  modifying or agreeing to modify the private members club membership program or any club membership agreements related to the private members' club that may be operated at the Property from time to time;

(xxxiii)  subjecting all or any part of the Property to a condominium regime;

(xxxiv)  seeking or consenting to any change in the zoning or other land use regulations affecting the Property or any permits or approvals granted thereunder;

(xxxv)  Settling any casualty loss or condemnation claim in excess of [**Twenty-Five Thousand Dollars ($25,000)**], the terms of any such settlement and the form and substance of all documents proposed to be entered into that evidence such settlement; *[Note to Reignwood: confirm threshold amount]*

(xxxvi)  rebuilding or reconstructing the improvements on the Property if they are substantially damaged by a fire or other casualty or taken by eminent domain or such other condemnation event; and *[Note to Reignwood:  Confirm rebuilding/restoration following a fire or other casualty is a mutual decision]*

(xxxvii) undertaking any activities in connection with the development or conversion of any portion of the Property for the creation of the private members' club including, without limitation, any design, feasibility or market studies, permitting or other activities with respect to any such development or conversion, in each case other than as expressly provided in and in accordance with the then applicable Business Plan (the "**Club Conversion Project**").  **[NTD: Discuss whether club conversion will be undertaken pursuant to a separate project management agreement or included in the HMA]**

Section 6.1.4     Other Business Activities.  Operating Member, shall devote such of its business time as is necessary to competently manage and operate the Company and the Subsidiaries in accordance with the Performance Standard and, in each case to the extent of their responsibilities described herein.  Without limiting the obligations of Manager under the Hotel Management Agreement and except as otherwise expressly set forth in this Agreement or with respect to AB and its Affiliates as set forth in the Hotel Management Agreement, the officers and employees of the Members shall not be required to devote a majority of their time to Company and may engage in other businesses, including businesses identical or similar to or competitive with the Company's business.  The Members may engage in or possess any interest, directly or indirectly, in any other business venture of any nature or description independently or with others; provided, however, so long as Operating Member is a Member of the Company, Operating Member and its Affiliates, as more particularly set forth in the Hotel Management Agreement shall not own any interest (direct or indirect) in or operate or manage or asset manage any hotel, resort or transient occupancy facility located within the Restricted Area.[6]  Membership in the Company and the assumption by each of the Members of any duties hereunder shall be without prejudice to the Members' rights (or the rights of their Affiliates) to have such other interests and activities and to receive and enjoy profits or compensation therefrom, except as expressly provided in this Agreement.  Neither the Company nor the other Members shall have any right by virtue of this Agreement in and to such other ventures or the

---

[6] Restrictions relating to management, operation and/or ownership of a private members' club to be addressed in Club JV Agreement.

income or profits derived therefrom, except as specifically provided herein, or as remedy for breach of the applicable restriction herewith.  Nothing in this <u>Section 6.1.4</u> shall change the obligations of Operating Member's Affiliates under this Agreement or the Hotel Management Agreement.  [**NTD: Consider whether any other carveouts are required in connection with the Club Management Co**]

        Section 6.1.5    <u>Investment Opportunities</u>.  If either Member or any Affiliate of a Member is presented with, approached by a Third Party offering or otherwise has the opportunity to invest in (regardless of the scope of such investment) or develop a hotel, resort or other transient lodging facility in the [People's Republic of China], **[*Note to Reignwood: Confirm whether right of first look should only apply to PRC and not also to Hong Kong*]** then such Member or such Affiliate of a Member (the "**Offering Member**") shall first present such opportunity to the other Member prior to approaching any other potential capital or operating partners or if such an opportunity is first presented to a Member by another potential Capital or operating partner, then such Member shall also present the opportunity to the other Member (the "**Right of First Look**").  **[*Note to Reignwood:  Discuss mechanics of First Look if opportunity is brought to RW by another Hotel operator  other hotel operators may not be willing to enter into a deal with a "competitor"*]** If connection with any such Right of First Look, the Members shall negotiate in good faith for at least (thirty (30) days the proposed terms of a new joint venture to pursue such opportunity.  If Investor and its Affiliates, on the one hand, and AB and its Affiliates, on the other hand, are not able to reach agreement on the principal terms of the proposed venture after thirty (30) days of good faith negotiations, and provided that the Offering Member (or such Affiliate) has complied with the terms of this <u>Section 6.1.5</u> with respect to the Right of First Look, then the Offering Member or such Affiliate shall have the right to pursue such opportunity for its own account, without the other Member and as it otherwise desires.  If Offering Member or its Affiliate does not consummate the acquisition of such opportunity within an 18-month period following the termination of negotiations with the other Member, then such opportunity that subsequently arises will be subject to the Right of First Look again.  Except as set forth in this Agreement, (i) neither Member shall be obligated to present any investment opportunity to the Company or the other Member based on the Member's status and participation as a Member of the Company, even if the opportunity is of a character consistent with the Company's other activities and interests, and (ii) each Member shall have the right to take for its own account, or to recommend to others, any investment opportunity presented to such Member.

        Section 6.2    <u>Limitation of Liability</u>.

        Section 6.2.1    <u>Exculpatory Provisions</u>.  Neither the  Operating Member, nor any Member or Related Party of any Member or any agent, officer, partner, employee, representative, director or shareholder of any Member or any Related Party of any Member shall be liable, responsible or accountable in damages or otherwise to the Company, the Operating Member, any officer of the Company or any Member for (i) any act performed in good faith within the scope of the authority conferred by and the limitations of  this Agreement, (ii) any good faith failure or refusal to perform any acts except those required by the terms of this Agreement, or (iii) any performance or omission to perform any acts in reliance on the advice of accountants or legal counsel for the Company; provided, however, that any such party shall nevertheless be liable in all events for fraud, gross negligence or willful misconduct and nothing herein shall limit the obligations of any Member or its Creditworthy Affiliate under any Cross-Indemnity Agreement.

ACTIVE/87979073.5

Section 6.2.2     Indemnification.  To the fullest extent permitted by law, the Company shall indemnify and save harmless each Member and each Member's Related Parties and each agent, servant, officer and employee of the Company or of any Member or of any Member's Related Parties from any loss, cost, damage, fee (including without limitation, reasonable legal fees and costs) or expense (collectively "**Liabilities**") incurred by reason of (i) such party's status as a Member or Related Party of such Member or as an agent, servant, officer or employee of the Company (or any Subsidiary) or of such Member or Related Party of such Member, (ii) any act performed in good faith within the scope of the authority conferred by this Agreement, (iii) any good faith failure or refusal to perform any acts except those required by the terms of this Agreement or (iv) any performance or omission to perform any acts based upon reasonable good faith reliance on the advice of accountants or legal counsel for the Company, provided that no indemnification shall be given with respect to acts or omissions which constitute fraud, willful misconduct or gross negligence of the party seeking indemnification under this Section 6.2.2.  In the event any litigation, lawsuit, arbitration, mediation, claim or cause of action (collectively, "**Standard Litigation**") is brought by Standard International against any one or more of Balazs, AB, Investor, the Company or any Subsidiary, then, except as otherwise set forth herein, the Company shall indemnify, defend and hold harmless Balazs, AB and Investor, and their respective Affiliates, from and against any Liabilities arising in connection with any such Standard Litigation.  Notwithstanding the foregoing, if pursuant to a final non-appealable determination by a court of competent jurisdiction Balazs, AB or any of their respective Affiliates (collectively, the "**Balazs Parties**") is determined to have committed a breach or violation of (A) any fiduciary duties as a member, shareholder, investor, partner or employee of Standard International or (B) any non-competition or non-compete agreement or covenant or similar agreement between any Balazs Party and Standard International (any such determination, a "**Judgment**"), then Balazs and AB (and not the Company) shall pay the entirety of all damages, costs and expenses (including any attorneys' fees) awarded to Standard International in connection with such Judgment; provided, however, (X) in no event shall such payment of any Judgment by AB constitute a Contribution by AB to the Company or loan by AB to the Company or Investor (or any of its Affiliates), and (Y) subject to the Balazs Parties' compliance with the terms set forth herein, the Company shall be responsible for all reasonable out-of-pocket legal fees and costs (but excluding the Judgment) incurred by any Balazs Party in connection with the Standard Litigation  The Balazs Parties shall take the lead in defending and responding to the Standard Litigation, provided that Investor shall have the right to reasonably Approve all material decisions relating to the Standard Litigation (including, but not limited to, the right to comment on all pleadings and to participate in settlement and other material discussions regarding the Standard Litigation) and shall be kept reasonably informed at all times with respect to the developments, including, but not limited to, any depositions, court conferences or hearings, arbitrations, mediations, settlement discussions, settlement negotiations or any other similar developments  in the Standard Litigation.  *[Note to Reignwood: This provision as currently drafted reflects the terms of the Letter Agreement.  Discuss whether this should be revised to reflect proposed amendment to letter agreement. If the parties do not modify the terms of the Letter Agreement, consider whether AB should provide a personal guaranty with respect to any Judgment]*

Section 6.2.3     Modification of Liability.  The Members specifically acknowledge that any fiduciary or other duty imposed under the Act or any other applicable law, rule or regulation shall be deemed modified, waived or limited in each case only as and to the extent required to permit the Members to act pursuant to any express grants of authority afforded under this Agreement, and to the extent such statutory duties are inconsistent with the provisions of this Section 6.2.3.  The Members acknowledge that the grants of decision-making

authority and waivers of duty among the Members shall constitute an undertaking by and among the Members and by and between the Company and each Member.

      Section 6.3    <u>Related Party Transactions</u>.

      <u>Section 6.3.1</u>    Except as expressly permitted hereunder, the Operating Member shall not, and shall not cause the Company or any Subsidiary to, engage or pay any compensation to itself or any Related Party of the Operating Member for the provision of services to the Company or any Subsidiary.

      <u>Section 6.3.2</u>    The Operating Member on behalf of the Company shall have the right to cause the Hotel Owner to enter into the Hotel Management Agreement attached hereto as <u>Exhibit G</u>. ***[Note to Reignwood: Consistent with the Letter Agreement, the JV agreement contemplates the termination of Standard International at Closing and the JV entering into a new hotel management agreement with AB's hotel management company]***

      Section 6.4    <u>Compensation of Members</u>.  Except as may be expressly provided for herein or otherwise approved by the Members (which shall include any compensation payable to the Hotel Manager under the Hotel Management Agreement), no payment shall be made to any Member or any member, partner, employee or affiliate of any Member for services rendered by such Member to the Company, any Subsidiary or otherwise.  The Members shall have the right to reimbursement from the Company for any reasonable, necessary and direct out-of-pocket third party expenses incurred or payments made on behalf of the Company, provided that (a) such expenses or payments are appropriate for the conduct of Company business and (b) any such expenses or payments were set forth in the then applicable Business Plan or as otherwise Approved in writing by both Members.

      Section 6.5    <u>Employees</u>.  Neither the Company nor any Subsidiary shall have any employees.  Each Member shall be solely responsible for all wages, benefits, insurance, and payroll taxes with respect to any of its (or its Affiliates) employees, whether they devote all or a portion of their time working on Company (or any Subsidiary) business.

**ARTICLE VII**
**LIABILITIES OF MEMBERS**

      No Member shall be liable for any debts, liabilities, contracts or other obligations of the Company or of the other Member, nor shall any Member be required to lend funds to the Company.  The Company shall not be liable for any debts, liabilities, contracts or other obligations of any Member except those Transaction costs incurred for the benefit of the Company prior to the acquisition of the Property by the Company or the Hotel Owner, and except as otherwise expressly provided in this Agreement.  Except as may be otherwise specifically required by <u>Article III</u> or by applicable law, no Member shall be required to make any Contributions to the Company.

**ARTICLE VIII**
**TRANSFER OF COMPANY INTEREST**

      Section 8.1    <u>Transfer by the Members</u>.

      <u>Section 8.1.1</u>    <u>General Restrictions</u>.  No Member shall sell, assign, transfer, mortgage, charge or otherwise encumber, or permit any Third Party to sell, assign, transfer,

ACTIVE/87979073.5

mortgage, charge or otherwise encumber, or contract to do or permit any of the foregoing, directly or indirectly and whether voluntarily or by operation by law (collectively referred to as a "**Transfer**") any part or all of such Member's interest (whether direct or indirect) in the Company except as provided in this Article VIII.  Any attempt to effect any of the foregoing prohibited actions shall be void and, in addition to other rights and remedies at law and in equity, the other Member shall be entitled to injunctive relief enjoining the prohibited action.  The Members expressly acknowledge that damages at law would be an inadequate remedy for a breach or threatened breach of the provisions concerning transfer set forth in this Agreement.  The giving of consent or approval by the Member required under this Article VIII in any one or more instances shall not limit or waive the need for such consent or approval in any other or subsequent instances.  Notwithstanding anything in this Article VIII or this Agreement to the contrary, without the prior approval of the other Members, no Member shall have the right to effect any Transfer of its interest in the Company if such Transfer would cause the Company to terminate under applicable law or if the Transfer, in the opinion of counsel to the Company, constitutes a violation of any state or federal securities laws or violate the terms of any Authorized Financing.

> Section 8.1.2     Indirect Transfers and Minimum Controlling Interest.  Transfers of direct or indirect interests in AB shall be deemed Transfers subject to the restrictions of this Section unless following the transfer Balazs, directly or indirectly, would hold [seventy-five percent (75%)] or more of the interests in AB and possess the  right to direct and control decision-making and authority with respect to AB.  [*Note to Reignwood:  Discuss Restrictions on indirect transfers (including what percentage interest Andre most hold) also need to confirm restrictions are addressed in the HMA and the club agreement*]

> Section 8.1.3     Permitted Transfers.  Without the prior approval of the other Member (which approval may be given or withheld as a matter of each approving party's sole discretion), each Member shall, subject to Sections 8.1.1, 8.1.2 and 8.1.4 have the right to Transfer all [or a portion] of its interest in the Company solely if such Transfer is to an entity which is owned or controlled by, is under common ownership and control with or owns and controls the original Member (for such purposes, any Transfer of direct or indirect interests in AB which yields any of the effective changes in ownership or control enumerated in Section 8.1.2 shall not be treated as such a permitted "common ownership or control" Transfer) of the original Member. [Nothing contained herein shall limit or restrict any Transfer of a direct or indirect interests in Investor so long as following such Transfer Mr. Chanchai Ruayrungruang, or Entities that are under common ownership or control of Mr. Chanchai Ruayrungruang, hold at least [51%] of the interests, whether directly or indirectly, in Investor or a merger or other business combination or an initial public offering involving [REIGNWOOD GROUP] or a direct or indirect parent of [INSERT APPLICABLE REIGNWOOD ENTITIES] or the sale of all or substantially all of the assets of [REIGNWOOD GROUP] or a direct or indirect parent of [REIGNWOOD ENTITY TBD].  [*Note to Reignwood: Discuss Permitted Transfer and possible strategic corporate transactions that need to be permitted as well as whether partial transfers of interests should be permitted]*

> Section 8.1.4     Conditions to Substitutions.  An assignee or transferee of a Member shall not be entitled to vote on Company matters and shall not have any other rights of a Member other than its right to distributions, unless and until the assignee is admitted as a substituted Member.  Thereafter, subject to the last sentence of this Section, such assignee shall have all rights and obligations of a Member hereunder.  An assignee or transferee shall be admitted as a substituted Member when and if the assignee or transferee (a) pays all Company expenses incurred in connection with its substitution; (b) submits a duly executed instrument of

ACTIVE/87979073.5

assignment and assumption, in a form reasonably satisfactory to the non-assigning Member, specifying the membership interest assigned to it and setting forth the assigning Member's intention that the assignee succeed to such portion of the assigning Member's membership interest and acknowledging that the assignor or transferor remains liable for its obligations; (c) obtains approval if required hereunder; and (d) executes a copy of this Agreement or an amendment to this Agreement.  The admission of a substituted Member shall be effective as of the close of the day on which all of the conditions specified in this <u>Section 8.1.4</u> have been satisfied.

   Section 8.2  <u>Members</u>.

    Section 8.2.1  <u>Terminating Event</u>.  Upon the occurrence of a Terminating Event with respect to a Member (the "**Terminated Member**") (assuming that the other Member elects to continue the Company pursuant to <u>Section 1.6</u>), the other Member may elect, in its sole discretion, to purchase the membership interest of the Terminated Member by written notice to the Terminated Member's successor or legal representative within sixty (60) days after the date that such other Member(s) receive(s) notice of the Terminating Event.  After notice of an election to purchase, the Terminated Member shall no longer be entitled to any voting or decision-making rights of a Member (including any mutual decision items set forth in <u>Section 6.1.3</u>) and if the Terminated Member is the Operating Member, such Member shall be replaced as the Operating Member by the non-Terminated Member or its designee.  If the other Member so elects to purchase the Terminated Member's interest, the purchase price payable to the Terminated Member shall be ninety-five percent (95%) of the Membership Value of the interest being purchased, unless the Terminating Event is the death or disability of a natural person as more particularly described in clause (a) of the definition of Terminating Event, in which case, the purchase price payable shall be one hundred percent (100%) of the Membership Value of the interest being purchased, in each instance, based upon the Company's Fair Market Value as of the date of the Terminating Event determined pursuant to the valuation procedure set forth in <u>Section 8.2.3</u> below.

    Section 8.2.2  <u>AB Event of Default</u>.  Upon an Event of Default by AB under this Agreement (an "**AB Event of Default**"), in addition to all rights and remedies set forth in this Agreement, Investor shall, subject to the provisions of this <u>Section 8.2.2</u>, have the right to purchase AB's interest in the Company by written notice to AB within thirty (30) days of the AB Event of Default.  Notwithstanding the foregoing, a [Performance Termination Event] **[Confirm defined term under HMA]**, as such term is defined in the Hotel Management Agreement], shall <u>not</u> constitute an AB Event of Default (and, consequently, shall <u>not</u> trigger Investor's right to purchase set forth above).  After notice of Investor's election to purchase AB's interests in the Company, AB shall no longer be entitled to any voting or decision-making rights as a Member (including, but not limited to any Mutual Decisions) or shall be replaced as the Operating Member by Investor or Investor's designee.  If Investor elects to purchase AB's interest, the purchase price payable to AB shall be ninety-five percent (95%) of the Membership Value of AB's interest in the Company, based upon the Company's Fair Market Value on the day following the AB Event of Default (taking into consideration any impact on the Fair Market Value of the Company as a result of such AB Event of Default), determined pursuant to the valuation procedure set forth in <u>Section 8.2.3</u> below.  [==*Note to Reignwood: Confirm buy-out right pricing; also note we have limited the buy-out right to AB Events of Default – AB does not have a similar right with respect to a Reignwood Event of Default]*==

    Section 8.2.3  <u>Fair Market Value</u>.  For the purposes of this <u>Article VIII</u>, the "**Fair Market Value**" of the Company's Assets shall be determined as follows:

ACTIVE/87979073.5

(i)      The Members shall endeavor to agree upon the Fair Market Value of the Assets.  If the Members cannot so agree within ten (10) days after a request for determination from either Member, within ten (10) days after the expiration of such 10-day period, each Member (A) shall set forth in writing such Member's determination of Fair Market Value and (B) shall designate, by notice given to the other, a Qualified Appraiser for determination of Fair Market Value.  If the lower of the two valuation amounts is ninety-five percent (95%) or greater of the higher valuation amount, Fair Market Value shall be the average of the two Member-determined values. If the lower valuation is less than ninety-five percent (95%) of the higher valuation amount (i.e., a variance of more than five percent (5%) of the higher value), within forty-five (45) days after the close of the 10-day period, each such Qualified Appraiser shall submit to the Members the determined valuation.

(ii)     If either Member fails to express its determination of Fair Market Value or designate a Qualified Appraiser within the 10-day period described above or in the event that a Qualified Appraiser designated by a Member fails to submit its valuation within the required 45-day period, and if any such failure continues for ten (10) days after notice of such failure from the other party, such failure shall be deemed for all purposes to constitute acceptance of the valuation expressed by the Member complying with each of such procedural requirements.  If the two Qualified Appraisers are appointed and deliver reports in timely fashion and if the two valuations set forth vary by five percent (5%) or less of the greater value, Fair Market Value shall be the average of the two values determined.

(iii)    If the valuations set forth in the two reports vary by more than five percent (5%) of the greater value, the two Qualified Appraisers shall select a third Qualified Appraiser within ten (10) days after delivery of such two reports to the Members.  If the initial two Qualified Appraisers are unable to agree upon the appointment of a third within the required 10-day period, either Member may, upon written notice to the other, request that such appointment be made by any judge sitting for a state or Federal court of competent jurisdiction in New York, New York.

(iv)    In the event that all three of the Qualified Appraisers cannot agree upon the valuation within fifteen (15) days following the selection of the third Qualified Appraiser (which agreed value shall in no event be higher than the higher of the two previously submitted nor lower than the lower of such previous valuations), the third Qualified Appraiser shall, within twenty-five (25) days thereafter, submit a valuation to the other two Qualified Appraisers and to the Members in writing, and the Fair Market Value shall be the average of the two numerically closest values (or, if the values are equidistant, the average of all three values) determined by the three Qualified Appraisers.

(v)     In the event that any Qualified Appraiser appointed hereunder resigns, refuses or is unable to perform his or her obligation hereunder for reasons unrelated to the acts or omissions of the appointing party, then the party or parties appointing such Qualified Appraiser shall have the right unilaterally to appoint a substitute Qualified Appraiser and the deadline for the production of such Qualified Appraiser's appraisal shall be subject to an extension of not more than ten (10) days.

(vi)    In connection with any valuation process, the Members will provide the Qualified Appraisers full access during normal business hours to examine

38

the Assets and all pertinent books, records and files, agreements, leases and other operating agreements.  The fees and expenses of the Qualified Appraisers shall be borne by the Company.

Section 8.2.4     Withdrawal by Members.  Notwithstanding any provision of the Act to the contrary, no Member may resign, withdraw or withdraw capital from the Company, except pursuant to a right expressly set forth herein.

Section 8.3     [Right of First Offer.  [**Note to Reignwood: Set forth below is a possible ROFO provision, however, we need to discuss the concept of the ROFO and the terms and mechanics of a ROFO, especially since the sale of the property requires the mutual approval of the Members.  We also should discuss the Lockout Period – i.e. does the ROFO right expire after the Lockout Period and whether the Lockout even is necessary.**] In the event that the Members mutually agree pursuant to the terms of Section 6.1.3(xiii) to sell the Property and in connection therewith have mutually agreed upon a target sale price for the Property (the "**Target Price**"), and provided that there is no uncured AB Event of Default at the time in question, then AB shall have a right of first offer to purchase the Property at the Target Price and upon the terms and conditions set forth herein (the **"ROFO"**).  AB shall have a period of thirty (30) days following the mutual agreement of the Members to sell the Property pursuant to Section 6.1.3(xiii) to exercise the ROFO by providing written notice of AB's election to Investor (the "**ROFO Notice**") prior to the end of such 30-day period.  Concurrently with AB's delivery of the ROFO Notice, AB shall deposit in an escrow with a mutually acceptable nationally recognized title insurance company an amount equal to three percent (3%) of the Target Price (the "**Deposit**").  The Deposit shall be nonrefundable in all regards, except in the case of a default by Investor to cause the Company to sell the Property to AB following AB's performance of its obligation to purchase the Property.  The closing of the sale of the Property shall occur no later than six (6) months following the date of the delivery of the ROFO Notice (the "**Outside Closing Date**").  The sale of the Property to AB pursuant to this Section 8.3 shall be without any representations, warranties or covenants with respect to the Property or any component thereof.  In connection with the acquisition of the Property, AB shall obtain, at its sole cost and expense, the release of Investor and any of its Affiliates under any Carveout Guaranty (any other agreement entered into in connection with any Authorized Financing) from any and all obligations first arising after the closing of the sale of the Property to AB.  **NTD: Discuss whether we should include a form of purchase agreement**] The Members agree to reasonably cooperate and work together to structure the sale of the Property as a sale of the interests in the Company or any of its Subsidiaries to the extent such entity transfer would not result in adverse tax consequences for Investor; provided, however, that no additional representations or warranties shall be made with respect to the Company or any of the Subsidiaries with respect to any such sale structured as a transfer of membership interests in the Company or any Subsidiary.  In the event that AB shall fail to complete the acquisition of the Property following the issuance of the ROFO Notice prior to the Outside Closing Date (an "**AB ROFO Default**"), then Company shall retain the Deposit as liquidated damages (and not as penalty) and such amount shall be distributed to the Members in accordance with their Proportionate Shares.  If AB notifies Investor that it does not desire to exercise the ROFO or if AB does not issue a ROFO Notice prior to the expiration of the 30-day period described above, in which event AB shall be deemed to have waived its right to the ROFO in its entirety, or if an AB ROFO Default shall occur,  then, notwithstanding the terms of Section 6.1.3(xiii), Investor shall have the right to pursue the sale of the Property for a period of twelve (12) months following (x) the date of AB's waiver (or deemed waiver) of the ROFO or (y) the occurrence of the AB ROFO Default, as applicable, at a gross purchase price of not less than ninety (90%) of the Target Price without triggering AB's rights under this Section 8.3.

ACTIVE/87979073.5

## ARTICLE IX
## BOOKS/RECORDS, BUSINESS PLAN AND BUDGET,
## REPORTING AND ACCOUNTING MATTERS

Section 9.1    <u>Fiscal Year</u>.  Except as provided by the Code, the Fiscal Year and the taxable year of the Company shall be the calendar year.

Section 9.2    <u>Maintenance of Records</u>.  All records of the Company shall be maintained by Operating Member whether at the principal office or at the Property or at such other location or locations as Operating Member may designate, up on prior written notice to Investor. Operating Member shall cause the books and records of the Company and all Subsidiaries to accurately reflect all Company transactions.  Operating Member shall cause the Company to maintain at its principal office all of the following:

(i)    a current list of the name and last known business or residence address of each Member, together with the Contributions, Subordinated Deemed Capital Contribution, Capital Account and Proportionate Share of each Member;

(ii)    a copy of the certificates of formation of the Company and all Subsidiaries and any and all amendments thereto, together with executed copies of this Agreement (and all amendments) and all applicable operating agreements of the Subsidiaries (and all amendments;

(iii)    copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

(iv)    copies of the annual financial statements of the Company and each subsidiary, if any, for the six (6) most recent taxable years; and

(v)    the books and records of the Company and each Subsidiary as they relate to the internal affairs of the Company, if any, for at least the Six (6) most recent taxable years.

Upon the request of any Member, Operating Member shall promptly deliver to the requesting Member at Company expense a copy of the information requested that is required to be maintained by Operating Member.  Each Member has the right, upon reasonable written request to Operating Member, to inspect and, at Company expense, copy during normal business hours any of the Company records described herein.

Section 9.3    <u>Required Plans, Budgets, Reports & Bank Accounts</u>.

<u>Section 9.3.1</u>    <u>Business Plan and Budget</u>.  On or before November 1 of each year, as provided below, the Operating Member shall prepare (or cause the Hotel Manager to prepare) and submit a proposed strategic business plan and Budget for the Company, the Subsidiaries and the Property consistent with the Strategic Plan, as follows:

(i)    <u>Form of Business Plan and Budget</u>.  The Operating Member shall be responsible for preparing and submitting to the other Members for Approval a proposed business plan and Budget for the Company, the Subsidiaries, and the Property, for each Fiscal Year, consistent with the Strategic Plan (the "**Proposed Business Plan**").  The Proposed Business Plan shall set forth for the applicable Fiscal

ACTIVE/87979073.5

Year all anticipated income, operating expenses and capital and other costs and expenses of the Company and the Subsidiaries.  To the extent reasonably feasible at the time of preparation thereof, the Operating Member will develop proposed strategies regarding (i) operating, positioning and managing the Property, (ii) plans for redevelopment, construction or rehabilitation of the Property, and for renewing, renegotiating or replacing any material lease or agreements (including any franchise or license agreements) with respect to the Property, (iii) preparation and release of all promotional and advertising material relating to the Property or concerning the Company or any Subsidiary, (iv) terms for any proposed sale or disposition of the Property or any portion thereof, and (v) selection of contractors, construction or other managers, legal counsel, accountants, structural and environmental engineers, appraisers and other consultants for the Company or any Subsidiary to efficiently implement the business plan.  The Operating Member will also consider and make recommendations to the extent it deems the same appropriate regarding the amendment, modification, alteration, change, cancellation, or prepayment of any indebtedness evidenced by any Authorized Financing affecting the Property or any portion thereof, and procurement of title insurance and other insurance for the Company or Hotel Owner, or decrease or vary any other the insurance carried by or on behalf of the Company or any Subsidiary. The Proposed Business Plan shall include guidelines for the operation and management of the hotel and club portions of the Property, including, but not limited to, franchise affiliation (if any), hotel and club management, union and employee matters, marketing and advertising, guest room rental rates, membership development, membership programing, food and beverage facilities and operations, guest amenities, member amenities, privileges and rights and banquet, catering and conference business.  The Business Plan shall include the detailed business plan and Budgets for the Property that are required to be approved by Hotel Owner pursuant to the terms of the Hotel Management Agreement.  Approval of the Proposed Business Plan as described in this Section 9.3.1(i) in accordance with the terms of Section 9.3.1(ii) shall constitute Investor's approval of the [Annual Plan] under the Hotel Management Agreement. [**NTD: Confirm applicable defined terms in HMA**] The Proposed Business Plan shall be prepared in form as reasonably requested from time to time by Investor.

(ii)    Approval of Business Plan.  After the Proposed Business Plan is submitted to Investor for Approval, Investor and the Operating Member shall in good faith attempt to reach final agreement on such proposal.  The Operating Member agrees that at the request of Investor, it shall meet with Investor regarding such proposal and shall provide Investor with such additional information as Investor shall from time to time reasonably request.  The Proposed Business Plan when Approved shall be the "**Business Plan**" for the applicable Fiscal Year.  Prior to [December 1], 2016, Operating Member shall provide to Investor for its Approval, the Fiscal Year 2017 Proposed Business Plan for the Company (the "**Initial Business Plan**").  [**NTD: Confirm timing for Initial Business Plan – ideally we attach it to the JV Agreement**] Notwithstanding anything to the contrary contained herein, to the extent the Proposed Business Plan, or any portion thereof, has been previously submitted by Hotel Manager under the Hotel Management Agreement and Approved by Investor and no adjustments or amendments are required to be made to such Business Plan, or any portion thereof due to its applicability to the Company (or any Subsidiary) rather than Hotel Owner, such Approval shall be deemed given hereunder.  In the event that the proposed Business Plan for the upcoming year is not approved before the start of the year for any reason, until such time as such proposed Business Plan is Approved, the Operating Member shall operate and cause to be operated the Company, the Subsidiaries and the Property in

ACTIVE/87979073.5

accordance with the most recently Approved Business Plan except to the extent of any Approval of a portion of the Proposed Business Plan which shall then govern with respect to such Approved matters.  In no event shall the Operating Member have any authority to make any discretionary expenditure without the prior written approval of Investor during such period.

Section 9.3.2    Budget Controls.  In accordance with the Performance Standard, Operating Member shall use commercially reasonable efforts to avoid causing the actual costs of operation and management of the Company, any Subsidiary or the Property to exceed the amounts Approved in the then applicable Business Plan as it relates to the Company, any Subsidiary and the Property.  The Operating Member shall secure the prior written Approval of Investor before expending, obligating the Company, or any Subsidiary for or approving any expenditure in excess of the amounts set forth under in the then applicable Business Plan; provided, however, that where emergency action is necessary to prevent imminent risk to health and safety, imminent property damage, or imminent imposition of criminal or civil sanctions against the Company, any Subsidiary or any Member, the Operating Member may make, or cause to be made, expenditures not contemplated by the then applicable Business Plan if (A) any emergency expenditure made without approval is, in the Operating Member's good faith judgment, reasonable under the circumstances and (B) the Operating Member endeavors diligently and in good faith (1) to notify Investor of any such emergency and (2) obtain verbal approval for any required expenditure from Investor

Section 9.4    Reporting.  *[Note to Reignwood: Discuss Reporting Requirements – for both annual and quarterly/monthly reporting; need to also consider reporting that will be undertaken as part of the HMA]*

Section 9.4.1    Annual Financial Statements.  Operating Member shall cause the Company's accountants to prepare an annual financial statement for the Company, at Company expense.  The financial statement shall be prepared in accordance with the generally accepted accounting principles and the Uniform System.  At Investor's election, (i) a similar financial statement shall be provided for each Subsidiary and (ii) the financial statements for both the Company and each Subsidiary shall be audited and certified by a certified public accounting firm selected by Members.  Each Member shall be provided with a copy of each such financial statement within sixty (60) days after the completion of each taxable year of the Company.  *[Note to Reignwood:  Are audited financials required at the Company and Hotel levels?  Please also confirm GAAP Accounting as modified by the Uniform System]*

Section 9.4.2    Company Interim Reports.  [Operating Member shall prepare and deliver to the Members, at Company's expense, the following reports within ten (10) Business Days after the end of each calendar month, all in the form reasonably requested by Investor [**NTD: Need to compare to reports prepared as part of HMA**]:

(i)    a variance schedule showing any deviations from the revenue and expense line items provided for in the then applicable Business Plan;

(ii)    a financial statement of the Company, including a balance sheet and an income statement, along with a current financial analysis of the Company's performance to date and, if requested by any Member, a statement of sources and applications of funds;

42

(iii)     any updates with respect to any renovation or construction then ongoing at the Property and an update on the marketing report and strategy for the Property;

(iv)     cash projection needs for the Company and any Subsidiary for the next thirty (30), sixty (60) and ninety (90) day periods; and

(v)     such other reports required by any third party contract entered into by the Company (such as required in connection with any Authorized Financing ).  AB shall personally pay any fine or other payment due to a third party as a result of AB's failure in its role as Operating Member to deliver required reports by the time required in such contracts.]

Section 9.5     AB as Tax Matters Partner.  [AB is designated the tax matters partner of the Company as provided in Section 6231(a)(7) of the Code and corresponding provisions of applicable state law.  This designation is effective only for the purpose of activities performed pursuant to the Code, corresponding provisions of applicable state law and under this Agreement.  AB shall obtain the prior written Approval of Investor with respect to any material decisions or actions proposed to be taken by AB as the tax matters partner.]  [**NTD: Subject to further review by Goodwin Tax**]

Section 9.6     Taxation as a Partnership.  It is the intent of the Company and its Members that the Company be treated as a partnership for income tax purposes, and the terms of this Agreement shall be construed so as to accomplish that goal, and all Members will use their best efforts to cause the Company to be so treated.

Section 9.7     Tax Elections.  AB and Investor shall jointly make all elections and decisions with respect to tax matters and the filing of all tax returns.

**ARTICLE X**
**DISSOLUTION AND EVENTS OF DEFAULT**

Section 10.1     Dissolution.  Dissolution of the Company shall be effective on the day of the event giving rise to the dissolution.  The Company shall not terminate until the Assets of the Company have been distributed as provided herein and a certificate of cancellation of the Company has been filed with the Secretary of State of Delaware.  In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs, including a sale of the Assets of the Company in an orderly manner and the Assets of the Company shall be applied in the manner and in the priority set forth in this Agreement.

Section 10.2     Events of Default.  There will be an "**Event of Default**" under this Agreement if any one or more of the following events or circumstances shall transpire or exist and shall not be cured within any applicable period of notice and grace specified below:

Section 10.2.1     Breach of Obligations.  If either Member is in default of any payment obligation hereunder (including, without limitation, any payment or contribution obligation under Article III), or is in breach of any other material obligation under this Agreement and such default or breach is not corrected within twenty (20) days after written notice thereof from the other Member (subject, however, to applicable provisions of Section 3.7 to the extent applicable with respect to a failure to fund capital contributions).

43

ACTIVE/87979073.5

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 255 of 277

Section 10.2.2   Fraud, Negligence or Willful Misconduct.  If either Member shall commit an act involving fraud, willful misconduct or gross negligence in connection with any of its obligations hereunder.

Section 10.2.3   Principals.  If Balazs does not remain actively involved as principal with effective decision-making control and authority over AB, for reasons other than his death or incapacity; provided, however, if he does not remain actively involved as principal as set forth above, and such failure is due to his death or incapacity, then unless the AB is able to identify a successor to perform his functions Approved by Investor within sixty (60) days following such event, such failure shall constitute a Terminating Event under Section 8.2.1, but shall not constitute an Event of Default hereunder.

Section 10.2.4   Prohibited Transfer.  Any Transfer by either Member in violation of the provisions of Article VIII.

Section 10.2.5   AB Affiliate Agreement Event of Default.  The occurrence of any event of default by AB or its Affiliate, under any AB Affiliate Agreement.

Section 10.2.6   Bankruptcy/Dissolution Event.  If either Member suffers a Bankruptcy/Dissolution Event (subject to any applicable cure periods as set forth in the definition thereof)

Section 10.2.7   Breach Under Third Party Agreement.  The conduct of AB or its Affiliates has caused the Company or a Subsidiary to breach (a) any agreement with a Company lender under any Authorized Financing or (b) any other material agreement to which the Company or a Subsidiary is a party or by which the Property is bound.

Section 10.3   Remedies.  Upon an Event of Default by either Member, the other Member shall have, in addition to any other rights set forth in this Agreement, all of the rights available at law and in equity as a member of a limited liability company.  In addition to the foregoing, upon an AB Event of Default, (A) Investor shall have the right to remove AB as the Operating Member and in connection therewith, Investor shall have the right to appoint itself or any designee as the Operating Member and (B) AB shall no longer be entitled to any voting or decision-making rights of a Member (including any Mutual Decision items set forth in Section 6.1.3).  Following any AB Event of Default, Investor shall be permitted to take any such acts with respect to the operation and management of the Company and its Assets, including, the admission of any new Member, provided that in connection with the admission of a new Member, in no event shall AB be disproportionately impacted by such admission of a new Member.  *[Note to Reignwood:  Discuss whether the Company should have the right to terminate the HMA or any other Affiliate Contract with AB if the there is an AB Event of Default.  Also, AB should forfeit Subordinated Capital Interest following an Event of Default. Discuss whether following an Event of Default, AB should have a few limited approval rights with respect to certain Mutual Decisions (i.e. approve affiliate contracts or modifications to the venture's organizational structure)]*

ACTIVE/87979073.5

**ARTICLE XI**
**MISCELLANEOUS**

Section 11.1    Notices.

(a)    Any and all notices, demands, consents, approvals, offers, elections and other communications required or permitted under this Agreement (collectively, "**Notices**") shall be deemed adequately given if in writing and the same shall be delivered either in hand or by mail or Federal Express or similar expedited commercial carrier, addressed to the recipient of the notice, postpaid and registered or certified with return receipt requested (if by mail), or with all freight charges prepaid (if by Federal Express or similar carrier).

(b)    All notices required or permitted to be sent hereunder shall be deemed to have been given for all purposes of this Agreement upon the date of acknowledged receipt and in all other cases, upon the date of receipt or refusal, except that whenever under this Agreement a notice is either received on a day which is not a Business Day or is required to be delivered on or before a specific day which is not a Business Day, the day of receipt or required delivery shall automatically be extended to the next Business Day.  The email addresses set forth below are included merely for convenience and no notices under this Agreement sent via email shall be effective unless also delivered in the manner provided above.

(c)    All such notices shall be addressed:

If to Investor, to:

[Reignwood Group]
[_____]
[_____]
[_____]
Attn:  [_____]
Email:  [_____]

with a copy to:

Goodwin Procter LLP
3 Embarcadero Center, 24th Floor
San Francisco, CA 94111
Attn:  Benjamin C. Tschann
Email:  btschann@goodwinlaw.com

If to AB to:

[_____]
[_____]
[_____]
[_____]
Attn: [_____]
Email:  [_____]

45

with a copy to

[_____]
[_____]
[_____]
[_____]
Attn: [_____]
Email: [_____]

(d)     By notice given as herein provided, the parties hereto and their respective successors and assigns shall have the right from time to time and at any time during the term of this Agreement to change their respective addresses effective upon receipt by the other parties of such notice and each shall have the right to specify as its address any other address within the United States of America.

Section 11.2   Interpretation.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to the principles of conflicts of law.  The parties agree that any dispute arising in connection with this Agreement shall be resolved in the Chancery Court in the State of Delaware, and each party hereby submits to the jurisdiction of that court.  Each party hereby waives its right to trial by jury in connection with any dispute between any of the parties to this Agreement arising out of this Agreement or the rights or obligations of the parties hereunder.  The table of contents and titles of the Articles and Sections in this Agreement are for convenience only and shall not be considered in construing this Agreement.  Pronouns used with reference to the Members shall be construed to refer to the feminine, neuter, singular and plural as the identity of the individual or entity referred to may require.  The Exhibits and schedules attached hereto are incorporated in and form a part of this Agreement.  This Agreement, together with the documents and agreements being executed on the date hereof, constitutes the entire agreement among the Members and supersedes any prior written or oral agreements, including the Letter Agreement (to the extent of the subject matter of this Agreement) with respect to the subject matter of this Agreement.  No provision of this Agreement (including, without limitation, any obligation of any Member to make Contributions) shall be interpreted as bestowing any rights whatsoever upon any third party.  A cross-reference to another section shall be deemed to be to such section of this Agreement, unless explicitly stated otherwise. Whenever action must be taken (including the giving of notice or the delivery of documents) under this Agreement during a certain period of time or by a particular date that ends or occurs on a non-Business Day, then such period or date shall be extended until the immediately following Business Day.

Section 11.3   Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and signature pages received via facsimile or .pdf format shall be sufficient to bind the parties hereto.

Section 11.4   No Partition.  No Member nor any Legal Successor of a Member shall have the right to partition the Company, any Subsidiary or the Property or any part thereof or interest therein, or to file a complaint or institute any proceeding at law or in equity to partition the Company, any Subsidiary or the Property or any part thereof or interest therein.  Each Member, for such Member and such Member's Legal Successor, hereby waives any such rights.  The Members intend that, during the term of this Agreement, the rights of the Members and their successors in interest, as among themselves, shall be governed solely by the terms of this Agreement and by the Act.

ACTIVE/87979073.5

Section 11.5 <u>Attorneys' Fees</u>. If any Member seeks to enforce such Member's rights under this Agreement by legal proceedings or otherwise, the non-prevailing party shall be responsible for all costs and expenses in connection therewith, including without limitation, reasonable attorneys' fees and witness fees.

Section 11.6 <u>Severability</u>. If any provision of this Agreement is determined to be unenforceable for any reason, it shall be adjusted rather than voided, if possible, to achieve the intent of the parties. In any event, all other provisions shall be deemed valid and enforceable to the greatest possible extent.

Section 11.7 <u>Binding on Successors</u>. Subject to the provisions of <u>Article VIII</u>, the rights and obligations of the Members under this Agreement shall inure to the benefit of and bind their respective heirs, successors and assigns.

Section 11.8 <u>Confidentiality</u>. Both parties agree to maintain the confidentiality of the terms and conditions of this Agreement and to maintain the confidentiality of (i) any information provided by one party to the other, and (ii) all information contained in any books, records, computer discs and similar materials containing Property or any Company or Subsidiary information, invoices and other documents received or maintained by the Company pursuant to this Agreement, other than information that is available from public sources. Either Member may, however, disclose any of such information to its agents, directors, officers, employees, advisors, attorneys, Affiliates or representatives who require such information for the purpose of performing or assisting in the performance of its obligations or services hereunder, and to investors or lenders or proposed investors or lenders, provided that in all such cases such parties shall be informed of the confidential nature of such information. Either Member hereto may also disclose any such information (x) to the extent required by law or court order provided that such party shall have first, to the extent reasonably practicable, advised the other of the requirement to disclose such information and shall have afforded the other an opportunity to dispute such requirement and seek relief therefrom by legal process, (y) in connection with any suit, action, arbitration or other proceedings between the parties hereto or their respective Related Parties, or (z) to the extent required in connection with the preparation or filing of any tax returns or other filings required by any applicable law.

Section 11.9 <u>Suretyship</u>. Each Member hereby unconditionally waives any guarantor or suretyship defense that may otherwise apply with respect to this Agreement.

Section 11.10 <u>No Confidentiality Regarding Tax Treatment</u>. Notwithstanding any provision to the contrary herein, and notwithstanding any other express or implied agreement, arrangement or understanding to the contrary, the parties hereto hereby agree that each such party (and each of their respective employees, representatives and agents) may disclose to any and all persons, without limitation of any kind: (i) the tax treatment and tax structure of the transactions contemplated by this Agreement and the tax treatment and tax structure of all related transactions, and (ii) all materials of any kind (including opinions or other tax analyses) that are provided to such party relating to such tax treatment or tax structure.

Section 11.11 <u>Representations and Warranties of AB</u>. As an inducement to Investor to enter into this Agreement, in addition to its representations and warranties contained in this Agreement, AB makes the additional representations and warranties contained in <u>Exhibit H-1</u> attached hereto and made a part hereof. AB hereby agrees to indemnify and hold harmless Investor and the Company from and against any and all costs, claims, losses, liabilities, damages and expenses (including without limitation attorneys' fees and costs) arising from any

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 259 of 277

breach of any representation or warranty contained in Exhibit H-1 or its representations and warranties contained elsewhere in this Agreement.  *[Note to Reignwood:  Discuss whether AB's Credit-worthy Guarantor should back-stop his reps]*

Section 11.12  Representations and Warranties of Investor.  As an inducement to AB to enter into this Agreement, in addition to its representations and warranties contained in this Agreement, Investor makes the additional representations and warranties contained in Exhibit H-2 attached hereto and made a part hereof.  Investor hereby agrees to indemnify and hold harmless AB and the Company from and against any and all costs, claims, losses, liabilities, damages and expenses (including without limitation attorneys' fees and costs) arising from any breach of any representation or warranty contained in Exhibit H-2 or its representations and warranties contained elsewhere in this Agreement.

Section 11.13  Brokerage Commissions.  The parties hereto represent and warrant to each other that except for Teresa Teague or any Persons related to Teresa Teague ("**Broker**") they have not dealt with any brokers, investment bankers, consultants or other third parties in the negotiation of this Agreement and the transactions contemplated herein.  Any and all fees or commissions payable to Broker shall be paid entirely by AB or its Affiliate pursuant to a separate agreement with Broker and in no event shall any such costs, expenses or fees constitute a Transaction Cost or an operating expense of the Company.  The parties further agree to indemnify, defend and hold each other harmless from and against any liability, claim, damage, cost or expense (including, without limitation, reasonable attorneys' fees) arising out of or in connection with the claims for commissions or any other fees due in connection with this Agreement and the transaction contemplated herein arising from such Member's actions.

Section 11.14          Legal Representation.

Section 11.14.1  Investor's Counsel.  The Members acknowledge and agree that Goodwin Procter LLP ("**Goodwin**") has represented Investor and its Affiliates in connection with this Agreement, all other agreements contemplated by this Agreement and the Property.  From time to time, and at the request of Investor and/or its Affiliates, Goodwin shall render legal advice and provide legal services to Investor and its Affiliates with respect to the Property, the Company, the Subsidiaries and related matters at fees and costs to be paid by Investor and/or its Affiliates.  In no event shall an attorney/client relationship exist between Goodwin, on the one hand, and AB, Balazs or any of their respective Affiliates, on the other hand, with respect to the Property, the Company, the Subsidiaries or any matters related thereto as a result of any such representation; provided, that, the foregoing shall not limit Investor's duty to disclose to AB material information known by Investor or its Affiliates regarding the Company, Subsidiaries or Property.  Neither the  Company nor the Subsidiaries shall be obligated to pay any fees and costs incurred as a result of any such representation except as otherwise agreed by the Members as Mutual Decision under Section 6.1.3 or as expressly set forth in the then applicable Business Plan.

Section 11.14.2  AB's Counsel.  The Members acknowledge and agree that Paul Weiss Rifkind, Wharton & Garrison LLP ("**Paul Weiss**") has represented AB, Balazs and their respective Affiliates in connection with this Agreement, all other agreements contemplated by this Agreement and the Property.  From time to time, Paul Weiss shall, at the request of AB, Balazs and/or their respective Affiliates, render legal advice and provide legal services to AB, Balazs and/or their respective Affiliates with respect to the Property, the Company, the Subsidiaries and related matters at fees and costs to be paid by AB, Balazs and/or their Affiliates.  In no event shall an attorney/client relationship exist between Paul Weiss, on the one

hand, and Investor or any of its Affiliates, on the other hand, as a result of any such representation; provided, that, the foregoing shall not limit AB's duty to disclose to Investor material information known by AB, Balazs or their respective Affiliates regarding the Company, the Subsidiaries or Property. Neither the Company nor the Subsidiaries shall be obligated to pay any such fees and costs as a result of any such representation except as otherwise agreed by the Members as Mutual Decision under Section 6.1.3.

Section 11.14.3 Counsel to Company. To the extent specifically requested and approved in writing by Members, Goodwin and/or Paul Weiss shall be permitted to render legal advice and to provide legal services to the Company and the Subsidiaries from time to time, and each Member covenants and agrees that such representation of the Company and the Subsidiaries by Goodwin and/or Paul Weiss shall not: (i) result in the existence of an attorney/client relationship between Goodwin, on the one hand, and AB, Balazs and/or their respective Affiliates, on the other hand; (ii) result in the existence of an attorney/client relationship between Paul Weiss, on the one hand, and Investor and/or its Affiliates, on the other hand; and (iii) disqualify Goodwin and/or Paul Weiss from providing legal advice and legal services as set forth in above at any time in the future.

Section 11.16 Time is of the Essence. Time is of the essence with respect to all time or notice deadlines set forth herein.

Section 11.17 No Certificated Interests. The membership interests shall not be certificated unless otherwise Approved by both Members. A Member's membership interest shall be personal property for all purposes.

Section 11.18 No State Law Partnership. The Company shall not be a partnership or joint venture under any state or federal law, and no Member shall be a partner or joint venturer of any other Member for any purposes, other than under the Code and other applicable tax laws, and this Agreement may not be construed otherwise.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

ACTIVE/87979073.5

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 261 of 277

**IN WITNESS WHEREOF**, each of the Members has executed this Agreement as of the date first written above.

**INVESTOR**:

[**Reignwood Entity**]

By: _____

Name:
Title:  Authorized Person

**AB**:

[_____], a [_____]
limited liability company

By: _____

Name:
Title: Authorized Person

[Signature Page to Company Agreement]

**Exhibit A**

| MEMBERS | ADDRESS | PROPORTIONATE SHARE |
|---|---|---|
| Investor | | 90% (Initial) |
| AB | | 10% (Initial) |
| | TOTAL | 100% |

ACTIVE/87979073.5

**Exhibit B**

**Baseline 2016 Net Cash Flow**

ACTIVE/87979073.5

**Exhibit C**

**[Description of Club Conversion Plans]**

Exhibit C Page 1

ACTIVE/87979073.5

**Exhibit D**

**Form of Promissory Note [for Member Loans] [**or Default or Special Loans]**

$_____                                          _____, 20___

      **WHEREAS**, [_____] ("**AB**" and [_____] ("**Investor**") entered into that certain Limited Liability Company Agreement (the "**LLC Agreement**"), dated as of ____, 2016, of AB RW HL HOLDINGS LLC, a Delaware limited liability company (the "**Company**");

      **WHEREAS**, AB and Investor are required pursuant to the LLC Agreement to make certain contributions of capital to the Company, as more specifically set forth in the LLC Agreement;

      **WHEREAS**, AB has failed to make a contribution required to be made pursuant to <u>Article III</u> of the Company Agreement;

      **WHEREAS**, Investor has agreed to lend to [_____] as Borrower (defined below) a total of _____ Dollars ($_____), to be contributed on behalf of the Dow to the Company;

      **NOW THEREFORE, FOR VALUE RECEIVED**, AB with an address of [_____] (the "**Borrower**"), promise(s) to pay to the order of Investor (together with any successor holder or holders of this Note, the "**Lender**") at its office at [_____] or such other place as Lender may designate, the principal sum of _____ Dollars ($_____), or so much thereof as shall be advanced hereunder, together with interest thereon, as hereinafter set forth.

      Interest on the principal balance of this Note from time to time outstanding shall accrue from the date hereof at an annual rate which shall equal the "**Interest Rate**" (defined below). Subject to Borrower's right to defer payments of interest as provided below, interest shall be payable on the unpaid principal balance from time to time outstanding, on a quarterly basis in arrears on the first day of each Calendar Quarter (the "**Interest Payment Date**") beginning with the first day of [_____].  Interest shall be computed on the basis of a three hundred and sixty (360)-day year and shall be paid for the actual number of days on which principal is outstanding.

      Interest Rate shall mean:

      [If a **Member Loan:** an interest rate equal to the lowest interest rate available to Investor from a nationally recognized banking association or other institutional lender making loans in the United States for a 5-year unsecured loan.]

      [If a **Default Loan:** means eighteen percent (18%) per annum]

      [If a **Special Loan**: means twelve percent (12%) per annum]

      [If a **Guaranty Loan**: [NTD confirm rate]

      **[Note to Reignwood: Confirm rates as previously noted]**

ACTIVE/87979073.5

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 266 of 277

Borrower may defer payments of interest to the extent that a payment of interest due on an Interest Payment Date exceeds the amount of distributions to Borrower from the Company during the Calendar Quarter immediately preceding said Interest Payment Date (such excess, known hereinafter as the "**Deferred Interest**").  Deferred Interest shall accrue interest at the Interest Rate, compounded monthly (such Deferred Interest together with the interest thereon shall be referred to as "**Interest Accruals**").

To the extent that distributions to Borrower from the Company, including without limitation any return of capital to Borrower by the Company, for any Calendar Quarter prior to an Interest Payment Date exceed the amount due on said Interest Payment Date, then Borrower shall pay such excess to Lender to the extent of and to reduce: first, any late charges or other costs or expenses due hereunder, second, Interest Accruals then outstanding, third, interest then due, and fourth, the outstanding principal balance of this Note.

The entire outstanding principal balance of this Note, together with any interest, Interest Accruals and other charges as may be due hereunder, shall be paid on the earlier of: (i) _____, _____ , [**NTD:  insert Date 5 years from date of Note**] (ii) the dissolution of the Company, (iii) the sale of all of the property owned by the Company, (iv) the sale of all or substantially all of the Borrower's membership interest in the Company or (v) the occurrence of an Event of Default (hereinafter defined) hereunder (the earlier of such dates, the "**Maturity Date**").

In the event that any payment required hereunder is not paid within five (5) days after the date it is due (such ten day period, the "**Grace Period**;" which failure to pay within the Grace Period shall constitute an "**Event of Default**" hereunder), Lender shall have the right, in addition to any other rights hereunder, upon written demand to Borrower, to collect a late charge as compensation for increased costs of administering such late payment.  Such late charge shall be in an amount equal to four percent (4%) of the amount of any payment amount remaining unpaid after the expiration of the Grace Period, which sum Borrower agrees to pay upon demand; *provided, however*, that said late charge shall not be Lender's sole remedy for Borrower's default hereunder.

In the event that any payment due hereunder is not paid prior to the expiration of the Grace Period, Lender at its option may declare immediately due and payable the entire outstanding balance of principal and interest, together with all other charges to which Lender may be entitled.

The outstanding principal amount due hereunder may be prepaid in whole or in part, together with any interest or Interest Accruals then outstanding, without penalty or premium, upon five (5) days prior written notice to Lender.

Any notice required or permitted to be delivered hereunder shall be in writing and shall be deemed to be delivered on the earlier of (i) the date received, or (ii) the date of delivery, refusal, or non-delivery indicated on the return receipt, if deposited in a United States Postal Service depository, postage prepaid, sent registered or certified mail, return receipt requested, addressed to the party to receive the same at the address of such party set forth at the beginning of this Note, or at such other address as may be designated in a notice delivered or mailed as herein provided.

ACTIVE/87979073.5

Borrower agrees to pay all charges (including reasonable attorney's fees) of Lender in connection with the collection and/or enforcement of this Note or in protecting or preserving the security for this Note, whether or not suit is brought against Borrower.

The failure of Lender at any time to exercise any option or right hereunder shall not constitute a waiver of Lender's right to exercise such option or right at any other time.

Borrower and all endorsers and guarantors of this Note hereby jointly and severally waive presentment, demand, notice, protest and all other suretyship defenses generally and agree that (i) any renewal, extension or postponement of the time of payment or any other indulgence, or (ii) any substitution, exchange or release of collateral or the addition or release of any person or entity primarily or secondarily liable, may be effected without notice to Borrower or any endorser or guarantor of Borrower's obligations, and without releasing Borrower or such endorser or guarantor from any liability hereunder.

This Note is issued pursuant to, is entitled to the benefits of, and is subject to, the provisions of a certain Limited Liability Company Agreement of the Company dated as of ___, 2016 (the "**LLC Agreement**").  Capitalized terms not otherwise defined herein shall have the meaning ascribed thereto in the LLC Agreement.

This Note shall be governed by, construed, and enforced in accordance with the laws of the State of Delaware.  If any provision of this Note is held to be invalid or unenforceable by a court of competent jurisdiction, the other provisions of this Note shall remain in full force and effect.   All agreements between the Borrower, on the one hand, and the Lender, on the other hand, pursuant to this Note shall be expressly limited so that in no event whatsoever, whether by reason of acceleration of the obligations or otherwise, shall the amount paid or agreed to be paid to the Lender exceed the maximum permissible under applicable law.  As used herein, the term "applicable law" shall mean the law in effect from time to time.  In this regard, it is expressly agreed that it is the intent of the parties hereto in the execution, delivery and acceptance of this Note to contract in strict compliance with the laws of the State of Delaware from time to time in effect.  If fulfillment of any provision hereof shall involve transcending the limit of such validity prescribed by applicable law, then the obligation to be fulfilled shall automatically be reduced to the limits of such validity, and if the Lender should ever receive as interest any amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the principal balance of the indebtedness evidenced hereby and not to the payment of interest.  This provision shall control every other provision of all agreements between the Borrower, on the one hand, and the Lender, on the other hand.

 [* This Exhibit D sets forth the form of Note to be used in the event that AB is the "borrowing" Member pursuant to Article III.  This form shall be revised as appropriate in the event that Investor is the borrowing Member.]

[**This Exhibit D shall also be revised as appropriate for any Default Loan, Special Loan or Company Loan]

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 268 of 277

IN WITNESS WHEREOF, Borrower has duly executed and delivered this Promissory Note as of the day and year first above written.


BORROWER:

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 269 of 277

**Exhibit E**

**Strategic Plan**

ACTIVE/87979073.5

**Exhibit F**

**Form of Funding Notice**

$_____

Re:     Funding of Capital to [_____]

Gentlemen:

Reference is hereby made to the Limited Liability Company Agreement of [AB RW HL HOLDINGS, LLC,] a Delaware limited liability company, dated as of _____ ___, 201_ (the "**Operating Agreement**").  Capitalized terms not otherwise defined shall have the meaning ascribed to them in the Operating Agreement.

Pursuant to <u>Section 3.3</u> of the Operating Agreement, you are advised, as the _____ Member of the Company, that the _____ Member has determined that capital is required in the aggregate amount of $_____ to fund [*add description of reason for capital*] in connection with the Company and/or the Property.

Each Member is hereby requested to contribute, in the form of cash or cash equivalents, funds in the amount of its Proportionate Share (as set forth below) of such required Capital within fifteen (15) days of the date of this notice.

[

|  | Contribution | Proportionate Share |
|---|---|---|
| Investor | $ | [_____]% |
| AB | $ | [_____]% |
| TOTAL | $ | 100% |

ACTIVE/87979073.5

**Exhibit G**

**Form of Hotel Management Agreement**

[see attached]

ACTIVE/87979073.5

## Exhibit H-1

## Representations and Warranties of AB

(a)     AB is a [limited liability company] duly organized and validly existing under the laws of [Delaware], with full power and authority and legal right to be a Member of the Company and to carry on its business in the manner and in the locations in which such business has been and is now being conducted by it, to execute and deliver this Agreement and to perform its obligations hereunder.

(b)     No consent of any third party is required as a condition to the entering into of this Agreement by AB other than such consent as has been previously obtained.

(c)     The execution and delivery of this Agreement has been duly authorized and executed by AB and this Agreement constitutes the valid and binding obligation and agreement of AB, enforceable in accordance with its terms (subject to the effect of bankruptcy, insolvency or creditor's rights generally, and to limitations imposed by general principals of equity).

(d)     Neither the execution and delivery of this Agreement, nor compliance with the terms and provisions hereof, will result in any breach of the terms, conditions or provisions of, or conflict with or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any property or assets of AB pursuant to the terms of any indenture, mortgage, deed of trust, note, evidence of indebtedness, agreement or other instrument or contract to which AB may be party or by which it or they or any of its properties or assets may be bound, or violate any provision of law, or any applicable order, writ, injunction, judgment or decree of any court, or any order or other public regulation of any governmental commission, bureau or administrative agency.

(e)     Except as in each instance previously disclosed to Investor in writing, there are no judgments presently outstanding and unsatisfied against AB or any of its assets and neither AB nor any of its assets is involved in any litigation at law or in equity, or in any proceeding before any court, or by or before any governmental or administrative agency, which judgment, litigation or proceeding could reasonably be anticipated to have a material adverse effect on AB, the Company, the Hotel Owner, any other Subsidiary or the Property and no such material judgment, litigation or proceeding is, to the best of AB's knowledge, threatened against the AB or any of its facilities, and to the best of the AB's knowledge, no investigation looking toward such a proceeding has begun or is contemplated.

(f)     No order, permission, consent, approval, license, authorization, registration or validation of, or filing with, or exemption by, any governmental agency, commission, board or public authority is required to authorize, or is required in connection with the execution, delivery and performance by AB of this Agreement or the taking of any action thereby contemplated, which has not been obtained, other than any such order, permission, consent, approval, license, authorization, registration or validation of, or filing with, or exemption by, any governmental agency, commission, board or public authority required in connection with the ownership or the development of the Property or with the other operations of the Company or the Hotel Owner or any other Subsidiary.

(g)     AB has provided a true, correct and complete copy of the Purchase Agreement, and there are no amendments, modifications, side letters, contracts or other agreements relating to the purchase and sale of the Property.

ACTIVE/87979073.5

(h)  Neither AB nor the Hotel Manager nor any of their respective underlying direct or indirect beneficial owners, have engaged in any dealings or transactions, directly or indirectly, (i) in contravention of any U.S., international or other anti-money laundering regulations or conventions, including, without limitation, the United States Bank Secrecy Act, the United States Money Laundering Control Act of 1986, the United States International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, Trading with the Enemy Act (50 U.S.C. §1 et seq., as amended), any foreign asset control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 and the regulations promulgated thereunder (collectively, the "**Patriot Act**"), or any order issued with respect to anti-money laundering by the U.S. Department of the Treasury's Office of Foreign Assets Control ("**OFAC**"), or (ii) in contravention of Executive Order No. 13224 issued by the President of the United States on September 24, 2001 (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), as may be amended or supplemented from time to time ("**Executive Order 13224**") or (iii) on behalf of terrorists or terrorist organizations, including those persons or entities that are included on any relevant lists maintained by the United Nations, North Atlantic Treaty Organization, Organization of Economic Cooperation and Development, OFAC, Financial Action Task Force, U.S. Securities & Exchange Commission, U.S. Federal Bureau of Investigation, U.S. Central Intelligence Agency, U.S. Internal Revenue Service, or any country or organization, all as may be amended from time to time.

(i)  Neither AB nor the Hotel Manager nor any of their respective underlying direct or indirect beneficial owners is, nor is there any reason to believe that any such parties will be, a person or entity (i) that is listed in the Annex to or is otherwise subject to the provisions of Execute Order 13224, (ii) whose name appears on OFAC's most current list of "Specifically Designed Nationals and Blocked Persons," (which list may be published from time to time in various mediums including, but not limited to, the OFAC website, http:www.treas.gov/ofac/tllsdn.pdf), (iii) who commits, threatens to commit or supports "terrorism", as that term is defined in Executive Order 13224, or (iv) who has been associated with or is otherwise affiliated with any entity or person listed above.

[*Note to Reignwood:  Are there any other property or Hotel or due diligence related representations you would like to include?*]

**Exhibit H-2**

**Representations and Warranties of Investor**

(a)    Investor is a [_____] organized and validly existing under the laws of the [_____,] with full power and authority and legal right to be a Member of the Company and to carry on its business in the manner and in the locations in which such business has been and is now being conducted by it, to execute and deliver this Agreement and to perform its obligations hereunder.

(b)    No consent of any third party is required as a condition to the entering into of this Agreement by Investor other than such consent as has been previously obtained.

(c)    The execution and delivery of this Agreement has been duly authorized and executed by Investor and this Agreement constitutes the valid and binding obligation and agreement of Investor, enforceable in accordance with its terms (subject to the effect of bankruptcy, insolvency or creditor's rights generally, and to limitations imposed by general principals of equity).

(d)    Neither the execution and delivery of this Agreement, nor compliance with the terms and provisions hereof, will result in any breach of the terms, conditions or provisions of, or conflict with or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any property or assets of Investor pursuant to the terms of any indenture, mortgage, deed of trust, note, evidence of indebtedness, agreement or other instrument to which Investor may be party or by which it or they or any of its properties or assets may be bound, or violate any provision of law, or any applicable order, writ, injunction, judgment or decree of any court, or any order or other public regulation of any governmental commission, bureau or administrative agency.

(e)    Except as in each instance previously disclosed to Investor in writing, there are no judgments presently outstanding and unsatisfied against Investor or any of its assets and neither Investor nor any of its assets is involved in any litigation at law or in equity, or in any proceeding before any court, or by or before any governmental or administrative agency, which judgment, litigation or proceeding could reasonably be anticipated to have a material adverse effect on Investor, the Company, the Hotel Owner, the other Subsidiaries, or the Property and no such material judgment, litigation or proceeding is, to the best of Investor's knowledge, threatened against Investor or any of its facilities, and to the best of Investor's knowledge, no investigation looking toward such a proceeding has begun or is contemplated.

(f)    No order, permission, consent, approval, license, authorization, registration or validation of, or filing with, or exemption by, any governmental agency, commission, board or public authority is required to authorize, or is required in connection with the execution, delivery and performance by Investor of this Agreement or the taking of any action thereby contemplated, which has not been obtained, other than any such order, permission, consent, approval, license, authorization, registration or validation of, or filing with, or exemption by, any governmental agency, commission, board or public authority required in connection with the ownership or the development of the Property or with the other operations of the Company or the Hotel Owner or other Subsidiary.

(g)    Investor has not engaged in any dealings or transactions, directly or indirectly, (i) in contravention of any U.S., international or other anti- money laundering regulations or

conventions, including, without limitation, the United States Bank Secrecy Act, the United States Money Laundering Control Act of 1986, the United States International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, Trading with the Enemy Act (50 U.S.C. §1 et seq., as amended), any foreign asset control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 and the regulations promulgated thereunder (collectively, the "**Patriot Act**"), or any order issued with respect to anti-money laundering by the U.S. Department of the Treasury's Office of Foreign Assets Control ("**OFAC**"), or (ii) in contravention of Executive Order No. 13224 issued by the President of the United States on September 24, 2001 (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), as may be amended or supplemented from time to time ("**Executive Order 13224**") or (iii) on behalf of terrorists or terrorist organizations, including those persons or entities that are included on any relevant lists maintained by the United Nations, North Atlantic Treaty Organization, Organization of Economic Cooperation and Development, OFAC, Financial Action Task Force, U.S. Securities & Exchange Commission, U.S. Federal Bureau of Investigation, U.S. Central Intelligence Agency, U.S. Internal Revenue Service, or any country or organization, all as may be amended from time to time.

(h)     Investor is not, nor is there any reason to believe that it will be, a person or entity (i) that is listed in the Annex to or is otherwise subject to the provisions of Executive Order 13224, (ii) whose name appears on OFAC's most current list of "Specifically Designed Nationals and Blocked Persons," (which list may be published from time to time in various mediums including, but not limited to, the OFAC website, http:www.treas.gov/ofac/t11sdn.pdf), (iii) who commits, threatens to commit or supports "terrorism", as that term is defined in Executive Order 13224, or (iv) who has been associated with or is otherwise affiliated with any entity or person listed above.

ACTIVE/87979073.5

**Exhibit I**

**Property Improvement Budget**

Exhibit I Page 1

ACTIVE/87979073.5

Case 1:17-cv-08776-JGK   Document 1-1   Filed 11/10/17   Page 277 of 277

**Exhibit J**

**Form of Cross-Indemnity Agreement**

ACTIVE/87979073.5